482-14/MF/PJG
FREEHILL HOGAN & MAHAR, LLP
*Attorneys for Plaintiff*
Hapag-Lloyd Aktiengesellschaft
80 Pine Street
New York, NY  10005
(212) 425-1900 / (212) 425-1901 (Fax)
Peter J. Gutowski
Michael Fernandez
Gina M. Venezia

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

HAPAG-LLOYD AKTIENGESELLSCHAFT,

                                        Plaintiff,

         -against-

U.S. OIL TRADING LLC, O.W. BUNKER
GERMANY GMBH, O.W. BUNKER & TRADING
A/S, O.W. BUNKER USA, INC., ING BANK N.V.,
CRÉDIT AGRICOLE CIB.

                                        Defendants.

**14 Civ. 9949 (VEC)**

**FIRST AMENDED COMPLAINT
FOR INTERPLEADER AND
DECLARATORY JUDGMENT**

Plaintiff Hapag-Lloyd Aktiengesellschaft, by its attorneys Freehill Hogan & Mahar LLP,

files its Complaint for Interpleader pursuant to 28 U.S.C. §§1335 and 2361 and Declaratory

Judgment pursuant to 28 U.S.C. §2201 against U.S. Oil Trading LLC, O.W. Bunker Germany

GmbH, O.W. Bunker & Trading A/S, O.W. Bunker USA, Inc., ING Bank N.V., and Crédit

Agricole CIB, and respectfully alleges upon information and belief as follows:

## THE PARTIES

1.      Plaintiff Hapag-Lloyd Aktiengesellschaft (hereinafter "HLAG") is an entity

organized and existing under the laws of a foreign country with its principal place of business at

Ballindaum 25, D-20095 Hamburg, Germany.

426740.1

2.      Defendant U.S. Oil Trading LLC (hereinafter "USOT") is an entity organized and existing under the laws of Delaware, is registered with the Washington Secretary of State and is authorized to do business within Washington State, and maintains its principal place of business at 3001 Marshall Ave., Tacoma, Washington 98421.

3.      Defendant O.W. Bunker Germany GmbH (hereinafter "OW Germany") is an entity organized and existing under the laws of a foreign country with its principal place of business at Neumühlen 11, 22763 Hamburg, Germany.

4.      Defendant O.W. Bunker & Trading AS (hereinafter "OW Denmark") is an entity organized and existing under the laws of a foreign country with its principal place of business at Stigsborgvej 60, DK-9400 Noerresnby, Denmark.

4(a).   Defendant O.W. Bunker USA, Inc. (hereinafter "OW USA") is an entity organized and existing under the laws of a Texas with its principal place of business at 2603 Augusta Dr., Suite 440, Houston, Texas 77057.

5.      Defendant ING Bank N.V. (hereinafter "ING") is an entity organized and existing under the laws of a foreign country with its principal place of business at Amsterdam Poort, Bijlmerplein 888, 1102 MG Amsterdam, The Netherlands, and does business in this jurisdiction.

6.      Defendant Crédit Agricole CIB (hereinafter "Agricole") is an entity organized and existing under the laws of a foreign country with its principal place of business at 9, quai du Président Paul Doumer, 92920 Paris La Défense Cedex, France, and does business in this jurisdiction through its New York office at 1301 Avenue of the Americas, New York, New York 10019.

**JURISDICTION AND VENUE**

7.      This Court has jurisdiction over this action pursuant to 28 U.S.C. §1333, and this action involves an admiralty and maritime claims under Fed. R. Civ. P. 9(h), inasmuch as this action involves competing claims to the payment for marine bunkers provided to four ocean-going vessels owned and/or operated by HLAG.

8.      This Court also has jurisdiction over this interpleader action pursuant to 28 U.S.C. §1335 in that: a) at least two of the claimants are of diverse citizenship; b) the dispute between the claimants involves funds in an amount exceeding $500.00, exclusive of interest and costs; and c) HLAG is the stakeholder of the funds and is prepared to file the bond required by §1335, covering amounts claimed against HLAG as more particularly described below.

9.      This Court also has supplemental jurisdiction over the declaratory judgment aspects of this action under 28 U.S.C. §1367.

10.      This Court has personal jurisdiction over Defendant USOT pursuant to 28 U.S.C. §2361 and Rule 4(k) of the Federal Rules of Civil Procedure.  Additionally, this Court has jurisdiction over USOT pursuant to the OW Bunker Group Terms and Conditions of sale for Marine Bunkers (hereinafter "OW Terms and Conditions").

11.      This Court has personal jurisdiction over Defendant OW Germany pursuant to the OW Terms and Conditions.  Additionally, OW Germany continuously and systematically conducts business and/or transacts business in the United States as to the supply of marine bunkers to vessels for purposes of jurisdiction under Fed R. Civ. P. 4(k).

12.      This Court has personal jurisdiction over Defendant OW Denmark pursuant to the OW Terms and Conditions.  Additionally, OW Denmark continuously and systematically

conducts business and/or transacts business in the United States as to the supply of marine bunkers to vessels for purposes of jurisdiction under Fed R. Civ. P. 4(k).

12(a).   This Court has personal jurisdiction over Defendant OW USA pursuant to 28 U.S.C. § 2361 and Rule 4(k) of the Federal Rules of Civil Procedure. Additionally, this Court has jurisdiction over OW USA pursuant to the OW Terms and Conditions.

13.   This Court has personal jurisdiction over Defendant ING to the extent that it is or may be a third-party beneficiary of the bunker supply contracts at issue in this dispute, and to the extent that it is an alleged assignee of the receivables of OW Germany and OW Denmark. Alternatively, this Court has personal jurisdiction over ING pursuant to New York CPLR §301 as ING is engaged in continuous and systematic business within the State of New York through its New York subsidiary at 1325 Avenue of the Americas, New York, New York 10019.

14.   This Court has personal jurisdiction over Defendant Agricole to the extent that it is or may be a third-party beneficiary of the bunker supply contracts at issue in this dispute, and to the extent that it is an alleged assignee of the receivables of USOT. Alternatively, this Court has personal jurisdiction over Agricole pursuant to New York CPLR §301 as Agricole is engaged in continuous and systematic business within the State of New York through its New York office at 1301 Avenue of the Americas, New York, New York 10019.

15.   Venue is proper in this District under 28 U.S.C. §1397 and/or the OW Terms and Conditions.

## FACTUAL BACKGROUND

16.   HLAG is the time charterer of the SANTA ROBERTA and SEASPAN HAMBURG, and the registered owner of the VIENNA EXPRESS and SOFIA EXPRESS

(collectively the "Vessels"), and had all obligations with respect to the purchase and payment for the supply of bunkers to all of the Vessels.

17.     On or about January 1, 2014, HLAG contracted with OW Germany for the supply of marine bunkers ("bunkers") to vessels during the contract term of January 1, 2014, to December 31, 2014. A copy of the contract between HLAG and OW Germany (hereinafter "HLAG Marine Fuel Contract") is attached hereto as **Exhibit 1**, as well as the OW terms, which those entities have contended applied.

18.     Thereafter, HLAG placed orders with OW Germany for the delivery of bunkers to, *inter alia*, the Vessels.

19.     In the normal course of business, HLAG would remit payment to OW Germany for bunkers supplied under the HLAG Marine Fuel Contract.  Whatever payment arrangements may have existed downstream of OW Germany to its affiliates and/or subcontractors was unknown to HLAG.

## THE SEASPAN HAMBURG

20.     In or about October 2014, HLAG submitted to OW Germany an order for the supply of bunkers to the M/V SEASPAN HAMBURG, and bunkers were provided at the Port of Tacoma, Washington, ostensibly by USOT.  (Copies of the relevant purchase, sale and delivery documents are annexed hereto as **Exhibit 2**.)

21.     HLAG has been invoiced $1,516,809.83 by OW Germany for the bunkers supplied to the SEASPAN HAMBURG.

22.     HLAG has made no payment with respect to the supply of bunkers to the M/V SEASPAN HAMBURG, and competing claims have been or may be made by Defendants

against HLAG and/or that vessel asserting entitlement to the payment from HLAG.  Threats have also been made to arrest the vessel.

### THE SOFIA EXPRESS

23.     In or about October 2014, HLAG submitted to OW Germany an order for the supply of bunkers to the M/V SOFIA EXPRESS, and bunkers were provided at the Port of Tacoma, Washington, ostensibly by USOT.  (Copies of the relevant purchase, sale and delivery documents are annexed hereto as **Exhibit 3**.)

24.     HLAG has been invoiced $1,318,668.24 by OW Germany for the bunkers supplied to the SOFIA EXPRESS.

25.     HLAG has made no payment with respect to the supply of bunkers to the M/V SOFIA EXPRESS, and competing claims have been or may be made by Defendants against HLAG and/or that vessel asserting entitlement to the payment from HLAG.  Threats have also been made to arrest the vessel.

### THE VIENNA EXPRESS

26.     In or about October 2014, HLAG submitted to OW Germany an order for the supply of bunkers to the M/V VIENNA EXPRESS, and bunkers were provided at the Port of Tacoma, Washington, ostensibly by USOT.  (Copies of the relevant purchase, sale and delivery documents are annexed hereto as **Exhibit 4**.)

27.     HLAG has been invoiced $1,431,371.04 by OW Germany for the supply of bunkers to the VIENNA EXPRESS.

28.     HLAG has made no payment with respect to the supply of bunkers to the M/V VIENNA EXPRESS, and competing claims have been or may be made by Defendants against HLAG and/or the vessel asserting entitlement to the payment from HLAG.

29.     Threats have also been made to arrest the vessel, and in response to a threat from Defendant USOT, a Letter of Undertaking was issued by HLAG's underwriter in the amount of $1,725,000 to avoid the arrest of the VIENNA EXPRESS.  (A copy of the Letter of Undertaking is attached hereto as **Exhibit 6**.)

**THE SANTA ROBERTA**

30.     In or about October 2014, HLAG submitted to OW Germany an order for the supply of bunkers to the M/V SANTA ROBERTA, and bunkers were provided at the Port of Tacoma, Washington, ostensibly by USOT.  (Copies of the relevant purchase, sale and delivery documents are annexed hereto as **Exhibit 5**.)

31.     HLAG was invoiced $1,495,860.94 by OW Germany for the supply of bunkers to the M/V SANTA ROBERTA

32.     HLAG paid OW Germany with respect to the supply of bunkers to the M/V SANTA ROBERTA, but competing claims have been or may be made by the other defendants asserting entitlement to a further payment from HLAG and/or claiming lien rights against the vessel with respect to that supply.

**FIRST CAUSE OF ACTION – INTERPLEADER**
**WITH RESPECT TO THE M/V SEASPAN HAMBURG AND M/V SOFIA EXPRESS**

33.     Plaintiff repeats and reasserts each and every allegation set forth above in paragraphs 1-32, inclusive, as if fully set forth at length herein.

34.     There are various competing interests for the amounts due and owing by HLAG for the bunkers supplied to the SEASPAN HAMBURG and SOFIA EXPRESS, including but not limited to a claim by OW Germany and/or its parent entity OW Denmark and/or OW USA for payment under the HLAG Marine Fuel Contract (Ex. 1), a claim by Agricole and/or ING as

purported assignees and/or secured parties, and a claim by USOT, the purported physical supplier of the bunkers, asserting a maritime lien against these two vessels.

35.     HLAG is unsure of which party to pay for the bunkers supplied to these two vessels and accordingly has not made any payments to anyone in response to the competing demands.

36.     Based on the foregoing, HLAG, a disinterested stakeholder, has been and will be subject to multiple claims for payment for the bunkers supplied to the SEASPAN HAMBURG and the SOFIA EXPRESS, and the interests of the defendants in the property subject to this interpleader are adverse as there is a dispute as to which entity or entities are entitled to payment from HLAG for the bunkers.

37.     HLAG has a reasonable fear of multiple liabilities because of these adverse claims including, but not limited to, the threat of *in rem* seizure of the two vessels or other property owned by HLAG.

38.     In accordance with 28 U.S.C. §1335(a)(1) and 28 U.S.C. §2361, HLAG has or will post a bond covering and securing the indebtedness to the appropriate party (once determined by the Court), and is therefore entitled to relief in the form of: (a)   an order compelling any and all claimants, including Defendants, to file in this proceeding their claims for payment for the bunkers supplied; (b)   an order, in accordance with 28 U.S.C. §1335(a)(1) and §2361, precluding the commencement of or continuation of any action or proceeding anywhere to recover payment relating to the supply of the bunkers, including but not limited to arrest, attachment or other restraint of the vessels or any other property of HLAG; and (c) ultimately, an order determining the party or entity to which payment should be made and discharging HLAG from any liability after payment (as secured by the bond) is effected to the party or entity so

designated by the Court to receive the payment for the supply of the bunkers to the two vessels identified in this First Cause of Action.

**SECOND CAUSE OF ACTION – INTERPLEADER, OR IN THE ALTERNATIVE, DECLARATORY JUDGMENT ACTION WITH RESPECT TO THE M/V VIENNA EXPRESS**

39.     Plaintiff repeats and reasserts each and every allegation set forth above in paragraphs 1-32, inclusive, as if fully set forth at length herein.

40.     There are various competing interests for the amounts due and owing by HLAG for the bunkers supplied to the VIENNA EXPRESS, including but not limited to a claim by OW Germany and/or its parent entity OW Denmark and/or OW USA for payment under the HLAG Marine Fuel Contract (Ex. 1), a claim by Agricole and/or ING as purported assignees and/or secured parties, and a claim by USOT, the purported physical supplier of the bunkers, asserting a maritime lien against these two vessels.

41.     HLAG is unsure of which party to pay for the bunkers supplied to this vessel and accordingly has not made any payments to anyone in response to the competing demands.

42.     However, in response to a threat of arrest of the vessel by USOT, and to enable the vessel to continue to trade, HLAG was compelled to provide security to USOT in the form of the Letter of Undertaking described above.

43.     The proposed bond tendered with the filing of this complaint includes security for the payment that is due from HLAG to whomever the Court determines is entitled to that payment, including USOT, and the Letter of Undertaking should be cancelled and returned because there can be only one payment and the bond, as drafted, will fully secure any payment due to USOT to the extent it is determined to be the party entitled to receive same.

44.     Further, to the extent the bond acts as security for USOT and all other claimants, the substitution of the bond for the Letter of Undertaking enables the competing claims to be treated in an interpleader context and fosters judicial economy.

45.     Based on the foregoing, HLAG prays for: (a) an order directing the return of the Letter of Undertaking at which point the security under the bond (filed or to be filed) with respect to the VIENNA EXPRESS will be automatically activated; (b) an order compelling any and all claimants, including Defendants, to file in this proceeding their claims for payment for the bunkers supplied; (c) an order, in accordance with 28 U.S.C. §1335(a)(1) and §2361, precluding the commencement of or continuation of any action or proceeding anywhere to recover payment relating to the supply of the bunkers, including but not limited to an order precluding the arrest, attachment or other restraint of the vessels or any other property of HLAG, and (d) ultimately, an order determining the party or entity to which payment should be made and discharging HLAG from any liability after payment (as secured by the bond) is effected to the party or entity so designated by the Court to receive payment for the supply of the bunkers to the vessel identified in this Second Cause of Action.

46.     In the alternative, and if the Letter of Undertaking is not returned and cancelled, HLAG seeks a declaration that USOT has no maritime lien as to the supply of bunkers to the VIENNA EXPRESS, and that therefore, all obligations under the Letter of Undertaking are cancelled, and that upon payment to the entity determined by the Court to be entitled to the payment, HLAG is discharged and shall have no further liability to anyone for the supply of the bunkers to this vessel to any party or entity.

**THIRD CAUSE OF ACTION – INTERPLEADER OR IN THE ALTERNATIVE
DECLARATORY JUDGMENT WITH RESPECT TO THE M/V SANTA ROBERTA**

47.     Plaintiff repeats and reasserts each and every allegation set forth above in paragraphs 1-32, inclusive, as if fully set forth at length herein.

48.     Despite the payment already made by HLAG to OW Germany for the supply of bunkers to the SANTA ROBERTA, there are or may be claims by other entities, including but not limited to USOT, which demand that HLAG pay again.

49.     More specifically, USOT claims entitlement to a maritime lien on the SANTA ROBERTA and maintains that HLAG's payment to OW Germany did not extinguish the lien, providing USOT with a right of arrest of the vessel and the right to receive a further payment from HLAG.

50.     USOT has and continues to threaten the arrest of the vessel later this week.

51.     HLAG maintains that its payment to OW Germany extinguished all claims and liens with respect to the bunker supply, but HLAG nonetheless has a reasonable fear of multiple liabilities because of these adverse claims including, but not limited to, the threat of *in rem* seizure of the vessel or other property owned by HLAG.

52.     In accordance with 28 U.S.C. §1335(a)(1) and 28 U.S.C. §2361, HLAG has or will post a bond covering and securing the indebtedness, if any (which HLAG denies), to the appropriate party (once determined by the Court), and is therefore entitled to relief in the form of: (a)   an order compelling any and all claimants, including Defendants, to file in this proceeding their claims for HLAG to make another payment for the bunkers supplied; (b)  an order, in accordance with 28 U.S.C. §1335(a)(1) and §2361, precluding the commencement of or continuation of any action or proceeding anywhere to recover payment relating to the supply of the bunkers, including but not limited to arrest, attachment or other restraint of the vessels or any

other property of HLAG; and (c) ultimately, an order determining whether any such additional payment is due from HLAG, and if so, the party or entity to which payment should be made and discharging HLAG from any liability after payment (as secured by the bond) is effected to the party or entity so designated by the Court to receive the payment for the supply of the bunkers to this vessel.

53.     In the alternative, and apart from the interpleader relief, HLAG seeks a declaration that USOT has no maritime lien as to the supply of bunkers to the SANTA ROBERTA, and, that any such lien, if any, was extinguished by HLAG's payment of $1,495,860.94 to OW GERMANY on November 6, 2014.

54.     Additionally, and as the bond provided herein by HLAG secures the claim of USOT relating to the claim for payment for the bunkers supplied to the SANTA ROBERTA, an order should issue, precluding the commencement of or continuation of any action or proceeding anywhere to recover payment relating to the supply of the bunkers, including but not limited to an order precluding the arrest, attachment or other restraint of the vessel or any other property of HLAG or the owner with respect to the supply of bunkers to this vessel.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff HLAG respectfully prays that:

1.     Process in due form be issued to the defendants citing them to appear and answer the complaint, failing which a default can be taken;

2.     With respect to the First Cause of Action, the Court:

    (a)     approve the bond tendered by HLAG;

    (b)     issue an immediate order, in accordance with 28 U.S.C. §1335(a)(1) and §2361, precluding the commencement of or the continuation of any action

or proceeding anywhere by the defendants (or any number of them) to recover payment relating to the supply of the bunkers, including but not limited to an order precluding the arrest, attachment or other restraint of the vessels SEASPAN HAMBURG and SOFIA EXPRESS or any other property of HLAG or the owners or any other entity within the same management;

(c)    direct the defendants to file their claims for payment related to the supply of bunkers to these vessels in these proceedings for the Court to adjudicate the proper entity to which payment is due; and

(d)    declare, upon such determination and payment, as secured by the bond, that HLAG is discharged from all liability with respect to the supply of the bunkers as to all other parties and entities.

3.    With respect to the Second Cause of Action, the Court:

(a)    approve the bond tendered by HLAG;

(b)    issue an immediate order directing the return of the Letter of Undertaking and a concomitant order, in accordance with 28 U.S.C. §1335(a)(1) and §2361, precluding the commencement of or the continuation of any action or proceeding anywhere by defendants (or any number of them) to recover payment relating to the supply of the bunkers, including but not limited to an order precluding the arrest, attachment or other restraint of the vessel VIENNA EXPRESS or any other property of HLAG or the owners or any other entity within the same management;

(c)    direct the defendants to file their claims for payment related to the supply of bunkers to these vessels in these proceedings for the Court to adjudicate the proper entity to which payment is due; and

(d)    declare, upon such determination and payment, as secured by the bond, that HLAG is discharged from all liability with respect to the supply of the bunkers as to all other parties and entities, and to the extent USOT is determined not to be the party entitled to payment, the obligations under the Letter of Undertaking are cancelled and discharged.

4.    With respect to the Third Cause of Action, the Court:

(a)    approve the bond tendered by HLAG;

(b)    issue an immediate order, in accordance with 28 U.S.C. §1335(a)(1) and §2361, precluding the commencement of or the continuation of any action or proceeding anywhere by defendants (or any number of them) to recover any further payment relating to the supply of the bunkers, including but

not limited to an order precluding the arrest, attachment or other restraint of the vessel SANTA ROBERTA by USOT or any other property of HLAG or the vessel owner or any other entity within the same management; and

(c)    direct the defendants to file their claims for payment related to the supply of bunkers to this vessel in these proceedings for the Court to adjudicate the proper entity to which payment is due, if any such party; and

(d)    ultimately declaring that USOT has no maritime lien on the vessel and/or any such lien was extinguished by the payment already made by HLAG, or in the alternative, should the Court determine that a further payment is due, that HLAG is discharged from all liability with respect to the supply of the bunkers as to all other parties and entities upon such payment (as secured by the bond).

5.    That HLAG be awarded such other and further relief which this Court may deem just and proper including but not limited to the attorneys fees and costs to which HLAG is entitled under the relevant statutes.

Dated: New York, NY
July 14, 2015                  Respectfully Submitted,

/s/ Gina M. Venezia
_____
Peter J. Gutowski
Michael Fernandez
Gina M. Venezia
80 Pine Street
New York, NY  10005
(212) 425-1900 / (212) 425-1901 (Fax)
*Attorneys for Plaintiff,*
*Hapag-Lloyd Aktiengesellschaft*

# Exhibit 1



## ARA - Contract

Seller                  : OW Bunker Germany GmbH

Buyer                   : Hapag Lloyd AG, Hamburg

Port of delivery        : Antwerp (ANR)
                          Rotterdam (RTD)

Contract term           : January 1st -- December 31st 2014

| No. | Product | Antwerp | Rotterdam | Lot size min | Lot Size max | Formula | Rebate / Premium FIXED |
|---|---|---|---|---|---|---|---|
| 1 | RMG 380, max.3,50% Sulfur | 150.000 | 15.000 | 300 | 5.000 | Low on Platts "FOB RDAM BARGES, 3.5 PCT HSFO" | - 2,00 |
| 2 | RMK 700 or RMK 500 or RMG 380, max. 1,00% sulfur | 25.000 | 35.000 | 200 | 2.000 | Low on Platts "FOB RDAM BARGES, 1.0 PCT HSFO" | - 2,00 |
| 5 | RMK 500 or RMG 380, max, 1,00% sulfur | 50.000 | 10.000 | 200 | 2.000 | Low on Platts "FOB RDAM BARGES, 1.0 PCT HSFO" | - 2,00 |
| 6 | RMG 380, max. 1,00% sulphur | 140.000 | 20.000 | 200 | 2.000 | Low on Platts "FOB RDAM BARGES, 1.0 PCT HSFO" | - 2,00 |
| 7 | DMZ max. 0,10% sulphur or DMA max.0,10% sulphur | 20.000 | 20.000 | 90 | 500 | Low on Platts "FOB RDAM BARGES, GASOIL 0.1% " | - 32,00 |

The above mentioned quantities are indicative and the buyer is allowed to exceed or reduce the quantities along with buyers requirements in the above mentioned ports by +/-20%.

Preplanning              : monthly preplanning schedule to be sent in advance (at least 5 days
                           before the end of the month) for the following month

Nomination               : minimum 7 working days prior to ETA.

Pricing                  : 4 working days prior to ETA.

