# Exhibit LL

Page 1

```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------x
HAPAG-LLOYD AKTIENGESELLSCHAFT,

              Plaintiff,
                                      Case No.
     -against-                        14-cv-9949 (VEC)

U.S. OIL TRADING LLC, O.W. BUNKER
GERMANY GMBH, O.W. BUNKER & TRADING
A/S, ING BANK N.V., CREDIT AGRICOLE
S.A.,

              Defendants.
----------------------------------x

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------x
HAPAG-LLOYD AKTIENGESELLSCHAFT,

              Plaintiff,
                                      Case No.
     -against-                        14-cv-10027 (VEC)

O'ROURKE MARINE SERVICES, L.P.,
L.L.P., O.W. BUNKER GERMANY GMBH,
O.W. BUNKER USA, INC., ING BANK N.V.,

              Defendants.
----------------------------------x

                    January 19, 2016
                    10:05 a.m.


        DEPOSITION of RULE 30(b)(6) WITNESS

                   NORBERT KOCK
```

Page 2

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ---------------------------------x
     U.S. OIL TRADING LLC,
 3            Plaintiff,
 4                      Case No.
        -against-     15-cv-6718 (VEC)
 5
     M/V VIENNA EXPRESS, her tackle,
 6   boilers, apparel, furniture,
     engines, appurtenances, etc.,
 7   in rem: M/V SOFIA EXPRESS, her
     tackle, boilers, apparel, furniture,
 8   engines, appurtenances, etc., in rem,
              Defendants.
 9   ---------------------------------x
     HAPAG-LLOYD AKTIENGESELLSCHAFT, as
10   Claimant to the M/V VIENNA EXPRESS,
11            Counter-Claimant and
                Third-Party Plaintiff,
12
        - against -
13
     U.S. OIL TRADING LLC,
14
              Counter-Defendant and
15
     O.W. BUNKER GERMANY GMBH, O.W. BUNKER
16   & TRADING A/S, ING BANK N.V., and CREDIT
     AGRICOLE CORPORATE AND INVESTMENT BANK
17   a division or arm of CREDIT AGRICOLE S.A.,
18              Third-Party Defendant.
     ---------------------------------x
19
20      Deposition of Rule 30(b)(6) Witness,
21   NORBERT KOCK, pursuant to Notice, held at the
22   offices of Freehill Hogan & Mahar LLP, 80 Pine
23   Street, New York, New York, before Roberta
24   Caiola, a Shorthand Reporter and Notary Public
25   within and for the State of New York.
```

Page 3

```
 1     A P P E A R A N C E S:
 2
 3     Attorneys for Defendant ING Bank N.V.,
 4     as Security Agent:
 5     SEWARD & KISSEL LLP
 6        One Battery Park Plaza
 7        New York, New York 10004
 8     BY:  BRIAN P. MALONEY, ESQ.
 9     AND: MICHAEL W. BROZ, ESQ.
10
11
12     Attorneys for Hapag-Lloyd Aktiengesellschaft:
13     FREEHILL HOGAN & MAHAR LLP
14        80 Pine Street
15        New York, New York 10005
16     BY:  MICHAEL FERNANDEZ, ESQ.
17     AND: MICHAEL DEHART, ESQ.
```

Page 4

```
 1     A P P E A R A N C E S:
 2
 3     Attorneys for U.S. Oil Trading LLC:
 4     CLYDE & CO. US LLP
 5        405 Lexington Avenue
 6        New York, New York 10174
 7     BY:  CASEY BURLAGE, ESQ.
 8     AND: JOHN KEOUGH, ESQ.
 9
10     Attorneys for O.W. Bunker Germany GMBH:
11     HILL RIVKINS LLP
12        45 Broadway, Suite 1500
13        New York, New York 10006-3739
14     BY:  JUSTIN M. HEILIG, ESQ.
15
16     Attorneys for O'Rourke Marine Services L.P.:
17     SIMMS SHOWERS LLP
18        201 International Circle, Suite 250
19        Hunt Valley, Maryland 21030
20     BY:  CASEY L. BRYANT, ESQ.
21        (Appearing Telephonically)
22
23     ALSO PRESENT:
24     Andrew Rona, The Interpreter
```

Page 5

```
 1              INDEX
 2   Witness     Examination By       Page
 3   Norbert Kock  Mr. Maloney          12
 4           Mr. Heilig             120
 5           Mr. Keough             165
 6           Ms. Bryant             216
 7           Mr. Maloney            220
 8
 9            E X H I B I T S
10   Kock       Description         Page
11   Exhibit 1  Notice of Rule 30(b)(6)   12
12        Deposition
13   Exhibit 2  Notice of Rule 30(b)(6)   12
14        Deposition
15   Exhibit 3  Document Bates stamped USOT   24
16        000101 through USOT 107
17   Exhibit 4  Document Bates stamped       41
18        HPL-USOT page 131
19   Exhibit 5  Document Bates stamped       43
20        HPL-USOT 135 and HPL-USOT 136
21   Exhibit 6  Document Bates stamped       49
22        HPL-USOT 137 and HPL-USOT 138
23   Exhibit 7  Document Bates stamped       50
24        HPL-USOT 139 and HPL-USOT 140
```

2 (Pages 2 to 5)

