UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| HAPAG-LLOYD AKTIENGESELLSCHAFT,<br><br>        Plaintiff,<br><br> - against -<br><br>U.S. OIL TRADING L.L.C., O.W. BUNKER GERMANY GMBH, and ING BANK N.V.,<br><br>        Defendants. | No. 14 Civ. 9949 (VEC) |
| U.S. OIL TRADING LLC,<br><br>        Plaintiff,<br><br> - against -<br><br>M/V VIENNA EXPRESS, her tackle, boilers, apparel, furniture, engines, appurtenances, etc., *in rem*, and M/V SOFIA EXPRESS, her tackle, boilers, apparel, furniture, engines, appurtenances, etc., *in rem*,<br><br>        Defendants. | No. 15 Civ. 6718 (VEC) |
| HAPAG-LLOYD AG, as claimant to the in rem defendant M/V VIENNA EXPRESS,<br><br>       Third-Party Plaintiff,<br><br> - against -<br><br>O.W. BUNKER GERMANY GMBH, and ING BANK N.V.,<br><br>       Third-Party Defendants. | |

**<u>ING BANK'S RULE 56.1 STATEMENT OF MATERIAL FACTS</u>**

Interpleader Defendant ING Bank N.V. ("ING Bank"), as Security Agent, sets forth herein its Local Civil Rule 56.1 Statement of Material Facts in support of its motion for summary judgment. ING Bank seeks an order finding that (1) U.S. Oil Trading LLC's ("USOT") maritime lien claims fail because USOT cannot show it took its orders from the owner or a person authorized by the owner and (2) that the funds on deposit with the Court should be disbursed into a designated account as Collection Proceeds and handled in an agreed manner by ING and O.W. Bunker Germany GmbH ("O.W. Germany") in accordance with their Cooperation Agreement.

## ING Bank's Statement of Material Facts

**The Supply Chain for the Vessels**

1. Hapag-Lloyd Aktiengesellschaft ("HLAG") is the time charterer of the M/V SANTA ROBERTA and the M/V SEASPAN HAMBURG, and the registered owner of the M/V VIENNA EXPRESS and the M/V SOFIA EXPRESS (collectively, the "Vessels"). Ex. 1; Ex. 2; Ex. 3 (Kock Tr.) at 22:24-23:3, 91:14-19.[1]

2. In October, 2014, HLAG entered into four separate contracts with O.W. Germany for the supply of bunkers to the Vessels in the Port of Tacoma. Ex. 4; Ex. 5; Ex. 6; Ex. 7; Ex. 3 (Kock Tr.) at 23:15-22; *id*. at 135:10-15.

3. For all four transactions, O.W. Germany subcontracted the supply of bunkers to O.W. USA. Ex. 8; Ex. 9; Ex. 10; Ex. 11.

4. For all four transactions, O.W. USA subcontracted with local physical supplier USOT to deliver the bunkers to the Vessels. Ex. 12; Ex. 13; Ex. 14; Ex. 15.

5. Three separate, bilateral contracts were executed with respect to each fuel delivery. Ex. 16, Ex. 17, Ex. 18, and Ex. 12 (contracts regarding M/V SANTA ROBERTA); Ex.

---

[1] "Ex. __" refers to the exhibits to the Affidavit of Brian P. Maloney, Esq., sworn to May 13, 2016.

19, Ex. 20, Ex. 21, and Ex. 13 (M/V SEASPAN HAMBURG); Ex. 22, Ex. 23, Ex. 24, and Ex. 14 (M/V SOFIA EXPRESS); Ex. 25, Ex. 26, Ex. 27, and Ex. 15 (M/V VIENNA EXPRESS).

6. Although USOT's invoices were directed to O.W. USA's parent company, O.W. Bunker & Trading A/S ("O.W. Denmark"), O.W. USA was USOT's contractual counterparty for each of the four agreements to purchase fuel for the Vessels. Ex. 12; Ex. 13; Ex. 14; Ex. 15; Ex. 28 (Nielsen Tr.) at 29:16-19; *id*. at 54:10-14.

7. USOT's corporate representative, Thor Nielsen, confirmed that all communications regarding the subject deliveries were with O.W. USA – *not* O.W. Denmark. Ex. 28 (Nielsen Tr.) at 71:15-72:4.

8. The bunkers that HLAG ordered from O.W. Germany were delivered to the Vessels in October 2014. Ex. 29; Ex. 30; Ex. 31; Ex. 32.

