UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| HAPAG-LLOYD AG,<br><br>          Plaintiff,<br>  - against -<br><br>U.S. OIL TRADING LLC, O.W. BUNKER<br>GERMANY GMBH, and ING BANK N.V.,<br><br>          Defendants. | 14-cv-9949 (VEC) |
| U.S. OIL TRADING LLC,<br><br>          Plaintiff,<br>  - against -<br><br>M/V VIENNA EXPRESS, her tackle, boilers,<br>etc., *in rem*, and M/V SOFIA EXPRESS, her<br>tackle, boilers, etc., *in rem,*<br><br>          Defendants. | 15-cv-6718 (VEC) |
| HAPAG-LLOYD AG, as claimant to the<br>*in rem* defendant M/V VIENNA EXPRESS,<br><br>          Third-Party Plaintiff,<br><br>  - against -<br><br>O.W. BUNKER GERMANY GMBH, and<br>ING BANK N.V.,<br><br>          Third-Party Defendants. | |

**O.W. BUNKER GERMANY GMBH'S
MEMORANDUM OF LAW
IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ................................................................................................ ii

PRELIMINARY STATEMENT ........................................................................................... 1

FACTUAL BACKGROUND ................................................................................................ 2

    A.  The OW Bunker Group ............................................................................................. 2

    B.  The Bunker Fuel Transactions ................................................................................. 3

PROCEDURAL BACKGROUND ....................................................................................... 8

COOPERATION AGREEMENT BETWEEN OW GERMANY AND ING BANK .................. 12

RULE 56 SUMMARY JUDGMENT STANDARD .............................................................. 14

ARGUMENT ..................................................................................................................... 14

OW GERMANY IS ENTITLED TO SUMMARY JUDGMENT ON ITS
*IN PERSONAM* CLAIMS

    I.   Hapag Readily Admits the Existence of Valid Contracts with
        and its Payment Obligation to OW Germany ................................................... 15

    II.  German Law Governs the Contracts between Hapag and OW Germany ....................... 20

    III.  OW Germany Is Entitled to Interest at the Contractual Rate of 12% ............................ 22

CONCLUSION ................................................................................................................... 25

i

# TABLE OF AUTHORITIES

**Cases**                                                                                          **Pages**

*Amoco Transport Co. v. Dietze, Inc.*,
   582 F.Supp. 804 (S.D.N.Y. 1984) ...................................................................................24

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986).........................................................................................................14

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986).........................................................................................................14

*D'Amico v. City of New York*,
   132 F.3d 145 (2d Cir. 1998)............................................................................................14

*Equifax, Inc. v. Luster*,
   463 F.Supp. 352 (E.D. Ark. 1978) ..................................................................................24

*Great Lakes Transit Corp. v. Marceau*,
   154 F.2d 623 (2d Cir. 1946)............................................................................................24

*Hapag-Lloyd AG v. U.S. Oil Trading LLC*,
   814 F.3d 146 (2d Cir. 2016)............................................................................................10

*Harros Corp. v. McBride & Assocs., Inc.*,
   2002 WL 1677695 (W.D.N.Y. July 19, 2002)................................................................19

*Lee Nat'l Corp. v. Kansas City S. Indus., Inc.*,
   50 F.R.D. 412 (S.D.N.Y. 1970) ......................................................................................24

*O'Rourke Marine Servs. L.P. v. M/V Cosco Haifa*,
   ---F.Supp.3d---, 2016 WL 1544742 (S.D.N.Y. Apr. 8, 2016) .........................................15

*Schoolcraft v. City of New York*,
   103 F.Supp.3d 465 (S.D.N.Y. 2015)...............................................................................15

*Scott v. Harris*,
   550 U.S. 372 (2007)........................................................................................................14

*Sista v. CDC Ixis N. Am., Inc.*,
   445 F.3d 161 (2d Cir. 2006)............................................................................................14

*Textil, LDA v. Judy-Philippine, Inc.*,
   2001 WL 963993 (S.D.N.Y. Aug. 23, 2001)............................................................. 19-20

*UPT Pool Ltd. v. Dynamic Oil Trading (Singapore) PTE Ltd.*,
   2015 A.M.C. 2070, 2079 (S.D.N.Y. 2015) ......................................................................19

**Statutes**

28 U.S.C. § 1335 ............................................................................................. 8-9, 22

28 U.S.C. § 2361 ..................................................................................................9

46 U.S.C. §§ 31341-31342 ...................................................................................2

**Other Authorities**

German Civil Code § 280 ......................................................................................21

German Federal Court (BGH) Ruling, dated April 2 1998
   file no. IX ZR 79-97 (Dresden).......................................................................23

German Federal Court (BGH) Ruling, dated Dec. 4, 1986
   file no. VII ZR 354/85 (Oldenburg).................................................................23

O.W. Bunker Germany GmbH ("OW Germany"), by and through its undersigned attorneys, respectfully submits this Memorandum of Law in support of its Motion for Summary Judgment on OW Germany's *in personam* interpleader claims and counterclaims against Hapag-Lloyd Aktiengesellshaft ("Hapag") pursuant to Rule 56.

## PRELIMINARY STATEMENT

OW Germany contracted with Hapag to supply four ocean-going vessels with marine fuel at the Port of Tacoma, Washington in October 2014.  Neither party disputes the existence of such contracts nor the principal amounts invoiced to Hapag by OW Germany, as seller, upon delivery of the fuel.  Hapag further admits that, in the normal course of business, it would have paid OW Germany directly, irrespective of how many subcontractors were involved in those fuel deliveries.  Indeed, Hapag paid OW Germany for one of the four transactions at issue in these cases.  Yet, due to OW Germany's intervening insolvency and subsequent threats by other parties to arrest the subject vessels, Hapag has withheld payment to OW Germany for *inter alia* three deliveries and has asked this Court to determine whether payment should instead go to some other claimant.

Notably, the local physical supplier, U.S. Oil Trading LLC ("USOT"), claims that it has maritime liens against the vessels and therefore is entitled to payment even in the absence of a direct contractual relationship with Hapag.  However, USOT does *not* have maritime liens against Hapag's vessels and must look to its own contractual counterparty for recourse—even if that means pursuing claims as an unsecured creditor in bankruptcy proceedings.  OW Germany, on the other hand, was the only party that: (a) took its order from the shipowner/charterer; (b) stood in privity of contract with Hapag; (c) invoiced Hapag for the fuel; and (d) received payment from Hapag in the normal course of business.  Thus, summary judgment on OW

1

Germany's *in personam* interpleader claims and counterclaims against Hapag is appropriate in the absence of any genuine dispute as to the contractual rights and obligations of the parties.

OW Germany also joins the request of ING Bank N.V. ("ING") for dismissal of USOT's maritime lien claims against the subject vessels.  The undisputed evidence shows that USOT cannot satisfy the requirements of the Commercial Instruments and Maritime Lien Act ("CIMLA"), 46 U.S.C. §§ 31341-31342, and therefore dismissal of USOT's *in rem* claims is appropriate at this time.  In addition to joining ING's request, OW Germany will submit a separate Opposition to USOT's competing Motion for Summary Judgment in due course.