Quality                  : Antwerp:      ISO 8217:2010 (E)
                           Rotterdam:    ISO 8217:2010 (E)

Quality guarantee        : Seller guarantees a max claim rate of 3% of total supplied volume. In
                           case  seller exceed the max claim rate an additional discount of 0.25
                           usd/mt to apply on all supplied volume. This will be calculated on a
                           quarterly basis. A claim is determined as a supply conducted outside the
                           product specification stated in the contract. Volume differences due to
                           density excluded.



| | |
|---|---|
| Contract KPI's | Each contract will be evaluated on quarterly Quality meetings with participation of the relevant stakeholders from both the buyer and seller |
| Sulphur level | : 3,50%  1,00% |
| Confidence level 97,50% | : 3,29%  0,93% |
| Max. CCAI limits | : RMG 380 max. 855<br>RMK 500 max. 870<br>RMK 700 max. 870 |
| Energy | : Specific Energy as per ISO parameters (net calorific energy) of 40,00 MJ/Kg for all Marine Fuel Oils is aimed but not guaranteed (especially for RMK products). |
| Quality | : Seller has to ensure the product delivered is derived from petroleum crude oil and must neither contain: contaminants (i.e. chemical waste, polypropylene, used lubricants, abrasive materials) nor blending components derived from coal and shale distillations processes. In case analysis from legal sample shows any added substances like DCPD, Styrene, Phenol, 1-Butanol, Indene, 1 Phenyl-ethanol seller is fully responsible for all possible consequences including but not limited to direct and indirect damages to the vessel's engine. |
| Sulphur | : LSFO fitted for use in SECA's. In case first analysis exceeds 1,00 % level, the result of the representative sample, sealed and signed by both parties will be final and binding for all parties. |
| Payment Terms | : 30 days after delivery |
| Max. claim notice period | : 60 CALENDAR DAYS OF THE DATE OF DELIVERY FOR TERM CONTRACTED LOW SULPHUR FUEL OIL SUPPLIES IN ANTWERP OR ROTTERDAM.<br>30 CALENDAR DAYS OF THE DATE OF DELIVERY FOR SUPPLIES IN ALL REMAINING PORTS WORLD WIDE |
| Termination period | : 60 days from both sides otherwise till end of 2014 |
| Terms and Conditions | : Hapag Lloyd AG's standard terms and conditions version 2014 to apply. (version 7.11.3849.00 15623934) |
| Non disclosure | : Buyer and seller agrees that it will keep the pricing terms of this contract confidential |

O.W. BUNKER GERMANY GMBH
Neumühlen 11
D-22763 Hamburg
Phone +49 40 32 66 90 0 · Fax +49 40 33 04 71
mail: hamburg@owbunker.de

---

Hapag Lloyd AG
(Buyer)

O.W. Bunker Germany GmbH
(Seller)



## _MARINE FUEL OIL TERMS & CONDITIONS OF PURCHASE_

### 1. DEFINITIONS

THROUGHOUT THIS CONTRACT THE FOLLOWING DEFINITIONS SHALL APPLY TO THESE PURCHASE TERMS:

| | | | | |
|---|---|---|---|---|
| * BUYERS | : | HAPAG-LLOYD AG<br>BALLINDAMM 25<br>20095 HAMBURG<br>GERMANY | OR | HAPAG-LLOYD<br>KREUZFAHRTEN GMBH<br>BALLINDAMM 25<br>20095 HAMBURG<br>GERMANY |

* SELLERS     :     THE CONTRACTING COMPANY FROM WHOM THE BUYERS PURCHASE THE MARINE FUELS.
* SUPPLIERS  :     THE COMPANY FROM WHOM THE SELLERS PROCURE THE SUPPLY OF MARINE FUELS.

* MARINE DISTILLATED OIL AND MARINE FUEL OIL:    AS PER ISO 8217 : LATEST EDITION - INTERNATIONAL STANDARD PETROLEUM PRODUCTS - FUELS (CLASS F) WHICH PROVISIONS SHALL BE DEEMED INCORPORATED HEREIN. SPECIFICATIONS OF MARINE FUELS AS WELL AS ANY SUBSEQUENT AMENDMENTS THEREOF, HEREINAFTER REFERRED TO AS "FUEL".

### 2. APPLICATION AND ENTIRE AGREEMENT PROVISIONS

THESE PURCHASE TERMS SHALL APPLY TO ANY PURCHASE CONTRACT BETWEEN THE BUYERS AND THE SELLERS FOR "FUEL" AND SUPERSEDE ALL PRIOR AGREEMENTS, ARRANGEMENTS, REPRESENTATIONS (AND MISREPRESENTATIONS) AND STIPULATIONS HOWSOEVER AND WHENSOEVER OCCURRING IN RESPECT OF THE SAME SUBJECT, WHETHER MADE IN WRITING OR ORALLY AND FUTURE CHANGES TO THESE PURCHASE TERMS MAY ONLY BE MADE IN WRITING AND MUST BE SIGNED BY BOTH PARTIES:

### 3. APPLICATION OF THE SINGAPORE BUNKERING PROCEDURE (SBP)

WHERE DELIVERY OF "FUEL" IS CARRIED OUT BY BARGES/TANKERS IN SINGAPORE, THE DELIVERY OPERATION SHALL FOLLOW THE PROCEDURES PRESCRIBED BY THE SINGAPORE BUNKER PROCEDURE LATEST EDITION, ISSUED BY SINGAPORE NATIONAL SHIPPING ASSOCIATION WHICH PROVISIONS SHALL BE DEEMED INCORPORATED HEREIN.

### 4. DOCUMENTATION

BEFORE COMMENCEMENT OF DELIVERY THE SELLERS SHALL PRESENT FOR ACKNOWLEDGEMENT BY THE MASTER OF THE VESSEL OR HIS REPRESENTATIVES, A BUNKER REQUISITION OR SIMILAR DOCUMENT; DULY SIGNED BY THE SELLERS OR THEIR REPRESENTATIVES, WHICH SHALL CONTAIN THE QUANTITIES TO BE DELIVERED AND ALL INFORMATION REQUIRED IN ACCORDANCE WITH IMO/ISO RECOMMENDATIONS AND SPECIFICATIONS, INCLUDING IN PARTICULAR,
ACTUAL VALUES FOR:

* VISCOSITY
* DENSITY
* WATER CONTENT
* SULPHUR CONTENT
* FLASHPOINT
* DELIVERY TEMPERATURE
* POUR POINT

IN ADDITION, AND IF AVAILABLE, SIMILAR INFORMATION SHALL BE PROVIDED FOR ALUMINIUM/SILICON, VANADIUM AND ASH CONTENT.

ONCE THE DELIVERY IS COMPLETED AND QUANTITIES MEASURED, A RECEIPT SHALL BE SIGNED AND STAMPED BY THE MASTER OF THE VESSEL, AND RETURNED TO THE SELLERS OR HIS REPRESENTATIVES, AS ACKNOWLEDGEMENT OF THE DELIVERY ONLY AND A DUPLICATE COPY SHALL BE RETAINED BY THE MASTER OF THE VESSEL. THIS RECEIPT SHALL NOT IN ANY WAY BE CONSTRUED AS ACCEPTANCE BY THE BUYERS OF THE INFORMATION CONTAINED THEREIN, INCLUDING:

7.11/3849.00 16023034



* DELIVERED QUANTITY IN VOLUME UNITS AT ACTUAL TEMPERATURE
* ACTUAL DELIVERY TEMPERATURE
* DELIVERED QUANTITY IN VOLUME AT 15 DEGR. C.
* DENSITY IN KG/CBM AT 15 DEGR. C.
* DELIVERED QUANTITY IN WEIGHT UNITS.
* FLASHPOINT
* SULPHUR CONTENT IN % M/M

5. QUANTITY

THE QUANTITY OF "FUEL" DELIVERED SHALL BE DETERMINED BY DIPPING OF TANKS OR METER READING AND
CARGO TEMPERATURE READING OF THE BARGES/TANKERS TANKS EFFECTING DELIVERY.
IN CASE DELIVERY WILL TAKE PLACE FROM SHORESIDE THE QUANTITY THEN SHALL BE DETERMINED BY METER
READING.
THE SELLERS' FIGURES, HOWEVER, SHALL NOT BE REGARDED AS CONCLUSIVE OR BINDING, AND THE BUYERS SHALL
HAVE THE RIGHT TO PROVE THAT THE FIGURES SHOWN IN THE BUNKER DELIVERY RECEIPT ARE INCORRECT.
SELLERS SHALL INVITE BUYERS REPRESENTATIVE TO WITNESS THE DELIVERY PROCEDURE.
THE FINDINGS OBTAINED AND NECESSARY ADJUSTMENTS IN VOLUME SHALL BE CALCULATED IN ACCORDANCE
WITH THE ASTM-IP PETROLEUM MEASUREMENT TABLES.
MASTER OR HIS REPRESENTATIVE SHALL SIGN THE BUNKER DELIVERY RECEIPT FOR ACTUAL VOLUME AND ACTUAL
DELIVERY TEMPERATURE ONLY, BUT NOT FOR THE DENSITY SHOWN IN THE BUNKER DELIVERY RECEIPT.
MASS IN VACUUM OR WEIGHT IN AIR SHALL BE SUBJECT TO VERIFICATION OF DENSITY OR WEIGHT FACTOR
RESPECTIVELY BY ANALYSIS OF VESSEL'S RETAINED SAMPLE.
IF DISCREPANCIES ARISE BETWEEN SUPPLIERS AND BUYERS AS TO QUANTITIES OF "FUEL" SUPPLIED, SUCH
DISCREPANCIES SHALL HAVE TO BE DISCUSSED BETWEEN BUYERS AND SELLERS WITH A VIEW TO FINDING A FAIR
AND REASONABLE SOLUTION, FAILING WHICH CLAUSE 13 SHALL APPLY.

6. QUALITY/GRADE

THE BUYERS SHALL HAVE THE SOLE RESPONSIBILITY FOR THE NOMINATION OF THE GRADES OF MARINE FUEL OIL
SUITABLE TO THE VESSEL AND SHALL STATE THE GRADES REQUIRED IN THE NOMINATION ORDER.
THE SELLERS WARRANT THAT THE MARINE FUEL OIL SHALL BE OF A HOMOGENEOUS AND STABLE NATURE AND
SHALL COMPLY WITH THE ISO GRADE NOMINATED BY THE BUYERS. SELLERS WARRANT, AND BUYERS RELY ON
SELLERS' EXPERTISE IN PROVIDING SUCH A WARRANTY, THAT THE FUEL SUPPLIED WILL NOT ONLY MEET THE
RELEVANT ISO CRITERIA FOR THE GRADE OF FUEL SUPPLIED BUT WILL ALSO BE FIT AND/OR SUITABLE FOR THE
PURPOSE OF PARTICULAR ENGINE INTENDED.
THE MARINE FUEL OIL SHALL IN ALL OTHER RESPECTS COMPLY WITH ISO STANDARDS 8217:2010 AND ANY
SUBSEQUENT AMENDMENTS THEREOF.

7. DELIVERY

THE "FUEL" SHALL BE DELIVERED TO THE VESSEL EX WHARF OR EX LIGHTER IN THE OPTION OF THE BUYERS OR
BUYERS REPRESENTATIVES IN CASE BOTH ALTERNATIVES EXIST.

IF DELIVERY BY BARGE IS REQUESTED, THE SELLERS WILL ARRANGE FOR SUFFICIENT BARGE AND PUMPING
CAPACITY FOR TIMELY AND SPEEDY DELIVERY.

THE LIGHTERAGE CHARGE TO BE FOR THE BUYERS ACCOUNT, UNLESS THE PRICES ARE QUOTED FREE DELIVERED TO
BUYERS VESSEL.

DELIVERY SHALL BE MADE AT DAY- AND NIGHT-TIME, SUNDAYS AND HOLIDAYS IF NECESSARY AND AS LONG AS
ALLOWED BY APPLICABLE LOCAL LAWS OR REGULATIONS.

THE SELLERS SHALL BE IN POSSESSION OF ALL LICENCES, PERMISSIONS, AUTHORISATIONS, CONSENTS AND PERMITS
REQUIRED TO COMPLY WITH ALL RELEVANT APPLICABLE LAWS, ENACTMENTS, ORDERS, REGULATIONS AND ALL
OTHER INSTRUMENTS RELATING TO THE SUPPLY AND DELIVERY OF MARINE "FUEL" AT THE PORT OR PLACE OF
DELIVERY AND SHALL, SUBJECT TO LOCAL LAWS PERMITTING, AND BE RESPONSIBLE TO MAKE ALL CONNECTIONS
AND DISCONNECTION'S BETWEEN THE DELIVERY HOSE(S) AND THE VESSEL'S INTAKE PIPE AND TO ENSURE THAT
THE HOSE(S) ARE PROPERLY SECURED TO THE VESSEL'S MANIFOLD PRIOR TO THE COMMENCEMENT OF DELIVERY.

8. BOOMING

BOOMING TO BE ARRANGED BY SELLERS/ SUPPLIERS ACCORDING TO ALL REQUIREMENTS OF ALL APPLICABLE
LOCAL LAWS AND REGULATIONS.

7.11.3040.00 16023004





9. SURVEY

EVERY "FUEL" DELIVERY WILL BE ATTENDED BY AN INDEPENDENT SURVEY COMPANY APPOINTED BY THE BUYERS. BUYERS WILL BEAR THE COSTS OF SUCH SURVEY.

10. SAMPLING

THE SELLERS SHALL ARRANGE AT LEAST FOR SIX (6) IDENTICAL REPRESENTATIVE SAMPLES OF EACH GRADE OF THE "FUEL" ( INCLUDING ONE (1) MARPOL SAMPLE) TO BE DRAWN THROUGHOUT THE ENTIRE BUNKERING OPERATION IN THE PRESENCE OF BOTH THE SUPPLIERS AND THE BUYERS OR THEIR RESPECTIVE REPRESENTATIVES.

THE SAMPLES SHALL BE DRAWN AT A POINT TO BE MUTUALLY AGREED BETWEEN SELLERS/SUPPLIERS AND THE BUYERS OR THEIR RESPECTIVE AGENTS, CLOSEST TO OR AT (WHERE POSSIBLE) THE VESSEL'S BUNKER MANIFOLD.

THE SAMPLES SHALL BE DRAWN USING A MUTUALLY ACCEPTED SAMPLING DEVICE WHICH SHALL BE CONSTRUCTED, SECURED AND SEALED IN SUCH A WAY SO AS TO PREVENT THE SAMPLING DEVICE AND THE SAMPLES BEING TAMPERED WITH THROUGHOUT THE TRANSFER PERIOD.

THE AFOREMENTIONED SAMPLES SHALL BE SECURELY SEALED AND PROVIDED WITH LABELS SHOWING THE VESSEL'S NAME , IDENTITY OF DELIVERY FACILITY, PRODUCT NAME, DELIVERY DATE AND PLACE AND SUPPLIERS SEAL NUMBER.

HOWEVER, SAMPLE BOTTLES MUST BE FITTED WITH TWO SEAL LUGS TO ENABLE BUYERS REPRESENTATIVES TO COUNTERSEAL THE SAMPLES. IN CASE SUPPLIERS CAN NOT PROVIDE SUCH SAMPLE BOTTLES, BUYERS SHALL HAND OVER SAID BOTTLES TO THE SUPPLIER FREE OF CHARGE UNTIL FURTHER NOTICE.

SUCH SAMPLES SHALL BE DISTRIBUTED AS FOLLOWS:
TWO (2) SAMPLES TO BARGE SUPPLIER, TWO SAMPLES TO ATTENDING SURVEYOR, ONE (1) SAMPLE TO SEAGOING VESSEL, ONE(1) SAMPLE TO MARPOL.

IT MUST BE NOTED THAT SAMPLES DRAWN EX INSTALLATION OR BEYOND BUYERS CONTROL AND/OR WITHOUT AN INDEPENDENT SURVEY OR AGREED BETWEEN THE SELLERS AND BUYERS BEING PRESENT ARE NOT REPRESENTATIVE OF THE DESCRIPTION, QUANTITY, QUALITY OR FITNESS FOR PURPOSE OF THE "FUEL", FOR THE AVOIDANCE OF DOUBT.   SIGNATURES FOR, OR ACCEPTANCE OF THE SAMPLE(S) BY THE VESSEL'S MASTER OR ANOTHER  VESSEL'S REPRESENTATIVE OR AGENT IN RELATION TO SUCH SAMPLES SHALL NOT MEAN THAT THE SAMPLES ARE REPRESENTATIVE OF THE "FUEL" SUPPLIED.
BARGE / SUPPLIERS SAMPLES TO BE RETAINED FOR NINETY ( 90 ) DAYS.

11. PRICE

THE PRICE OF "FUEL" DELIVERED SHALL BE AS AGREED, AND STATED IN THE BUYERS' PURCHASE ORDER.
ANY DEMURRAGE CHARGES DUE TO BUYERS FAILURE SHALL BE ABSORBED BY THE BUYERS.
ANY DEMURRAGE CHARGES DUE TO SELLER / SUPPLIERS FAILURE SHALL BE ABSORBED BY THE SELLERS / SUPPLIERS.

12. PAYMENT

UNLESS EXPLICITLY AGREED UPON IN WRITING BETWEEN SELLERS AND BUYERS PAYMENT IN US DOLLARS FOR THE "FUEL" DELIVERED WILL BE AVAILABLE TO THE SELLER'S ACCOUNT WITHIN THIRTY CALENDAR (30) DAYS AFTER THE COMPLETION OF DELIVERY OR FIFTEEN ( 15) RUNNING CALENDAR DAYS AFTER THE RECEIPT OF THE SELLERS' INVOICE, WHICHEVER IS THE LATER.

ANY DELAY IN PAYMENT SHALL ENTITLE THE SELLERS TO INTEREST AT THE RATE OF 12% PER ANNUM.
SELLERS SHALL INFORM BUYERS OF ANY OUTSTANDING PAYMENT WITHIN  3 WORKING DAYS AFTER DUE DATE OF INVOICE

SELLERS SHALL INFORM BUYERS OF ANY OUTSTANDING PAYMENT WITHIN 3 WORKING DAYS AFTER DUE DATE OF INVOICE.

THE INVOICE HAS TO INCLUDE THE NAME OF THE RECEIVING VESSEL, THE BUNKERING PORT, THE DATE OF DELIVERY, THE REFERENCE OF THE BUYERS, APART FROM DESCRIPTION OF THE QUANTITY AND QUALITY SUPPLIED.

13. CLAIMS

ANY DISPUTE AS TO THE QUANTITY DELIVERED MUST BE NOTED AT THE TIME OF DELIVERY IN THE BUNKER DELIVERY RECEIPT OR IN THE LETTER OF PROTEST. ANY CLAIM AS TO SHORT DELIVERY SHALL BE PRESENTED BY



THE BUYERS IN WRITING WITHIN 15 CALENDAR DAYS FROM THE DATE OF DELIVERY, FAILING WHICH ANY SUCH CLAIM SHALL BE DEEMED TO BE WAIVED AND ABSOLUTELY BARRED.

ANY CLAIM AS TO THE QUALITY OR DESCRIPTION OF THE "FUEL" MUST BE NOTIFIED IN WRITING PROMPTLY AFTER THE CIRCUMSTANCES GIVING RISE TO SUCH CLAIM HAVE BEEN DISCOVERED, IF THE BUYERS DO NOT NOTIFY THE SELLERS OF SUCH CLAIM WITHIN :
60 CALENDAR DAYS OF THE DATE OF DELIVERY FOR TERM CONTRACTED LOW SULPHUR FUEL, OIL SUPPLIES IN ANTWERP OR ROTTERDAM.
30 CALENDAR DAYS OF THE DATE OF DELIVERY FOR SUPPLIES IN ALL REMAINING PORTS WORLD WIDE,
THEN THOSE CIRCUMSTANCES SHALL BE PRESUMED NOT TO HAVE BEEN CAUSED BY ANY DEFICIENCY IN THE QUALITY OR DESCRIPTION OF THE "FUEL" SUPPLIED AND ANY SUCH CLAIM SHALL BE DEEMED TO BE WAIVED AND ABSOLUTELY BARRED.

IN THE EVENT OF A CLAIM AS TO QUALITY AND DESCRIPTION THE PARTIES HERETO SHALL HAVE THE QUALITY OF THE "FUEL" ANALYSED BY A MUTUALLY AGREED, QUALIFIED AND INDEPENDENT LABORATORY. THE SELLERS AND THE BUYERS SHALL PROVIDE THE LABORATORY WITH ONE OF THE SAMPLES RETAINED . IF ISO GRADES HAVE BEEN SPECIFIED THE ANALYSIS SHALL BE ESTABLISHED BY TESTS IN ACCORDANCE WITH ISO 8217: LATEST EDITION 10 AND ISO 4259 OR ANY SUBSEQUENT AMENDMENTS THEREOF, UNLESS OTHERWISE AGREED THE EXPENSES OF THE ANALYSES SHALL BE BORNE EQUALLY BY THE SELLERS AND THE BUYERS.

IN THE EVENT OF ANY DELAY RESULTING FROM:
THE BUYERS FAILURE TO GIVE PROPER NOTICES AND/OR THE BUYERS VESSEL FAILING TO RECEIVE "FUEL" AT THE PUMPING RATE

* THE SELLERS FAILURE TO COMMENCE DELIVERY OF THE "FUEL" PROMPTLY IN ACCORDANCE WITH THE BUYERS REQUIRED DELIVERY TIME   AND/OR THE SELLERS FAILURE TO DELIVER THE "FUEL" IN ACCORDANCE WITH THE MINIMUM HOURLY PUMPING RATE , THEN THE PARTY SUFFERING SUCH A DELAY SHALL BE ENTITLED TO COMPENSATION FROM THE OTHER PARTY FOR THAT DELAY.

14. RISK/TITLE

RISK IN THE MARINE FUEL SHALL PASS TO THE BUYERS ONCE THE "FUEL" HAS PASSED THE FLANGE CONNECTING THE VESSEL'S BUNKER MANIFOLD WITH THE DELIVERY FACILITIES PROVIDED BY THE SELLERS.
TITLE TO THE MARINE FUEL SHALL PASS TO THE BUYERS UPON PAYMENT FOR THE VALUE OF THE MARINE FUELS DELIVERED. UNTIL SUCH PAYMENT HAS BEEN MADE, THE SELLERS SHALL HAVE THE RIGHT OF LIEN OVER THE MARINE FUELS DELIVERED.

15. CANCELLATION

IF THE VESSEL FAILS TO ARRIVE AT THE PLACE OF DELIVERY WITHIN 72 HOURS FROM THE DATE NOMINATED/ESTIMATED TIME OF ARRIVAL AS STATED IN THE BUYERS' PURCHASE ORDER, EITHER PARTY HAS THE OPTION TO CANCEL THE DELIVERY OF "FUEL" IMMEDIATELY WITHOUT INCURRING ANY LIABILITY WHATSOEVER.

16. FORCE MAJEURE

NEITHER PARTY SHALL BE RESPONSIBLE FOR ANY LOSS, DAMAGE, DELAY OR FAILURE IN PERFORMANCE UNDER THESE TERMS RESULTING FROM THE ACT OF GOD, OR THE PORT OF DELIVERY BEING AFFECTED BY STORMS, FLOODS, WAR, CIVIL COMMOTION, RIOT, FIRE, SABOTAGE, QUARANTINE, STRIKES, STOPPAGES, LOCK-OUTS, ARRESTS, DETAINMENT'S OF KINGS, PRINCES, RULERS AND PEOPLE, ACTS OF TERRORISM OR ANY OTHER EVENT BEYOND THEIR CONTROL. ARISING AFTER AGREEING THESE TERMS WHICH CANNOT BE AVOIDED OR GUARDED AGAINST BY THE EXERCISE OF DUE DILIGENCE, OR THE CONSEQUENCES OF WHICH, AS MAY AFFECT THE PERFORMANCE OF THESE TERMS   CANNOT BE AVOIDED OR GUARDED AGAINST BY THE EXERCISE OF DUE DILIGENCE.

17. SAFETY AND THE ENVIRONMENT

IN THE EVENT OF ANY SPILLAGE, WHICH SHALL MEAN ANY LEAKAGE, ESCAPE, SPILLAGE OR OVERFLOW OF THE "FUEL", CAUSING OR LIKELY TO CAUSE POLLUTION OCCURRING AT ANY STAGE OF THE BUNKERING OPERATION, THE BUYERS AND THE SELLERS SHALL JOINTLY, AND REGARDLESS AS TO WHETHER THE BUYERS OR THE SELLERS ARE RESPONSIBLE , IMMEDIATELY TAKE SUCH ACTIONS AS ARE NECESSARY TO EFFECT CLEAN UP AND WHICH SHALL ALWAYS BE CONDUCTED IN ACCORDANCE WITH SUCH LOCAL LAWS AND REGULATIONS WHICH MAY COMPULSORILY APPLY.