```
                                                    Page 70
 1              Norbert Kock (1-19-16)
 2    attachment refer to?
 3        A.   This is a payment advice that
 4    Hapag-Lloyd is going to pay the different
 5    amounts for the different stamps to O.W. Bunker
 6    Germany.
 7        Q.   Payment advice, is that what
 8    Zahlungsbeleg refers to?
 9        A.   Yes.
10             MR. FERNANDEZ:  Just note my
11    objection.  You marked Exhibit 14 which is
12    numbered 170 through 173, I think that may have
13    been marked in error.  You have 170 and 171 seem
14    to be standalone documents.  Then 172 and 173 I
15    don't believe are affixed to the bunker delivery
16    note.  You can certainly ask the witness that,
17    but please note my objection to the way this
18    exhibit has been marked.
19             MR. MALONEY:  So noted.  I agree
20    with your characterization, Mr. Fernandez.
21        Q.   So is it the case, Mr. Kock, that
22    the bunker delivery note at page 171 is the
23    attachment to page 170?
24        A.   Yes.
25        Q.   And then the next pages 172 and 173
```

```
                                                    Page 71
 1              Norbert Kock (1-19-16)
 2    refer to a separate document?
 3        A.   Yes.  So this payment advice is
 4    normally not going through our department.  It's
 5    done by our accounting department, and our
 6    accounting department is sending it out to the
 7    different vendors they are paying.
 8             MR. FERNANDEZ:  Are we able to
 9    break these apart so the record is clear and
10    mark the two pages 14?
11             MR. MALONEY:  I'm happy to mark
12    pages 172 and 173 as Exhibit 15.
13             MR. FERNANDEZ:  Thank you.
14             (Kock Exhibit 15, Document Bates
15    stamped HPL-USOT 172 and HPL-USOT 173, marked
16    for identification.)
17        Q.   Just to clear up the record.  How
18    does the bunker purchasing department at
19    Hapag-Lloyd use the bunker delivery note that
20    was communicated to it here in Exhibit 14?
21        A.   The quantity stated on the bunker
22    delivery note, the metric tons, will be booked
23    as a stop receipt into our SAP system against
24    the existing purchase order.
25        Q.   If, for example, there was a
```

```
                                                    Page 72
 1              Norbert Kock (1-19-16)
 2    dispute about the quantity or the quality of the
 3    fuel listed on the bunker delivery note, who
 4    would Hapag-Lloyd deal with as to that dispute?
 5        A.   The responsible purchaser.
 6        Q.   So is that O.W. Bunker Germany?
 7             MR. FERNANDEZ:  Could you reframe
 8    the question please.
 9             MR. MALONEY:  Sure.
10        Q.   So once the bunker purchasing
11    department receives a bunker delivery note, they
12    check the quantity and quality against the
13    original purchase order placed with the seller,
14    is that fair?
15        A.   Yes.
16        Q.   And if there were any disputes
17    would Hapag-Lloyd go to its seller to resolve
18    those?
19        A.   Yes.
20        Q.   In this case that would be O.W.
21    Bunker Germany?
22        A.   Yes.
23        Q.   Do you know if there were any such
24    disputes about this particular transaction?
25        A.   I can't remember.  I don't think
```