9. To date, only the invoice issued by O.W. Germany to HLAG for the delivery to the M/V SANTA ROBERTA has been paid. Ex. 3 (Kock Tr.) at 65:10-15; Ex. 33; Ex. 3 (Kock Tr.) at 73:3-14; *id*. at 89:10-15, 94:23-25, 99:11-12.

**USOT's Involvement in the Fuel Deliveries**

10. USOT's *only* contracts with respect to the fuel deliveries in this case were with O.W. USA. Ex. 12; Ex. 13; Ex. 14; Ex. 15; Ex. 28 (Nielsen Tr.) at 54:10-14; *id*. at 66:25-67:12; Ex. 3 (Kock Tr.) at 96:7-12; *id*. at 69:9-17; Ex. 28 (Nielsen Tr.) at 38:6-10; Ex. 3 (Kock Tr.) at 128:24-129:10.

11. At the time of these agreements, O.W. USA's parent company, O.W. Denmark, had a $10 million line of credit with USOT. Ex. 28 (Nielsen Tr.) at 21:15-18; Ex. 34.

12. This credit line allowed O.W. Denmark's subsidiaries, including O.W. USA, to purchase fuel from USOT. Ex. 28 (Nielsen Tr.) at 30:23-31:14.

13.     USOT's extension of credit to its customers is based on an extensive review of the customer's credit and financial history, which requires the customer to submit a credit application, credit references, financial statements for the previous three years, and year-to-date current year financial statements.  Ex. 28 (Nielsen Tr.) at 15:15-17:6, 17:18-23, 20:20-21:18.

14.     Once it receives this information, USOT examines and analyzes the prospective customer's balance sheet, physical assets, debts, and payment history, reaches out to the company's credit references to gather information on the company's other outstanding balances and payment histories, and pulls either a Dun & Bradstreet report or, in the case of an international entity, an external "bunker report" detailing the company's history, business, and management team.  Ex. 28 (Nielsen Tr.) at 16:7-14, 19:3-20:7, 23:13-15, 23:24-25:7.

15.     USOT conducted this extensive credit review process for O.W. Denmark before extending the company a $10 million line of credit.  Ex. 28 (Nielsen Tr.) at 20:20-22:5; Ex. 34.

16.     USOT did not conduct a credit review on either the Vessels or their owners or charterers.  Ex. 28 (Nielsen Tr.) at 34:20-35:7.

17.     Each of the four contracts entered into between USOT and O.W. USA extended credit to O.W. USA on 30-day terms.  Ex. 12 at USOT 000110; Ex. 13 at USOT 000165; Ex. 14 at USOT 000055; Ex. 15 at USOT 000003.

18.     Neither O.W. Germany nor O.W. USA acted as an agent of HLAG with respect to the purchase of fuel for the Vessels, and HLAG never informed USOT that either entity was its agent.  Ex. 3 (Kock Tr.) at 138:19-25; *id*. at 139:2-5; Ex. 28 (Nielsen Tr.) at 69:10-16.

19.     HLAG had "no relation" to or contact with USOT with respect to the fuel deliveries to the Vessels, but rather was "just dealing with O.W. Germany."  Ex. 3 (Kock Tr.) at 109:22-25, 158:5-11; *id*. at 138:2-8.

20. Although HLAG may have been notified that USOT would be physically supplying the fuel to the Vessels, this information was simply "needed for logistical reasons" in order for its port agent, Norton Lilly, to coordinate the actual delivery of the fuel bunkers. Ex. 3 (Kock Tr.) at 58:14-24, 59:14-17, 64:8-13, 204:21-205:11.

21. Norton Lilly did not itself negotiate or contract for the purchase of fuel oil for the Vessels. Ex. 3 (Kock Tr.) at 154:20-24.

22. The port agents in these cases typically do not purchase fuel or have the authority to negotiate or conclude fuel bunker transactions to bind the vessel. Ex. 38 (Speckman Tr.) at 29:21-25; Ex. 39 (Ligerwood Tr.) at 40:23-41:5.

23. HLAG had no control over the selection of physical supplier for the Vessels, and did not direct O.W. Germany to use USOT for the supply of fuel to the Vessels. Ex. 3 (Kock Tr.) at 58:7-13, 141:19-22.