## FACTUAL BACKGROUND

**A.    The OW Bunker Group**

OW Germany was one of many worldwide subsidiaries and affiliates of O.W. Bunker A/S ("OW Denmark"), a corporation organized and existing under Danish law.  Founded in 1980, OW Denmark and its subsidiaries and affiliates (collectively the "OW Bunker Group") constituted one of the largest marine fuel suppliers in the world, with operations in approximately 29 countries and a global share of roughly 7% of the supply market in 2013. (Declaration of Justin M. Heilig dated May 13, 2016, hereinafter "Heilig Decl.," Ex. 1.)  OW Denmark went public in March 2014 with an initial public offering on the NASDAQ OMX Copenhagen Stock Exchange.  (*Id.* Exs. 1 & 2.)  The IPO was considered a great success, with OW Denmark's share price skyrocketing approximately 20% on the first day of trading, and the value of the company reaching nearly $1 billion USD.  (*Id.* Ex. 2.)

However, on October 7, 2014, OW Denmark released a profit warning, primarily due to an "unrealized accounting loss before tax of approx. USD 22 million in Q3 2014," triggered by the slide in oil prices.  (*Id.* Ex. 3.)  Two weeks later, OW Denmark restated the loss at $24.5

million.  (*Id.* Ex. 4.)  Shortly thereafter, on November 5, 2014, OW Denmark's management declared a loss of approximately $275 million and the company's shares were suspended from trading.  (*Id.* Exs. 1 & 5.)  According to preliminary investigations, two separate incidents precipitated the ensuing collapse of the OW Bunker Group: (1) the discovery of fraud perpetrated by senior employees in a Singapore-based subsidiary, Dynamic Oil Trading, which resulted in a $125 million loss; and (2) certain hedging transactions, which resulted in a "risk management loss" of $150 million in addition to the $45.5 million loss announced on October 7, 2014.  (*Id.*)

## B.    The Bunker Fuel Transactions

Headquartered in Hamburg, OW Germany operated as both a physical supplier and as a reseller or trader of bunker fuel.  (*Id.* Ex. 9, Tr. 36-39.)  In 2007, OW Germany began doing business with Hapag, one of the largest container liner shipping companies in the world.[1]  (*Id.* Ex. 7, Tr. 26-27.)  OW Germany sold bunker fuel to Hapag pursuant to both long-term and spot contracts.  (*Id.* Ex. 9, Tr. 38 & 108-11.)  For example, OW Germany and Hapag entered into a year-long contract for the supply of bunker fuel at the Ports of Antwerp and Rotterdam in 2014.[2] (*Id.* Ex. 7, Tr. 24-25 & Ex. 9, Tr. 108-11.)  However, Hapag did not prefer to conduct business with OW Germany over other entities; instead Hapag purchased bunkers from approximately 40 to 50 counterparties in 2014. (*Id.* 7, Tr. 50-52.)  As a prerequisite to doing business with Hapag, all sellers were required to consent to the application of Hapag's Marine Fuel Oil Terms &

---

[1] As of December 31, 2015, Hapag owns or operates a fleet of 177 vessels.  *See* Heilig Decl. at ¶ 8, Ex. 6.

[2] Although Hapag attached this "ARA-Contract" to its Complaint as Exhibit 1 in action 14-cv-9949 [Dkt. # 84], witnesses from both OW Germany and Hapag confirmed that the contract only related to bunker deliveries at the Ports of Antwerp and Rotterdam, and therefore has no relevance to these actions.  (Heilig Decl. Ex. 7, Tr. 126-27.)

Conditions of Purchase (the "Hapag Terms") to the bunker contracts, including OW Germany. (*Id.* Ex. 7, Tr. 61-62; Ex. 9, Tr. 113-14, 117; Ex. 10, Tr. 50, 54, 79-80.)

The bunker transactions at issue in these cases (the "Bunker Transactions") were spot sales by OW Germany to Hapag that occurred in October 2014. Each transaction followed the same basic format, and each transaction resulted in the delivery of bunker fuel to a vessel owned or chartered by Hapag at the Port of Tacoma, Washington. (*Id.* Ex. 7, Tr. 67-68, 142-43; Ex. 8, Tr. 54.) First, Hapag received bunker requisition forms from the Masters of the M/V SEASPAN HAMBURG, M/V SOFIA EXPRESS, M/V VIENNA EXPRESS, and M/V SANTA ROBERTA (collectively the "Vessels"), requesting Hapag to purchase certain volumes and grades of fuel for delivery at Tacoma. (*Id.* Ex. 11.) The requisition forms were not "orders" for bunker fuel—only Hapag's Purchasing Department was responsible for placing fuel orders with its contractual counterparty. (*Id.* Ex. 7, Tr. 17, 23, 144-45; Declaration of Norbert Kock dated July 27, 2015, hereinafter "Kock Decl.," ¶ 19, 15-cv-6718, Dkt. # 61.) In fact, the Masters did not have authority from Hapag to communicate directly with bunker traders or suppliers, and likewise did not have authority to either negotiate or enter into bunker supply contracts on Hapag's behalf. (*Id.*)

Next, Hapag analyzed market conditions and communicated with the Vessels to determine whether it would make more sense for them to refuel at other nearby ports, such as Oakland or Los Angeles. (Heilig Decl. Ex. 7, Tr. 48-49, 130-31.) In either case, Hapag then circulated emails by Bcc: (blind carbon copy) to OW Germany and other traders in competition with OW Germany (*e.g.*, Peninsula Petroleum Limited, Chemoil Energy Limited, and GEFO Gesellschaft für Oeltransporte mbH) to solicit bids for the spot purchases of bunker fuel. (*Id.* Ex. 7, Tr. 52-53, 84; Ex. 12.)

In order to bid on the contracts, OW Germany requested quotations from OW Bunker USA, Inc. ("OW USA") for the volumes and grades of fuel specified in the email solicitations. (*Id.* Ex. 13.)  OW USA was in charge of bunker procurement in the Americas for the OW Bunker Group, and its Houston office served as the sourcing or purchase center for all U.S. ports. (*Id.* Ex. 9, Tr. 95 & Ex. 10, Tr. 71-72.)  Accordingly, OW USA contacted multiple local suppliers (including USOT, Tersoro Corporation, and Phillips 66 Company) to obtain fuel specifications or "typicals" for potential deliveries or "stems" offered at Tacoma or other nearby ports.  (*Id.* Ex. 14.)  OW USA then quoted those typicals to OW Germany, which in turn submitted bids to Hapag.  (*Id.* Exs. 14 & 15.)  At no point did Hapag require or instruct either OW Germany or OW USA to seek quotations from, or subcontract with, a particular physical supplier.  (*Id.* Ex. 7, Tr. 58 & 141; Kock Decl. ¶ 14.)