WHERE IT IS A COMPULSORY REQUIREMENT OF THE LAW OF THE PORT OR PLACE OF DELIVERY OF THE "FUEL" THAT THE SELLERS SHALL HAVE IN PLACE THEIR OWN OIL SPILL CONTINGENCY PLANS, THE SELLERS SHALL  ENSURE

7.11.3040 00 16023934



THAT VALID OIL SPILL CONTINGENCY PLANS APPROVED BY THE RELEVANT AUTHORITIES ARE IN EFFECT TO THE EXTENT THAT IS SO REQUIRED.

THE SELLERS HEREBY GUARANTEE PAYMENT OF AND/OR AGREE TO INDEMNIFY AND HOLD THE BUYERS HARMLESS FOR ANY CLAIMS, LOSSES, DAMAGES, EXPENSES, PENALTIES OR OTHER LIABILITIES INCURRED BY THE BUYERS UNDER THE UNITED STATES OIL POLLUTION ACT OF 1990, OR OTHER POLLUTION LEGISLATION OF ANY STATE OF THE UNITED STATES OF AMERICA OR ANY OTHER COUNTRY OR JURISDICTION, AS A RESULT OF ANY SPILLAGE OCCURRING WHILST THE "FUEL" IS BEING TRANSPORTED DIRECTLY TO OR FROM THE BUYERS VESSEL'S MANIFOLD SAVE TO THE EXTENT THAT SUCH SPILLAGE IS CAUSED BY ANY FAULT ON THE PART OF THE BUYERS.
THE BUYERS SHALL SIMILARLY INDEMNIFY THE SELLERS WHERE ANY OF SUCH SPILLAGE OCCURS ONCE RISK IN THE "FUEL" HAS PASSED THE BUYERS VESSEL'S MANIFOLD SAVE TO THE EXTENT THAT SUCH A SPILLAGE IS CAUSED BY ANY FAULT ON THE PART OF THE SELLERS.

THE SELLERS SHALL ENSURE THAT THE BARGE COMPANY IS INSURED FOR OIL SPILLAGE DAMAGES UP TO A MINIMUM AMOUNT PER INCIDENT REQUIRED BY THE APPLICABLE LOCAL STATUTORY RULES OR REGULATIONS. IF SUCH COVERAGE OR INSURANCE IS NOT OBTAINED BY THE BARGE COMPANY IT SHALL BE THE SOLE RESPONSIBILITY OF THE SELLERS TO ESTABLISH SUCH COVERAGE FOR THEIR ACCOUNT.
PROOF AND CONDITIONS OF SUCH COVERAGE, WHETHER ESTABLISHED BY THE BARGE COMPANY OR BY THE SELLERS SHALL BE MADE AVAILABLE TO THE BUYERS AT THEIR REQUEST, AS SOON AS PRACTICALLY POSSIBLE AND BEFORE THE DELIVERY OF THE "FUEL".

18. LAW AND ARBITRATION

THE ARBITRATION SHALL BE CONDUCTED IN ACCORDANCE WITH THE LONDON MARITIME ARBITRATION ASSOCIATION ( LMAA ) RULES IN FORCE AT THE TIME THAT THE ARBITRATION PROCEEDINGS ARE COMMENCED.
THIS CONTRACT SHALL BE COVERED BY AND CONSTRUED IN ACCORDANCE WITH ENGLISH LAW AND ANY DISPUTE ARISING OUT OF THIS CONTRACT SHALL BE REFERRED TO ARBITRATION IN LONDON IN ACCORDANCE WITH THE ARBITRATION ACT 1996 OR ANY STATUTORY MODIFICATION OR RE - ENACTMENT THEREOF FOR THE TIME BEING IN FORCE. UNLESS THE PARTIES AGREE UPON A SOLE ARBITRATOR, ONE ARBITRATOR SHALL BE APPOINTED BY EACH PARTY AND THE ARBITRATORS SO APPOINTED SHALL APPOINT A THIRD ARBITRATOR. THE DECISION OF THE THREE-MAN TRIBUNAL THUS CONSTITUTED OR ANY TWO OF THEM, SHALL BE FINAL, ON THE RECEIPT BY ONE PARTY OF THE NOMINATION IN WRITING OF THE OTHER PARTY'S ARBITRATOR, THAT PARTY SHALL APPOINT THEIR ARBITRATOR WITHIN FOURTEEN DAYS, FAILING WHICH THE DECISION OF THE SINGLE ARBITRATOR APPOINTED SHALL BE FINAL.
GERMAN LAW SHALL APPLY ON THE "FUEL" CONTRACT WHENEVER THE SELLERS HAVE THEIR PLACE OF BUSINESS IN GERMANY.
IN THIS CASE ALL DISPUTES ARISING OUT OF OR IN CONNECTION WITH THIS CONTRACT OR CONCERNING ITS VALIDITY SHALL BE FINALLY SETTLED BY ARBITRATION IN HAMBURG IN ACCORDANCE WITH THE ARBITRATION RULES OF THE GERMAN MARITIME ARBITRATION ASSOCIATION (GMAA).


HAPAG-LLOYD AG

HAMBURG                                                                                      JULY 2014


O.W. BUNKER GERMANY GMBH
Neumühlen 11
D-22763 Hamburg
Phone +49 40 32 55 60/0 · Fax +49 40 33 04 71
e-mail: hamburg@owbunker.de

7.11.3049.00 15023934

# OW BUNKER GROUP

## Terms and Conditions of sale for Marine Bunkers
## Edition 2013

**A.**      **GENERAL INTRODUCTION**

A.1     This is a statement of the terms and conditions according to which the
         International O.W. Bunker Group (hereinafter called "OWB") will sell marine bunkers.

A.2     These conditions apply to all offers, quotations, orders, agreements, services and all subsequent
         contracts of whatever nature, except where otherwise is expressly agreed in writing by OWB.

A.3     General trading conditions of another party will not apply, unless expressly accepted in writing by OWB.

A.4     In the case that, for whatever reason, one or more of the (sub)clauses of these general conditions are
         invalid, the other (sub)clauses hereof shall remain valid and be binding upon the parties.

**B.**      **DEFINITIONS**

B.1     Throughout this document the following definitions shall apply:

| | |
|---|---|
| "Seller" | means OWB; any office, branch office, affiliate or associate of the OWB Group; being the legal entity within the OWB Group, whose name is included in the Order Confirmation, sent to the Buyer. |
| "Buyer" | means the vessel supplied and jointly and severally her Master, Owners, Managers/Operators, Disponent Owners, Time Charterers, Bareboat Charterers and Charterers or any party requesting offers or quotations for or ordering Bunkers and/or Services and any party on whose behalf the said offers, quotations, orders and subsequent agreements or contracts have been made; |
| "Bunkers" | means the commercial grades of bunker oils as generally offered to the Seller's customers for similar use at the time and place of delivery and/or services connected thereto; |
| "Owner" | means the registered Owner, Manager or Bareboat Charterer of the vessel; |
| "Vessel" | means the Buyer's Vessel, Ship, Barge or Off-Shore Unit that receives the supply/bunkers; either as end-user or as transfer unit to a third party; |
| "Nomination" | means the written request/requirement by the Buyer to the Seller, for the supply of the Bunkers; |
| "Order Confirmation" | means the written confirmation as issued by the Seller and forwarded to the Buyer to conclude the conclusion of the negotiated sale/purchase of the Bunkers. In case of conflict between the Nomination and the Order Confirmation, unless the Seller otherwise agrees in writing, the wording and content of the Order Confirmation is deemed contain the prevailing terms of the Agreement; |
| "Agreement" | means the concluded terms for the sale/purchase of the Bunkers; |
| "Supplier" | means any party instructed by or on behalf of the Seller to supply or deliver the Bunkers; |
| "GTC" | means these General Terms and Conditions which shall govern the contractual regulations between the Seller and the Buyer |
| "BDR" | means the Bunker Delivery Receipt, being the document(s) which is/are signed by the Buyer's representative(s) at the place of the supply of the Bunkers to the Vessel, evidencing the quality and quantity of the Bunkers supplied to and received by the Vessel. |

**C.**      **OFFERS, QUOTATIONS AND PRICES.**

C.1     An Agreement shall only be concluded and binding on the Seller when the Seller sends the Order
         Confirmation to the Buyer. Each Order Confirmation shall incorporate these GTC by reference so that the
         GTC are considered a part of the Confirmation.

C.2     Agreements entered into via brokers, or any other authorised representative on behalf of the Seller, shall
         only bind the Seller upon the Sellers' broker or other authorised representative sending the Order
         Confirmation to the Buyer or the Buyer's broker as the case may be.

C.3     The Seller's offer is based on the applicable taxes, duties, costs, charges and price level of components
         for Bunkers existing at the time of the conclusion of the Agreement. Any later or additional tax,
         assessment, duty or other charge of whatever nature and however named, or any increase of
         components for Bunkers or any additional costs borne by the Seller whatsoever caused by any change
         in the Seller's contemplated source of supply or otherwise, coming into existence after the Agreement
         has been concluded, shall be added to the agreed purchase price, provided that the Seller shall give

the Buyer prior notice of this effect within a reasonable (under the prevailing circumstances) time after the Seller becoming aware of the relevant circumstances.

C.4    All prices and/or tariffs are exclusive VAT, unless specifically stated otherwise. Any VAT or other charge and/or tax applicable and whenever imposed, shall be promptly paid by the Buyer, and unless otherwise agreed in writing all supplies are quoted and invoiced based on quantity calculated quantity in metric tons in vacuum.

C.5    If the party requesting Bunkers is not the Owner of the Vessel, the Seller shall have the right (but will not be obliged) to insist as a precondition of sale that a payment guarantee is provided by the Owner. The Seller shall have the right (but will not be obliged) to cancel any agreement with the Buyer at any time, if such payment guarantee is not received upon request thereof from the Seller to the Owner. The Seller's decision to forego obtaining a payment guarantee under this Clause C.5 shall have no effect on Seller's right to a lien on the Vessel for any Bunkers supplied under this Agreement.

C.6    The Buyer warrants that it is authorized as agent to order Bunkers for the Vessel, and that the Seller has a lien on the Vessel for any Bunkers supplied under this Agreement. If the party requesting Bunkers is not the Owner of the Vessel, Buyer assumes the sole responsibility for communicating the terms and conditions of this Agreement to the Owner of the Vessel prior to the date of delivery.

C.7    If at any time before the delivery the financial standing of the Buyer appears to the Seller (in its absolute discretion) to have become impaired or unsatisfactory, the Seller may require cash payment or security to be provided by the Buyer prior to delivery, failing which the Seller may cancel the delivery without any liability on the part of the latter or its subcontractors.

**D.    SPECIFICATIONS (QUALITY – QUANTITY)**

D.1    The Buyer assumes the sole responsibility for the choice of nominating the quantity and quality of Bunkers and determine (if applicable) potential compatibility with any Bunkers already on board the Vessel. The Buyer also assumes sole responsibility for the selection and fitness of its choice of Bunkers for any particular use or purpose, and the Seller shall assume no responsibility whatsoever for the compliance or fitness of the Bunkers for a specific type of engine or equipment which the Buyer may or may not have agreed upon in any C/P (Charterparty) term or otherwise. This includes but is not limited to the quality, sulphur content and any other specific characteristics of the Bunkers whatsoever. Any and all warranties regarding the satisfactory quality, merchantability, fitness for purpose, description or otherwise, are hereby excluded and disclaimed.
Where specifications designate a maximum value, no minimum value is guaranteed unless expressly stated in the Order Confirmation, and conversely where minimum values are provided in a specification, no maximum values are guaranteed unless expressly stated in the Order Confirmation.

D.2    The quality and quantity shall be as agreed between the Seller and the Buyer and shall correspond to the Seller's Order Confirmation. Unless otherwise agreed in writing the Bunkers are delivered and sold based on metric tons in vacuum.

D.3    Where standard specifications are being given or referred to, tolerances in accordance with ISO 4259 in respect of Reproducibility/Repeatability in quality are to be accepted without compensation or other consequences whatsoever.

D.4    In respect of the quantity agreed upon the Seller shall be at liberty to provide, and the Buyer shall accept a variation of 5% from the agreed quantity, with no other consequence than a similar variation to the corresponding invoice from the Seller.

D.5    Information regarding the typical characteristics of the Bunkers at any delivery location shall only be indicative of the Bunkers that have been made available at that location and shall not form a part of the specification of the Bunkers to be delivered. All grades of produce may contain petroleum industry allowed bio-derived components.

**E.    MEASUREMENTS – NON CLAUSING OF THE BDR(S)**

E.1    The quantities of bunkers shall be determined only from the official gauge or meter of the bunkering barge, tank truck or of the shore tank in case of delivery ex wharf.

E.2    The Buyer's representative shall together with the Seller's representative measure and verify the quantities of Bunkers delivered from the tank(s) from which the delivery is made. When supplied by bunkering barge/tanker the particular barge/tanker will present its tank calibration and ullage sounding records, which are agreed to be the sole valid and binding document(s) to determine the quantity or quantities supplied. Quantities calculated from the Receiving Vessel's soundings shall not be considered.

E.3   Should the Buyer's representative fail or decline to verify the quantities, the measurements of quantities made by the Seller or the Supplier shall be final, conclusive and binding and the Buyer shall be deemed to have waived any and all claims in regard to any variance.

E.4   The Buyer expressly undertakes not to make any endorsement, complaint/ comment (including but without limitation any "No-lien" clausing) on the BDR when presented for signature by the Buyer's representative(s), any such insertion shall be invalid and of no effect whatsoever.

E.5   In the event of complaint/comment on the quantity of Bunkers delivered, the Buyer or the Master of the Vessel shall give to the Seller/Supplier a letter of protest separately, followed by a complaint in detail to the Seller, setting out the exact quantity(ies) claimed shortsupplied, and with full supporting vouchers, in writing within 7 (seven) days thereof, failing which, any such claim by the Buyer shall be extinguished as non existent, and the Buyer shall be deemed to have expressly waived any such claim against the Seller/Supplier, the relevant claim being time barred, and the Seller/Supplier's weight and measurements shall be conclusive evidence of the quantity of Bunkers delivered.

## F,   SAMPLING

F.1   The Supplier shall arrange for four (4) representative samples of each grade of Bunkers to be drawn throughout the entire bunkering operation. The Buyer's representative has the responsibility to witness that such samples are drawn  correctly and shall confirm his witnessing thereof and also confirm the proper and correct sealing by signing the labels of the sample bottles.

F.2   In case that dripsampling is not available onboard the barge, tanktruck or shore tank, samples shall be taken as a composite of each tank from which supplies are made, onboard the barge (respectively at the shore tank or tanktruck), divided with 1/3 from each the top, mid and bottom of the tanks.

F.3   The samples shall be securely sealed and provided with labels showing the Vessel's name, identity of delivery facility, product name, delivery date and place and seal number, authenticated with the Vessel's stamp and signed by the Seller's representative and the Master of the Vessel or his representative. The seal numbers shall be inserted into the BDR/Bunker Delivery Receipts, and by signing the BDR both parties agrees to the fact that the samples referred to therein are deemed valid and taken in accordance with the requirements as specified in this Chapter F.

F.4   Two (2) samples shall be retained by the Seller for ninety (90) days after delivery of the Bunkers, or if requested by the Buyer in writing, for as long as the Buyer reasonably required. The other two (2) samples shall be retained by the receiving Vessel, one of which being dedicated as the MARPOL sample.

F.5   In the event of a dispute in regard to the quality of the Bunkers delivered, the samples drawn pursuant to this Chapter F, shall be conclusive and final evidence of the quality of the Bunkers delivered. One, and only one, of the samples retained by the Sellers shall be forwarded to an independent laboratory to perform a set of tests, the result of which is to be made available to both parties. Those test results shall be final and binding upon both Buyer and Seller as to the parameters tested. The parties are to use best endeavours to agree the independent laboratory to perform the tests. If, however, no agreement can be reached on the choice of laboratory within 3 days of the Buyer being advised of the Seller opting to have the sample tested, the Seller is at liberty to send the sample to a reputable and independent laboratory of its choice for the tests to be conducted, and those test result will be final and binding upon Buyer and Seller as set out above.

F.6   The seal must be breached only in presence of both parties unless one/both in writing have declared that they will not be present, or fails to be present at the appropriate time and place; and both parties shall have the right to appoint independent person(s) or surveyor(s) to witness the seal breaking.

F.7   No samples subsequently taken shall be allowed as (additional) evidence. If any of the seals have been removed or tampered with by an unauthorised person, such sample(s) shall be deemed to have no value as evidence.

F.8   Any eventual samples drawn by Buyer's personnel either during bunkering or at any later date after bunkering shall not be valid as indicator of the quality supplied. The fact that such samples may eventually bear the signature of personnel on board the barge or tank truck or other delivery conveyance shall have no legal significance as such local personnel have no authority to bind Seller to different contractual terms. Seller shall have no liability for claims arising in circumstances where Buyer may have commingled the products on board the Vessel with other fuels.

**G.**      **DELIVERY**

G.1      The time of delivery, as given by the Seller, has been given as an approximate time, unless it has been otherwise specifically agreed in writing between the parties.

G.2      The time of delivery will only be binding upon the Seller when all information necessary for the Seller to comply with its obligations hereunder, have been properly delivered to the Seller in reasonable time before the delivery. In the event the Nomination addresses a spread of dates for delivery, the Seller has the sole discretion to commence the delivery within any time, day/night/sshinc of these dates, always subject to the circumstances set out below in Clause G.3.

G.3      The Vessel shall under all circumstances be bunkered as promptly as the prevailing circumstances permit, having regard to congestion affecting the delivery facilities of Seller, its Suppliers or Agents and to prior commitments of barges or other delivery means. The Seller and/or the Supplier shall not be liable for any consequences or any time lost due to the Vessel having to wait for berth for bunkering or for completion of bunkering, and unless otherwise agreed in writing, the Seller shall not be obligated to deliver prior to the nominated date or spread of dates. The Seller is not responsible for delays caused by local customs, pilots, port- or other authorities.

G.4      In any case the Buyer, unless otherwise agreed in writing, must give not less than 72 (seventy two) hours approximate notice of readiness of the Vessel for delivery, which is to be followed by 48 (forty eight) hours and 24 (twenty four) hours such notices, where the last notice must also specify the exact place of delivery. All these notices must be given to the Sellers and the Seller's representatives/agents in writing.

G.5      The Seller shall be entitled to deliver the Bunkers by separate part deliveries, in which case each part delivery shall be construed as a separate delivery.

G.6      The Seller shall not be required to deliver any Bunkers if any customs and/or other government permit required for such purpose has not been obtained in due time before the delivery.

G.7      If the Seller at any time for any reason believes that there may be a shortage of supply at any place and that as a result thereof it may be unable to meet the demands of all its customers, the Seller may allocate its available and anticipated quantity/ies of Bunkers among its customers in such a manner as it may determine appropriate in its sole discretion.

G.8      The Vessel shall be accessible at all times to Seller and Supplier and shall be bunkered as promptly as the circumstances permit. The Seller and/or the Supplier shall not be liable for any demurrage paid or incurred by the Buyer or for any loss, damage or delay of the Vessel (consequential and/or liquidating damages included) of any nature whatsoever due to congestion at the loading terminal, prior commitments of available barges or tank trucks or any other reason.

G.9      The Buyer shall ensure that the Vessel provides a free, safe and always afloat and accessible side for the delivery of bunkers and that all necessary assistance as required by the Seller or the Seller's representative is rendered in connection with the delivery. If in the Supplier's opinion clear and safe berth is unavailable, delivery might be delayed or, in Seller's option, cancelled and all costs related to above will be on account of the Buyer.

G.10     The Vessel shall moor, unmoor, hoist and lower bunkering hose(s) from the barge(s) whenever required by the Seller, Seller's representative or Supplier, free of expenses and in any way as may be requested to assist the barge equipment to a smooth supply. The Buyer shall make and be responsible for all connections and disconnections between the delivery hose(s) and the Vessel's bunker intake manifold/pipe and ensure that the hose(s) are properly secured to the Vessel's manifold prior to commencement of delivery.
During bunkering the Vessel's scuppers must be safely blocked, which blocking must be made by the Vessel's own crew. Furthermore the Vessel must ensure that all pipes and manifolds and receiving tanks are properly checked and ready to receive the bunkers, including but not limited to ensuring proper opening/closing of relevant valves, without any risk for spillages, etc, during the bunkering.
Local further special requirements for receiving bunkers must be followed strictly by the Vessel, whether advised or not by the Seller or the Seller's representative, as it is always the Vessel and the Buyer who remains solely responsible for the knowledge and awareness of such eventual additional requirements for safety reasons.

G.11     In the event that the Vessel is not able to receive the delivery promptly, the Buyer is thereby in default and shall pay damages and/or any reasonable demurrage claim to the barging/supplying facilities and shall indemnify the Seller in each and every respect as a result thereof.

G.12     Delivery shall be deemed completed and all risk and liabilities, including loss, damage, deterioration, depreciation, contamination, evaporation or shrinkage to the Bunkers delivered and responsibility for loss, damage and harm caused by pollution or in any other manner to third parties shall pass to the Buyer

from the time the Bunkers reach the flange/connecting pipe line(s)/delivery hoses provided by the Seller on the barge/ tank truck/shore tank.

G.13   If the Buyer for whatever reason is unable or refuses to receive the full quantity ordered, the Seller shall have the right to invoice the Buyer for the loss incurred by having to transport the undelivered Bunkers back to the storage or by having to sell the Bunkers in a degraded form or at a lower price. The Seller may exercise this right without prejudice to the Seller's other rights for damages or otherwise pursuant to these conditions.

G.14   The Vessel shall provide and have appropriate and segregated tanks to receive the contracted quantity of Bunkers; and the Vessel shall always be able to perform its own blending on board if any blending is deemed to be required by the Buyer. The Vessel shall upon delivery test the Bunkers supplied by running her engines or auxiliaries or equipment, for which the Bunkers are supplied, for a minimum of 1 (one) hour to determine that the Bunkers are satisfactory. In the event the Bunkers are not considered satisfactory, the Seller and Supplier are to be notified in writing immediately after such test period has expired. Otherwise, it shall be deemed that the Bunkers were satisfactory and that in any event the Buyer has waived any right to claim in this regard.

G.15   If delivery is required outside normal business hours or on local weekends, Saturday, Sunday, national religious or public holidays the extra expenses incidental to such delivery shall be reimbursed by the Buyer as additional costs.

G.16   In the event the Bunker delivery is made by vessel or barge as a ship-to-ship transfer, any damage caused by contact and/or collision and/or swell and/or other weather or sea related condition or incident, is to be dealt with by the Owners directly with the owners of the units involved, and Seller/Supplier shall not be held nor be responsible for any such damages. If, however, any of the involved units choose to pursue Seller and/or Supplier, Buyer will fully indemnify and hold Seller harmless in relation thereto.

G.17   For safety reasons it is agreed that it is solely the Master of the bunkering barge that determines whether mooring alongside is safe, taking weather, swell and forecasts into consideration, Supplier/Seller not to be held responsible for any delays, demurrages, liquidating damages or similar whatsoever as a result of any eventual delays caused by any decision by the Master of the barge in this connection. Supplies being always performed weather permitting.

G.18   Without prejudice to any other article(s) herein, any and all supply/ies will be based on as per best endeavours only if the receiving Vessel arrives outside the originally agreed time slot as per the Order Confirmation forwarded.

## H.   TITLE

H.1   Title in and to the Bunkers delivered and/or property rights in and to such Bunkers shall remain vested in the Seller until full payment has been received by the Seller of all amounts due in connection with the respective delivery. The provisions in this section are without prejudice to such other rights as the Seller may have under the laws of the governing jurisdiction against the Buyer or the Vessel in the event of non-payment.

H.2   Until full payment of the full amount due to the Seller has been made and subject to Article G.14 hereof, the Buyer agreed that it is in possession of the Bunkers solely as Bailee for the Seller, and shall not be entitled to use the Bunkers other than for the propulsion of the Vessel, nor mix, blend, sell, encumber, pledge, alienate, or surrender the Bunkers to any third party or other Vessel.

H.3   In case of non or short payment for the Bunkers by the Buyer, the Seller is entitled (but not obliged) to repossess the Bunkers without prior juridical intervention, without prejudice to all other rights or remedies available to the Seller.

H.4   In the event that the Bunkers have been mixed with other bunkers on board the Vessel, the Seller shall have the right to trace its proprietary interest in the Bunkers into the mixed bunkers and/or a right of lien to such part of the mixed bunkers as corresponds to the quantity or net value of the Bunkers delivered.