```
                                                    Page 73
 1              Norbert Kock (1-19-16)
 2    there was a dispute here in this respect.
 3        Q.   Now turning to Exhibit 15 which is
 4    Bates labeled HPL-USOT 172 to 173.  It appears
 5    there are seven separate fuel transactions with
 6    different vessels, is that correct?
 7        A.   Yes.
 8        Q.   One of those vessels is the SANTA
 9    ROBERTA?
10        A.   Yes.
11        Q.   This document reflects payment made
12    to O.W. Germany on the SANTA ROBERTA and other
13    transactions?
14        A.   Yes.
15        Q.   Would you mind translating for the
16    record what the German text reads after "ladies
17    and gentlemen"?
18        A.   This is separate -- there is a
19    separate payment of the below mentioned items.
20    We did --
21             THE INTERPRETER:  On advisement of
22    the correctness.
23        A.   Of the supplies.
24             THE INTERPRETER:  Of the supplies
25    or.
```

Elisa Dreier Reporting Corp., a U.S. Legal Support Company   (212) 557-5558
             950 Third Avenue, New York, NY  10022

Page 78

Norbert Kock (1-19-16)

1  
2  department.
3  Q. Does RQMT stand for requirement?
4  A. Yes.
5  Q. What is TIW in the subject line?
6  A. This is the abbreviation of the
7  port.
8  Q. Tacoma Washington?
9  A. This is a -- I think this is a
10 code. This is a UN code -- no, this is not a UN
11 code. For me this is a self-created
12 abbreviation from the vessel.
13 Q. Is there any physical supplier
14 specified in this email or its attachment?
15 A. No.
16       (Kock Exhibit 19, Document Bates
17 stamped HPL-USOT 92 through HPL-USOT 94, marked
18 for identification.)
19 Q. We've marked as Exhibit 192 emails
20 and attachments that have been Bates labeled
21 HPL-USOT 92, 93 and 94, and it appears that
22 there are two emails and then a document behind
23 that; is that fair to say?
24 A. There's also some hiccup here I
25 see, because the covering page is referring to

Page 79

Norbert Kock (1-19-16)

1  
2  an inquiry Mr. Lukas Gaus placed into the market
3  for this vessel calling for Tacoma, Oakland and
4  Los Angeles in a row, and behind there is
5  communication between Karl Heinz Selmer and O.W.
6  Bunker and Lukas Gaus about the typical
7  specifications of the ordered product, and
8  another attachment referring to our price
9  comparison we are doing.
10      So the first page here has nothing
11 to do with the attachments and behind. I would
12 have expected here a copy of the inquiry from
13 Mr. Lukas Gaus, like we had it for the previous
14 vessel.
15 Q. Noted.
16      MR. FERNANDEZ: The top page, is
17 that what you're referring to?
18 A. This is the top page for our
19 inquiry.
20 Q. Page 92 refers to the inquiry that
21 was sent into the marketplace by Hapag-Lloyd,
22 correct?
23 A. Yes.
24 Q. Then page 93, is that a response
25 from O.W. Bunker Germany?

Page 80

Norbert Kock (1-19-16)

1  
2  A. Yes.
3  Q. Page 94 is a separate document?
4  A. Yes.
5  Q. What does the heading mean on page
6  94?
7  A. This is a price comperance (sic)
8  showing --
9  Q. Is it a price comparison?
10 A. The meaning here is
11 Preisvereinbarungen.
12      THE INTERPRETER: Agreement.
13 A. Which means agreement.
14 Q. It says for HFO and MDO?
15 A. Yes.
16 Q. What is HFO and MDO?
17 A. HFO is heavy fuel, a heavy fuel
18 oil, and MDO means marine distillate oil.
19 Q. This chart refers to the vessel,
20 the SEASPAN HAMBURG?
21 A. Yes.
22 Q. Who fills out a chart like this?
23 A. The responsible purchaser.
24 Q. This appears to be a document
25 filled out by Karl Heinz Selmer, is that

Page 81

Norbert Kock (1-19-16)

1  
2  correct?
3      MR. KEOUGH: Objection.
4  A. This document has been filled out
5  by the responsible purchaser.
6  Q. Who is the responsible purchaser?
7  A. At that time it looks like Lukas
8  Gaus was working on this vessel here, and he's
9  using this piece of paper here to compare all
10 the incoming orders to evaluate which offer is
11 best, most favorable for Hapag-Lloyd.
12      So I call it price comperance sheet
13 because it's not an agreement. After we find an
14 agreement here and it states with whom Mr. Gaus
15 was making this agreement here, with O.W. Bunker
16 Germany and Karl Heinz Selmer.
17 Q. In the lower right, does that refer
18 to the price that was agreed with O.W. Germany?
19 A. In the lower right, the
20 1.5 million?
21 Q. Yes.
22 A. This is the total, the total U.S.
23 dollar order amount based on the order quantity
24 multiplied with the price O.W. Bunker Germany
25 gave us.

Page 82

Norbert Kock (1-19-16)

1
2  Q. Do you know why O.W. Bunker is
3  listed twice over there on the left, in the
4  first column entitled "Anbieter"?
5      MR. KEOUGH: Objection.
6  A. Because they offered twice. They
7  offered us $520 in Oakland and they offered us
8  $523 in Tacoma. Although it looks like the $523
9  is more expensive than the other ones, we picked
10 it because it was representing the highest
11 energy contents.
12      So for us it lowers energy costs,
13 and also a very good ignition product, the CCAI
14 value gives you some kind of knowledge about the
15 ignition quality of the offered fuel oil, and
16 825 is very good.
17 Q. So because the fuel had a higher
18 quality at a lower price O.W. Bunker got the
19 nomination?
20 A. Yes. You can see there's a column
21 here under "Bestellkombination," there is the
22 first column here.
23      MR. KEOUGH: You can say it in
24 English please.
25 A. This is the total cost weighted on

Page 83

Norbert Kock (1-19-16)

1
2  energy contents.
3      MR. KEOUGH: Which column are you
4  referring to, sir?
5      THE INTERPRETER: The one before
6  last.
7      MR. KEOUGH: Mr. Interpreter, since
8  we haven't sworn you in yet --
9      MR. MALONEY: He has been sworn.
10     MR. KEOUGH: Okay. Please go
11 ahead, sir.
12     THE INTERPRETER: The one before
13 last, it says IFO/MFO.
14     THE INTERPRETER: The total cost by
15 weight/energy.
16 A. Sorry to correct you. It's not by
17 weight, the energy is weighted in this cost
18 here.
19     THE INTERPRETER: Considered,
20 listed weighted.
21 A. No, weighted, because we do an
22 energy calculation here. We have an Energlewert
23 here also. This Energlewert will be weighted in
24 the total cost. So this offer here, the second
25 offer by O.W. was for us the most economic

Page 84

Norbert Kock (1-19-16)

1
2  offer. You can see it on the weighted U.S.
3  dollar amount.
4  Q. Do you know what is GEFO in the
5  first column of the persons who offered?
6  A. GEFO is a Hamburg-based trader, who
7  is also working based on our terms and
8  conditions. As any other parties here mentioned
9  as well.
10 Q. And Peninsula refers to Peninsula
11 Petroleum?
12 A. Yes.
13 Q. This document is dated October 10,
14 2014, is that correct?
15 A. This was the date of the fixing
16 here, right, October 10th.
17     (Kock Exhibit 20, Document Bates
18 stamped HPL-USOT 95 through HPL-USOT 98, marked
19 for identification.)
20     MR. FERNANDEZ: Off the record.
21     (Off-the-record discussion held.)
22 Q. We've marked as Exhibit 20 a
23 document Bates labeled HPL-USOT 95 through 98.
24 Have you seen this document before, sir?
25 A. Yes.

Page 85

Norbert Kock (1-19-16)

1
2  Q. What is this document?
3  A. This is an order confirmation
4  coming from O.W. Bunker Germany to Hapag-Lloyd
5  confirming the bunker deal for the SEASPAN
6  HAMBURG at Tacoma.
7  Q. Just like with the SANTA ROBERTA,
8  O.W. Bunker Germany is the seller?
9  A. Yes.
10 Q. And Hapag-Lloyd AG is the buyer?
11 A. Yes.
12 Q. The same remarks "HALO GCT2007
13 shall apply" are listed on page 96?
14 A. Yes.
15 Q. Norton Lilly is being used as a
16 port agent?
17 A. Right.
18 Q. On page 95 Mr. Selmer writes to
19 Mr. Gaus "Dear Lukas, thank you for your
20 support."
21     Do you have an understanding of
22 what he means by that?
23 A. To receive the offer. Sorry, to
24 receive the order.
25     (Kock Exhibit 21, Document Bates

22 (Pages 82 to 85)

**Page 138**

Norbert Kock (1-19-16)

parties which could be an in between.

Q. Is it fair so say then that Hapag did not care what happened downstream of O.W. Germany in terms of dealing with subcontractors, physical suppliers?

MR. KEOUGH: Objection.

A. That's not our business.

Q. If I understand correctly from what you said a few minutes ago, O.W. Germany's solicitation of business, as having the ability to serve as a one-stop shop, satisfied Hapag's upper management that they could begin doing business with O.W. Germany in 2007, is that correct?

MR. FERNANDEZ: Objection to the form. You can answer the question.

A. Yes, it seems so.

Q. So if I understand sort of as a synthesis of what you said already, Hapag-Lloyd never authorized or pointed O.W. Germany as an agent to order fuel on Hapag's behalf, is that correct?

MR. KEOUGH: Objection.

A. Never.

**Page 139**

Norbert Kock (1-19-16)

Q. Did Hapag-Lloyd ever advise U.S. Oil or O'Rourke Marine that O.W. Germany was acting as an agent of Hapag-Lloyd?

A. No.

Q. Let's take a look at Exhibit H 1 which is attached to your declaration toward the back. I would also like you to take a look at Exhibit 3, the third page of Exhibit 3 which is Bates stamped USOT 000103 through 107. I want you to compare these two.

It seems like we have two sets of terms and conditions used by Hapag-Lloyd. The version attached to Exhibit 3 appears to be 3 pages long, and the version appearing at Exhibit H 1 of your declaration is 5 pages long.

Do you understand what the difference is between these two versions?

A. The first version here which was dated 2006, this is the version we were discussing earlier today, which has been always mentioned by O.W. as the terms and conditions of 2007.