24. USOT's corporate representative Thor Nielsen confirmed that the only communication between USOT and the Vessels or their owners or charterers took place during delivery, when Vessel officials signed certain logistical documents, including the bunker delivery receipts and documents "relat[ing] to taxes and things of that nature." Ex. 28 (Nielsen Tr.) at 36:25-37:22, 39:9-13.

25. Mr. Nielsen admitted that neither he nor anyone in USOT's tax and treasury group was even aware of the identity of the Vessels' owners or charterer at the time of these transactions. Ex. 28 (Nielsen Tr.) at 35:8-15.

**The Collapse of O.W. Bunker in November 2014**

26. O.W. Denmark, the parent of O.W. Germany and O.W. USA, was one of the world's largest providers of marine fuels. Ex. 35.

27. O.W. Denmark commenced in-court restructuring proceedings in Denmark in November 2014.  Ex. 35.

28. Many other O.W. Bunker entities are bankrupt, including O.W. Germany and O.W. USA, both of which are the subject of separate insolvency proceedings.  Ex. 35; 14 Civ. 9949, Dkts. #142 and 157.

**ING's Role**

29. On December 19, 2013, ING and O.W. Denmark entered into a $700 million revolving credit agreement (the "Credit Agreement"), funded by a syndicate of lenders including ING.  Ex. 36.

30. This credit facility served to provide operating capital for the global operations of the O.W. Bunker group.  Ex. 37 (Copley Tr.) at 81:6-15.

31. The amount that O.W. Denmark and its subsidiaries could draw down under the Credit Agreement depended on the "Borrowing Base," or the amount of the actual receivables owed to the O.W. Bunker group at a given time.  Ex. 37 (Copley Tr.) at 60:22-61:20, 80:3-81:5; *id*. at 88:10-89:2; Ex.36 at ING 00087.

32. At the time of its insolvency, O.W. Denmark had drawn down approximately $647 million from its lenders.  Ex. 37 (Copley Tr.) at 82:25-83:4.

33. On December 19, 2013, ING and O.W. Denmark entered into a security agreement (the "Security Agreement"), which set out the collateral assigned to ING as Security Agent on behalf of the syndicate of lenders financing the Credit Agreement.  Ex. 40.

34. Under the Security Agreement, each "Receivables Chargor" listed on Schedule 1 assigned to ING *all* "rights, title and interest in respect of the Supply Receivables" (as defined in the Security Agreement).  Ex. 40 at ING 00007, 00028.

35. Paragraph 2.3 of the Security Agreement provides, in relevant part:

<blockquote>

2.3 Supply Receivables and New Supply Receivables:

(a) Each Receivables Chargor…hereby agrees to assign and hereby assigns absolutely, with effect as of the date of this Deed, subject to a proviso for the reassignment on redemption, all of its rights, title and interest in respect of the Supply Receivables.

</blockquote>

Ex. 40 at ING 00007, ¶ 2.3(a)

36.  Supply Receivables are defined as "any amount owing, or to be owed, to a Receivables Chargor . . . under any Supply Contract" relating to the sale of oil products traded by the Group and including any invoice issued thereunder.  Ex. 40 at ING 00005.

37.  O.W. Germany is a Receivables Chargor under the Security Agreement.  Ex. 40 at ING 00028.

38.  Following the collapse of the O.W. Bunker group in November 2014, ING appointed a team of Joint Receivers from PricewaterhouseCoopers to collect assigned receivables (including those at issue here) in order to recover the financing extended to the O.W. Bunker group in reliance on that collateral.   Ex. 37 (Copley Tr.) at 48:20-49:17; Ex. 35.

39.  In December 2015, O.W. Germany issued a security challenge challenging the assignment of Supply Receivables under the Security Agreement. Ex. 42 (Musfeldt Tr.) at 12:18-13:3.

40.  Pursuant to a cooperation agreement entered into between O.W. Germany and ING, any proceeds of receivables awarded to either O.W. Germany or ING in this action are Collection Proceeds to be handled in an agreed-upon manner.  Ex. 42 (Musfeldt Tr.) at 47:24-48:6.

7

New York, New York
May 13, 2016

                                                Respectfully submitted,

                                                SEWARD & KISSEL LLP


                                                By: s/ Bruce G. Paulsen
                                                     Bruce G. Paulsen
                                                     Brian P. Maloney
                                                One Battery Park Plaza
                                                New York, NY  10004
                                                (212) 574-1200

                                                *Attorneys for ING Bank N.V., as Security Agent*