To evaluate the bids that it received, Hapag's Purchasing Department created internal charts that compared the prices and fuel specifications from all prospective sellers, including OW Germany.  (Heilig Decl. Ex. 16.)  Hapag did not necessarily award the contracts to the bidders offering the lowest sales prices.  Instead, Hapag's comparison charts calculated a total weighted cost that factored in the energy contents (as indicated by the fuel specifications) in order to identify the bunker stems with the best quality at the lowest price.  (*Id.* Ex. 7, Tr. 80-84 & 149-53; Kock Decl. ¶ 5.)  Thus, in some circumstances, Hapag would prefer a more expensive fuel if it had the highest energy contents.  (Heilig Decl. Ex. 7, Tr. 80-84.)

Ultimately, Hapag accepted OW Germany's bids to supply bunkers to the Vessels at the Port of Tacoma in October 2014.  (*Id.* Ex. 17; Kock Decl. ¶¶ 7 & 8.)  In each case, the parties exchanged written confirmations of the contracts: Hapag issued a purchase order email to OW Germany, while OW Germany issued a sales order confirmation to Hapag.  (Heilig Decl. Exs. 17

& 18.)  Each set of documents identified the "Seller" as OW Germany and the buyer's "Account" as Hapag.[3]  (*Id.*)  Likewise, the incorporated Hapag Terms defined the "Buyers" as Hapag and the "Sellers" as OW Germany, *i.e.*, "the contracting company from whom the Buyers purchase the marine fuels."  (Kock Decl. Ex. H1, 15-cv-6718, Dkt. # 61-1, Clause 1.)  The Hapag Terms separately defined "Suppliers" as "the company from whom the Sellers procure the supply of marine fuels."  (*Id.*)  Consistent with the purchase order, the Hapag Terms provided that payment for the bunkers would be made to the Sellers' account within thirty (30) days after the completion of delivery or fifteen days (15) after receipt of the Sellers' invoice, whichever is later.  (*Id.* Clause 12.)  The Hapag Terms also provided that "[a]ny delay in payment shall entitle the Sellers to interest at the rate of 12% per annum."  (*Id.*)

To fulfill its contracts with Hapag, OW Germany subcontracted to purchase the bunkers from OW USA.  (Heilig Decl. Ex. 10, Tr. 71-73; Exs. 19 & 20.)  Once again, OW USA and OW Germany exchanged written confirmations of the contracts: OW Germany issued purchase confirmations to OW USA, stating that the bunkers were being purchased for the "Account" of OW Germany, while OW USA issued sales order confirmations to OW Germany, identifying the "Seller" as OW USA.  (*Id.* Exs. 19 & 20.)

In turn, OW USA issued its own purchase order confirmations to USOT for the stems offered at Tacoma, all of which stated that the bunkers were being purchased for the "Account" of OW USA.  (*Id.* Ex. 21.)  Also, USOT issued sales confirmations to OW USA.[4]

---

[3] Along with Hapag, OW Germany's sales order confirmations listed the Master, Owner, Charterers, and/or the named Vessels as part of the buyer's "Account."  (Heilig Decl. Ex. 18.)

[4] The sales order confirmation from USOT identified the "Buyer" as OW Bunker & Trading A/S ("OWT"), another Danish entity within the OW Bunker Group.  (Heilig Decl. Ex. 22.)  USOT considered OWT to be its customer based on the extension of a line of credit to that entity, even though USOT neither communicated with nor received a purchase order from OWT in connection with the supply of bunker fuel to the Vessels.  (*Id.* Ex. 8, 29-31, 54, 71-72.)  Likewise, Hapag did not solicit bids from, or contract with, OWT.  (*Id.* Ex. 7, Tr. 69, 109; Ex. 8, Tr. 38-39.)

By way of this chain of contracts for each transaction, the following volumes of bunker fuel were delivered to the Vessels by barge at Tacoma in October 2014:

| Vessel | Volume | Delivery Date |
|---|---|---|
| SANTA ROBERTA | 2,700.11 mt | Oct. 09, 2014 |
| SEASPAN HAMBURG | 2,900.21 mt | Oct. 16, 2014 |
| VIENNA EXPRESS | 2,710.93 mt | Oct. 18, 2014 |
| SOFIA EXPRESS | 2,680.22 mt | Oct. 29, 2014 |

(Heilig Decl. Ex. 23.)  The delivering barge was chartered to USOT, but operated by Olympic Tug & Barge ("OTB").  (*Id.* Ex. 8, Tr. 52 & 74-75.)  After the bunkers were loaded on board the Vessels, bargemen employed by OTB presented bunker delivery receipts to either the Vessels' Masters or Chief Engineers, who signed and stamped the delivery receipts to confirm the volume and temperature of the fuel received. (*Id.* Ex. 7, Tr. 145-46 & Ex. 8, Tr. 74-75.)  The Masters or Chief Engineers then emailed copies of the delivery receipts to Hapag's Purchasing and/or Ship Management Departments.  (*Id.* Ex. 23.)

After the deliveries of bunker fuel to the Vessels, the parties issued their respective invoices: OW Germany invoiced Hapag; OW USA invoiced OW Germany; and USOT invoiced OWT's account (despite receiving a purchase order that identified OW USA as the buyer).  (*Id.* Exs. 24, 25 & 26.)  Notably, neither USOT nor OWT invoiced Hapag.  (*Id.* Ex. 7, Tr. 69, 128-29; Ex. 8, Tr. 38.)  In the normal course of business, Hapag would then remit payment to OW Germany as its contractual counterparty.  (*Id.* Ex. 7, Tr. 65, 128 & 161; Kock Decl. ¶ 6.)  In fact, Hapag *remitted payment to OW Germany* for the bunkers delivered to the M/V SANTA ROBERTA.  (Heilig Decl. Ex. 7, Tr. 65 & 73; Ex. 27.)  However, due to the collapse of the OW Bunker Group, Hapag did not remit payment to OW Germany for the bunkers supplied to the other three Vessels.  (*Id.* Ex. 7, Tr. 67-68 & 89; Kock Decl. ¶ 20.)  Thus, at present, the following invoices remain due and payable by Hapag to OW Germany:

| Vessel | Amount | Due Date |
|---|---|---|
| SEASPAN HAMBURG | $1,516,809.83 | Nov. 15, 2014 |
| VIENNA EXPRESS | $1,431,371.04 | Nov. 17, 2014 |
| SOFIA EXPRESS | $1,318,668.24 | Dec. 01, 2014 |

(Heilig Decl. Ex. 24.)

## PROCEDURAL BACKGROUND

Hapag commenced action 14-cv-9949 (the "Interpleader Action") against USOT, OW

Germany, OW Denmark, ING, and Crédit Agricole S.A. ("Crédit Agricole") on December 17,

2014, seeking statutory interpleader relief and requesting the Court to determine the proper

recipient(s) of payment for the bunkers delivered to three of the four Vessels pursuant to 28

U.S.C. § 1335.  Hapag also requested declaratory relief in the alternative—specifically a

declaration that USOT has no maritime lien against the M/V SANTA ROBERTA or that

Hapag's payment to OW Germany extinguished any such lien.  [14-cv-9949, Dkt. # 1-1 at ¶ 54.]