H.5   The provisions of this Chapter H do not prejudice or in any way limit the Seller's right to arrest/attach the Vessel and/or sister ship and/or any sister or associate ship and/or other assets of the Buyer (or the Owner of the Vessel or any other party liable), wherever situated in the world, without prior notice.

H.6   Where, notwithstanding these conditions, title in and to the Bunkers delivered has passed to the Buyer and/or any third party before full payment has been made to the Seller, the Buyer shall grant a pledge over such Bunkers to the Seller. The Buyer shall furthermore grant a pledge over any other Bunkers present in the respective Vessel, including any mixtures of the delivered Bunkers and other bunkers. Such pledge

will be deemed to have been given for any and all claims, of whatever origin and of whatever nature that the Seller may have against the Buyer.

H.7 For the avoidance of doubt, where a mortgagee bank enforces any rights against the Vessel and becomes a mortgagee in possession of the Bunkers then as bailee the mortgage bank is liable to the Seller for fulfilment of the Agreement.

I. PAYMENT -- MARITIME LIEN

I.1 Payment for the Bunkers and/or the relevant services and/or charges shall be made by the Buyer as directed by the Seller within the period agreed in writing.

I.2 Payment shall be made in full, without any set-off, counterclaim, deduction and/or discount free of bank charges to the bank account indicated by the Seller on the respective invoice(s).

I.3 (i) If at any time after delivery but before the due date the financial standing of the Buyer appears to the Seller (in its sole discretion) to have become impaired or unsatisfying, the Seller may require immediate full payment of all its invoices due and/or those not yet due, or such security as it shall deem to be satisfactory.
(ii) In the event that the Buyer shall default in making any payment due, the Seller may suspend deliveries of Bunkers until such payment has been made in full (together with default/delay compensation and costs), or the Seller may, in its discretion, elect to treat such default as a serious breach of the Agreement and thereupon terminate the Agreement on whole or in part without prejudice to any claim against the Buyer for damages, including cancellation charges. Such termination or suspension shall not relieve the Buyer of any obligation undertaken by virtue of an Agreement so terminated.
(iii) Where the Seller has extended any kind of credit facility to a group of companies or associated companies, default by any one relevant Buyer in respect to any invoice of the Seller shall give the right to the Seller to cancel all credit arrangements of the entire group or of all the associates, whereupon sub-clauses I.3.(i) and I.3.(ii) shall apply as appropriate.
(iv) Where the Buyer fails to pay timely, the Seller has the right to (without prejudice to its rights to receive default/delay compensation) take all appropriate steps to secure and enforce its claim; the Seller may also unilaterally cancel any credit arrangements agreed with/extended to the Buyer.
(v) All judicial and extrajudicial costs and expenses, including pre-action costs, fees, expenses and disbursements of the Seller's lawyers/attorneys-at-law, incurred in connection with non payment or delayed payment or by any other breach by the Buyer of these conditions, shall be for the Buyer's account, immediately payable by the latter to the Seller. In case of litigation, the Buyers shall also pay all the relevant expenses to the Seller, including but without limitation all his reasonable attorneys/lawyers' fees, costs and disbursements.

I.4 Payment shall be deemed to have been made on the date of which the Seller has received the full payment and such is available to the Seller. If payment falls due on a non-business day, the payment shall be made on or before the business day nearest to the due date. If the preceding and the succeeding business days are equally near to the due date, then payment shall be made on or before the preceding business day.

I.5 Any delay in payment of the full sum due shall entitle the Seller to interest at, the rate of 3 (three) per cent per month (compounded monthly for each month [or part thereof] of non payment) without prejudice to any rights or remedies available to the Seller. Furthermore the Seller is entitled to charge a delayed payment administration fee of USD 1.50 per mton supplied, or the equivalent thereof in local currency, with a minimum administration fee of USD 350.00 for each delivery made. All reasonable attorneys' fees incurred by Seller in connection with the collection of overdue payments shall be for the sole account of the Buyer.

I.6 Payments made by the Buyer in respect of a supply of Bunkers shall at all times be credited in the following order: (1) costs of any kind or nature, including but not limited to legal costs and attorneys' fees, (2) interest and administrational fee, and (3) invoices in their order of age, also if not yet due, or in Seller's sole discretion to specify a payment to any such invoice Seller considers relevant.

I.7 All costs borne by the Seller in connection with the collection of overdue payments, including those of the Seller's own legal and credit department and, including but not limited to, reasonable attorneys' fees, whether made in or out of court and in general all costs in connection with breach of any agreement by the Buyer, including but not limited to reasonable attorneys' fees, shall be for the sole account of the Buyer.

I.8 The Seller shall at all times, in its absolute discretion, be entitled to require the Buyer to provide the Seller what the Seller deems to be proper security for the performance of all of Buyer's obligations under the Agreement. Failing the immediate provision of such security upon Seller's demand, the Seller shall be

entitled to stop any further execution of any agreement(s) between the parties until such time as the Buyer has provided the required security.

I.9 Where Bunkers are supplied to a Vessel, in addition to any other security, the Agreement is entered into and the Goods are supplied upon the faith and credit of the Vessel. It is agreed and acknowledged that the sale of Bunkers to the Buyer and/or their acceptance on the Vessel create a maritime lien over the Vessel for the price of the Bunkers (and all interest and costs payable in respect thereof; including but not limited to the reasonable attorney's fees), such maritime lien afforded to the Seller over the Vessel. In any event any applicable Law shall not prejudice the right of the maritime lien of the Seller afforded hereunder or by any other applicable Law, be it of the place of delivery, or the flag of the Vessel, or the place of jurisdiction and/or an arrest of the Vessel, or otherwise howsoever.

I.10 It is mutually agreed that the Bunkers provided by the Seller to the Buyer under the terms of this Agreement have been ordered by the Buyer in the ordinary course of business between Seller and Buyer. All payments from Buyer to Seller for Bunkers supplied under this Agreement are deemed to have been made in the ordinary course of business between Seller and Buyer, according to these ordinary business terms agreed between them.

## J.   CLAIMS

J.1 In addition to the obligations referred to in Article E.4 and E.5 herein, any claim in connection with the quantity of the Bunkers delivered must be notified by the Buyer, or the Master of the Vessel, to the Seller or Supplier immediately after completion of delivery in the form of a letter of protest. If the Buyer or the Vessel's Master fails to present such immediate notice of protest to the Seller or Supplier, such claim shall be deemed to have been waived and shall be absolutely barred for all purposes.

J.2 Always without prejudice to Article G.14 herein, any and all claims concerning the quality of the Bunkers delivered or time consumed for the entire operation, shall be submitted to the Seller in writing within 15 (fifteen) days after delivery with a clear statement as to the nature or the claim(s) along with appropriate supporting documentation, failing which any rights to complain or claim compensation of whatever nature shall be deemed to have been waived and absolutely barred for all purposes.

J.3 The Buyer shall be obliged to make payment in full and fulfil all other obligations in accordance with the terms of the Agreement and these conditions, whether or not it has any claims or complaints. If Buyer submits a claim against Seller with respect to the quality or quantity of the products supplied, the Seller or the Seller's nominated representative shall be entitled to board the Vessel and investigate the Vessel's records, log books, engine logs, etc, and to make copies of any such document the Seller or the Seller's nominated representative may consider necessary for its investigations connected to the case. The Buyer shall allow this, or where Buyer has chartered the Vessel then the Buyer shall obtain authorization from Owner to allow the herein stated steps and to provide full assistance and support by the Vessel's officers and crew in any such manner the Seller or Seller's nominated representative may require. Failure to allow boarding and/or produce required copies of documents and/or lack of full cooperation by the Vessel's officers and crew shall constitute a waiver of the Buyer's claim.

J.4 The Seller shall be allowed, and the Buyer, Owner, Officers and Crew onboard the receiving Vessel shall agree and in any way support and cooperate with Seller's representative, to draw samples from the Vessel's storage tanks, settling tanks and service tank and/or from before and after the Vessel's centrifuges to have extra tests carried out for such samples at independent laboratory.

J.5 In each and every case, any and all claims of the Buyer shall be timebarred unless arbitration/legal proceedings have been commenced/issued at the competent tribunal/court set forth in Chapter P hereof and served within 12 (twelve) months from the date of delivery of the Bunkers, or the date that delivery should have commenced pursuant to the Order Confirmation from the Seller.

## K.   LIABILITY -- LIMIT TO SELLER'S LIABILITY

K.1 The Seller and/or Supplier shall not be liable for damages of whatever nature, including physical injury, nor for delay of delivery of Bunkers or services, no matter whether such damages or delay have been caused by fault or negligence on the side of the Seller. The Seller shall furthermore not be liable for damages or delay as described above when such damages or delay have been caused by the fault or negligence of its personnel, representatives, Supplier or (sub)contractors.

K.2 Liabilities of the Seller for consequential and/or liquidated damages including but not limited to loss of time, loss of cargo or charter cancelling date, loss of income or profit/earnings, are excluded. In any event and notwithstanding anything to the contrary herein, liability of the Seller shall under no

circumstances exceed the invoice value of the Bunkers supplied under the relevant agreement to the relevant Vessel.

K.3     The Buyer shall be liable towards the Seller and herewith undertakes to indemnify the Seller for any and all damages and/or costs suffered or otherwise incurred on the Seller due to a breach of contract and/or fault or neglect of the Buyers, its Supplier, agents, Servants, (sub)contractors, representatives, employees and the officers, crews and/or other people whether or not on board of the Vessel(s). The Buyer furthermore undertakes to hold the Seller harmless in case of any third party institutes a claim of whatever kind against the Seller whether direct or indirect relation to any agreement regulated by these terms and conditions. Third party shall mean any other (physical or legal) person/company than the Buyer.

K.4     No servant, supplier or agent of the Seller/Supplier (including independent (sub)contractors from time to time employed by the Seller/Supplier) shall be liable to the Buyer for loss, damage or delay, while acting in the course of or in connection with its employment and/or agency for the Seller. Without prejudice to the above every exemption, limitation, condition and liberty herein contained, and every right, exemption from or limit to liability, defence or immunity of whatever nature applicable to the Seller or to which it is entitled hereunder shall also be available and shall extend to protect every such servant, representative or agent of the Seller and/or the Supplier acting as aforesaid.

L.      EXEMPTIONS AND FORCE MAJEURE

L.1     Neither the Seller nor the Seller's Supplier shall be liable for any loss, claim, damage, delay or demurrage due to any delay or failure in their performance under this Agreement (a) by reason of compliance with any order or request of any government authority, or person purporting to act therefore, or (b) when supply of the Bunkers or any facility of production, manufacture, storage, transportation, distribution or delivery contemplated by the Seller or Supplier is interrupted, delayed by congestion or other event (also see Article G.3 above), or by unavailability of product and/or barge equipment or by inadequate resource for any cause whatsoever which interruption, delay, unavailability or inadequate resources is not within the immediate control of the Seller or the Supplier, including (without limitation) if such is caused wholly or partly by labour disputes, strikes, stoppages, lock-out, governmental intervention, wars, civil commotion, riot, quarantine, fire flood, earthquake, accident, storm, swell, ice, adverse weather or any act of God. Neither the Seller nor the Supplier shall be required to remove any such cause or replace any affected source or supply or facility if doing so shall involve additional expense or a deviation from the Seller's or the Supplier's normal practices. Neither the Seller, nor the Supplier shall be required to make any deliveries which fall in whole or in part as a result of the causes set out in this Article at any later time.

L.2     If the Buyer exercises reasonable diligence, the Buyer shall not be liable for failure to receive any particular delivery if prevented therefrom by force majeure. The Buyer shall indemnify the Seller or the Seller's supplier for any damage caused by the Buyer, the Buyer's agent or employees in connection with deliveries hereunder.

L.3     Declaration of Force Majeure shall be given without unduly delay once such event(s) have come to the knowledge of the respective party declaring same. However, under no circumstances and for no reason whatsoever, can Force Majeure entitle the Buyer not to pay promptly any Invoice of the Seller.

L.3     In the event that the Seller, as a result of force majeure, can only deliver a superior grade of bunkers, the Seller is entitled to offer the said grade, and the Buyer must accept delivery thereof and pay the applicable price.

L.4     (a)     These Terms and Conditions are subject to variation in circumstances where the physical supply of the Bunkers is being undertaken by a third party which insists that the Buyer is also bound by its own terms and conditions. In such circumstances, these Terms and Conditions shall be varied accordingly, and the Buyer shall be deemed to have read and accepted the terms and conditions imposed by the said third party.

        (b)     Without prejudice or limitation to the generality of the foregoing, in the event that the third party terms include:

        (i)     A shorter time limit for the doing of any act, or the making of any claim, then such shorter time limit shall be incorporated into these terms and conditions.

        (ii)     Any additional exclusion of liability clause, then same shall be incorporated mutatis mutandis into these.

        (ii)     A different law and/or forum selection for disputes to be determined, then such law selection and/or forum shall be incorporated into these terms and conditions.

(c)   It is acknowledged and agreed that the buyer shall not have any rights against the Seller which are greater or more extensive than the rights of the supplier against the aforesaid Third Party.

M.      BREACH/CANCELLATION

M.1     Without prejudice to any other remedies and rights, the Seller shall have the option immediately to cancel the Agreement in full or in part, or to store or procure the storage of the Bunkers, in whole or in part, for the account and risk of the Buyer and to charge the Buyer the expenses thereby incurred, or to hold the Buyer fully to the agreement, or take any other measures which the Seller deems appropriate, without prejudice to its rights of indemnification, without any liability on the side of the Seller, in any one of (but not limited to) the following cases:

a)      when the Buyer, for whatever reason, fails to accept the Bunkers in part or in full at the place and time designated for delivery;

b)      when the Buyer fails in part or in full to comply with its obligations to pay any amount due to the Seller and/or provide security as set out in these GTC;

c)      when, before the date of delivery, it is apparent in the opinion of the Seller that the financial position of the Buyer entails a risk to the Seller;

d)      when, in case of force majeure, the Seller is of the opinion that the execution of the agreement should be cancelled.

M.2     The Seller may terminate any Agreement with the Buyer in whole or in part, in its full discretion, upon the breach of any provisions hereof by the Buyer or in the event that the Buyer fails to make or suspends payment, ceases to carry on business, makes an arrangement with its creditors or undergoes any form of bankruptcy, administration, re-organisation or asset rearrangement.

M.3     The Seller has the option to immediately cancel the Agreement for the account and risk of the Buyer if at any time the Seller, in its sole discretion, has reasonable grounds to believe that:

a)      The Vessel; or

b)      The Charterer of the Vessel; or

c)      The fully or partly Owner(s) of the Vessel; or

d)      Any officers of the Vessel; or

e)      The Operator and/or Manager of the Vessel; or

f)      Any other person or entity in any way related to the Agreement or delivery is/are

1)      Iranian(s); or

2)      Related in any way to Iran or Iranians; or

3)      Listed on the US OFAC Specially Designated Nationals List; or

4)      Covered by any US, UN- and/or EU sanctions; or

5)      Covered by any sanctions of any other jurisdiction and/or administration.

Under no circumstances can the Seller be held liable for any loss, delays, claims or damages of whatever kind suffered by the Buyer due to a cancellation under this Article.

The Buyer must inform the Seller immediately the Buyer becomes aware of or has reasons to believe that any of the above items a) to f) in combination with any of the above items 1) to 5) are fulfilled/apply. Should the Buyer breach its obligation to inform the Seller, the Buyer shall fully indemnify and keep the Seller harmless for any damage or loss caused by such breach, including consequential or liquidated damages.

M.4     The Buyer acknowledges that any agreements with the Seller and any actions related to such agreements as well as any interaction with third parties related to such agreements are covered by certain anticorruption laws and regulations which can include any anticorruption law, including but not limited to the U.S. Foreign Corrupt Practices Act ("FCPA"), and the UK Bribery Act.  Therefore, the Buyer declare to comply with all applicable anticorruption laws and regulations and agrees that the Buyer has not, and will not, offer, promise, pay, or authorize the payment of any money or anything of value, or take any action in furtherance of such a payment, whether by direct or indirect means, to any public official or private individual to influence the decision of such person in the performance of his duties to a government or to his company. Any breach of this clause will void the related Agreement and in the sole discretion of the Buyer any other Agreement between the parties, making any claims for payment, delivery or any other obligation of the Seller under this Agreement void. The Buyer is liable for all and any costs or losses incurred by the Seller due to such breach and/or an Agreement becoming void as a consequence.

N.      SPILLAGE, ENVIRONMENTAL PROTECTION

N.1     If a spill occurs while the Bunkers are being delivered, the Buyer shall promptly take such action as is necessary to remove the spilled Bunkers and mitigate the effects of such spill. Without prejudice to the

generally of the foregoing the Seller is hereby authorised by the Buyer in the absolute discretion of the Seller, but at the expense of the Buyer, to take such measures and incur such expenses (whether by employing its own resources or by contraction with others) as are necessary in the judgment of the Seller to remove the spilled Bunkers and mitigate the effects of such spill. The Buyer shall cooperate and render such assistance as is required by the Seller in the course of the action. All expenses, claims, costs, losses, damages, liability and penalties arising from spills shall be borne by the party that caused the spill by a negligent act or omission. If both parties have acted negligently, all expenses, claims, losses, damages, liability and penalties, shall be divided between the parties in accordance with the respective degree of negligence. The burden of proof to show the Seller's negligence shall be on the Buyer. The Buyer shall give the Seller all documents and other information concerning any spill or any programme for the prevention thereof that is required by the Seller, or is required by law or regulation applicable at the time and place of delivery.

## O,    DELAYS AND CANCELLATIONS

O.1    Notwithstanding anything else to the contrary herein, and without prejudice to any rights or remedies otherwise available to the Seller, the Buyer, by its acceptance of these conditions, expressly agrees that Seller has the sole discretion to cancel or to adjust prices in the event the Vessel is suffering a delay exceeding 24 hours from the (last) nomination date.

O.2    If the Buyer for whatever reason (including circumstances entirely outside Buyer's control) cancels the Agreement, where Order Confirmation has been sent by Seller, the Buyer shall be liable for any and all losses suffered and liabilities incurred by the Seller and/or the Supplier as a result of such cancellation, including, but not limited to, barge costs, re-storing of the Bunkers, and hedging costs, and also in Seller's sole option any difference between the contract price of the undelivered product and the amount received by the Seller upon resale to another party or, if another buyer cannot be found, any market diminution in the value of the product as reasonably determined from available market indexes. These losses and liabilities shall be indemnified by a minimum amount of USD 4,000 by way of agreed minimum liquidated damages, and shall be indemnified in full if they in total exceed USD 4,000.

## P,    LAW AND JURISDICTION

P.1    This Agreement shall be governed and construed in accordance with English law.
The 1980 United Nations Convention on Contracts for the International Sale of Goods (CISG) shall not apply.
Except for circumstance referred to in Clause P.5 below all disputes arising in connection with this Agreement or any agreement relating hereto, save where the Seller decides otherwise in its sole discretion, shall be finally settled by arbitration in London, England in accordance with the Arbitration Act 1996 (or any subsequent amendment).

P.2    In the event that the Seller determines to refer any dispute to arbitration it shall be referred to a tribunal of three arbitrators consisting of one arbitrator to be appointed by the Seller, one by the Buyer, and one by the two arbitrators already appointed. Each member of the tribunal shall be a full member of The London Maritime Arbitrators Association (the ''LMAA''). Either party may call for Arbitration by service of written notice, specifying the name and address of the arbitrator appointed and a brief description of the dispute(s) or difference(s) to be the subject or the Arbitration. If the other party does not within 14 days serve notice of appointment of an arbitrator to arbitrate the dispute(s) or difference(s), then the first moving party shall have the right without further notice to appoint its own arbitrator as sole arbitrator and shall subsequently advise the other party accordingly. The award of the sole arbitrator shall be binding on both parties as if he had been appointed by agreement.  Provided each party appointed their own arbitrator then these two arbitrators shall jointly appoint the third arbitrator. In the event that the two arbitrators fail to appoint a third arbitrator within twenty days of the appointment of the second arbitrator, either party may apply to the English courts for the appointment of a third arbitrator.
Any disputes to be referred to Arbitration are to be determined in accordance with the current LMAA terms unless the parties agree otherwise.

P.3    Nothing herein shall prevent the parties agreeing in writing to vary these provisions to provide for the appointment of a sole arbitrator.

P.4    In cases where neither the claim nor any counterclaim exceeds the amount of USD 100,000 (or such other sum as the parties may agree) the Arbitration shall be conducted in accordance with the LMAA Small Claims Procedure current at the time when the arbitration proceedings are commenced.

P.5    The General Maritime Law of the United States shall always apply with respect to the existence of a maritime lien, regardless of the country in which Seller takes legal action. Seller shall be entitled to assert

its rights of lien or attachment or other rights, whether in law, in equity or otherwise, in any jurisdiction where the Vessel may be found.

Without prejudice to any other Clause herein any disputes and/or claims arising in connection with these conditions and/or any Agreement governed by them, any dispute and/or claim arisen in connection with a Vessel detained by Seller at any port, place or anchorage within the United States shall be submitted to the United States District Court for the Southern District of New York,

P.6     If any procedure of any nature whatsoever is instituted under Clause P.5 above, in connection with any controversy arising out of this Agreement or to interpret or enforce any rights under this Agreement, the prevailing party shall have the right to recover from the losing party its reasonable costs and attorneys' fees incurred in such proceeding.


Q.      VALIDITY

Q.1     These terms and conditions shall be valid and binding for all offers, quotations, prices and deliveries made by the O.W. Bunker Group, any associated company, representative or agent as of September 1, 2013, or at any later date.

Q.2     These terms and conditions are available at the website www.owbunker.com, on which site as well the Sellers may notify amendments, alterations, changes or verifications to same. Such amendments, alterations, changes or verifications are deemed to be a part of the entire terms once same have been advised on the website.

# Exhibit 2

**DEHART, MICHAEL**

| | |
|---|---|
| From: | Gaus, Lukas [Lukas.Gaus@hlag.com] on behalf of RQMT-SECTION1 [rqmt-section1 @hlag.com] |
| Sent: | Monday, October 13, 2014 2:55 AM |
| To: | khse@owbunker.de; trading@owbunker.de |
| Subject: | RE: Mv Seaspan Hamburg/USTIW PO 4604073597 |

Moin Karl,

just for your info - as agreed correct ETA shall read 16.10.2014 of course.

brgds,
Lukas


-----Original Message-----
From: Lukas Gaus [mailto:lukas.gaus@hlag.com]
Sent: Friday, October 10, 2014 2:23 PM
To: khse@owbunker.de; Gaus, Lukas; trading@owbunker.de
Subject: Mv Seaspan Hamburg/USTIW PO 4504073597


TO   : O.W. Bunker Germany GmbH
FOR  : BUNKER DEPARTMENT

HAPAG-LLOYD BUNKER PURCHASE ORDER

WE HEREWITH CONFIRM HAVING NOMINATED IN ACCORDANCE WITH OUR TERMS AND CONDITIONS OF PURCHASE
LATEST EDITION (A COPY SHOULD ALREADY BE IN YOUR POSSESSION - PLEASE ADVISE IF A FURTHER COPY
IS REQUIRED) AND TO ANY AMENDMENT THERETO WHICH MAY HAVE BEEN AGREED BETWEEN US.

ALL FUEL DELIVERED TO HAPAG-LLOYD AG AS WELL AS TO HAPAG-LLOYD KREUZFAHRTEN HAVE TO MEET ISO
8217 FOURTH EDITION 2010-07-01 - REFERENCE NO. ISO 8217:2010 (E) PETROLEUM PRODUCTS FUELS
(CLASS F) - SPECIFICATIONS OF MARINE FUELS AND ANY AMENDMENT THERETO AND MUST BE IN
ACCORDANCE WITH MARPOL 73/78 ANNEX VI AND ANY AMENDMENT THERETO.