Q. And that's the version attached as Exhibit H 1 to your declaration?

**Page 140**

Norbert Kock (1-19-16)

A. Yes.

Q. The 2006 version?

A. Yes.

Q. And the version attached to Exhibit 3?

A. This is the version which has been negotiated with O.W. Bunker during the process of negotiating the contract in Rotterdam and Antwerp.

Q. The ARA contract?

A. The ARA contract.

Q. Which has no relevance to the transactions at issue here in these actions?

MR. KEOUGH: Objection to the form.

A. Right.

Q. So really the version attached to Exhibit H 1 are the terms that apply to the contracts between Hapag-Lloyd and O.W. Germany for these transactions?

A. Yeah.

MR. KEOUGH: Objection.

A. This has been also confirmed by O.W..

Q. It's signed and stamped by O.W.

**Page 141**

Norbert Kock (1-19-16)

Germany?

A. Yeah, but it has been also confirmed by O.W. in their order.

Q. In their sales order confirmations. Even though Hapag's purchase order confirmations refer to the latest edition, it's the sales order confirmation and O.W. Germany's identification of the 2006 version that apply?

A. Yes.

MR. KEOUGH: Objection.

Q. Correct me if I'm wrong, but I believe you testified earlier that Hapag did not control O.W. Germany's selection of a physical supplier or a subcontractor for the purchase of a bunker fuel that had been supplied to Hapag?

MR. KEOUGH: Objection.

A. This is not our business.

Q. So Hapag did not instruct O.W. Germany to use certain physical suppliers at various ports?

A. No.

MR. KEOUGH: Objection.

MR. HEILIG: Let's take a 3-minute break and mark some exhibits.

Page 158

Norbert Kock (1-19-16)

1  claim was valid, there would be an adjustment in
2  price to O.W. Germany's invoice to Hapag-Lloyd?
3      A.   That's right.
4      Q.   Irrespective of whether or not
5  there would be a corresponding reduction or
6  adjustment in price of the physical supplier's
7  invoice to O.W.?
8      A.   We have no relation to the physical
9  supplier. We are just dealing with O.W.
10 Germany.
11     Q.   This all stems from that issue in
12 the '90s where you dealt with the broker who
13 simply washed his hands with the situation, and
14 left Hapag with the recourse?
15     A.   Yes.
16     Q.   Let's take a look at Exhibit 14. I
17 believe this was an email from the vessel
18 attaching the bunker delivery note that was sent
19 directly to Hapag?
20     A.   Yes.
21     Q.   Would Hapag have also received a
22 copy of the bunker delivery note from O.W.
23 Germany at some point?
24     A.   It could have been done at some

Page 159

Norbert Kock (1-19-16)

1  point together with the invoice.
2      Q.   Okay. Let's take a look at a
3  document that has been marked as Exhibit 51,
4  Bates number OWG-9949-230 through 233.
5           The email on page 230 is in German
6  so I will have to rely on you to translate, or
7  our trusted translator. Can you describe this
8  email for me?
9      A.   Yeah. This is a message from
10 Victoria Bohn who's an administrative worker at
11 O.W. at that time addressing this email to
12 Marion Sakowski, who is a manager in our
13 accounting department saying hello Frau Sakowski
14 or hello Mrs. Sakowski, attached you receive
15 invoice and bunker delivery note for the
16 bunkering of M/V, Motor Vessel SANTA ROBERTA in
17 Tacoma on October 9, 2014. The original will
18 follow per courier.
19     Q.   So Hapag would receive copies of
20 the bunker delivery note and the invoice and the
21 original by mail?
22     A.   Yes.
23     Q.   If we look at the third page,
24 document number 232, we have a copy of O.W.

Page 160

Norbert Kock (1-19-16)

1  Germany's invoice to Hapag-Lloyd for the SANTA
2  ROBERTA transaction, correct?
3      A.   That's right.
4      Q.   This one is not stamped because it
5  has not yet been entered into Hapag's accounting
6  system?
7      A.   That's right.
8      Q.   Looking earlier we looked at the
9  stamped version of the invoice?
10     A.   Yes.
11     Q.   And it would have been entered in
12 the system?
13     A.   This is depending on where the
14 copies are coming from. If the copies are
15 coming out of our system and they had been
16 booked into the system there is a stamp. In
17 this case here, this is communication from O.W.
18 Bunker to our bookkeeping department, and at
19 that time the invoice has not been booked.
20     Q.   The stamp is Hapag's stamp?
21     A.   Yes.
22     Q.   Do you know whether Hapag would
23 have stamped the copy received by email or would
24 Hapag have waited for the original to arrive by

Page 161

Norbert Kock (1-19-16)

1  courier?
2      A.   At that time the accounting
3  department was not allowed to process invoices
4  coming by email. The local taxing authorities
5  in German were demanding us just to process
6  original invoices received and not copies.
7      Q.   So it's fair to assume the stamped
8  version we looked at earlier was the hard copy
9  received by Hapag-Lloyd?
10     A.   Yes.
11     Q.   Let's take a look at Exhibit 15.
12 Just remind me again what the German word
13 translates to?
14     A.   This is the payment notice that
15 there is money in the pipeline.
16     Q.   We looked earlier and saw that the
17 SANTA ROBERTA is identified on this document?
18     A.   Yes.
19     Q.   How would Hapag-Lloyd make payment
20 to O.W. Germany, physical payment; was it by
21 check or wire payment?
22     A.   Wire payment.
23     Q.   Would this document be issued
24 before or after the actual wire payment was

Page 162

Norbert Kock (1-19-16)
1
2   made?
3       A.   Before.
4       Q.   So this is simply advising that
5   payment is on its way?
6       A.   Yeah, something is coming.
7       Q.   At the time this document was
8   generated had payment already been approved by
9   Hapag's accounting department, or could payment
10  have been stopped for any number of reasons?
11      A.   If this document is going out the
12  payment is in the pipeline.
13      Q.   Are there any other records, any
14  other accounting records of the actual wire
15  transfer that Hapag maintains?
16      A.   There could be. I'm not
17  responsible for the accounting, but there should
18  be records available.
19      Q.   Are you satisfied that based on the
20  issuance of this document, Hapag-Lloyd paid O.W.
21  Germany for the SANTA ROBERTA transaction?
22      A.   Yeah, but take care, this is not
23  our business here, this is done by the
24  accounting department and we are not in copy of
25  this document here, so we have no idea or no

Page 163

1       Norbert Kock (1-19-16)
2   information. This is just an email which was
3   sent by our accounting department direct to O.W.
4   at that time, without copy to our department.
5       Q.   I understand it's not your
6   department, but you've been designated as
7   Hapag's representative. My question is, does
8   this document satisfy you that Hapag-Lloyd has
9   made payment to O.W. Germany for the SANTA
10  ROBERTA transaction, notwithstanding the filing
11  of insolvency proceedings?
12      A.   Yeah.
13      Q.   Do you know how this document would
14  have been transmitted to O.W. Germany?
15      A.   As I see the posted address here I
16  would say in an envelope by post, by mail.
17      Q.   So you don't know whether or not
18  this document would have also been emailed?
19      A.   No, I don't know.
20      Q.   That seems to be a general rundown
21  of the bunkering process. Let me just recap and
22  see if you agree.
23           We have the advance notice of a
24  bunker requisition form from the vessel, we have
25  the actual requisition from the vessel, we have

Page 164

1       Norbert Kock (1-19-16)
2   Hapag evaluating the requisition from the
3   vessel, we have Hapag soliciting bids from
4   traders, physical suppliers, we have Hapag
5   evaluating those bids and accepting one of them
6   and awarding the nomination to a physical
7   supplier or a trader.
8            We have the exchange of
9   confirmations, we have the physical delivery of
10  fuel to the vessel, we have the issuance of a
11  bunker delivery note and a survey report for
12  quality and specifications, we have invoicing by
13  Hapag, excuse me, from the seller to Hapag, and
14  payment from Hapag to the seller.
15           Is that generally accurate in all
16  respects for each of these transactions?
17           MR. KEOUGH: Objection to the form.
18           MR. FERNANDEZ: Objection to the
19  form.
20      A.   Not necessarily. The pre-invoice
21  of the vessel to the stowage center is normally
22  not copied to us; but all other documents I
23  agree, this is the process.
24           MR. HEILIG: With that I will pass
25  the witness, reserving any further questions for

Page 165

1       Norbert Kock (1-19-16)
2   the follow-up.
3            MR. KEOUGH: Let's take 10 minutes
4   or so.
5            (Short recess taken.)
6            (Kock Exhibit 52, Notice of
7   Deposition, marked for identification.)
8   EXAMINATION BY MR. KEOUGH:
9       Q.   Good afternoon, Mr. Kock. My name
10  is John Keough, I'm an attorney with Clyde &
11  Co.. With me is Casey Burlage of my office, and
12  we represent U.S. Oil Trading in these actions.
13  I'm going to ask you a few questions following
14  on questions that were asked of you earlier. If
15  you don't understand my question please say so.
16      A.   Um-hum.
17      Q.   And you need to speak your answer
18  yes or no, okay?
19      A.   Yes.
20      Q.   If you need a break at any time
21  please let us know, we'll do our best to
22  accommodate you. If you don't understand any
23  question please speak up and we'll try to make
24  it clear and understandable, otherwise anyone
25  reading the record may believe that you

**Page 170**