On the same day, USOT commenced action 15-cv-6718 (the "Arrest Action") against the

M/V VIENNA EXPRESS and M/V SOFIA EXPRESS, *in rem*, in the United States District

Court for the Western District of Washington (original case no. 14-cv-5982).  Prior to the

commencement of the Arrest Action, Hapag's P&I Club provided a letter of undertaking (the

"LOU") to USOT to prevent the arrest of the M/V VIENNA EXPRESS.  [15-cv-6718, Dkt. # 39,

Ex. A.]  Thus, USOT filed suit to: (a) enforce its alleged maritime lien against the M/V VIENNA

EXPRESS and to collect payment against the LOU; and (b) arrest the M/V SOFIA EXPRESS at

the Port of Tacoma and thereby secure a second maritime lien claim.

On December 18, 2014, the District Court in Washington granted USOT's *ex parte*

application for an order directing the issuance of a maritime arrest warrant against the M/V

SOFIA EXPRESS pursuant to Rule C of the Supplemental Rules for Admiralty or Maritime

Claims (the "Supplemental Rules").  [15-cv-6718, Dkt. # 10.]  Meanwhile, on the same day, this Court held an omnibus hearing and determined that injunctive relief was appropriate in the Interpleader Action upon Hapag's posting of security in the form of a surety bond.  [14-cv-9286, Dkt. # 18.]  This Court formalized its decision in an Order dated December 19, 2014 (the "Restraining Order"), which continues to restrain the defendants in the Interpleader Action from instituting or prosecuting any action against the M/V SEASPAN HAMBURG, M/V SOFIA EXPRESS, and M/V SANTA ROBERTA pursuant to 28 U.S.C. § 2361.  [14-cv-9949, Dkt. # 5.]  However, this Court denied Hapag's application as to the M/V VIENNA EXPRESS due to the prior issuance of the LOU by Hapag's P&I Club.  [14-cv-9286, Dkt. # 18 at 91-94.]  Accordingly, the bond posted by Hapag to satisfy the jurisdictional requirements of 28 U.S.C. § 1335(a)(2) in the Interpleader Action (the "Bond") does not secure any claims asserted by the defendants in the Interpleader Action with respect to the M/V VIENNA EXPRESS, and the Restraining Order does not prevent USOT from prosecuting the Arrest Action.  [14-cv-9949, Dkt. # 9]

On December 22, 2014, USOT filed an application in the Interpleader Action for an Order to Show Cause why the Restraining Order should not be vacated or modified to allow USOT to serve process *in rem* on the M/V SOFIA EXPRESS in Tacoma.  [14-cv-9949, Dkt. # 10.]  This Court denied USOT's application without prejudice by Order dated December 30, 2014.  [14-cv-9949, Dkt. # 17.]  USOT then filed a Notice of Interlocutory Appeal from both the December 19 and 30, 2014 Orders to the Second Circuit.  [14-cv-9949, Dkt. # 28.]  However, on February 24, 2016, the Second Circuit primarily affirmed the Orders, but remanded the case with instructions for this Court to enter another order that either eliminates or retains the foreign scope

of the anti-suit injunction under the *China Trade* test.  *See Hapag-Lloyd AG v. U.S. Oil Trading LLC*, 814 F.3d 146 (2d Cir. 2016).[5]

Meanwhile, on January 21, 2015, Hapag filed a Verified Statement of Interest and Notice of Restricted Appearance in the Arrest Action as claimant to the *in rem* defendant VIENNA EXPRESS pursuant to Supplemental Rules C(6) and E(8).  [15-cv-6718, Dkt. # 15]  Hapag then filed a Verified Answer to USOT's Complaint on February 11, 2015, as well as a Counterclaim and a Third-Party Complaint against USOT, OW Germany, OW Denmark, ING, and Crédit Agricole for rule interpleader relief pursuant to Rules 13(h), 14 and 22.  [15-cv-6718, Dkt. # 23.] Shortly before OW Germany appeared in the Arrest Action on June 9, 2015, USOT filed a *pre-discovery* motion for summary judgment on June 4, 2015, arguing that it has satisfied the requirements of CIMLA as a matter of law and thus holds a valid maritime lien against the M/V VIENNA EXPRESS. [15-cv-6718, Dkt. # 37.]  OW Germany then filed a motion to transfer the Arrest Action to this District pursuant to 28 U.S.C. § 1404(a), which the District Court in Washington granted on August 7, 2015.  [15-cv-6718, Dkt. # 73.]

On July 14, 2015, Hapag amended its Complaint in the Interpleader Action to add OW USA as an additional defendant.  [14-cv-9949, Dkt. # 84.]  However, on January 22, 2016, OW USA (through its liquidating trust) disclaimed "all interest in any claims arising from the bunker supply transactions at issue" in the Interpleader Action and to the "interpleader property," including any *in rem* claims against the Vessels and any *in personam* claims against Hapag.  [14-cv-9949, Dkt. # 157.]  Thereafter, this Court dismissed OW USA from the Interpleader Action by Order dated February 4, 2016.  [14-cv-9949, Dkt. # 165.]  Similarly, OW Denmark and Crédit Agricole disclaimed any interest in the funds at issue and confirmed by stipulation that they will

---

[5] The Court recently issued that Order on May 6, 2016, retaining the foreign scope of the anti-suit injunction.  [14-cv-9949, Dkt. # 217.]

not pursue any claims against Hapag or the Vessels arising out of the subject bunker deliveries.[6] [14-cv-9949, Dkt. # 115 & # 167-1; 15-cv-6718, Dkt. # 88 & 128-1.]

OW Germany answered Hapag's Complaint in the Interpleader Action on July 17, 2015, asserting both interpleader claims and two counterclaims against Hapag with respect to the bunkers delivered to the M/V SEASPAN HAMBURG, M/V SOFIA EXPRESS, and M/V VIENNA EXPRESS.[7] [14-cv-9949, Dkt. # 93.]  First, as interpleader claims against the Bond, OW Germany asserted that no other defendant contracted directly with Hapag to supply the M/V SEASPAN HAMBURG and M/V SOFIA EXPRESS with bunker fuel at the Port of Tacoma in October 2014, and that OW Germany is therefore entitled to payment for the full amount of its invoices pursuant to the sales agreements and course of dealing between OW Germany and Hapag.  [*Id.* at ¶¶ 81-82.]  Second, as a counterclaim, OW Germany asserted that Hapag breached its agreement with OW Germany by not remitting payment for the bunker fuel supplied to the M/V VIENNA EXPRESS, i.e., the one vessel not covered by Hapag's Bond.  [*Id.* at ¶¶ 95-97.]  Third, as an additional counterclaim, OW Germany asserted that it is entitled to further recovery against Hapag insofar as the Bond is insufficient to satisfy Hapag's payment obligations to OW Germany with respect to the M/V SEASPAN HAMBURG and M/V SOFIA EXPRESS.  [*Id.* at 100.]  Similarly, OW Germany answered Hapag's Third-Party Complaint in the Arrest Action on July 24, 2015, once again asserting interpleader claims and a counterclaim

---

[6] The Court "so ordered" the dismissal of Crédit Agricole on September 15, 2015.  [14-cv-9949, Dkt. # 115; 15-cv-6718, Dkt. # 88.]  It also endorsed a prior stipulation to dismiss OWT on January 28, 2016.  [14-cv-9949, Dkt. # 163; 15-cv-6718, Dkt. # 127.]  However, that stipulation contained a typographical error that wrongly identified the dismissed party as "O.W. Supply & Trading A/S" instead of "O.W. Bunker & Trading A/S."  [*See* 14-cv-9949, Dkt. # 167; 15-cv-6718, Dkt. # 128.]