REF.NO.    : 028/4504073597 TO BE STATED ON INVOICE
ACCOUNT    : HAPAG-LLOYD AG, HAMBURG
SELLER     : O.W. Bunker Germany GmbH,

VESSEL     : Mv Seaspan Hamburg
PORT       : TACOMA, WA
DATE       : ESTIMATED ARRIVAL ON 16.10.2014 REVISED
             ETA AND ETD SUBJECT TO CHANGE, PLEASE COORDINATE
             TIME OF DELIVERY CAREFULLY WITH AGENT
AGENTS     : Norton Lilly, Seattle

POSITION   : 00010
QUANTITY   : 2.900,000 TO
ISO GRADE  : MARINE FUEL ISO RMK 700 MAX 3,50% SULFUR
PRICE      : 523,00 USD / TO FOB
SUPPLIER   : US OIL


DELIVERY   : STRICTLY ONE BARGE LOAD UPON VESSEL'S ARRIVAL
SURVEYOR   : Oiltest APPOINTED, PHONE:

1

```
---ADDITIONAL REMARKS---
ISO GRADES   : SELLER HAS TO ENSURE THAT THE PRODUCT DELIVERED IS
               DERIVED FROM PETROLEUM CRUDE OIL AND MUST NEITHER
               CONTAIN: CONTAMINANTS (I.E. CHEMICAL
               WASTE, POLYPROPYLENE, USED LUBRICANTS, ABRASIVE
               MATERIALS) NOR BLENDING COMPONENTS DERIVED FROM COAL
               AND SHALE DISTILLATIONS PROCESSES.


SPECIFICATION: SUPPLIER WILL ADVISE BUYER AT LATEST 24H
               (OR THE LAST WORKING DAY BY NOON; HAMBURG TIME)
               BEFORE DELIVERY ABOUT TYPICAL SPECIFICATIONS OF
               THE ABOVE MENTIONED PRODUCTS:

               CCAI: MAX. 855 FOR RMG 380/
               CCAI: MAX. 865 FOR RMK 500 / RMK 700


DELIVERY     : - TRANSFER TEMP.: MIN. 50 °C - MAX. 70 °C
               IF DELIVERY HAS TO BE ARRANGED BY MORE THAN ONE BARGE,
               TYPICAL SPES OF EACH BARGE LOAD TO BE ADVISED WELL IN
               ADVANCE IN CASE SPECS ARE NOT IDENTICAL.
               IN CASE SUPPLIER FAILS TO DELIVER QUANTITY IN FULL
               WITHIN LAYTIME OR VESSEL WILL BE DELAYED DUE TO BAD
               PERFORMANCE THEN THE SELLER/SUPPLIER WILL DELIVER THE
               QUANTITY IN QUESTION IN THE NEXT PORT OF CALL WITHOUT
               ANY COSTS TO THE BUYER AND WILL ALSO PAY FOR THE FUEL
               WHICH WILL BE CONSUMED IN ADDITION TO SPEED UP FOR
               COMPENSATION. ALL DEMURRAGE AND PUMP BACK CHARGES
               RESULTING THEREFROM TO BE ABSORBED BY THE SELLER AS WELL.


SURVEY       : IT IS MUTUALLY AGREED TO APPOINT A SURVEYOR TO
               CARRY OUT THE QUANTITY/QUALITY SURVEY.
               IT IS FURTHER AGREED THAT VOLUMES SHOWN IN THE
               B.D.R. ARE FINAL TO ALL PARTIES AS LONG AS THEY DO
               NOT DIFFER MORE THAN TOTAL 0,3% COMPARED TO THE
               FINDINGS OF THE SURVEYOR.
SAMPLING     : THE SAMPLES SHALL BE DRAWN JOINTLY AT A POINT TO
               BE MUTUALLY AGREED BETWEEN ALL PARTIES, BUT
               CLOSEST TO THE VESSEL'S MANIFOLD.
               5 SAMPLES MUST BE DRAWN AND DISTRIBUTED:
               MASTER: 1   SUPPLIER: 2    SURVEYOR: 2

               IT IS MUTUALLY AGREED BETWEEN SELLER/SUPPLIER AND
               BUYER TO USE ONLY SAMPLE BOTTLES FITTED WITH TWO SEAL
               LUGS. IN CASE SUPPLIERS CANNOT PROVIDE SUCH BOTTLES
               THEN VESSEL'S REPRESENTATIVE SHALL HAND OVER SAID
               BOTTLES TO SUPPLIERS FREE OF CHARGE. SAMPLES TO BE
               SIGNED BY BOTH PARTIES, SEALED BY SUPPLIER AND
               COUNTERSEALED BY VESSEL'S REPRESENTATIVE.
               IT MUST BE NOTED THAT SAMPLES DRAWN EX INSTALLATION
               OR BEYOND BUYERS CONTROL ARE NOT LEGALLY BINDING IN
               CASE OF A DISPUTE. THIS INCLUDES ALSO BUNKERSTEMS NOT
               ATTENDED BY AN INDEPENDENT SURVEYOR. SUCCESSFUL HAND
               OVER OF SUCH INSTALLATION SAMPLES OR SPECICAL ACCEPTANCE
               NOTES ON CORRESPONDING BUNKER RECEIPTS EVEN THOUGH
               ACCEPTED BY THE VESSEL BY SIGNING SUCH RECEIPTS OR
```

SAMPLES ARE DECLARED AS NOT REPRESENTATIVE BY ALL MEANS.

PAYMENT        : 30 DD / 15 DI
                 IF WE DO NOT RECEIVE YOUR INVOICE WITHIN 15 DAYS
                 AFTER DATE OF DELIVERY, THE DUE DATE TO BE EXTENDED
                 BY THE NUMBER OF DELAYED DAYS ACCORDINGLY.
                 IN THAT CASE NO INTEREST WILL BE PAID.

INVOICING      : BY REGULAR MAIL OR COURIER.
                 PLEASE SEND YOUR INVOICES STRICTLY TO:
                         HAPAG-LLOYD AG
                         8300 FINANZ-& RECHNUNGSWESEN
                         BALLINDAMM 25
                         20095 HAMBURG
                         GERMANY

PLEASE KEEP CLOSE CONTACT TO AGENTS, RECHECK ALL DETAILS MENTIONED.

SELLER/SUPPLIER WARRENTS THAT THE PRODUCT OFFERED OR NOMINATED IN A POTENTIAL ORDER IS NOT
DESIGNATED IN ANY SANCTIONS LIST ISSUED BY THE UN, US OR EU AND IS NOT OWNED OR CONTROLLED BY
ANY PERSON OR ENTITY REGISTERED IN OR OPERATING FROM SYRIA, IRAN OR DESIGNATED IN ANY
SANCTIONS ISSUED BY THE UN, US OR EU.

MANY THANKS AND BEST REGARDS.
Lukas Gaus
--------------------------------------------------------------
HAPAG-LLOYD AG
4140 FUEL/LUBRICANTS PURCHASING & SUPPLY BALLINDAMM 25
20095 HAMBURG

PHONE  +49 40 30012650-
FAX    +49 40 30012658-
MAILTO lukas.gaus@hlag.com
www.hapag-lloyd.com


Vorsitzender des Aufsichtsrats: Dipl.-Ing. Dr.-Ing. E.h. Jürgen Weber
Vorstand: Rolf Habben Jansen, Vorsitzender, Anthony J. Firmin, Peter Ganz
Sitz: Hamburg, Handelsregister: Amtsgericht Hamburg HRB 97937

Chairman of the Supervisory Board: Dipl.-Ing. Dr.-Ing. E.h. Jürgen Weber Executive Board:
Rolf Habben Jansen ( CEO ), Anthony J. Firmin, Peter Ganz Registered Office: Hamburg, Company
Register: Amtsgericht Hamburg HRB
97937

**O.W. Bunker Germany GmbH**
**WW Division**

(W) **Bunker**

Hapag-Lloyd AG
Ballindamm 25
D-20095 Hamburg
Germany

Neumühlen 11
D-22763 Hamburg
Germany
Phone: +49 40 3255900
Fax: +49 40 330471
Tax No. / Steuer Nr. 41/768/03458
E-mail: trading@owbunker.de
Internet: http://www.owbunker.com
Managing director: Götz Lehsten
HR B 100089
ING Bank N.V.
IBAN: NL26 INGB 0020 1180 31
IBAN: NL10 INGB 0651 3696 81
SWIFT: INGBNL2A

## Sales Order Confirmation

Sales Order No.     119-28241

We are hereby pleased to acknowledge receipt of your order as follows:

Hamburg   10. October 2014

| | |
|---|---|
| Vessel | SEASPAN HAMBURG (IMO: 9224300) |
| Port | TACOMA |
| Delivery date | 16. October 2014 |
| Seller | O.W. Bunker Germany GmbH |
| Your ref. | |
| Account | MASTER AND/OR OWNER AND/OR CHARTERERS AND/OR MV SEASPAN HAMBURG AND/OR HAPAG-LLOYD AG |

| Quantity | Unit | Product / Quality | Curr | Price | Unit | Supplier |
|---|---|---|---|---|---|---|
| 2.900,00 | MT | Fueloil 700 CST 3,5% | USD | 523,00 | MT | US OIL |
| | | | | | | Delivery : Barge |
| 1,00 | LPS | Booming fee | USD | 0,00 | LPS | US OIL |

| | |
|---|---|
| Agent | NORTON LILLY |
| Payment | WITHIN 30 DAYS FROM DATE OF DELIVERY UPON PRESENTATION OF INVOICE (ORIGINAL/TELEX/FAX), COPY OF DELIVERY RECEIPT WILL BE FORWARDED WHEN WE HAVE RECEIVED SAME. |
| Remarks | all per ISO8217 2005(E) HALO GTC 2007 shall apply. |

We thank you for this nomination.

Kind Regards

Karl Heinz Selmer

| | |
|---|---|
| Direct | +49 4032 5590 12 |
| Mobile | +49 151 276 276 80 |
| Yahoo ID | khse_owbunker |
| E-Mail | khse@owbunker.de |
| Office E-Mail | trading@owbunker.de |

**O.W. Bunker Germany GmbH**
**WW Division**



TERMS AND CONDITIONS.
---------------------------------------------

SAMPLES:

Measuring and sampling to be done at barge/tanktruck/shoreside manifold, and receiving Vessels crew is requested to witness and verify the measuring of quantity and the drawing and sealing of samples. These verified quantities as noted in the BDR aswell as these samples taken are the only ones deemed representative, and any dispute regarding quality to be settled by testing these retained samples by an independent laboratory at port/place of delivery, and result of this testing is deemed to be final and binding for both parties.

TERMS:

The sale and delivery of the marine fuels described above are subject to the OW Bunker Group's Terms and Conditions of sale(s) for Marine Bunkers. The acceptance of the marine bunkers by the vessel named above shall be deemed to constitute acceptance of the said general terms applicable to you as 'Buyer' and to O.W. Bunker Germany GmbH as 'Seller'.
The fixed terms and conditions are well known to you and remain in your possession. If this is not the case, the terms can be found under the web address:
http://owbunker.com/wp-content/uploads/2013/12/OWB_GTC_ValidFrom01092013.pdf

GUIDELINES FOR RECEIVING BUNKERS:

We strongly urge you to forward the information regarding: General Instructions and Guidelines for Bunkering, for Receiving Vessels, on page 3, soonest possible to your Chief Engineer onboard.Following the suggested Guidelines should minimize risk of quantity disputes.Please bear in mind that barge figures are the sole valid quantity determination, wherefore Chief Engineer's attendance onboard the barge is extremely important.

OTHERWISE:

Any errors or omissions in above Confirmation should be reported immediately.

PLEASE INFORM US BY RETURN IF ABOVE NOMINATION DETAILS ARE NOT IN ACCORDANCE WITH YOUR UNDERSTANDING.

**O.W. Bunker Germany GmbH**
**WW Division**



GENERAL INSTRUCTIONS AND GUIDELINES FOR BUNKERING, FOR RECEIVING VESSELS

BEFORE BUNKERING:

Please make sure to check all information given by the supplier on Bunker Requisition Form or such similar form as the supplier presents via the barge. If you notice changes in quantity or quality please urgently contact the relevant person in charge in your own operations to have same verified.

Make sure to witness and verify initial measurements and ullaging onboard the barge before. ALL tanks to be checked and measured including actual temperature of cargo – also including those tanks said not to be included in the particular supply (idle tanks). Compare measurements and verify the quantities as per barge ullage tables. When in full agreement please sign the ullage/sounding report for Before Supply figures. If any disagreements with the measurements, temperature and thereby figures please advise this on the Sounding form or, if not allowed, on separate Letter of Protest (make sure to obtain signature and stamp from barge Master for receipt).

If surveyor attends please ensure the surveyor also participates in measuring all barge tanks before supply and verify the figures.

DURING BUNKERING:

Always place a watchman to witness safe operation including also proper and correct sampling. The watchman must ensure that sampling is done properly, as continuous drip sampling throughout the delivery, and that clean devices are used for sampling. Also the watchman must witness proper and correct division into minimum 4 (four) clean and new identical sample bottles, including proper labeling and sealing of ALL samples. Make sure original sample (cubitainer) is shaken vigorously for 3 minutes before splitting into the 4 sample bottles and that bottles are filled in several passes.  All seal numbers to be inserted into the Bunker Delivery Receipt (BDR). The MARPOL sample must be one of these samples drawn under witnessing.

The watchman must pay special attention to the bunker hose, and any un-agreed attempts to transfer air via same should cause immediate stoppage unless the use of air is caused by stripping of barge tanks, which stripping to be agreed in advance by both parties. If air is blown on continued basis, and stoppage on the supply not possible for any reason, the incident to be stated on a Letter of Protest, which should also contain the time (hours from/to) that airblow was notified.

It is known in some areas that the so-called Cappucino Effect may be used or attempted to be used during supply. Pay special attention hereto and take all necessary precautions to observe, which includes:
- During tank measurements before it should be notified whether there are signs of air on the measuring tape used for ullaging.
- Look carefully for any signs of bubbles or similar on the surface of the fuel when it is still onboard the barge.
- Agree with the barge when and if they are going to make stripping of their tanks.
- Check and note the draft fore, mid and aft on the barge before and after supply to compare.
- If any signs at all of cappuccino or similar (except eventual stripping, agreed in advance), please stop the supply immediately and compare supply quantities made so far.
- Contact vessel operator in charge and request notification to the Seller and Supplier immediately.
- If surveyor attending please ensure that the surveyor signs a Letter of Protest also.
- After stopping the bunker supply please wait minimum 1 hour to await bubbles to disappear and re-measure the barge jointly with barge Master.

AFTER COMPLETION:

Repeat the measurement, sounding and ullaging of the barge, including verification of temperature of each tank. Make sure also on completion to verify contents of ALL tanks, including those being idle.

Report (ullage) must be signed by all parties involved, including eventual nominated surveyor. If disagreements with the figures (mm, temperature) a Letter of Protest to be issued, but also such specific disagreements to be stated on the Ullage report covering "after" supply.

QUANTITY COMPLAINTS:

Receiving Vessel to inform discrepancies in writing latest upon completion of taking the bunkers.

# U.S. OIL TRADING, LLC

**MARINE BUNKER**
**RECEIPT FOR DELIVERY TO VESSEL**

| TACOMA REFINERY<br>P.O. BOX 2255<br>TACOMA, WA 98401-2255<br>(253) 383-1651 | VESSEL NAME:<br>**SEASPAN HAMBURG** | IMO#<br>924300 | VESSEL AGENT:<br>**NORTON LILLY** |
|---|---|---|---|
| | BARGE COMPANY:<br>**OLYMPIC TUG & BARGE** | BARGE NO.:<br>**BETSY ARNTZ** | U.S. OIL B.A. NUMBER:<br>14-104 |
| | DELIVERY LOCATION (INCLUDE TERMINAL OR DOCK NAME)<br>POT | | |

## PRODUCT

| GRADE | DENSITY<br>kg/m3 @ 15° | API<br>GRAVITY | FLASH<br>PMCC °F | POUR POINT<br>DEGREES C | SULFUR<br>WT% | BS&W<br>VOL% | VISCOSITY<br>CST @ 50° | VANADIUM<br>PPM | ALUMINUM<br>PPM |
|---|---|---|---|---|---|---|---|---|---|
| RMK-700 | 978 | 13.1 | 209° | -6 | 2.725% | <0.05 | 674.00 | | |

THIS FUEL OIL COMPLIED WITH REGULATION 14 (1) OR (4) (a) AND REGULATION 18 (1) OF MARPOL ANNEX VI.

REPRESENTATIVE SAMPLES TAKEN AND RETAINED BY _____

PHYSICAL PROPERTY TEST RESULTS LISTED BY _____   SAMPLES DELIVERED TO VESSEL BY _____

### THIS SECTION TO BE COMPLETED BY BARGE COMPANY REPRESENTATIVE

## QUANTITY

| | GRADE: RMK 700 | GRADE: BMG 380 | GRADE: MGO |
|---|---|---|---|
| Total Gross Barrels Delivered by Barge | (19376.16) | 0.00 | 0.00 |
| Temp. and Grav. Conversion Factor | 0.9641 | | |
| Total Net Barrels | 18679.73 | 0.00 | 0.00 |
| Conversion Factor - Bbls/ M. Ton | 0.16526 | | |
| Metric Tons Delivered | 2900.21 | 0.00 | 0.00 |

| DATE AND TIME ALL FAST<br>AT LOADING TERMINAL | TIME STARTED PUMPING<br>TO VESSEL | DATE AND TIME FINISHED<br>PUMPING TO VESSEL |
|---|---|---|
| October 16, 2014 | 7:55 | October 16, 2014 | October 16, 2014 |

**CERTIFICATION OF EXPORT:** Vessel certifies that it intends to use product delivered to barge at U.S. Oil's terminal for bunkers on a voyage leaving the U.S. Port.

**EXEMPTION FROM SALES AND USE TAX & AIR POLLUTION REGULATION:** The shipper vessel to which this product is delivered is engaged in operating as a private or common carrier by water in interstate or foreign commerce. The recipient certifies that the product purchased under this receipt is for use in connection with its business of operating as a private or common carrier by water in interstate or foreign commerce; that while the vessel is within the territorial boundaries of the State of Washington, it will not consume the product delivered hereunder; and that the sale is entitled to exemption from the retail sales and use tax of the State of Washington under the provisions of RCW 82.08.0261 and WAC 458-20-175, and exemption from Section 9.07 (d) of PSAPCA Regulation I.

**DISCLAIMER(S):** No disclaimer, stamp or any type of form will be accepted on this bunker certificate, nor should any such stamp be applied, nor will it alter, change or waive this, U.S. Oil's and this vessel or waive the vessel's ultimate responsibility and liability for the debt incurred through this certificate.

**MARITIME LIENS:** All disputes arising out of this transaction shall be interpreted and enforced in accordance with the maritime law of the United States of America and all statutes, thereto.

**DELIVERY POINT:** Title to and the risk of loss of oil passes to customer on delivery of oil to vessel at the vessel's flange.

**REMARKS:**

* ERRORS MADE BY THE BARGEMAN AND CORRECTED BY THE BARGING COMPANY WILL APPEAR AS CORRECTIONS ON THE WHITE COPY ONLY.

| PRODUCT DISCHARGED TO VESSEL LISTED ABOVE<br>A REPRESENTATIVE SAMPLE WAS DRAWN DELIVERED TO THE VESSEL REPRESENTATIVE. | WE FOREGOING RECEIVED ON BOARD THE VESSEL BY STATEMENT OF QUANTITY<br>**M.V. "SEASPAN HAMBURG"** |
|---|---|
| SEAL #: Ship (39833779) Barge (39833728) Manifold (39833707) | SEAL #:<br>BMG 380 |
| BARGE COMPANY REPRESENTATIVE      BY _____ 16-Oct-14<br>(BARGE CO. REPRESENTATIVE)      (DATE) | _____<br>(AUTHORIZED VESSEL OFFICIAL)      Chief Engineer      (DATE) |

511 55 05 035 / 5 14 88 53 2



**W Bunker**

M/V SEASPAN HAMBURG
AND/OR OWNERS/CHARTERERS

Hapag-Lloyd AG
8300 Accounting
Ballindamm 25
D-20095 Hamburg
Germany

DATE OF INVOICE    :  16, October 2014

INVOICE NO         :  119-29423

ORDER NO.          :  119-28241

DATE OF SUPPLY     :  16, October 2014

DUE DATE           :  15, November 2014

PORT: TACOMA
YOUR REFERENCE: 028/4304073597 M. Yaylaoglu

*Hapag-Lloyd Aktiengesellschaft — Einkauf — 28. Okt. 2014 — Rechnungswesen — gebucht 28. Okt. 2014*

| Quantity supplied | Quality/description | Price/per | Invoice amount |
|---|---|---|---|
| 2,900,210  MT | Fueloil 700 CST 3,5% | 523,00  MT | 1,516,809,83 |
| 1,000  LPS | Booming fee | LPS | |



1,28140

HL00100166379349

Our VAT.No.    DE814847085

| | | Total | USD | 1,516,809,83 |
|---|---|---|---|---|

The prices are excl. all taxes and/or other fees.

TERMS OF PAYMENT30 days from date of delivery With value date not later than DUE DATE or previous working day
when it is a holiday. In case of delays in payment interest will be charged in accordance with our valid General Terms and Conditions

BANK:      ING Bank N.V.

ACCOUNT:   IBAN: NL26 INGB 0020 1180 31       USD and all other currencies
           IBAN: NL10 INGB 0651 3696 81       EUR

           SWIFT: INGBNL2A

O.W. BUNKER GERMANY GMBH
Neumühlen 11

D-22763 Hamburg

Phone: +49 40 3288900
Fax: +49 40 330471

Tax No. / Steuer Nr. 41/768/03488

E-mail: trading@owbunker.de
Internet: http://www.owbunker.com

Managing director: Götz Lehsten
HR B 100089

Per telegraphic transfer directly to our account without deduction
of bank charges which are for buyer's account.



U.S. OIL TRADING LLC
3001 MARSHALL AVE (98421)
P. O. BOX 2255 (98401)
TACOMA, WA 98421
(253) 383-1651

**INVOICE**

Number: BWTD   83450
Date: 10/16/2014
Due: 11/17/2014

Shipping Point:   Tacoma, WA
Destination:      Tacoma, WA
Cont/PO#:         SEASPAN HAMBURG
Freight:          Prepaid
F.O.B.:           Destination

Customer #:   C06551400

Past Due Accounts are
Subject To Interest

Account:
OW BUNKER & TRADING A/S
STIGSBORGVEJ 60
NOERRESUNBY, DL-9400 DENMARK,

Customer License/Registration #'s:
State:      EXEMPT
Federal:    EXEMPT
Reseller:   EXEMPT

| P/U | Carr | Product | Mentions | Price | Amount |
|-----|------|---------|----------|-------|--------|
| 012819 | BETSY | RMK-700 | 2,900.21 | 519.0000 | 1,505,208.99 |
|  |  | Boom Charge |  | 0.0000 | 2,200.00 |

Invoice Total  $1,507,408.99

Exempt WA Sales & Use Tax

A security interest and all rights arising from the transaction have been granted to Credit Agricole. You are directed to make payment without offset, deduction or counterclaim via FED-WIRE TRANSFER to Wells Fargo Bank, N.A.
ABA No. 121000248
Further Credit U.S. Oil Trading LLC, A/C No. 4122063720
Questions regarding this invoice - Billing Discrepancies, Billing Credit Payments, Treasury

# Exhibit 3

## DEHART, MICHAEL

| | |
|---|---|
| From: | Niemeyer, Dorit [Dorit.Niemeyer@hlag.com] |
| Sent: | Thursday, October 23, 2014 4:44 AM |
| To: | Niemeyer, Dorit; khse@owbunker.de; trading@owbunker.de |
| Subject: | Sofia Express/USTIW PO 4504078460 |

```
TO   : O.W. Bunker Germany GmbH
FOR  : BUNKER DEPARTMENT
```

HAPAG-LLOYD BUNKER PURCHASE ORDER

WE HEREWITH CONFIRM HAVING NOMINATED IN ACCORDANCE WITH OUR TERMS AND CONDITIONS OF PURCHASE
LATEST EDITION (A COPY SHOULD ALREADY BE IN YOUR POSSESSION - PLEASE ADVISE IF A FURTHER COPY
IS REQUIRED) AND TO ANY AMENDMENT THERETO WHICH MAY HAVE BEEN AGREED BETWEEN US.