```
 1            Norbert Kock (1-19-16)
 2   it says "First Amended Complaint."  Do you see
 3   that in this caption on the side in bold print?
 4        A.   Yes.
 5        Q.   Directing your attention to page 5
 6   and paragraph 17.  You answered counsel's
 7   questions about that paragraph 17.  Do you
 8   recall that testimony?
 9        A.   Yes.
10        Q.   A copy of the exhibit before you
11   does not have a copy of the Exhibit 1 to that
12   document, does it?
13             Is there a copy of Exhibit 1
14   attached to that document?
15        A.   No.
16        Q.   I'm going to show you a copy of
17   Exhibit 1.  That is attached to the actual
18   document on file, and I will represent as I show
19   you that this appears to be a true and accurate
20   copy of Exhibit 1 to this First Amended
21   Complaint.  I ask you to take a look at that.
22             Do you see that the first page
23   refers to that ARA contract that you testified
24   about before?
25        A.   Yes.
```

**Page 171**

```
 1            Norbert Kock (1-19-16)
 2        Q.   It's your testimony that this page,
 3   this document, this two-page document has
 4   nothing to do with the shipments that are the
 5   subject of this case to the vessels that we're
 6   talking about here today, is that right?
 7        A.   This is just on Rotterdam and
 8   Antwerp here.
 9        Q.   So it has nothing to do with the
10   case here?
11        A.   Nothing.
12        Q.   The same thing is true as I turn to
13   the third page which are the marine fuel oil
14   terms and conditions, pages 1 of 5 through 5 of
15   5.
16             Those terms and conditions, the
17   July 2014 terms and conditions in your view did
18   not apply here, is that right?
19        A.   That's right.
20        Q.   To any of these ships that we've
21   been talking about?
22        A.   That's right.
23        Q.   Thank you.  The next page is a
24   document labeled "O.W. Bunker Group Terms and
25   Conditions of Sale for Marine Bunkers, Edition
```

**Page 172**