[7] OW Germany expressly reserved the right to assert an additional interpleader claim against the bond posted by Hapag in case discovery showed that Hapag did not remit payment to OW Germany for the bunkers supplied to the M/V SANTA ROBERTA.  [14-cv-9949, Dkt. #93 at ¶ 85.]  However, discovery ultimately showed that OW Germany was paid for that transaction.

against Hapag with respect to the bunkers delivered to M/V VIENNA EXPRESS.  [15-cv-6718, Dkt. # 53.]  In both of its Answers, OW Germany gave notice and reserved the right to rely on foreign law pursuant to Rule 44.1.[8]

OW Germany also moved to consolidate the Interpleader and Arrest Actions on September 10, 2015.  [14-cv-994, Dkt. # 110.]  However, this Court denied the motion on September 15, 2015, noting *inter alia* that "there is no interpleader stake on deposit in the Court's Registry" with respect to the M/V VIENNA EXPRESS, and that the Court first needed to determine whether USOT's motion for summary judgment in the Arrest Action could proceed without discovery.  [14-cv-9949, Dkt. # 116.]  Ultimately, the Court denied USOT's motion on September 24, 2015, without prejudice to renewal upon completion of discovery.  [15-cv-6718, Dkt. # 94.]  Discovery ended in both actions on March 18, 2016.  [14-cv-9949, Dkt. # 182.]

## COOPERATION AGREEMENT
## BETWEEN OW GERMANY AND ING BANK

ING answered Hapag's Complaint in the Interpleader Action on March 9, 2015, asserting a counterclaim and reservation of rights as "Security Agent" under a USD $700,000,000 Multicurrency Revolving Borrowing Base Facilities Agreement ("Credit Agreement") and a related English Omnibus Security Agreement ("Security Agreement"), each dated December 19, 2013, among ING, OW Denmark, and certain affiliates or subsidiaries, including OW USA and OW Germany.  [14-cv-9949, Dkt. # 57.]  Thereafter, ING amended its Answer and Counterclaim on July 28, 2015, to allege that OW Germany assigned all of its rights to ING in respect of the amounts owed by Hapag under the applicable supply contracts, and that ING is entitled to damages for Hapag's breaches of contract. [14-cv-9949, Dkt. # 98, 2nd Counterclaim ¶¶ 18-21.]

---

[8] OW Germany gave supplemental notice of its intent to rely on German law on April 12, 2016.  [14-cv-9949, Dkt. # 211.]

ING asserted the same allegations and counterclaims with respect to the M/V VIENNA EXPRESS in its Answer to Hapag's Third-Party Complaint in the Arrest Action on September 17, 2015.  [15-cv-6718, Dkt. # 91, 2nd Counterclaim ¶¶ 18-21.]  However, OW Germany and ING have *not* asserted cross-claims against each other.

Instead, on May 11, 2015, Dr. Gideon Böhm (as Insolvency Administrator over the assets of OW Germany), Messrs. Paul David Copley, Ian David Green, and Anthony Victor Lomas of PricewaterhouseCoopers LLC (as Receivers of certain assets charged by companies in the OW Bunker Group), and ING (as Security Agent) entered into a Cooperation Agreement ("Cooperation Agreement") to facilitate the collection of all receivables due to OW Germany, including the amounts owed by Hapag for the Bunker Transactions.[9]  (Heilig Decl. Ex. 28.)  OW Germany and ING have accordingly agreed that any funds recovered pursuant to a judgment on OW Germany's *in personam* claims in these actions shall be treated as "Collection Proceeds" under the Cooperation Agreement, with each party reserving its rights to claim ultimate entitlement to the funds through future proceedings (if needed) in Europe.  Thus, OW Germany and ING have agreed that adjudication of the assignment claims is unnecessary as a result of their cooperation and alignment in these actions.  As such, any amounts recovered by OW Germany in these actions will be handled in an agreed manner with ING in accordance with the terms of the Cooperation Agreement, and entitlement to such funds will be resolved outside of this forum.

---

[9] The Cooperation Agreement was designated "Highly Confidential" pursuant to the Protective Order issued by the Court on December 7, 2015.  [14-cv-9949, Dkt. # 149.]  It was also supplemented and amended in writing on September 28, 2015, and again on January 28, 2016 (with an effective date of December 31, 2015).

## RULE 56 SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "A material fact is one that would 'affect the outcome of the suit under the governing law,' and a dispute about a genuine issue of material fact occurs if the evidence is such that 'a reasonable [factfinder] could return a verdict for the nonmoving party.'" *Sista v. CDC Ixis N. Am., Inc.*, 445 F.3d 161, 169 (2d Cir. 2006) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "At the summary judgment stage, facts must be viewed in the light most favorable to the nonmoving party *only if* there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 380 (2007) (emphasis added). The Supreme Court has "emphasized" that, when the movant has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some "metaphysical doubt" as to the material facts. *Id.* Thus, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Id.* (quoting *Anderson*, 477 U.S. at 247-48) (emphasis in original); *see also D'Amico v. City of New York*, 132 F.3d 145, 149 (2d Cir. 1998) ("The non-moving party may not rely on mere conclusory allegations nor speculation, but instead must offer some hard evidence showing that its version of the events is not wholly fanciful.").

## ARGUMENT

### OW GERMANY IS ENTITLED TO SUMMARY JUDGMENT ON ITS *IN PERSONAM* CLAIMS

As demonstrated above, OW Germany was the only party that: (a) agreed to the application of Hapag's Terms as a condition to selling bunker fuel to Hapag; (b) received purchase orders from, and issued sales confirmations to, Hapag; (c) invoiced Hapag for the bunker fuel supplied to the Vessels; and (d) received payment from Hapag in the regular course of business.  All of these material facts have been admitted by Hapag.  Accordingly, OW Germany is entitled to summary judgment on its contractual interpleader claims and counterclaims against Hapag for the three unpaid Bunker Transactions.  And while USOT contends that it is entitled to payment against (i) the Bond as substitute *res* for the Vessels in the Interpleader Action and (ii) the LOU in the Arrest Action, USOT's assertion of maritime lien claims in no way diminishes or terminates OW Germany's contractual rights.[10]  Furthermore, USOT does *not* have maritime liens against the Vessels—as OW Germany will demonstrate in greater detail in its Opposition to USOT's competing Motion for Summary Judgment.