ALL FUEL DELIVERED TO HAPAG-LLOYD AG AS WELL AS TO HAPAG-LLOYD KREUZFAHRTEN HAVE TO MEET ISO
8217 FOURTH EDITION 2010-07-01 - REFERENCE NO. ISO 8217:2010 (E) PETROLEUM PRODUCTS FUELS
(CLASS F) - SPECIFICATIONS OF MARINE FUELS AND ANY AMENDMENT THERETO AND MUST BE IN
ACCORDANCE WITH MARPOL 73/78 ANNEX VI AND ANY AMENDMENT THERETO.

```
REF.NO.     : 029/4504078460 TO BE STATED ON INVOICE
ACCOUNT     : HAPAG-LLOYD AG, HAMBURG
SELLER      : O.W. Bunker Germany GmbH,

VESSEL      : Sofia Express
PORT        : TACOMA, WA
DATE        : ESTIMATED ARRIVAL ON 29.10.2014
              ETA AND ETD SUBJECT TO CHANGE, PLEASE COORDINATE
              TIME OF DELIVERY CAREFULLY WITH AGENT
AGENTS      : Norton Lilly, Seattle

POSITION    : 00010
QUANTITY    : 2.700,000 TO
ISO GRADE   : MARINE FUEL ISO RMK 700 MAX 3,50% SULFUR
PRICE       : 492,00 USD / TO FOB
SUPPLIER    : US OIL


DELIVERY    : STRICTLY ONE BARGE LOAD UPON VESSEL'S ARRIVAL
SURVEYOR    : Oiltest APPOINTED, PHONE:


---ADDITIONAL REMARKS---
ISO GRADES  : SELLER HAS TO ENSURE THAT THE PRODUCT DELIVERED IS
              DERIVED FROM PETROLEUM CRUDE OIL AND MUST NEITHER
              CONTAIN: CONTAMINANTS (I.E. CHEMICAL
              WASTE, POLYPROPYLENE, USED LUBRICANTS, ABRASIVE
              MATERIALS) NOR BLENDING COMPONENTS DERIVED FROM COAL
              AND SHALE DISTILLATIONS PROCESSES.

SPECIFICATION: SUPPLIER WILL ADVISE BUYER AT LATEST 24H
              (OR THE LAST WORKING DAY BY NOON; HAMBURG TIME)
              BEFORE DELIVERY ABOUT TYPICAL SPECIFICATIONS OF
              THE ABOVE MENTIONED PRODUCTS:
```

```
                      CCAI: MAX. 855 FOR RMG 380/
                      CCAI: MAX. 865 FOR RMK 500 / RMK 700

DELIVERY      : - TRANSFER TEMP.: MIN. 50 °C - MAX. 70 °C
                IF DELIVERY HAS TO BE ARRANGED BY MORE THAN ONE BARGE,
                TYPICAL SPES OF EACH BARGE LOAD TO BE ADVISED WELL IN
                ADVANCE IN CASE SPECS ARE NOT IDENTICAL.
                IN CASE SUPPLIER FAILS TO DELIVER QUANTITY IN FULL
                WITHIN LAYTIME OR VESSEL WILL BE DELAYED DUE TO BAD
                PERFORMANCE THEN THE SELLER/SUPPLIER WILL DELIVER THE
                QUANTITY IN QUESTION IN THE NEXT PORT OF CALL WITHOUT
                ANY COSTS TO THE BUYER AND WILL ALSO PAY FOR THE FUEL
                WHICH WILL BE CONSUMED IN ADDITION TO SPEED UP FOR
                COMPENSATION. ALL DEMURRAGE AND PUMP BACK CHARGES
                RESULTING THEREFROM TO BE ABSORBED BY THE SELLER AS WELL.

SURVEY        : IT IS MUTUALLY AGREED TO APPOINT A SURVEYOR TO
                CARRY OUT THE QUANTITY/QUALITY SURVEY.
                IT IS FURTHER AGREED THAT VOLUMES SHOWN IN THE
                B.D.R. ARE FINAL TO ALL PARTIES AS LONG AS THEY DO
                NOT DIFFER MORE THAN TOTAL 0,3% COMPARED TO THE
                FINDINGS OF THE SURVEYOR.

SAMPLING      : THE SAMPLES SHALL BE DRAWN JOINTLY AT A POINT TO
                BE MUTUALLY AGREED BETWEEN ALL PARTIES, BUT
                CLOSEST TO THE VESSEL'S MANIFOLD.
                5 SAMPLES MUST BE DRAWN AND DISTRIBUTED:
                MASTER: 1   SUPPLIER: 2    SURVEYOR: 2

                IT IS MUTUALLY AGREED BETWEEN SELLER/SUPPLIER AND
                BUYER TO USE ONLY SAMPLE BOTTLES FITTED WITH TWO SEAL
                LUGS. IN CASE SUPPLIERS CANNOT PROVIDE SUCH BOTTLES
                THEN VESSEL'S REPRESENTATIVE SHALL HAND OVER SAID
                BOTTLES TO SUPPLIERS FREE OF CHARGE. SAMPLES TO BE
                SIGNED BY BOTH PARTIES, SEALED BY SUPPLIER AND
                COUNTERSEALED BY VESSEL'S REPRESENTATIVE.
                IT MUST BE NOTED THAT SAMPLES DRAWN EX INSTALLATION
                OR BEYOND BUYERS CONTROL ARE NOT LEGALLY BINDING IN
                CASE OF A DISPUTE. THIS INCLUDES ALSO BUNKERSTEMS NOT
                ATTENDED BY AN INDEPENDENT SURVEYOR. SUCCESSFUL HAND
                OVER OF SUCH INSTALLATION SAMPLES OR SPECICAL ACCEPTANCE
                NOTES ON CORRESPONDING BUNKER RECEIPTS EVEN THOUGH
                ACCEPTED BY THE VESSEL BY SIGNING SUCH RECEIPTS OR
                SAMPLES ARE DECLARED AS NOT REPRESENTATIVE BY ALL MEANS.

PAYMENT       : 30 DD / 15 DI
                IF WE DO NOT RECEIVE YOUR INVOICE WITHIN 15 DAYS
                AFTER DATE OF DELIVERY, THE DUE DATE TO BE EXTENDED
                BY THE NUMBER OF DELAYED DAYS ACCORDINGLY.
                IN THAT CASE NO INTEREST WILL BE PAID.

INVOICING     : BY REGULAR MAIL OR COURIER.
                PLEASE SEND YOUR INVOICES STRICTLY TO:
                      HAPAG-LLOYD AG
                      8300 FINANZ-& RECHNUNGSWESEN
                      BALLINDAMM 25
                      20095 HAMBURG
                      GERMANY
```

PLEASE KEEP CLOSE CONTACT TO AGENTS, RECHECK ALL DETAILS MENTIONED.

SELLER/SUPPLIER WARRENTS THAT THE PRODUCT OFFERED OR NOMINATED IN A POTENTIAL ORDER IS NOT DESIGNATED IN ANY SANCTIONS LIST ISSUED BY THE UN, US OR EU AND IS NOT OWNED OR CONTROLLED BY ANY PERSON OR ENTITY REGISTERED IN OR OPERATING FROM SYRIA, IRAN OR DESIGNATED IN ANY SANCTIONS ISSUED BY THE UN, US OR EU.

MANY THANKS AND BEST REGARDS,
Dorit Niemeyer
---------------------------------------------------------------
HAPAG-LLOYD AG
4140 FUEL/LUBRICANTS PURCHASING & SUPPLY BALLINDAMM 25
20095 HAMBURG

PHONE   +49 40 3001-2657
FAX     +49 40 3001-2658
MAILTO dorit.niemeyer@hlag.com
www.hapag-lloyd.com


Vorsitzender des Aufsichtsrats: Dipl.-Ing. Dr.-Ing. E.h. Jürgen Weber
Vorstand: Rolf Habben Jansen, Vorsitzender, Anthony J. Firmin, Peter Ganz
Sitz: Hamburg, Handelsregister: Amtsgericht Hamburg HRB 97937

Chairman of the Supervisory Board: Dipl.-Ing. Dr.-Ing. E.h. Jürgen Weber Executive Board:
Rolf Habben Jansen ( CEO ), Anthony J. Firmin, Peter Ganz Registered Office: Hamburg, Company
Register: Amtsgericht Hamburg HRB
97937

**U.S. OIL TRADING, LLC**

MARINE BUNKER
RECEIPT FOR DELIVERY TO VESSEL

| TACOMA REFINERY<br>P.O. BOX 2255<br>TACOMA, WA 98401-2255<br>(253) 383-1651 | VESSEL NAME:<br>SOFIA EXPRESS | IMO#<br>9450404 | VESSEL AGENT:<br>NORTON LILLY |
|---|---|---|---|
| | BARGE COMPANY:<br>OLYMPIC TUG & BARGE | BARGE NO.:<br>BETSY ARNTZ | U.S. OIL S.A. NUMBER:<br>14-190 |
| | DELIVERY LOCATION (INCLUDE TERMINAL OR DOCK NAME):<br>WUT | | |

| GRADE | DENSITY<br>kg/m3 @ 15C | API<br>GRAVITY | FLASH<br>PMCC °F | POUR POINT<br>DEGREES C | SULFUR<br>WT% | SEDIV<br>VOL% | VISCOSITY<br>CST @ 50C | VANADIUM<br>PPM | ALUMINUM<br>PPM |
|---|---|---|---|---|---|---|---|---|---|
| RMK 700 | 983 | 12.4 | 216° | -6 | 2.740% | <0.05 | 688.00 | | |

THIS FUEL OIL COMPLIED WITH REGULATION 14 (1) OR (4) (A) AND REGULATION 18 (1) OF MARPOL ANNEX VI.

REPRESENTATIVE SAMPLES TAKEN AND RETAINED BY

PHYSICAL PROPERTY TEST RESULTS LISTED BY _____   SAMPLES DELIVERED TO BARGE BY _____

THIS SECTION TO BE COMPLETED BY BARGE COMPANY REPRESENTATIVE

QUANTITY**

| | GRADE: RMK 700 | GRADE: MGO | GRADE: F/O 2.2 |
|---|---|---|---|
| Total Gross Barrels Delivered By Barge | (17829.12) | 0.00 | 0.00 |
| Temp. and Grav. Conversion Factor | 0.9629 | | |
| Total Net Barrels | -17167.66 | 0.00 | 0.00 |
| Conversion Factor - Bbls/ M. Ton | 0.16612 | | |
| Metric Tons Delivered | 2860.22 | 0.00 | 0.00 |

| DATE AND TIME ALL FAST<br>AT LOADING TERMINAL | TIME STARTED PUMPING<br>TO VESSEL | DATE AND TIME FINISHED<br>PUMPING TO VESSEL |
|---|---|---|
| October 29, 2014     7:25 | October 29, 2014     8:35 | October 29, 2014     12:55 |

CERTIFICATION OF EXPORT. Vessel certifies that it intends to use product delivered to barge at U.S. Oil's terminal for bunkers on a voyage leaving the U.S. Port.

EXEMPTION FROM SALES AND USE TAX & AIR POLLUTION REGULATION: The shipper vessel to which this product is delivered is engaged in operating as a private or common carrier by water in interstate or foreign commerce. The recipient certifies that the product purchased under this receipt is for use in connection with its business of operating as a private or common carrier by water in interstate or foreign commerce; that while the vessel is within the territorial boundaries of the State of Washington, it will not consume the product delivered hereunder, and that the sale is entitled to exemption from the retail sales and use tax of the State of Washington under the provisions of RCW 82.08.0261 and WAC 458-20-175, and exemption from Section 9.07 (d) of PSAPCA Regulation 1.

DISCLAIMER(S): No disclaimer stamp of any type or form will be accepted on this bunker certificate, nor should any such stamp be applied, nor will it alter, change or waive U.S. Oil's Maritime Lien against the vessel or waive the vessel's ultimate responsibility and liability for the debt incurred through this transaction.

MARITIME LIEN(S): All disputes arising out of this transaction shall be interpreted and enforced in accordance with the general maritime law of the United States of America and all statutes related thereto.

DELIVERY POINT: Title to and the risk of loss of all passes to customer

Signed as receipt for volume
and delivery-temperature only.
Specifications subject to veri-
fication by analysis of vessel's
retained sample.

REMARKS:

** ERRORS MADE BY THE BARGEMAN AND CORRECTED BY THE BARGING COMPANY WILL APPEAR AS CORRECTIONS ON THE WHITE COPY ONLY.

PRODUCT DISCHARGED TO VESSEL LISTED ABOVE
A REPRESENTATIVE SAMPLE HAS BEEN DELIVERED TO THE VESSEL REPRESENTATIVE.

SEAL #:  M(36757041)S(36833745)B(36833723)

BARGE COMPANY REPRESENTATIVE   BY _____   29-Oct-14
(BARGE CO. REPRESENTATIVE)   (DATE)

THIS FORE GOING RECEIVED ON BOARD VESSEL (SEE STATEMENT ABOVE)

SEAL #:   M(7602800)S(7602814)B(7602804)
MGO

_____   _____   Captain
(VESSEL REPRESENTATIVE)   (TITLE)   (DATE)

Hapag-Lloyd
Ship Management
gez. Gründel



M/V SOFIA EXPRESS
AND/OR OWNERS/CHARTERERS

Hapag-Lloyd AG
8300 Accounting
Ballindamm 25
D-20095 Hamburg
Germany

DATE OF INVOICE : 01. November 2014

INVOICE NO       : 119-29521

ORDER NO.        : 119-28331

DATE OF SUPPLY   : 01. November 2014

PORT: TACOMA
YOUR REFERENCE: 029/4504078460

DUE DATE         : 01. December 2014

| Quantity supplied | Quality/description | Price/per | Invoice amount |
|---|---|---|---|
| 2.680,220  MT | Fueloil 700 CST 3,5% | 492,00  MT | 1,318.668,24 |
| 1.000  LPS | Booming fee | LPS | |

Nicht steuerbare Lieferung im Ausland /
Non-taxable delivery abroad

*(handwritten notes)*

| Your VAT No. | DE 813960018 | VAT Amount | USD | 0,00 |
|---|---|---|---|---|
| Our VAT No. | DE814847085 | Total | USD | 1,318.668,24 |

The prices are excl. all taxes and/or other fees.

TERMS OF PAYMENT 30 days from date of delivery With value date not later than DUE DATE or previous working day
when it is a holiday. In case of delays in payment interest will be charged in accordance with our valid General Terms and Conditions

BANK:      ING Bank N.V.

ACCOUNT:   IBAN: NL26 INGB 0020 1180 31
           IBAN: NL10 INGB 0651 3696 81

           SWIFT: INGBNL2A

USD and all other currencies
EUR

O.W. BUNKER GERMANY GMBH
Neumühlen 11
D-22765 Hamburg

Phone: +49 40 3268900
Fax: +49 40 330471

Tax No / Steuer Nr. 41/760/03460

E-Mail: trading@owbunker.de
Internet http://www.owbunker.com

Managing director: Götz Lehsten
HR B 100089

Per telegraphic transfer directly to our account without deduction
of bank charges which are for buyers account.

GESAMTSEITEN 01



U.S. OIL TRADING LLC
3001 MARSHALL AVE (98421)
P. O. BOX 2255 (98401)
TACOMA, WA 98421
(253) 383-1651

**INVOICE**

Number:  BWTD    83463
Date:  10/29/2014
Due:  11/28/2014

| Shipping Point: | Tacoma,  WA |
| Destination: | Tacoma,  WA |
| Cont/PO#: | SOFIA EXPRESS |
| Freight: | Prepaid |
| F.O.B.: | Destination |

Customer #:    C06651400

Past Due Accounts are
Subject To Interest

Account:
OW BUNKER & TRADING A/S
STIGSBORGVEJ 60

NOERRESUNBY, DL-9400 DENMARK,

Customer License/Registration #'s:
State:          EXEMPT
Federal:        EXEMPT
Reseller:       EXEMPT

| | | | Metric Tons | Price | Amount |
|---|---|---|---|---|---|
| 012829 | BETSY | RMK-700 | 2,680.22 | 490.0000 | 1,313,307.80 |
| | | Boom Charge | | 0.0000 | 2,200.00 |

Invoice Total  $1,315,507.80

Exempt WA Sales & Use Tax

A security interest in and an assignment of proceeds from this transaction have been granted to
Credit Agricole, you are directed to make payment without offset, deduction or
counterclaim via RED WIRE TRANSFER to Wells Fargo Bank, NA.
ABA No.: 121000248
Further Credit: U.S. Oil Trading LLC, A/C No.: 4122063720

Questions regarding this invoice: Billing Discrepancies, Billing Dept, Payments, Treasury

# Exhibit 4

**DEHART, MICHAEL**

From:              Niemeyer, Dorit [Dorit.Niemeyer@hlag.com]
Sent:             Thursday, October 09, 2014 7:36 AM
To:                Niemeyer, Dorit; khse@owbunker.de; trading@owbunker.de
Subject:         Vienna Express/USTIW PO 4504073073


TO   : O.W. Bunker Germany GmbH
FOR  : BUNKER DEPARTMENT

HAPAG-LLOYD BUNKER PURCHASE ORDER

WE HEREWITH CONFIRM HAVING NOMINATED IN ACCORDANCE WITH OUR TERMS AND CONDITIONS OF PURCHASE
LATEST EDITION (A COPY SHOULD ALREADY BE IN YOUR POSSESSION - PLEASE ADVISE IF A FURTHER COPY
IS REQUIRED) AND TO ANY AMENDMENT THERETO WHICH MAY HAVE BEEN AGREED BETWEEN US.

ALL FUEL DELIVERED TO HAPAG-LLOYD AG AS WELL AS TO HAPAG-LLOYD KREUZFAHRTEN HAVE TO MEET ISO
8217 FOURTH EDITION 2010-07-01 - REFERENCE NO. ISO 8217:2010 (E) PETROLEUM PRODUCTS FUELS
(CLASS F) - SPECIFICATIONS OF MARINE FUELS AND ANY AMENDMENT THERETO AND MUST BE IN
ACCORDANCE WITH MARPOL 73/78 ANNEX VI AND ANY AMENDMENT THERETO.

REF.NO.    : 029/4504073073 TO BE STATED ON INVOICE
ACCOUNT    : HAPAG-LLOYD AG, HAMBURG
SELLER     : O.W. Bunker Germany GmbH,

VESSEL     : Vienna Express
PORT       : TACOMA, WA
DATE       : ESTIMATED ARRIVAL ON 16.10.2014
           ETA AND ETD SUBJECT TO CHANGE, PLEASE COORDINATE
           TIME OF DELIVERY CAREFULLY WITH AGENT
AGENTS     : Norton Lilly, Seattle

POSITION   : 00010
QUANTITY   : 2.700,000 TO
ISO GRADE  : MARINE FUEL OIL ISO RMK 500 MAX 3,50 % S
PRICE      : 528,00 USD / TO FOB
SUPPLIER   : US Oil


DELIVERY   : STRICTLY ONE BARGE LOAD UPON VESSEL'S ARRIVAL
SURVEYOR   : Oiltest APPOINTED, PHONE:


---ADDITIONAL REMARKS---
ISO GRADES  : SELLER HAS TO ENSURE THAT THE PRODUCT DELIVERED IS
           DERIVED FROM PETROLEUM CRUDE OIL AND MUST NEITHER
           CONTAIN: CONTAMINANTS (I.E. CHEMICAL
           WASTE, POLYPROPYLENE, USED LUBRICANTS, ABRASIVE
           MATERIALS) NOR BLENDING COMPONENTS DERIVED FROM COAL
           AND SHALE DISTILLATIONS PROCESSES.

SPECIFICATION: SUPPLIER WILL ADVISE BUYER AT LATEST 24H
           (OR THE LAST WORKING DAY BY NOON; HAMBURG TIME)
           BEFORE DELIVERY ABOUT TYPICAL SPECIFICATIONS OF
           THE ABOVE MENTIONED PRODUCTS:

```
                        CCAI: MAX. 855 FOR RMG 380/
                        CCAI: MAX. 865 FOR RMK 500 / RMK 700

DELIVERY        : - TRANSFER TEMP.: MIN. 50 °C - MAX. 70 °C
                  IF DELIVERY HAS TO BE ARRANGED BY MORE THAN ONE BARGE,
                  TYPICAL SPES OF EACH BARGE LOAD TO BE ADVISED WELL IN
                  ADVANCE IN CASE SPECS ARE NOT IDENTICAL.
                  IN CASE SUPPLIER FAILS TO DELIVER QUANTITY IN FULL
                  WITHIN LAYTIME OR VESSEL WILL BE DELAYED DUE TO BAD
                  PERFORMANCE THEN THE SELLER/SUPPLIER WILL DELIVER THE
                  QUANTITY IN QUESTION IN THE NEXT PORT OF CALL WITHOUT
                  ANY COSTS TO THE BUYER AND WILL ALSO PAY FOR THE FUEL
                  WHICH WILL BE CONSUMED IN ADDITION TO SPEED UP FOR
                  COMPENSATION. ALL DEMURRAGE AND PUMP BACK CHARGES
                  RESULTING THEREFROM TO BE ABSORBED BY THE SELLER AS WELL.

SURVEY          : IT IS MUTUALLY AGREED TO APPOINT A SURVEYOR TO
                  CARRY OUT THE QUANTITY/QUALITY SURVEY.
                  IT IS FURTHER AGREED THAT VOLUMES SHOWN IN THE
                  B.D.R. ARE FINAL TO ALL PARTIES AS LONG AS THEY DO
                  NOT DIFFER MORE THAN TOTAL 0,3% COMPARED TO THE
                  FINDINGS OF THE SURVEYOR.

SAMPLING        : THE SAMPLES SHALL BE DRAWN JOINTLY AT A POINT TO
                  BE MUTUALLY AGREED BETWEEN ALL PARTIES, BUT
                  CLOSEST TO THE VESSEL'S MANIFOLD.
                  5 SAMPLES MUST BE DRAWN AND DISTRIBUTED:
                  MASTER: 1  SUPPLIER: 2   SURVEYOR: 2

                  IT IS MUTUALLY AGREED BETWEEN SELLER/SUPPLIER AND
                  BUYER TO USE ONLY SAMPLE BOTTLES FITTED WITH TWO SEAL
                  LUGS. IN CASE SUPPLIERS CANNOT PROVIDE SUCH BOTTLES
                  THEN VESSEL'S REPRESENTATIVE SHALL HAND OVER SAID
                  BOTTLES TO SUPPLIERS FREE OF CHARGE. SAMPLES TO BE
                  SIGNED BY BOTH PARTIES, SEALED BY SUPPLIER AND
                  COUNTERSEALED BY VESSEL'S REPRESENTATIVE.
                  IT MUST BE NOTED THAT SAMPLES DRAWN EX INSTALLATION
                  OR BEYOND BUYERS CONTROL ARE NOT LEGALLY BINDING IN
                  CASE OF A DISPUTE. THIS INCLUDES ALSO BUNKERSTEMS NOT
                  ATTENDED BY AN INDEPENDENT SURVEYOR. SUCCESSFUL HAND
                  OVER OF SUCH INSTALLATION SAMPLES OR SPECICAL ACCEPTANCE
                  NOTES ON CORRESPONDING BUNKER RECEIPTS EVEN THOUGH
                  ACCEPTED BY THE VESSEL BY SIGNING SUCH RECEIPTS OR
                  SAMPLES ARE DECLARED AS NOT REPRESENTATIVE BY ALL MEANS.

PAYMENT         : 30 DD / 15 DI
                  IF WE DO NOT RECEIVE YOUR INVOICE WITHIN 15 DAYS
                  AFTER DATE OF DELIVERY, THE DUE DATE TO BE EXTENDED
                  BY THE NUMBER OF DELAYED DAYS ACCORDINGLY.
                  IN THAT CASE NO INTEREST WILL BE PAID.

INVOICING       : BY REGULAR MAIL OR COURIER.
                  PLEASE SEND YOUR INVOICES STRICTLY TO:
                        HAPAG-LLOYD AG
                        8300 FINANZ-& RECHNUNGSWESEN
                        BALLINDAMM 25
                        20095 HAMBURG
                        GERMANY
```

2

PLEASE KEEP CLOSE CONTACT TO AGENTS, RECHECK ALL DETAILS MENTIONED.

SELLER/SUPPLIER WARRENTS THAT THE PRODUCT OFFERED OR NOMINATED IN A POTENTIAL ORDER IS NOT
DESIGNATED IN ANY SANCTIONS LIST ISSUED BY THE UN, US OR EU AND IS NOT OWNED OR CONTROLLED BY
ANY PERSON OR ENTITY REGISTERED IN OR OPERATING FROM SYRIA, IRAN OR DESIGNATED IN ANY
SANCTIONS ISSUED BY THE UN, US OR EU.