```
 1            Norbert Kock (1-19-16)
 2   2013."  Do you see that?
 3        A.   Um-hum, yes.
 4        Q.   Is it your testimony that those
 5   terms and conditions formed any part of your
 6   contract with O.W. Germany?
 7        A.   No.
 8        Q.   It is your testimony that those
 9   terms and conditions did not apply to your sale
10   to O.W. Germany for any of these vessels, is
11   that right?
12        A.   That's correct.
13        Q.   It's your understanding as you sit
14   here today that O.W. Germany agrees with you in
15   that respect?
16        A.   Yes.
17        Q.   I'm showing you what's been marked
18   as Exhibit 7 sir, or would you get Exhibit 7,
19   you have the originals there in front of you.
20             Would you please turn to Exhibit 7.
21   Do you have that in front of you?
22        A.   Yes.
23        Q.   That's an email dated
24   September 30th, correct?
25        A.   Yes.
```

**Page 173**

```
 1            Norbert Kock (1-19-16)
 2        Q.   Lukas Gaus reports to you in your
 3   department?
 4        A.   That's right, yes.
 5        Q.   Now, turning to the second page,
 6   the reverse side of that document which is page
 7   140.  This is the bunker fuel's inquiry?
 8        A.   Yes.
 9        Q.   This is for the SANTA ROBERTA,
10   correct?
11        A.   Yes.
12        Q.   You do not identify the recipients
13   of these inquiries and you explain why, correct?
14        A.   That's right, yes.
15        Q.   Approximately how many persons
16   received a copy of this request to bid from
17   outside of Hapag-Lloyd?
18        A.   I think we have the bunker
19   comparison sheet here in our records as well,
20   the names are listed on this sheet.
21        Q.   Would you turn to the bunker
22   comparison for the SANTA ROBERTA, which is --
23        A.   I think it was Chemoil, G4.
24        Q.   Hold on one second, let's get that
25   in front of you.  Look at Exhibit 8 please, the
```

Page 174

```
 1              Norbert Kock (1-19-16)
 2   second page of that exhibit?
 3       A.   Yes.
 4       Q.   The companies that are listed in
 5   the left-hand column, those are companies
 6   that --
 7       A.   Have been contacted.
 8       Q.   Have been contacted.  Is that your
 9   testimony?
10       A.   Yes.
11       Q.   Chemoil did not submit a bid?
12       A.   Right.  They did not offer.
13       Q.   What does the term KA mean?
14       A.   No quote, no offer.
15       Q.   At the top of that page it says
16   4140, do you see that?
17       A.   Yes.
18       Q.   Then a word in German that begins
19   with sounding like mineral, do you see that?
20       A.   Yes.
21       Q.   What does that number mean?
22       A.   4140 is the organizational number
23   of our department.  Mineralol
24   Preisvereinbarungen is a German word for bunker
25   procurement department or bunker purchasing.
```

Page 175