## I.      Hapag Readily Admits the Existence of Valid Contracts with and its Payment Obligation to OW Germany

Hapag affirmatively pleaded in its Complaints that it would order bunkers from and remit payment to OW Germany in the normal course of business [*e.g.*, 14-cv-9949, Dkt. # 84 at ¶¶ 17-19].  Moreover, Hapag repeatedly confirmed during discovery that it contracted with OW Germany, and *no other party*, to procure the bunkers.  For example, the Director of Hapag's Purchasing Department, Norbert Kock, testified:

---

[10] USOT did not assert any *in personam* claims (whether against Hapag or any other party) in either its Answer or its Claims against Bond No. SNO0000012 in the Interpleader Action.  [14-cv-9949, Dkt. # 27 & # 183.]  Similarly, USOT did not assert any *in personam* claims in its Complaint in the Arrest Action.  [15-cv-6718, Dkt. # 1.]  USOT is therefore precluded from pursuing such claims at this stage of litigation.  *See O'Rourke Marine Servs. L.P. v. M/V COSCO HAIFA*, ---F.Supp.3d---, 2016 WL 1544742 at *1 n.1 (S.D.N.Y. Apr. 8, 2016) (rejecting physical supplier's attempt to raise unpled breach of contract and unjust enrichment claims at summary judgment stage in another OW Bunker-related action) (quoting *Schoolcraft v. City of New York*, 103 F.Supp.3d 465, 526 (S.D.N.Y. 2015)).

Q.      … So in connection with those vessels that I mentioned, those six vessels, who did Hapag-Lloyd's bunker purchasing department purchase the fuel from?

A.      We purchased the fuel from O.W. Bunker in Germany.

Q.      O.W. Bunker Germany GmbH?

A.      Yes.

(Heilig Decl. Ex. 7, Tr. 23:15-22; *see also* 71:25 – 72:22.)

Q.      We have marked as Exhibit 23 a document Bates labeled HPL-USOT 24.  Have you seen this document before?

A.      Yes.

Q.      What is this document?

A.      This is the invoice from O.W. Hamburg to Hapag-Lloyd for the supply of fuel oil at Tacoma.

Q.      The invoice from O.W. Germany to Hapag-Lloyd?

A.      Right.

Q.      There are again some stamps on the invoice.  Was this booked by Hapag-Lloyd's accounting department in [sic] October 28th of 2014?

A.      Yes.   You like the name.   It has been booked by the accounting manager, Mrs. Yaylaoglu.  I think she's coming from Turkey.

Q.      Do you know whether this invoice was paid by Hapag-Lloyd to O.W. Germany?

A.      Yes.

Q.      Yes, it was paid?

A.      No. Wait.  Due date November 15th.  I strongly believe we have stopped it.

Q.      Ordinarily the terms of payment are within 30 days from the date of delivery listed there on the invoice?

    A.      Right, providing the invoice is coming within 14 days or 15 days after supply.  If not, we are paying 15 days after receipt of the invoice.

(*Id*. Ex. 7, Tr. 88:16 – 89:22.)

    Q.      … So if I understand you correctly, the ARA contract does not have any relevancy to bunker transactions at U.S. ports.[11] So my question is, is this still correct, that in the normal course of business Hapag would remit payment to O.W. Germany for bunker transactions taking place at U.S. ports?

            Mr. Keough:  Objection to the form.

            Mr. Fernandez:  Objection.

    A.      Yes.

(*Id*. Ex. 7, Tr. 128:3-12.)

    Q.      …From Hapag's perspective O.W. Germany was its contractual counterparty, correct?

    A.      O.W. Germany was our contractual counterparty.

    Q.      Hapag-Lloyd did not contract with O.W. Denmark in these transactions?

    A.      Never.

    Q.      And O.W. Germany was a trader in part because it agreed to A, sell the bunker fuel to Hapag-Lloyd; and B agree [sic] to accept Hapag-Lloyd's terms and conditions; and (C) assume the risk for that sale?

    A.      That's right.

            Mr. Keough:  Objection.

(*Id*. Ex. 7, Tr. 135:11-25.)

    Q.      If a claim were presented by Hapag-Lloyd, I believe you testified that it would be presented to O.W. Germany?

---

[11] See footnote 2, *supra*.

A.    Yes.

Q.    And to no one else?

A.    Right.

Q.    And Hapag-Lloyd didn't care what happened downstream of O.W. Germany with respect to those claims, correct?

A.    That's right.

Q.    All right.  And if it were determined or agreed by the parties that the claim was valid, there would be an adjustment in price to O.W. Germany's invoice to Hapag-Lloyd?

A.    That's right.

Q.    Irrespective of whether or not there would be a corresponding reduction or adjustment in price of the physical supplier's invoice to O.W.?

A.    We have no relation to the physical supplier.  We are just dealing with O.W. Germany.

(*Id.* Ex. 157:14 – 158:11.)  In opposition to USOT's pre-discovery motion for summary

judgment in the Arrest Action, Mr. Kock further declared:

7.    From approximately May-June 2007 and up until late 2014, Hapag ordered and purchased fuel directly from OW Germany, a bunker trader located in Germany.  Indeed, OW Germany solicited business as having the ability to serve as a 'one stop shop' for the sale/supply of fuel to Vessels thereby undertaking complete responsibility for all aspects of the transaction including, *inter alia*, procurement, delivery, supply, quality and quantity.

8.    In its capacity as a trader, OW Germany was the direct contractual seller of fuel to Hapag, as buyer.  OW Germany was never authorized or appointed by Hapag as an agent or broker to order or supply fuel to Vessels from third parties (i.e. physical suppliers such as USOT).
. . .

20.    OW Germany invoiced Hapag for the order and supply of fuel to the VIENNA EXPRESS . . . Hapag did not receive any invoice or demand for payment from USOT in the ordinary course of business.  Given the insolvency proceedings commenced by OW

*

Germany, Hapag has not remitted payment to OW Germany and await further direction from the Courts and counsel in that regard.

[15-cv-6718, Dkt. # 61, Declaration of Norbert Kock dated July 27, 2015.]

Thus, there is no genuine dispute as to the existence of: (1) a consistent course of dealing between Hapag and OW Germany; (2) spot contracts between Hapag and OW Germany for the supply of bunker fuel to the Vessels; and (3) an obligation for Hapag to remit payment in accordance with OW Germany's invoices.  Indeed, the only reason Hapag did not remit payment to OW Germany for the bunkers delivered to the M/V SEASPAN HAMBURG, M/V SOFIA EXPRESS, and M/V VIENNA EXPRESS was USOT's decision to sidestep the bankruptcy proceedings of its counterparty, and to threaten Hapag with the arrest of its vessels, following the collapse of the OW Bunker Group.  *See UPT Pool Ltd. v. Dynamic Oil Trading (Singapore) PTE Ltd.*, 2015 A.M.C. 2070, 2079 (S.D.N.Y. 2015) ("It did not take a brilliant legal strategist to figure out that, in lieu of standing in line in the Chapter 11 proceeding, the Objecting Claimants could jump that line by proceeding directly against the Vessel[s], *in rem*, pursuant to 46 U.S.C. § 31342 to collect the amounts due.").