MANY THANKS AND BEST REGARDS,
Dorit Niemeyer
----------------------------------------------------------------
HAPAG-LLOYD AG
4140 FUEL/LUBRICANTS PURCHASING & SUPPLY BALLINDAMM 25
20095 HAMBURG

PHONE  +49 40 3001-2657
FAX    +49 40 3001-2658
MAILTO dorit.niemeyer@hlag.com
www.hapag-lloyd.com


Vorsitzender des Aufsichtsrats: Dipl.-Ing. Dr.-Ing. E.h. Jürgen Weber
Vorstand: Rolf Habben Jansen, Vorsitzender, Anthony J. Firmin, Peter Ganz
Sitz: Hamburg, Handelsregister: Amtsgericht Hamburg HRB 97937

Chairman of the Supervisory Board: Dipl.-Ing. Dr.-Ing. E.h. Jürgen Weber Executive Board:
Rolf Habben Jansen ( CEO ), Anthony J. Firmin, Peter Ganz Registered Office: Hamburg, Company
Register: Amtsgericht Hamburg HRB
97937

**O.W. Bunker Germany GmbH**
**WW Division**

 **Bunker**

Hapag-Lloyd AG
Ballindamm 25
D-20095 Hamburg
Germany

Neumühlen 11
D-22763 Hamburg
Germany
Phone: +49 40 3255900
Fax: +49 40 330471
Tax No. / Steuer Nr. 41/768/03468
E-mail: trading@owbunker.de
Internet: http://www.owbunker.com
Managing director: Götz Lehsten
HR B 100089
ING Bank N.V.
IBAN: NL26 INGB 0020 1180 31
IBAN: NL10 INGB 0661 3696 81
SWIFT: INGBNL2A

## Sales Order Confirmation

Sales Order No.        119-28229

We are hereby pleased to acknowledge receipt of your order as follows:

| | |
|---|---|
| Vessel | VIENNA EXPRESS (IMO: 9450416) |
| Port | TACOMA |
| Delivery date | 16. October 2014 |
| Seller | O.W. Bunker Germany GmbH |
| Your ref. | |
| Account | MASTER AND/OR OWNER AND/OR CHARTERERS AND/OR MV VIENNA EXPRESS AND/OR HAPAG-LLOYD AG |

Hamburg  9. October 2014

| Quantity | Unit | Product / Quality | Curr | Price | Unit | Supplier |
|---|---|---|---|---|---|---|
| 2.700,00 | MT | Fueloil 700 CST 3,5% | USD | 528,00 | MT | US OIL Delivery : Barge |
| 1,00 | LPS | Booming fee | USD | 0,00 | LPS | US OIL |

| | |
|---|---|
| Agent | NORTEN LILLY |
| Payment | WITHIN 30 DAYS FROM DATE OF DELIVERY UPON PRESENTATION OF INVOICE (ORIGINAL/TELEX/FAX). COPY OF DELIVERY RECEIPT WILL BE FORWARDED WHEN WE HAVE RECEIVED SAME. |
| Remarks | all per ISO8217 2005(E) HALO GTC2007 shall apply |

We thank you for this nomination.

Kind Regards

Karl Heinz Selmer

| | |
|---|---|
| Direct | +49 4032 5590 12 |
| Mobile | +49 151 276 276 80 |
| Yahoo ID | khse_owbunker |
| E-Mail | khse@owbunker.de |
| Office E-Mail | trading@owbunker.de |

**O.W. Bunker Germany GmbH**
**WW Division**

 **Bunker**

TERMS AND CONDITIONS.
------------------------------------------------

SAMPLES:

Measuring and sampling to be done at barge/tanktruck/shoreside manifold, and receiving Vessels crew is
requested to witness and verify the measuring of quantity and the drawing and sealing of samples. These verified
quantities as noted in the BDR aswell as these samples taken are the only ones deemed representative, and any
dispute regarding quality to be settled by testing these retained samples by an independent laboratory at
port/place of delivery, and result of this testing is deemed to be final and binding for both parties.

TERMS:

The sale and delivery of the marine fuels described above are subject to the OW Bunker Group's Terms and
Conditions of sale(s) for Marine Bunkers. The acceptance of the marine bunkers by the vessel named above shall
be deemed to constitute acceptance of the said general terms applicable to you as 'Buyer' and to O.W. Bunker
Germany GmbH as 'Seller'.
The fixed terms and conditions are well known to you and remain in your possession. If this is not the case, the
terms can be found under the web address:
http://owbunker.com/wp-content/uploads/2013/12/OWB_GTC_ValidFrom01092013.pdf

GUIDELINES FOR RECEIVING BUNKERS:

We strongly urge you to forward the information regarding: General Instructions and Guidelines for Bunkering, for
Receiving Vessels, on page 3, soonest possible to your Chief Engineer onboard. Following the suggested
Guidelines should minimize risk of quantity disputes. Please bear in mind that barge figures are the sole valid
quantity determination, wherefore Chief Engineer's attendance onboard the barge is extremely important.

OTHERWISE:

Any errors or omissions in above Confirmation should be reported immediately.


PLEASE INFORM US BY RETURN IF ABOVE NOMINATION DETAILS ARE NOT IN ACCORDANCE WITH YOUR
UNDERSTANDING.

**O.W. Bunker Germany GmbH**
**WW Division**



GENERAL INSTRUCTIONS AND GUIDELINES FOR BUNKERING, FOR RECEIVING VESSELS

BEFORE BUNKERING:

Please make sure to check all information given by the supplier on Bunker Requisition Form or such similar form as the supplier presents via the barge. If you notice changes in quantity or quality please urgently contact the relevant person in charge in your own operations to have same verified.

Make sure to witness and verify initial measurements and ullaging onboard the barge before. ALL tanks to be checked and measured including actual temperature of cargo – also including those tanks said not to be included in the particular supply (idle tanks). Compare measurements and verify the quantities as per barge ullage tables. When in full agreement please sign the ullage/sounding report for Before Supply figures. If any disagreements with the measurements, temperature and thereby figures please advise this on the Sounding form or, if not allowed, on separate Letter of Protest (make sure to obtain signature and stamp from barge Master for receipt).

If surveyor attends please ensure the surveyor also participates in measuring all barge tanks before supply and verify the figures.

DURING BUNKERING:

Always place a watchman to witness safe operation including also proper and correct sampling. The watchman must ensure that sampling is done properly, as continuous drip sampling throughout the delivery, and that clean devices are used for sampling. Also the watchman must witness proper and correct division into minimum 4 (four) clean and new identical sample bottles, including proper labeling and sealing of ALL samples. Make sure original sample (cubitainer) is shaken vigorously for 3 minutes before splitting into the 4 sample bottles and that bottles are filled in several passes. All seal numbers to be inserted into the Bunker Delivery Receipt (BDR). The MARPOL sample must be one of these samples drawn under witnessing.

The watchman must pay special attention to the bunker hose, and any un-agreed attempts to transfer air via same should cause immediate stoppage unless the use of air is caused by stripping of barge tanks, which stripping to be agreed in advance by both parties. If air is blown on continued basis, and stoppage on the supply not possible for any reason, the incident to be stated on a Letter of Protest, which should also contain the time (hours from/to) that airblow was notified.

It is known in some areas that the so-called Cappucino Effect may be used or attempted to be used during supply. Pay special attention hereto and take all necessary precautions to observe, which includes:
- During tank measurements before it should be notified whether there are signs of air on the measuring tape used for ullaging.
- Look carefully for any signs of bubbles or similar on the surface of the fuel when it is still onboard the barge.
- Agree with the barge when and if they are going to make stripping of their tanks.
- Check and note the draft fore, mid and aft on the barge before and after supply to compare.
- If any signs at all of cappucino or similar (except eventual stripping, agreed in advance), please stop the supply immediately and compare supply quantities made so far.
- Contact vessel operator in charge and request notification to the Seller and Supplier immediately.
- If surveyor attending please ensure that the surveyor signs a Letter of Protest also.
- After stopping the bunker supply please wait minimum 1 hour to await bubbles to disappear and re-measure the barge jointly with barge Master.

AFTER COMPLETION:

Repeat the measurement, sounding and ullaging of the barge, including verification of temperature of each tank. Make sure also on completion to verify contents of ALL tanks, including those being idle.

Report (ullage) must be signed by all parties involved, including eventual nominated surveyor. If disagreements with the figures (mm, temperature) a Letter of Protest to be issued, but also such specific disagreements to be stated on the Ullage report covering "after" supply.

QUANTITY COMPLAINTS:

Receiving Vessel to inform discrepancies in writing latest upon completion of taking the bunkers.

# U.S. OIL TRADING, LLC

**MARINE BUNKER**
**RECEIPT FOR DELIVERY TO VESSEL**

| TACOMA REFINERY<br>P.O. BOX 2286<br>TACOMA, WA 98401-2255<br>(253) 383-1651 | VESSEL NAME:<br>VIENNA EXPRESS | IMO#<br>9460416 | VESSEL AGENT:<br>NORTON LILLY |
|---|---|---|---|
| | BARGE COMPANY:<br>OLYMPIC TUG & BARGE | BARGE NO.:<br>BETSY ARNTZ | U.S. OIL S.A. NUMBER:<br>14-195 |
| | DELIVERY LOCATION (INCLUDE TERMINAL OR DOCK NAME)<br>WUT | | |

## PRODUCT

| GRADE | DENSITY kg/m3 @ 15C | API GRAVITY | FLASH PMCC F | POUR POINT DEGREES @ | SULFUR WT% | BS&W VOL% | VISCOSITY CST @ 50C | VANADIUM PPM | ALUMINUM PPM |
|---|---|---|---|---|---|---|---|---|---|
| RMK 700 | 979 | 13.0 | 212° | +6 | 2.749% | <0.25 | 667.00 | | |

THIS FUEL OIL COMPLIES WITH REGULATION 14 (1) OR (4) AND REGULATION 18 (1) OF MARPOL ANNEX VI.

REPRESENTATIVE SAMPLES TAKEN AND RETAINED BY

PHYSICAL PROPERTY TESTS RESULTS LISTED BY _____ SAMPLES DELIVERED TO BARGE BY

**THIS SECTION TO BE COMPLETED BY BARGE COMPANY REPRESENTATIVE**

## QUANTITY"

| | GRADE: RMK 700 | GRADE: MGO | GRADE: |
|---|---|---|---|
| Total Gross Barrels Delivered By Barge | (18084.82) | 0.00 | 0.00 |
| Temp. and Grav. Conversion Factor | 0.9649 | | |
| Total Net Barrels | -17449.35 | 0.00 | 0.00 |
| Conversion Factor - Bbls/ M. Ton | 0.15536 | | |
| Metric Tons Delivered | -2710.93 | 0.00 | 0.00 |

| DATE AND TIME ALL FAST AT LOADING TERMINAL | | TIME STARTED PUMPING TO VESSEL | | DATE AND TIME FINISHED PUMPING TO VESSEL | |
|---|---|---|---|---|---|
| October 18, 2014 | 12:05 | October 18, 2014 | 13:05 | October 18, 2014 | 16:50 |

**CERTIFICATION OF EXPORT:** Vessel certifies that it intends to use product delivered to barge at U.S. Oil's terminal for bunkers on a voyage leaving the U.S. Port.

**EXEMPTION FROM SALES AND USE TAX & AIR POLLUTION REGULATION:** The shipper vessel to which this product is delivered is engaged in operating as a private or common carrier by water in interstate or foreign commerce. The recipient certifies that the product purchased under this receipt is for use in connection with the business of operating as a private or common carrier by water in interstate or foreign commerce, that while the vessel is within the territorial boundaries of the State of Washington, it will not consume the product delivered hereunder, and that the sale is entitled to exemption from the retail sales and use tax of the State of Washington under the provisions of RCW 82.08.0261 and WAC 458-20-175, and exemption from Section 9.07 (d) of PSAPCA Regulation 1.

REMARKS:

**DISCLAIMER:** No disclaimer stamp of any type or form will be accepted on this bunker certificate, nor should any such stamp be applied, nor will it alter, change or waive U.S. Oil's Maritime Lien against the vessel or waive the vessel's ultimate responsibility and liability for the debt incurred through this transaction.

**MARITIME LIENS:** All disputes arising out of this transaction shall be interpreted and enforced in accordance with the general maritime law of the United States of America and all statutes related thereto.

**DELIVERY POINT:** Title to and the risk of loss of impassed to customer on delivery of oil to vessel at the vessel's flange.

> Signed as receipt for volume
> and delivery-temperature only.
> Specifications subject to veri-
> fication by analysis of vessel's
> retained sample.

" ERRORS MADE BY THE BARGEMAN AND CORRECTED BY THE BARGING COMPANY WILL APPEAR AS CORRECTIONS ON THE WHITE COPY ONLY.

| PRODUCT DISCHARGED TO VESSEL LISTED ABOVE<br>A REPRESENTATIVE SAMPLE HAS BEEN DELIVERED TO THE VESSEL REPRESENTATIVE | THE FOREGOING RECEIVED ONBOARD VESSEL AS A STATEMENT | |
|---|---|---|
| SEAL #: Ship (39033576) Barge (39033765) Marpol (39033724) | SEAL #: | **Hapag-Lloyd** |
| | MGO | Ship Management<br>gez. Bak |
| (BARGE COMPANY REPRESENTATIVE)         18-Oct-14<br>(BARGE CO. REPRESENTATIVE)         (DATE) | (AUTHORIZED VESSEL REPRESENTATIVE)         (DATE) | |

*5M991H963*
*(S1H99540)*

**W Bunker**

gebucht
29. Okt. 2014
M. Sakowski

M/V VIENNA EXPRESS
AND/OR OWNERS/CHARTERERS

Hapag-Lloyd AG
8300 Accounting
Ballindamm 25
D-20095 Hamburg
Germany

*Kvargl*

PORT: TACOMA
YOUR REFERENCE: 029/4504073073

| | | |
|---|---|---|
| DATE OF INVOICE | : | 18. October 2014 |
| INVOICE NO | : | 119-29447 |
| ORDER NO. | : | 119-28229 |
| DATE OF SUPPLY | : | 18. October 2014 |
| DUE DATE | : | 17. November 2014 |

| Quantity supplied | Quality/description | Price/per | Invoice amount |
|---|---|---|---|
| 2,710,930 MT | Fueloil 700 CST 3,5% | 528,00 MT | 1.431.371,04 |
| 1,000 LPS | Booming fee | LPS | |

HL0010018751074 0

*1,28140*

| Our VAT No. | DE814847085 | Total | USD | 1.431.371,04 |
|---|---|---|---|---|

The prices are excl. all taxes and/or other fees.

TERMS OF PAYMENT 30 days from date of delivry With valud date not later than DUE DATE or previous working day
when it is a holiday. In case of delays in payment interest will be charged in accordance with our valid General Terms and Conditions

| BANK: | ING Bank N.V. | | O.W. BUNKER GERMANY GMBH |
|---|---|---|---|
| | | | Naumühlen 11 |
| ACCOUNT: | IBAN: NL26 INGB 0020 1180 31 | USD and all other currencies | D-22763 Hamburg |
| | IBAN: NL10 INGB 0651 3696 81 | EUR | |
| | | | Phone: +49 40 3258900. |
| | SWIFT: INGBNL2A | | Fax: +49 40 330471 |

Tax No. / Steuer Nr. 41/763/03466

E-mail: trading@owbunker.de
Internet: http://www.owbunker.com

Managing director: Götz Lehsten
HR B 100089

Per telegraphic transfer directly to our account without deduction
of bank charges which are for buyers account.



U.S. OIL TRADING LLC
3001 MARSHALL AVE (98421)
P. O. BOX 2255 (98401)
TACOMA, WA 98421
(253) 383-1651

**INVOICE**

Number:  BWTD    83451
Date:  10/18/2014
Due:  11/17/2014

Shipping Point:     Tacoma,  WA
Destination:        Tacoma,  WA
Cont/PO#:           VIENNA EXPRESS
Freight:            Prepaid
F.O.B.:             Destination

Customer #:     C06551400

Past Due Accounts are
Subject To Interest

Account:
OW BUNKER & TRADING A/S
STIGSBORGVEJ 60

NOERRESUNBY, DL-9400 DENMARK,

Customer License/Registration #'s:
State:       EXEMPT
Federal:     EXEMPT
Reseller:    EXEMPT

| B/L# | Carrier | Product | Invoice Total | Price | Amount |
|------|---------|---------|---------------|-------|--------|
| 012818 | BETSY | RMK-700 | 2,710.93 | 521.0000 | 1,412,394.53 |
|  |  | Boom Charge |  | 0.0000 | 2,200.00 |

Invoice Total  $1,414,594.53

Exempt WA Sales & Use Tax

A security interest in and an assignment of proceeds from this transaction have been granted to
Credit Agricole. You are directed to make payment without offset, deduction or
counterclaim via FED. WIRE TRANSFER to: Wells Fargo Bank, NA,
ABA No. 121000248,
Further Credit: U. S. Oil Trading LLC, AC No. 4122063720.

Questions regarding this invoice: Billing Discrepancies: Billing Dept. Payments: Treasury

# Exhibit 5

## DEHART, MICHAEL

| | |
|---|---|
| From: | Gaus, Lukas [Lukas.Gaus@hlag.com] |
| Sent: | Wednesday, October 01, 2014 6:27 AM |
| To: | khse@owbunker.de; Gaus, Lukas; trading@owbunker.de |
| Subject: | Santa Roberta/USTIW PO 4504069984 |

```
TO   : O.W. Bunker Germany GmbH
FOR  : BUNKER DEPARTMENT

HAPAG-LLOYD BUNKER PURCHASE ORDER

WE HEREWITH CONFIRM HAVING NOMINATED IN ACCORDANCE WITH OUR TERMS AND CONDITIONS OF PURCHASE
LATEST EDITION (A COPY SHOULD ALREADY BE IN YOUR POSSESSION - PLEASE ADVISE IF A FURTHER COPY
IS REQUIRED) AND TO ANY AMENDMENT THERETO WHICH MAY HAVE BEEN AGREED BETWEEN US.

ALL FUEL DELIVERED TO HAPAG-LLOYD AG AS WELL AS TO HAPAG-LLOYD KREUZFAHRTEN HAVE TO MEET ISO
8217 FOURTH EDITION 2010-07-01 - REFERENCE NO. ISO 8217:2010 (E) PETROLEUM PRODUCTS FUELS
(CLASS F) - SPECIFICATIONS OF MARINE FUELS AND ANY AMENDMENT THERETO AND MUST BE IN
ACCORDANCE WITH MARPOL 73/78 ANNEX VI AND ANY AMENDMENT THERETO.

REF.NO.     : 028/4504069984 TO BE STATED ON INVOICE
ACCOUNT     : HAPAG-LLOYD AG, HAMBURG
SELLER      : O.W. Bunker Germany GmbH,

VESSEL      : Santa Roberta
PORT        : TACOMA, WA
DATE        : ESTIMATED ARRIVAL ON 09.10.2014
              ETA AND ETD SUBJECT TO CHANGE, PLEASE COORDINATE
              TIME OF DELIVERY CAREFULLY WITH AGENT
AGENTS      : Norton Lilly, Seattle

POSITION    : 00010
QUANTITY    : 2.700,000 TO
ISO GRADE   : MARINE FUEL OIL ISO RMK 500 MAX 3,50 % S
PRICE       : 554,00 USD / TO FOB
SUPPLIER    : US Oil

DELIVERY    : STRICTLY ONE BARGE LOAD UPON VESSEL'S ARRIVAL
SURVEYOR    : Oiltest APPOINTED, PHONE:


---ADDITIONAL REMARKS---
ISO GRADES  : SELLER HAS TO ENSURE THAT THE PRODUCT DELIVERED IS
              DERIVED FROM PETROLEUM CRUDE OIL AND MUST NEITHER
              CONTAIN: CONTAMINANTS (I.E. CHEMICAL
              WASTE, POLYPROPYLENE, USED LUBRICANTS, ABRASIVE
              MATERIALS) NOR BLENDING COMPONENTS DERIVED FROM COAL
              AND SHALE DISTILLATIONS PROCESSES.

SPECIFICATION: SUPPLIER WILL ADVISE BUYER AT LATEST 24H
              (OR THE LAST WORKING DAY BY NOON; HAMBURG TIME)
              BEFORE DELIVERY ABOUT TYPICAL SPECIFICATIONS OF
              THE ABOVE MENTIONED PRODUCTS:

              CCAI: MAX. 855 FOR RMG 380/
```

1

                    CCAI: MAX. 865 FOR RMK 500 / RMK 700

DELIVERY      : - TRANSFER TEMP.: MIN. 50 °C - MAX. 70 °C
                IF DELIVERY HAS TO BE ARRANGED BY MORE THAN ONE BARGE,
                TYPICAL SPES OF EACH BARGE LOAD TO BE ADVISED WELL IN
                ADVANCE IN CASE SPECS ARE NOT IDENTICAL.
                IN CASE SUPPLIER FAILS TO DELIVER QUANTITY IN FULL
                WITHIN LAYTIME OR VESSEL WILL BE DELAYED DUE TO BAD
                PERFORMANCE THEN THE SELLER/SUPPLIER WILL DELIVER THE
                QUANTITY IN QUESTION IN THE NEXT PORT OF CALL WITHOUT
                ANY COSTS TO THE BUYER AND WILL ALSO PAY FOR THE FUEL
                WHICH WILL BE CONSUMED IN ADDITION TO SPEED UP FOR
                COMPENSATION. ALL DEMURRAGE AND PUMP BACK CHARGES
                RESULTING THEREFROM TO BE ABSORBED BY THE SELLER AS WELL.

SURVEY        : IT IS MUTUALLY AGREED TO APPOINT A SURVEYOR TO
                CARRY OUT THE QUANTITY/QUALITY SURVEY.
                IT IS FURTHER AGREED THAT VOLUMES SHOWN IN THE
                B.D.R. ARE FINAL TO ALL PARTIES AS LONG AS THEY DO
                NOT DIFFER MORE THAN TOTAL 0,3% COMPARED TO THE
                FINDINGS OF THE SURVEYOR.

SAMPLING      : THE SAMPLES SHALL BE DRAWN JOINTLY AT A POINT TO
                BE MUTUALLY AGREED BETWEEN ALL PARTIES, BUT
                CLOSEST TO THE VESSEL'S MANIFOLD.
                5 SAMPLES MUST BE DRAWN AND DISTRIBUTED:
                MASTER: 1   SUPPLIER: 2     SURVEYOR: 2

                IT IS MUTUALLY AGREED BETWEEN SELLER/SUPPLIER AND
                BUYER TO USE ONLY SAMPLE BOTTLES FITTED WITH TWO SEAL
                LUGS. IN CASE SUPPLIERS CANNOT PROVIDE SUCH BOTTLES
                THEN VESSEL'S REPRESENTATIVE SHALL HAND OVER SAID
                BOTTLES TO SUPPLIERS FREE OF CHARGE. SAMPLES TO BE
                SIGNED BY BOTH PARTIES, SEALED BY SUPPLIER AND
                COUNTERSEALED BY VESSEL'S REPRESENTATIVE.
                IT MUST BE NOTED THAT SAMPLES DRAWN EX INSTALLATION
                OR BEYOND BUYERS CONTROL ARE NOT LEGALLY BINDING IN
                CASE OF A DISPUTE. THIS INCLUDES ALSO BUNKERSTEMS NOT
                ATTENDED BY AN INDEPENDENT SURVEYOR. SUCCESSFUL HAND
                OVER OF SUCH INSTALLATION SAMPLES OR SPECICAL ACCEPTANCE
                NOTES ON CORRESPONDING BUNKER RECEIPTS EVEN THOUGH
                ACCEPTED BY THE VESSEL BY SIGNING SUCH RECEIPTS OR
                SAMPLES ARE DECLARED AS NOT REPRESENTATIVE BY ALL MEANS.

PAYMENT       : 30 DD / 15 DI
                IF WE DO NOT RECEIVE YOUR INVOICE WITHIN 15 DAYS
                AFTER DATE OF DELIVERY, THE DUE DATE TO BE EXTENDED
                BY THE NUMBER OF DELAYED DAYS ACCORDINGLY.
                IN THAT CASE NO INTEREST WILL BE PAID.

INVOICING     : BY REGULAR MAIL OR COURIER.
                PLEASE SEND YOUR INVOICES STRICTLY TO:
                        HAPAG-LLOYD AG
                        8300 FINANZ-& RECHNUNGSWESEN
                        BALLINDAMM 25
                        20095 HAMBURG
                        GERMANY

                                  2

PLEASE KEEP CLOSE CONTACT TO AGENTS, RECHECK ALL DETAILS MENTIONED.