```
 1              Norbert Kock (1-19-16)
 2       Q.   In the left-hand column the word
 3   Wahl means choice?
 4       A.   Yes.
 5       Q.   The next column over, excuse my
 6   pronunciation, Anbieter?
 7       A.   Seller.
 8       Q.   That means seller, okay.  The word
 9   Verkaufer at the bottom, what does that mean?
10       A.   Seller.
11       Q.   So are you saying Anbieter and
12   Verkaufer both mean seller?
13            THE INTERPRETER:  Anbieter is
14   offerer or seller.
15       A.   And Verkaufer means seller.
16       Q.   That reference on this form means
17   the seller that you decided would be the seller,
18   correct?
19       A.   Yes.
20       Q.   Below that, the next box in German
21   states "Physical Supplier"?
22       A.   Yes.
23       Q.   In the right-hand column, on the
24   far right side of the page or the second column
25   in, Notizen means notes?
```

Page 176

```
 1              Norbert Kock (1-19-16)
 2       A.   That means just notes.
 3            THE INTERPRETER:  Notes, comments.
 4       Q.   In the bottom of the page on the
 5   right side there is a column that says "Best
 6   Nr," do you see that?
 7       A.   Yeah.
 8       Q.   And then there's a number, 0208?
 9       A.   This is the application for
10   Bestellnummer, which means order number.  The
11   028 is the code of the responsible purchaser in
12   our department.
13       Q.   What is the number to the right of
14   that?
15       A.   Starting with the 45?
16       Q.   Yes.
17       A.   This is the purchase order number
18   which has been produced by our internal SAP
19   system where the order is going into.
20       Q.   Is this one of the first, if not
21   the first page where you or Hapag-Lloyd
22   indicates its purchase order number for this
23   transaction?
24       A.   Yes.
25       Q.   You see in the right-hand column
```

Page 177