Accordingly, summary judgment on OW Germany's contractual interpleader claims and counterclaims is appropriate because Hapag readily admits that it: (a) contracted to purchase the bunkers from OW Germany; (b) owed payment to OW Germany for those bunkers; and (c) has not remitted payment for three of the four Bunker Transactions.  *See, e.g., Harros Corp. v. McBride & Assocs., Inc.*, 2002 WL 1677695 at *4 (W.D.N.Y. July 19, 2002) (granting summary judgment on breach of contract claim "because it is undisputed that there existed several contracts between plaintiff and defendant for the delivery of goods, that plaintiff performed thereunder and that the defendant failed to pay the amounts due under the contracts."); *Textil, LDA v. Judy-Philippine, Inc.*, 2001 WL 963993 at *2 (S.D.N.Y. Aug. 23, 2001) (entering

summary judgment where it was undisputed that the parties had a contract and that defendant

failed to remit payment for delivered goods).

## II.       German Law Governs the Contracts between Hapag and OW Germany

As a condition to doing business with its sellers, Hapag required the application of its

Terms to each bunker purchase.  There was no exception for OW Germany.  As the Director of

Hapag's Purchasing Department testified:

> Q.       Was it always the case that Hapag-Lloyd terms and
> conditions applied to agreements with O.W. Germany?
>
> A.       Yes.
>
> Q.       In every fuel transaction that you conducted with them?
>
> A.       Yes.
>
> Q.       Were there ever any conflicts between the Hapag-Lloyd
> Group's [sic] terms and conditions and the O.W. Bunker
> Group's terms and conditions?
>
> A.       Yes.
>
> Q.       Were there any disputes with O.W. Germany about that?
>
> Mr. Fernandez:  Objection to the form.
>
> A.       No, because our requirement when we started the business
> relationship was to accept our terms and conditions of
> purchasing.  That the same with any other supplier working
> for us, everybody has to accept our terms and conditions for
> purchasing, otherwise we won't come into business with
> these guys.

(Heilig Decl. Ex. 7, Tr. 61:24 – 62:22.)  Both OW Germany's former Managing Director (Götz

Lehsten) and the former Manager of its Trading Department (Boris Gronenberg) confirmed this

prerequisite to doing business with Hapag.  (*Id.* Ex. 9, Tr. 113-14 & 117; Ex. 10, Tr. 50, 54, 79-

80.)

Thus, Hapag's Terms applied to the Bunker Transactions, including the choice-of-law provision in Clause 18, which states in relevant part: "GERMAN LAW SHALL BE APPLICABLE ON ALL BUNKER CONTRACTS WHICH WILL BE COVERED BY GERMAN SELLERS." (Kock Decl. Ex. H1, 15-cv-6718, Dkt. # 61-1, Clause 18.) There is no dispute that OW Germany was a German limited liability company (*Gesellschaft mit beschränkter Haftung*) with a principal place of business in Hamburg. [14-cv-9949, Dkt. # 92.] Likewise, there is no genuine dispute that OW Germany was a "Seller" under Hapag's Terms, defined in Clause 1 as "THE CONTRACTING COMPANY FROM WHOM THE BUYERS PURCHASE THE MARINE FUELS." (Kock Decl. Ex. H1, 15-cv-6718, Dkt. # 61-1, Clause 1.) OW Germany was also identified as the "Seller" on both the purchase orders issued by Hapag and the sales order confirmations issued to Hapag. (Heilig Decl. Exs. 17 & 18.) Accordingly, German law governs OW Germany's *in personam* claims against Hapag and the Bond.

Fortunately, the application of German contract law does not complicate this Motion as a result of Hapag's clear admissions of basic contractual liability to OW Germany. German law recognizes a cause of action for a money judgment on account of a breach of contract (*Vertragsverletzung*). (Declaration of Dr. Matthias Kampshoff dated May 13, 2016, hereinafter "Kampshoff Decl.," ¶ 3.) The German Civil Code also provides that if the obligor intentionally or negligently breaches a duty arising from the obligation, the obligee may demand damages for the damage caused thereby. (*Id*. citing German Civil Code § 280.) Here, OW Germany (as seller) was obligated to deliver bunker fuel to Hapag (as buyer) under the parties' agreements, and Hapag was obligated to pay OW Germany the agreed purchase price. There is no genuine dispute that OW Germany fulfilled its obligations to Hapag by subcontracting to procure the

bunker fuel delivered to the Vessels.[12]  Likewise, there is no genuine dispute that Hapag has

failed to fulfill its obligations to OW Germany by intentionally withholding payment for three of

the four Bunker Transactions.  As a result, OW Germany has valid contractual claims against

Hapag for the following principal amounts:

| Vessel | Amount | Due Date |
|---|---|---|
| SEASPAN HAMBURG | $1,516,809.83 | Nov. 15, 2014 |
| VIENNA EXPRESS | $1,431,371.04 | Nov. 17, 2014 |
| SOFIA EXPRESS | $1,318,668.24 | Dec. 01, 2014 |

(Heilig Decl. Ex. 24.)

Therefore, OW Germany is entitled to summary judgment on: (1) its interpleader claims

against the Bond for payment of the M/V SEASPAN HAMBURG and M/V SOFIA EXPRESS

invoices; and (2) its counterclaim against Hapag for payment of the M/V VIENNA EXPRESS

invoice.

### III.    OW Germany Is Entitled to Interest at the Contractual Rate of 12%

To satisfy the jurisdictional requirements of 28 U.S.C. § 1335(a)(2) in the Interpleader

Action, Hapag posted the Bond in the amount of OW Germany's invoices for the bunkers

supplied to the M/V SEASPAN HAMBURG, M/V SOFIA EXPRESS, and M/V SANTA

ROBERTA, plus an uplift of 6% for each transaction to cover costs and/or interest.[13]  Based on

Hapag's tender of an additional 6% on December 22, 2015, the aggregate liability of the surety

(National Casualty Company) is now limited to $1,698,827.01 with respect to claims involving

---

[12] As demonstrated above, OW Germany contracted to purchase the bunker fuel from OW USA, which in turn issued its own purchase order to USOT.  (Heilig Decl. Exs. 19, 20, 21.)  As the local physical supplier, USOT sold the bunker fuel on credit and then invoiced payment to be due within 30 days from the date of delivery. (*Id.* Ex. 8, Tr. 54, 71-72, 86-87.)  However, USOT did *not* have any general terms and conditions that applied to such transactions with its counterparty.  (*Id.* at 87)

[13] Presumably, Hapag borrowed the 6% interest rate from Supplemental Rule E(5).

the M/V SEASPAN HAMBURG, and $1,476,908.42 with respect to claims involving the M/V

SOFIA EXPRESS.  [14-cv-9949, Dkt. # 154.]

Notwithstanding the 6% uplifts, the amount of the Bond is insufficient to cover Hapag's

payment obligations with respect to bunkers supplied to the M/V SEASPAN HAMBURG and

M/V SOFIA EXPRESS on account of the contractual interest owed to OW Germany under

Hapag's Terms.  Moreover, the Bond does not cover OW Germany's claims arising from the

delivery of bunkers to the M/V VIENNA EXPRESS due to the LOU previously issued by

Hapag's P&I Club in favor of USOT only.