SELLER/SUPPLIER WARRENTS THAT THE PRODUCT OFFERED OR NOMINATED IN A POTENTIAL ORDER IS NOT
DESIGNATED IN ANY SANCTIONS LIST ISSUED BY THE UN, US OR EU AND IS NOT OWNED OR CONTROLLED BY
ANY PERSON OR ENTITY REGISTERED IN OR OPERATING FROM SYRIA, IRAN OR DESIGNATED IN ANY
SANCTIONS ISSUED BY THE UN, US OR EU.

MANY THANKS AND BEST REGARDS,
Lukas Gaus
-----------------------------------------------------------------
HAPAG-LLOYD AG
4140 FUEL/LUBRICANTS PURCHASING & SUPPLY BALLINDAMM 25
20095 HAMBURG

PHONE  +49 40 30012650-
FAX    +49 40 30012658-
MAILTO lukas.gaus@hlag.com
www.hapag-lloyd.com

Vorsitzender des Aufsichtsrats: Dipl.-Ing. Dr.-Ing. E.h. Jürgen Weber
Vorstand: Rolf Habben Jansen, Vorsitzender, Anthony J. Firmin, Peter Ganz
Sitz: Hamburg, Handelsregister: Amtsgericht Hamburg HRB 97937

Chairman of the Supervisory Board: Dipl.-Ing. Dr.-Ing. E.h. Jürgen Weber Executive Board:
Rolf Habben Jansen ( CEO ), Anthony J. Firmin, Peter Ganz Registered Office: Hamburg, Company
Register: Amtsgericht Hamburg HRB
97937

**O.W. Bunker Germany GmbH**
**WW Division**

 **Bunker**

Hapag-Lloyd AG
Ballindamm 25
D-20095 Hamburg
Germany

Neumühlen 11
D-22763 Hamburg
Germany
Phone: +49 40 3255900
Fax: +49 40 330471
Tax No. / Steuer Nr. 41/768/03458
E-mail: trading@owbunker.de
Internet: http://www.owbunker.com
Managing director: Götz Lehsten
HR B 100089
ING Bank N.V.
IBAN: NL26 INGB 0020 1180 31
IBAN: NL10 INGB 0651 3696 81
SWIFT: INGBNL2A

## Sales Order Confirmation

Sales Order No.     119-28179

We are hereby pleased to acknowledge receipt of your order as follows:

| | |
|---|---|
| Vessel | SANTA ROBERTA (IMO: 9227326) |
| Port | TACOMA |
| Delivery date | 9. October 2014 |
| Seller | O.W. Bunker Germany GmbH |
| Your ref. | |
| Account | MASTER AND/OR OWNER AND/OR CHARTERERS AND/OR MV SANTA ROBERTA AND/OR HAPAG-LLOYD AG |

Hamburg   1. October 2014

| Quantity | Unit | Product / Quality | Curr | Price | Unit | Supplier |
|---|---|---|---|---|---|---|
| 2.700,00 | MT | Fueloil 700 CST 3,5% | USD | 554,00 | MT | US OIL |
| 1,00 | LPS | Booming fee | USD | 0,00 | LPS | US OIL |

| | |
|---|---|
| Agent | NORTON LILLY |
| Payment | WITHIN 30 DAYS FROM DATE OF DELIVERY UPON PRESENTATION OF INVOICE (ORIGINAL/TELEX/FAX), COPY OF DELIVERY RECEIPT WILL BE FORWARDED WHEN WE HAVE RECEIVED SAME. |
| Remarks | all per ISO8217 2005(E) HALO GTC2007 shall apply. |

We thank you for this nomination.

Kind Regards

Karl Heinz Selmer

| | |
|---|---|
| Direct | +49 4032 5590 12 |
| Mobile | +49 151 276 276 80 |
| Yahoo ID | khse_owbunker |
| E-Mail | khse@owbunker.de |
| Office E-Mail | trading@owbunker.de |

**O.W. Bunker Germany GmbH**
**WW Division**

 **Bunker**

TERMS AND CONDITIONS.
----------------------------------------------

SAMPLES:

Measuring and sampling to be done at barge/tanktruck/shoreside manifold, and receiving Vessels crew is requested to witness and verify the measuring of quantity and the drawing and sealing of samples. These verified quantities as noted in the BDR aswell as these samples taken are the only ones deemed representative, and any dispute regarding quality to be settled by testing these retained samples by an independent laboratory at port/place of delivery, and result of this testing is deemed to be final and binding for both parties.

TERMS:

The sale and delivery of the marine fuels described above are subject to the OW Bunker Group's Terms and Conditions of sale(s) for Marine Bunkers. The acceptance of the marine bunkers by the vessel named above shall be deemed to constitute acceptance of the said general terms applicable to you as 'Buyer' and to O.W. Bunker Germany GmbH as 'Seller'.
The fixed terms and conditions are well known to you and remain in your possession. If this is not the case, the terms can be found under the web address:
http://owbunker.com/wp-content/uploads/2013/12/OWB_GTC_ValidFrom01092013.pdf

GUIDELINES FOR RECEIVING BUNKERS:

We strongly urge you to forward the information regarding: General Instructions and Guidelines for Bunkering, for Receiving Vessels, on page 3, soonest possible to your Chief Engineer onboard.Following the suggested Guidelines should minimize risk of quantity disputes.Please bear in mind that barge figures are the sole valid quantity determination, wherefore Chief Engineer's attendance onboard the barge is extremely important.

OTHERWISE:

Any errors or omissions in above Confirmation should be reported immediately.


PLEASE INFORM US BY RETURN IF ABOVE NOMINATION DETAILS ARE NOT IN ACCORDANCE WITH YOUR
UNDERSTANDING.

**O.W. Bunker Germany GmbH**
**WW Division**



GENERAL INSTRUCTIONS AND GUIDELINES FOR BUNKERING, FOR RECEIVING VESSELS

BEFORE BUNKERING:

Please make sure to check all information given by the supplier on Bunker Requisition Form or such similar form as the supplier presents via the barge, if you notice changes in quantity or quality please urgently contact the relevant person in charge in your own operations to have same verified.

Make sure to witness and verify initial measurements and ullaging onboard the barge before, ALL tanks to be checked and measured including actual temperature of cargo – also including those tanks said not to be included in the particular supply (idle tanks). Compare measurements and verify the quantities as per barge ullage tables. When in full agreement please sign the ullage/sounding report for Before Supply figures, if any disagreements with the measurements, temperature and thereby figures please advise this on the Sounding form or, if not allowed, on separate Letter of Protest (make sure to obtain signature and stamp from barge Master for receipt).

If surveyor attends please ensure the surveyor also participates in measuring all barge tanks before supply and verify the figures.

DURING BUNKERING:

Always place a watchman to witness safe operation including also proper and correct sampling. The watchman must ensure that sampling is done properly, as continuous drip sampling throughout the delivery, and that clean devices are used for sampling. Also the watchman must witness proper and correct division into minimum 4 (four) clean and new identical sample bottles, including proper labeling and sealing of ALL samples. Make sure original sample (cubitainer) is shaken vigorously for 3 minutes before splitting into the 4 sample bottles and that bottles are filled in several passes. All seal numbers to be inserted into the Bunker Delivery Receipt (BDR). The MARPOL sample must be one of these samples drawn under witnessing.

The watchman must pay special attention to the bunker hose, and any un-agreed attempts to transfer air via same should cause immediate stoppage unless the use of air is caused by stripping of barge tanks, which stripping to be agreed in advance by both parties, if air is blown on continued basis, and stoppage on the supply not possible for any reason, the incident to be stated on a Letter of Protest, which should also contain the time (hours from/to) that airblow was notified.

It is known in some areas that the so-called Cappucino Effect may be used or attempted to be used during supply. Pay special attention hereto and take all necessary precautions to observe, which includes:
- During tank measurements before it should be notified whether there are signs of air on the measuring tape used for ullaging.
- Look carefully for any signs of bubbles or similar on the surface of the fuel when it is still onboard the barge.
- Agree with the barge when and if they are going to make stripping of their tanks.
- Check and note the draft fore, mid and aft on the barge before and after supply to compare.
- If any signs at all of cappucino or similar (except eventual stripping, agreed in advance), please stop the supply immediately and compare supply quantities made so far.
- Contact vessel operator in charge and request notification to the Seller and Supplier immediately.
- If surveyor attending please ensure that the surveyor signs a Letter of Protest also.
- After stopping the bunker supply please wait minimum 1 hour to await bubbles to disappear and re-measure the barge jointly with barge Master.

AFTER COMPLETION:

Repeat the measurement, sounding and ullaging of the barge, including verification of temperature of each tank. Make sure also on completion to verify contents of ALL tanks, including those being idle.

Report (ullage) must be signed by all parties involved, including eventual nominated surveyor, if disagreements with the figures (mm, temperature) a Letter of Protest to be issued, but also such specific disagreements to be stated on the Ullage report covering "after" supply.

QUANTITY COMPLAINTS:

Receiving Vessel to inform discrepancies in writing latest upon completion of taking the bunkers.

# U.S. OIL TRADING, LLC

**MARINE BUNKER**
RECEIPT FOR DELIVERY TO VESSEL

| TACOMA REFINERY P.O. BOX 2255 TACOMA, WA 98401-2255 (253) 383-1651 | VESSEL NAME: SANTA ROBERTA | IMO# 9227326 | VESSEL AGENT: NORTON LILLY |
|---|---|---|---|
| | BARGE COMPANY: OLYMPIC TUG & BARGE | BARGE NO.: BETSY ARNTZ | U.S. OIL S.A. NUMBER: 14-179 |
| | DELIVERY LOCATION (INCLUDE TERMINAL OR DOCK NAME) POT | | |

## PRODUCT

| GRADE | DENSITY kg/m3 @ 150 | API GRAVITY | FLASH P&C0. F | POUR POINT DEGREE C | SULFUR WT% | BS&W VOL% | VISCOSITY CST @ 500 | VANADIUM PPM | ALUMINUM PPM |
|---|---|---|---|---|---|---|---|---|---|
| RMK 700 | 975 | 13.5 | 212° | .6 | 2.767% | <0.05 | 696.00 | | |

THIS FUEL OIL COMPLIES WITH REGULATION 14 (1) OR (4) (4) AND REGULATION 18 (1) OF MARPOL ANNEX VI.

REPRESENTATIVE SAMPLES TAKEN AND RETAINED BY

PHYSICAL PROPERTY TEST RESULTS LISTED BY _____   SAMPLE DELIVERED TO BARGE BY _____

THIS SECTION TO BE COMPLETED BY BARGE COMPANY REPRESENTATIVE

## QUANTITY**

| | GRADE: RMK 700 | GRADE: MGO | GRADE: |
|---|---|---|---|
| Total Gross Barrels Delivered By Barge | (18139.34) | 0.00 | 0.00 |
| Temp. and Grav. Conversion Factor | 0.9614 | | |
| Total Net Barrels | -17439.16 | 0.00 | 0.00 |
| Conversion Factor - Bbl/M. Ton | 0.15483 | | |
| Metric Tons Delivered | -2700.11 | 0.00 | 0.00 |

| DATE AND TIME ALL FAST AT LOADING TERMINAL | TIME STARTED PUMPING TO VESSEL | DATE AND TIME FINISHED PUMPING TO VESSEL |
|---|---|---|
| October 9, 2014          7:13 | October 9, 2014          9:03 | October 9, 2014          13:40 |

**CERTIFICATION OF EXPORT.** Vessel certifies that it intends to use product delivered to barge at U.S. Oil's terminal for bunkers on a voyage leaving the U.S. Port.

**EXEMPTION FROM SALES AND USE TAX & AIR POLLUTION REGULATION:** The shipper vessel to which this product is delivered is engaged in operating as a private or common carrier by water in interstate or foreign commerce. The recipient certifies that the product purchased under this receipt is for use in connection with the business of operating as a private or common carrier by water in interstate or foreign commerce; that while the vessel is within the territorial boundaries of the State of Washington it will not consume the product delivered hereunder and that the sale is entitled to exemption from the retail sales and use tax of the State of Washington under the provisions of RCW 82.08.0261 and WAC 458-20-175, and exemption from Section 9.07 (d) of PSAPCA Regulation 1.

**DISCLAIMERS:** No disclaimer stamp of any type or form will be accepted on this bunker certificate, nor should any such stamp be applied, nor will it alter, change or waive U.S. Oil's Maritime Lien against the vessel or waive the vessel's ultimate responsibility and liability for the debt incurred through this transaction.

**MARITIME LIEN:** All disputes arising out of this transaction shall be interpreted and enforced in accordance with the general maritime law of the United States of America and all statutes related thereto.

**DELIVERY POINT:** Title in and the risk of loss of oil passes to customer on delivery of oil to vessel at the vessel's flange.

REMARKS:

### SURVEYOR SEAL NUMBERS
M-2212305   S-2212305   B-2212304
R 2212317-2212302   T 2212301-2212321

** ERRORS MADE BY THE BARGEMAN AND CORRECTED BY THE BARGING COMPANY WILL APPEAR AS CORRECTIONS ON THE WHITE COPY ONLY.

PRODUCT DISCHARGED TO VESSEL LISTED ABOVE
A REPRESENTATIVE SAMPLE HAS BEEN DELIVERED TO THE VESSEL REPRESENTATIVE.

SEAL #: Marpol(30922404)Ship(30922905) Barge(06822873)

THE FOREGOING RECEIVED ON BOARD VESSEL (SEE STATEMENT ABOVE)

SEAL #: MGO

BARGE COMPANY REPRESENTATIVE          8-Oct-14
(BARGE CO. REPRESENTATIVE)          (DATE)

(AUTHORIZED VESSEL OFFICIAL)

M/V SANTA ROBERTA
(TITLE)          (DATE)

Date: _____   CHIEF ENGINEER

SM9857M6
(5M49M067)

 **W Bunker**

M/V  SANTA ROBERTA
AND/OR OWNERS/CHARTERERS

*gebucht*
20. Okt. 2014
M. Sakowski

*Viawgl.*

Hapag-Lloyd AG
8300 Accounting
Ballindamm 25
D-20095 Hamburg
Germany

| | |
|---|---|
| DATE OF INVOICE | : 09. October 2014 |
| INVOICE NO | : 119-29378 |
| ORDER NO. | : 119-28179 |
| DATE OF SUPPLY | : 09. October 2014 |
| DUE DATE | : 08. November 2014 |

PORT: TACOMA
YOUR REFERENCE: 028/4504069984

| Quantity supplied | Quality/description | Price/per | Invoice amount |
|---|---|---|---|
| 2,700,110 MT | Fueloil 700 CST 3,5% | 554,00 MT | 1,495,860,94 |
| 1,000 LPS | Booming fee | LPS | |

HL0010018750770 F

*1,26690*

| | | | |
|---|---|---|---|
| Our VAT No. | DE814847085 | Total | USD | 1,495,860,94 |

The prices are excl. all taxes and/or other fees.

**TERMS OF PAYMENT** 30 days from date of delivery With value date not later than DUE DATE or previous working day
when it is a holiday. In case of delays in payment interest will be charged in accordance with our valid General Terms and Conditions

| | | | |
|---|---|---|---|
| BANK: | ING Bank N.V. | | O.W. BUNKER GERMANY GMBH |
| | | | Neumühlen 11 |
| ACCOUNT: | IBAN: NL26 INGB 0020 1180 31 | USD and all other currencies | |
| | IBAN: NL10 INGB 0651 3696 81 | EUR | D-22763  Hamburg |
| | SWIFT: INGBNL2A | | Phone: +49 40 3255900 |
| | | | Fax: +49 40 330471 |
| | | | Tax No. / Steuer Nr. 41/769/03450 |
| | | | E-mail: trading@owbunker.de |
| | | | Internet: http://www.owbunker.com |

Per telegraphic transfer directly to our account without deduction
of bank charges which are for buyers account.

Managing director: Götz Lehsten
HR B 100089



U.S. OIL TRADING LLC
3001 MARSHALL AVE (98421)
P. O. BOX 2255 (98401)
TACOMA, WA 98421
(253) 383-1651

**INVOICE**

Number: BWTD    83441
Date: 10/9/2014
Due: 11/8/2014

Shipping Point:      Tacoma,  WA
Destination:         Tacoma,  WA
Cont/PO#:            SANTA ROBERTA
Freight:             Prepaid
F.O.B.:              Destination

Customer #:    C06551400

Past Due Accounts are
Subject To Interest

Account:
OW BUNKER & TRADING A/S
STIGSBORGVEJ 60

NOERRESUNBY, DL-9400 DENMARK,

Customer License/Registration #'s:
State:       EXEMPT
Federal:     EXEMPT
Reseller:    EXEMPT

| BOL # | Carrier | Product | | Quantity | Price | Amount |
|-------|---------|---------|---|----------|-------|--------|
| 012815 | BETSY | RMK-700 | | 2,700.11 | 548.0000 | 1,479,660.28 |
| | | Boom Charge | | | 0.0000 | 2,200.00 |

Invoice Total  $1,481,860.28

Exempt WA Sales & Use Tax

A security interest in and an assignment of proceeds from this transaction have been granted to
Credit Agricole. You are directed to make payment without offset, deduction or
counterclaim via FED WIRE TRANSFER to: Wells Fargo Bank NA
ABA No. 121000248,
Further Credit: U. S. Oil Trading LLC, AC No. 4122063720.

Questions regarding this invoice: Billing Discrepancies: Billing Dept. Payments: Treasury

# Exhibit 6

**UK P&I CLUB** 

The Managers
Thomas Miller P&I (Europe) Ltd.
90 Fenchurch Street
London
EC3M 4ST
T +44 (0)20 7283 4646
F +44 (0)20 7549 4243
ukpandi@thomasmiller.com
www.ukpandi.com

PLEASE REPLY DIRECT TO:
T +44 (0)20 7204 2019
F +44 (0)20 7549 4224
E LS2.ukclub@thomasmiller.com

Freehill Hogan and Mahar LLP
80 Pine Street
New York
NY 10005-1759
UNITED STATES OF AMERICA

For the attention of Michael Fernandez

Our Ref:   AZR/2014

28th November 2014

Dear Sirs,

M.V. "VIENNA EXPRESS" – Maritime Lien Claim of US Oil Trading LLC
("USOT") against the Vessel for Alleged Unpaid Bunkers Supplied to the Vessel

Please find enclosed the Club's original Letter of Undertaking signed and dated 28th
November 2014.

Kindly acknowledge safe receipt.

Yours sincerely,

Adam Russ
for Thomas Miller P&I Ltd.
as agents for Thomas Miller (Bermuda) Ltd.

Enc.

**UK P&I CLUB** 

The Managers
Thomas Miller P&I (Europe) Ltd.
90 Fenchurch Street
London
EC3M 4ST
T +44 (0)20 7283 4646
F +44 (0)20 7549 4243
ukpandi@thomasmiller.com
www.ukpandi.com

PLEASE REPLY DIRECT TO:
T +44 (0)20 7204 2109
F +44 (0)20 7549 4224
E LS2.ukclub@thomasmiller.com

To:  US Oil Trading LLC
C/o Clyde and Co.
The Chrysler Building
405 Lexington Avenue 16th Floor
New York, NY 10174

For the attention of John Keough

Our Ref:    AZR/2014

28th November 2014

Dear Sirs,

Vessel: M/V VIENNA EXPRESS / IMO 9450416 ("the Vessel")
Claim: Maritime Lien Claim of US Oil Trading LLC ("USOT") against the Vessel for
Alleged Unpaid Bunkers Supplied to the Vessel
Invoice Amount: USD 1,414,594.53
Invoice Number BWTD 83451 ("the Claim")

In consideration of your consenting to promptly release from arrest and/or to refrain from
taking any action for the purpose of founding jurisdiction and/or obtaining security in respect
of the above-mentioned Claim resulting in the arrest or detention of the Vessel, or any other
vessel or property of or in the same or associated ownership, management or control of the
Owners of the Vessel ("Vessel Owners"), the Vessel's manager(s) and/or Hapag-Lloyd AG,
the charterer of the Vessel ("Hapag-Lloyd AG") (collectively "Hapag-Lloyd"), we, the United
Kingdom Mutual Steam Ship Assurance Association (Europe) Limited ("the Association"),
and as agent for Hapag-Lloyd for purposes of this undertaking, hereby undertake:

1. To pay to you within 14 days of your written demand, such sums as may be settled upon
between the parties pursuant to a written settlement agreement between the parties hereto, and
specifically signed by Hapag-Lloyd AG, or adjudged by the U.S. District Court for the
Western District of Washington or such other court of competent jurisdiction in the U.S. as
may be agreed ("the District Court" or "the Court"), by final judgment, not subject to appeal,
to be recoverable against the Vessel in respect of the Claim, provided that the total of our
liability hereunder shall not exceed the sum of US$ 1,725,000.

2. To file or cause to be filed an appearance and claim of Owner on behalf of the Vessel in an
action asserting the Claim filed or to be filed by you in the said District Court, which Court

**UK P&I CLUB**

shall have exclusive in rem jurisdiction and venue over the Claim, and such appearance shall be made whether the Vessel is lost or not lost and irrespective of the presence or absence of the Vessel within the jurisdiction of the Court. This letter of undertaking will stand as security for your in rem maritime lien Claim against the Vessel with the same force and effect as if the Vessel had been arrested as of November 29, 2014, at Noon.

Hapag-LLoyd AG further undertakes to cause to be provided, no later than December 10, 2014, security in the form of an underwriter's surety bond, issued in a form and by a surety subject to USOT's approval, said approval not to be unreasonably withheld, in the total sum of $1,725,000 in favor of US Oil Trading LLC ("USOT"), or some other form of security agreeable to USOT, said approval not to be unreasonably withheld (hereinafter the "Security"), such Security to provide for and secure payment of any judgment or settlement as provided for herein, and said Security to remain in place until such time as: (i) the parties reach a written settlement of the Claim ("the Settlement") and the Settlement is paid in full, with any such agreed Settlement of the Claim to be in writing and signed by the authorized representatives of the parties, and specifically executed by Hapag-Lloyd AG and US Oil Trading LLC; or (ii) the Court renders a final judgment (after appeal, if any) adjudicating the Claims and the judgment is discharged and satisfied in full; or (iii) the Claim is dismissed (after appeal, if any).

Upon any settlement or judgment, as provided for in sub-paragraphs (i) and (ii) above, respectively, USOT will be entitled to receive either from Hapag-Lloyd or the Security the amount settled between the parties or adjudged by the Court (after appeal, if any), and shall thereafter return the Security or, as the case may be, any remaining balance of the Security (if part of the Security is utilized to satisfy any settlement or final judgment) to Hapag-Lloyd. In the event some portion of the Claim is settled and paid, or adjudicated and paid, or dismissed (all after appeal, if any), then the Security shall be reduced on a pro-rata basis.   Upon the provision of the Security referenced herein, this Undertaking shall be rendered null and void and shall be returned to us at the above address.

Except as provided for herein, this Undertaking and the Security described above is provided without prejudice to and with a full reservation of all rights and defenses available to the Vessel, her Owners, and/or Hapag-Lloyd AG in connection with the said Claim, including but not limited to any defense(s) that may be available under any contract, statute, law, equity or otherwise none of which is to be regarded as waived by virtue of the posting of this Undertaking, or the replacement of this Undertaking with the Security described above.

It is the intent of the parties and it is agreed and understood that the rights of the parties hereto shall be precisely the same as they would have been had the Vessel been arrested under process issued out of the District Court, then taken into custody by the United States Marshal under said in rem process, and released upon the filing of a release bond and a claim of Owner.

We acknowledge that the above Undertaking and any Security apply to the above-mentioned Claim only, and do not limit, waive or prevent any right you have to arrest or detain any vessel in connection with any other claim against Hapag-Lloyd AG or others.

If any action should be necessary to enforce the terms of this letter of undertaking, the Association consents to appear in any U.S. court of competent jurisdiction without contesting said jurisdiction.

**UK P&I CLUB**

This Undertaking shall be governed by and construed in accordance with U.S. maritime law.

Yours faithfully

Adam Russ
for Thomas Miller P&I (Europe) Ltd,
Managers
For and on behalf of The United Kingdom Mutual Steam
Ship Assurance Association (Europe) Limited.