```
 1              Norbert Kock (1-19-16)
 2   where it says notes there is the word U.S. Oil,
 3   right?
 4       A.   Yes.
 5       Q.   What does that mean to you?
 6       A.   This is stating the physical
 7   supplier of the offering seller.
 8       Q.   And Hapag-Lloyd decided that they
 9   would choose O.W. Bunker as the seller based
10   both on the price and on the, what you've
11   described as the energy factors; is that fair to
12   say?
13       A.   Yes.
14       Q.   And the energy factors are
15   described in these columns that depict the
16   specifications of the fuel oil, correct?
17       A.   Yes.
18       Q.   Those specifications were provided
19   originally by U.S. Oil, the physical supplier,
20   as far as you know, to O.W. Germany, right?
21            MR. FERNANDEZ:  Objection to the
22   form.
23            MR. MALONEY:  Objection to the
24   form.
25       A.   I have no idea.
```

Page 178

Norbert Kock (1-19-16)

2  Q. How would any of these offerers
3  obtain the typical specs for the physical
4  suppliers where they are not the physical
5  supplier, do you have any idea?
6  A. Maybe they have an analysis report
7  available or past business done, knowing the
8  product.
9  Q. And that's what you rely on in
10 placing your order?
11 A. Yes.
12     MR. FERNANDEZ: Objection.
13     MR. HEILIG: Objection.
14 A. Yes.
15 Q. Is it fair to say you're relying on
16 the quality that the physical supplier is going
17 to provide, correct?
18     MR. MALONEY: Objection to the
19 form.
20     MR. FERNANDEZ: Objection to the
21 form.
22 A. I'm relying on the quality the
23 responsible seller is providing to me.
24 Q. He's describing to you in these
25 documents, correct?

Page 179

Norbert Kock (1-19-16)

2     MR. FERNANDEZ: Objection to the
3  form.
4     MR. HEILIG: Objection.
5     MR. MALONEY: Objection to the
6  form.
7  A. Yes.
8  Q. Do you consider any facts, other
9  than the energy cost and the price, in deciding
10 whether to order a delivery from a particular
11 offerer?
12 A. No.
13 Q. Ever?
14     MR. FERNANDEZ: Objection to the
15 form.
16 A. Ever?
17 Q. Ever? Do you ever do that?
18     MR. FERNANDEZ: Objection.
19 A. I can't -- I can't state this
20 because I'm just the director, I'm not the
21 purchaser.
22 Q. But your purpose is to order bunker
23 deliveries to your vessels on the basis that the
24 price is the lowest and the energy cost is the
25 most favorable, correct?

Page 180

Norbert Kock (1-19-16)

2  A. That's correct.
3  Q. Would you briefly describe for us
4  what your educational background is, sir?
5  A. The educational background is I
6  don't carry any academic grade. I was visiting
7  the --
8     THE INTERPRETER: The usual middle
9  school.
10 A. Followed by a three-year served
11 course of commercial school in Hamburg, and then
12 followed by a two years apprenticeship in a
13 company belonging Philips Electronics at that
14 time, having a degree as an industry assistant
15 manager, I would translate it like this.
16     THE INTERPRETER: I agree with that
17 translation, yes.
18 Q. Now, in September and October of
19 2014, how would you describe your -- excuse me,
20 yes, 2014, how would you describe your duties as
21 the director of your department, generally?
22 A. To lead a team of purchasers, and
23 to ensure the availability of fuels and
24 lubricants in the most economic way to our fleet
25 of vessels and chartered vessels.

Page 181

Norbert Kock (1-19-16)

2  Q. For the vessels that you've been
3  referring to today, at least the VIENNA EXPRESS,
4  the SANTA ROBERTA, the SEASPAN HAMBURG and the
5  SOFIA EXPRESS, Hapag-Lloyd's agent at the Port
6  of Tacoma in October of 2014 was Norton Lilly,
7  correct?
8  A. Yes.
9     MR. FERNANDEZ: Just note my
10 objection to the form of the last question.
11 Q. Did Hapag-Lloyd rely on Norton
12 Lilly to help coordinate the delivery of the
13 fuel to these vessels?
14 A. Yes.
15 Q. That's what Norton Lilly does in
16 the usual course for Hapag, correct?
17     MR. FERNANDEZ: Objection.
18     MR. MALONEY: Objection.
19 A. Yes.
20 Q. Do they do that for both owned and
21 chartered vessels of Hapag?
22     MR. FERNANDEZ: Objection.
23     MR. HEILIG: Objection.
24 A. Yes.
25 Q. Please look at what's been marked

46 (Pages 178 to 181)

Page 198

Norbert Kock (1-19-16)
1
2        MR. FERNANDEZ:  Objection.
3     A.    It should have been Captain Grundel
4  if he was onboard at that time, yes.
5     Q.    According to the crew list he was
6  the captain?
7     A.    Yes.
8     Q.    At that time, right?
9     A.    Yes.
10       MR. FERNANDEZ:  Objection.
11    Q.    Is the SOFIA EXPRESS still owned by
12 Hapag-Lloyd?
13    A.    Yes.
14    Q.    Is the VIENNA EXPRESS still owned
15 by Hapag-Lloyd?
16    A.    Yes.
17    Q.    I direct your attention to
18 Exhibit 32, to the second page which is marked
19 HPL-USOT 00198.  Would you look at the second
20 page please, sir?
21       Is that the bunker delivery receipt
22 for the VIENNA EXPRESS?
23    A.    Yes.
24    Q.    Is it your understanding that the
25 chief engineer of the VIENNA EXPRESS signed that

Page 199

Norbert Kock (1-19-16)
1
2  bunker delivery receipt?
3        MR. FERNANDEZ:  Objection.
4     A.    Yeah, it has been signed by the
5  chief engineer.
6     Q.    And the chief engineer signed that
7  on behalf of the vessel?
8        MR. FERNANDEZ:  Objection.
9     Q.    Using the stamp marked there?
10       MR. FERNANDEZ:  Objection.
11       MR. MALONEY:  Objection.
12       MR. HEILIG:  Objection.
13    A.    He signed it on behalf of
14 Hapag-Lloyd.
15    Q.    And it bears the stamp also on the
16 right side, Hapag-Lloyd VIENNA EXPRESS, do you
17 see that?
18    A.    Yes.
19    Q.    In the course of your duties as the
20 director of purchasing, you're use to seeing
21 stamps of the vessel and Hapag-Lloyd on these
22 bunker delivery receipts?
23       MR. FERNANDEZ:  Objection.
24    A.    When it was a Hapag-Lloyd vessel,
25 yes.

Page 200

Norbert Kock (1-19-16)
1
2     Q.    I'm showing you what's been
3  produced by your counsel as HPL-USOT page 89,
4  which appears to be a crew list for the VIENNA
5  EXPRESS, which I'm placing before you.
6        Do you recognize that the name of
7  the chief engineer depicted on that page -- do
8  you recognize whether the name of the chief
9  engineer is depicted on that page?
10    A.    It looks like the chief engineer,
11 Marek Sojda, was the responsible chief engineer
12 for the vessel at that time, and the signature
13 looks like Sojda.  I would agree.
14    Q.    Other than the document that you've
15 reviewed in Germany and here, the testimony that
16 you described, did you review any diaries or
17 calendar that you may have kept in October of
18 2014?
19    A.    No.
20    Q.    In preparation for your testimony
21 today?
22    A.    No.
23    Q.    At the time, in October of 2014,
24 did you have a practice of maintaining a
25 notebook or a diary of the work that was going

Page 201

Norbert Kock (1-19-16)
1
2  on in your department?
3     A.    No.
4     Q.    In the course of your experience as
5  the director of purchasing for Hapag-Lloyd, have
6  you come to learn that a supplier of fuel to a
7  vessel, a Hapag-Lloyd vessel, may have a right
8  to assert a lien against the vessel itself?
9        MR. FERNANDEZ:  Objection.
10       MR. HEILIG:  Objection.
11       MR. MALONEY:  Objection.
12    A.    Maybe a seller, but a supplier, no.
13    Q.    You've developed some familiarity
14 that a seller might have a lien against a
15 Hapag-Lloyd vessel in some circumstances, is
16 that fair to say?
17       MR. FERNANDEZ:  Objection.
18    A.    I think this is part also of our
19 terms and conditions.
20    Q.    Prior to the O.W. bankruptcy, did
21 you have any experience with any seller or
22 supplier claiming that they had a lien against a
23 Hapag-Lloyd vessel for non-payment?
24    A.    No.
25       MR. HEILIG:  Objection.

51 (Pages 198 to 201)