Section 12 ("Payment") of the Hapag Terms provides in relevant part:

> UNLESS EXPLICITLY AGREED UPON IN WRITING BETWEEN SELLERS
> AND BUYERS PAYMENT IN US DOLLARS FOR THE MARINE FUEL OIL
> DELIVERED WILL BE AVAILABLE TO THE SELLER'S ACCOUNT WITHIN
> THIRTY (30) DAYS AFTER THE COMPLETION OF DELIVERY OR FIFTEEN
> (15) RUNNING DAYS AFTER THE RECEIPT OF THE SELLERS INVOICE,
> WHICHEVER IS THE LATER.
>
> ANY DELAY IN PAYMENT SHALL ENTITLE THE SELLERS TO INTEREST
> AT THE RATE OF 12% PER ANNUM.

(Kock Decl. Ex. H1, 15-cv-6718, Dkt. # 61-1.)  It is well established under German law that, as

the drafter and user of its own standard contractual terms, Hapag may not claim in defense that

the 12% interest provision is legally ineffective. *See* Ruling of the German Federal Court (BGH)

on 2 April 1998 – file no. IX ZR 79-97 (Dresden), and on 4 December 1986 – file no. VII ZR

354/85 (Oldenburg) (Kampshoff Decl. Exs. A & B).

In addition, Hapag's request for statutory (14-cv-9949) and rule (15-cv-6718)

interpleader relief does not deprive OW Germany of its contractual right to 12% interest under

Hapag's terms.  While the *actual deposit of funds* may prevent interest from accruing during the

pendency of an interpleader action, both the Second Circuit and other courts within this District

have found that interest continues to accrue when the interpleader plaintiff *merely posts a surety bond* to cover the disputed funds.[14]  *See Great Lakes Transit Corp. v. Marceau*, 154 F.2d 623, 626-27 (2d Cir. 1946) ("Plaintiff chose to retain the use of the $4500.00 and rather than pay the money into court, it gave a bond.  Plaintiff is entitled to receive the cost of the premiums on that bond, but not an order stopping the running of the interest against it."); *Amoco Transport Co. v. Dietze, Inc.*, 582 F.Supp. 804, 806 (S.D.N.Y. 1984) ("[I]n general, equitable considerations strongly favor a ruling that a stakeholder should be liable for interest on the disputed amount, less the premium on the bond, simply because the stakeholder has enjoyed unfettered use of a fund that admittedly belongs to one of the claimants."); *Lee Nat'l Corp. v. Kansas City S. Indus., Inc.*, 50 F.R.D. 412, 413 (S.D.N.Y. 1970) ("When the stakeholder places the fund in the court, he does not have the use of the fund; but when a bond is filed, the stakeholder does have the use of the fund less the premium.").  Other courts are in agreement with this position.  *See*, *e.g.*, *Equifax, Inc. v. Luster*, 463 F.Supp. 352, 357 (E.D. Ark. 1978) ("[P]ayment into court by a stakeholder is an unconditional tender terminating the right to interest.  The stakeholder has ceased to exert dominion over money.  That is not the case where the stakeholder has merely made bond.").

Accordingly, OW Germany is entitled to 12% interest on the principal amounts of its invoices for the bunkers supplied to the M/V SEASPAN HAMBURG, M/V SOFIA EXPRESS, and M/V VIENNA EXPRESS, running from due date of each invoice.  **As of May 13, 2016**, the amounts of interest owed to OW Germany total:[15]

---

[14] The district courts in both *Amoco Transport* and *Lee Nat'l* rejected the argument that the Second Circuit's decision in *Aetna Cas. & Surety Co. v. B.B.B. Construction Corp.*, 173 F.2d 307 (2d Cir. 1949), requires a different result.  In fact, the district court in *Lee Nat'l* remarked that *Aetna* "does not represent the culmination of a long line of sturdy precedent," particularly in light of the Second Circuit's decision in *Great Lakes Transit*.  50 F.R.D. at 414 n.1.

[15] OW Germany reserves the right to modify these interest figures depending on when OW Germany ultimately receives payment from Hapag.

| Vessel | Invoice Amount | Due Date | Interest at 12% per annum |
|---|---|---|---|
| SEASPAN HAMBURG | $1,516,809.83 | 11-15-2014 | $272,277.75  (546 days) |
| VIENNA EXPRESS | $1,431,371.04 | 11-17-2014 | $255,999.73  (544 days) |
| SOFIA EXPRESS | $1,318,668.24 | 12-01-2014 | $229,773.42  (530 days) |

While Hapag may be entitled to deduct the pro-rated amount that it paid as a premium to obtain the Bond for the M/V SEASPAN HAMBURG and M/V SOFIA EXPRESS (but not the M/V SANTA ROBERTA), the same cannot be said for the M/V VIENNA EXPRESS, for which the Bond does not serve as a substitute *res*.  In any event, the amounts of the Bond for the deliveries to the M/V SEASPAN HAMBURG and M/V SOFIA EXPRESS are approximately $90,260.57 and $71,533.24 less than the total amounts owed to OW Germany, respectively, without any further adjustment.

## CONCLUSION

For the foregoing reasons, OW Germany respectfully requests that summary judgment be entered in OW Germany's favor on: (a) its interpleader claims against the Bond for non-payment of the invoices issued by OW Germany for the bunkers delivered to the M/V SEASPAN HAMBURG and M/V SOFIA EXPRESS; (b) its counterclaims against Hapag for the amounts due and owing to OW Germany but not covered by the Bond, including contractual interest at a rate of 12% per annum; and (c) its counterclaims against Hapag for non-payment of the invoice issued by OW Germany for the bunkers delivered to the M/V VIENNA EXPRESS.  In addition, OW Germany requests an Order directing that any funds from either the Bond surety or Hapag be disbursed in a manner agreed upon with ING pursuant to and in accordance with the Cooperation Agreement.  Finally, for the reasons set forth in ING's Motion for Partial Summary Judgment, OW Germany respectfully requests the summary judgment dismissal of USOT's maritime lien claims against the Vessels *in rem*.

Dated: May 13, 2016

McDermott Will & Emery LLP

/s/ Timothy W. Walsh
Timothy W. Walsh
Darren Azman
340 Madison Avenue
New York, New York 10173
Telephone: (212) 547-5400
Facsimile: (212) 547-5444

-and-

Hill Rivkins LLP

/s/ Justin M. Heilig
Justin M. Heilig
Anthony J. Pruzinsky
45 Broadway, Suite 1500
New York, New York 10006
Telephone: (212) 669-0600
Facsimile: (212) 669-0698

*Attorneys for O.W. Bunker Germany GmbH*

## CERTIFICATE OF SERVICE

I hereby certify that on May 13, 2016, I caused the foregoing document to be filed on the Court's CM/ECF System for electronic service on all counsel of record in this action.

/s/  Justin M. Heilig