# **Exhibit 1**



CONFIDENTIAL



/ST ORIGINAL

# Time Charter

## GOVERNMENT FORM

### Approved by the New York Produce Exchange
### November 6th, 1913 - Amended October 20th, 1921; August 6th, 1931; October 3rd, 1946

1  This Charter Party, made and concluded in Hamburg this 3rd day of September..19  2013
2  Between  *SEASPAN CORPORATION of Unit 2-7th Floor, Bupa Centre, 141 Connaught Road West, Hong Kong, China,...*
3  Owners of the good Steamship/Motorship *SEASPAN HAMBURG* as per the vessel description set out in  *Clause 29* and with hull, machinery and equipment in a thoroughly
4  efficient state, and classed at of about cubic feet bale capacity deadweight capacity (cargo and bunkers, including fresh water and stores not exceeding one and
5  one-half percent of ship's deadweight capacity, allowing a minimum of fifty tons) on a draft of
6  feet *meters* inches on summer freeboard, inclusive of permanent bunkers,
7  which are of the capacity of about tons of fuel, and capable of steaming, fully laden, under good weather conditions about
8  knots on a consumption of about tons of best Welsh coal best grade fuel oil best grade Diesel oil,
9  and *HAPAG-LLOYD AG, Charterers of the City of Hamburg, Germany.*
10  
11  Witnesseth, that the said Owners agree to let, and the said Charterers agree to hire the said vessel, from the time of delivery, for a Time Charter period of
12  **Minimum 22 months – maximum 30 months, exact period in Charterers option.**
13  
14  
15  
16  *Subject to Owners prior approval which not to be unreasonably withheld,* Charterers to have liberty to sublet the vessel for all or any part of the time covered by this
17  Charter, but Charterers remaining responsible for the fulfillment of this Charter Party. Acceptance of delivery by Charterers shall not constitute any waiver of Owner's obligation
18  hereunder. Vessel to be placed at the disposal of the Charterers at *on arrival first sea pilot station Cagliari, Italy 3rd November 2013, 18:00 hrs – 23:59 hrs LT  atdnshinc,*
19  *Owners tendering 30/20/10/7/4/1 days' notice of vessels delivery to Charterers.* in such dock or at such wharf or place (where she may safely lie, always afloat, at all times
20  of tide, except as otherwise provided in clause No. 6), as the Charterers may direct. If such dock, wharf or place be not available time to count as provided for in clause No. 5.
21  Vessel on her delivery and throughout the duration of the Charter to be ready to receive containerized cargo with clean-swept holds  and tight, staunch, strong and in every
22  way fitted for the container cargo service, having water ballast, winches and donkey boiler with sufficient steam power, or if not equipped with donkey boiler, then other power
23  sufficient to run all the winches at one and the same time (and with full complement of officers, seamen, engineers and firemen for a vessel of her tonnage),to be employed in
24  carrying lawful merchandise in ISO containers, **and/or ISO Flatracks and/or ISO Tanktainers** excluding cargo set out in
25  *Clause 44.*
26  (vessel is not to be employed in the carriage of Live Stock, but Charterers are to have the privilege of shipping a small number at their risk,
27  all necessary fittings and other requirements to be for account of Charterers), in such lawful trades, between safe port and/or ports and / or safe anchorages and / or open
28  roads subject to Masters' approval which not to be unreasonably withheld in British North America, and/or United States of America, and/or West Indies, and/or Central
29  America, and/or Caribbean Sea, and/or Gulf of Mexico, and/or Mexico, and/or South America and/or Europe and/or Africa, and/or Asia, and/or Australia, and/or Tasmania,
30  and/or New Zealand, but excluding Magdalena River, River St. Lawrence between October 31st and May 15th, Hudson Bay and all unsafe ports; also excluding, when out of
31  season, White Sea, Black Sea and the Baltic.  **(Trading Exclusions as per Clause 76)**
32  as the Charterers or their Agents shall direct, on the following conditions:
33  1. That whilst on hire the Owners shall provide and pay for all provisions, wages, immigration, and consular shipping and discharging fees of the Crew, also all
34  consular fees pertaining to vessels' nationality or flag, and all garbage removal unless compulsory, in which case same to be for Charterers' account, shall pay for the
35  insurance of the vessel, also for all the cabin, deck, engine room and other necessary stores, including boiler water and fresh water and maintain her class and keep the vessel
36  in a thoroughly efficient state in hull, machinery, and equipment with all certificates necessary to comply with current requirements of ports of call for and during the service.
37  2. That whilst on hire, the Charterers shall provide and pay for all fuel and MDO except lubricating oil, Port Charges, customary Pilotages, Canal dues, River Dues,
38  Stevedoring, Tally Men, Boatage, Towage, Customary watchmen, (see also Clause 84) Agencies, Commissions, **taxes on cargo or freight** Consular Charges (except those
39  pertaining to the Crew and Vessel and or necessitated because of vessel's nationality or flag), and all other usual expenses except those before stated, but when the vessel



HPL-USOT 00201

40  puts into a port for causes for which vessel is responsible, then all such charges incurred shall be paid by the Owners. Fumigations ordered because of illness of the crew, to
41  be for Owners account. Fumigations ordered because of cargoes carried or ports visited while vessel is employed under this charter to be for Charterers' account. All other
42  fumigations to be for Charterers' account after vessel has been on charter for a continuous period of three months or more. Owners to provide and keep on board a valid
43  deratization or equivalent certificate throughout the Charter party period. See Clause 34
44  ~~Charterers to have the privilege of using shifting boards for dunnage, they making good any damage thereto.~~
45  ~~3. That the Charterers, at the port of delivery, and the Owners, at the port of re-delivery, shall take over and pay for all fuel remaining on~~
46  ~~board the vessel at the current prices in the respective ports, the vessel to be delivered with not less than...........................tons and not more than~~
47  ~~..............................tons and to be re-delivered with not less than.......................................tons and not more than tons~~
48  4. That the Charterers shall pay for the use and hire of the said Vessel at the rate of ▓▓▓▓ per day or pro rata, including overtime, net of address commission.
49  (and ▓▓▓▓ for vessel positional expenses,) all rates in United States Currency ~~per-ton on vessel's total deadweight carrying capacity, including bunkers and stores,~~
50  ~~on summer freeboard, per Calendar Month,~~ commencing on and from the day of her delivery, as aforesaid, and at the same rate for any part of a day month; hire to continue
51  until the hour of the day of her re-delivery in like good order and condition, ordinary wear and tear excepted, to the Owners (unless lost) on dropping last outward sea pilot,
52  One Safe port in charterers option, Singapore / South Japan Range including, Taiwan, full PRC, including Port Kelang, or in Charterers option on dropping last
53  outward sea pilot, 1 safe port Hamburg / Le Havre range, or, in Charterers option on dropping last outward sea pilot 1 safe port full Mediterranean range, port in
54  Charterers option, anytime day or night, Sundays and holidays included unless otherwise mutually agreed. Charterers are to give Owners 30/20/10 day's approximate
55  and 7/4/1 definite notice of vessel's re-delivery, and probable port. Tendering redelivery notice will render option null and void. No redelivery between 1st December – 1st
56  February during this Charter.
57  5. Hire to be paid with first hire from date of delivery, until the 1st / 00:00 hours of the following month, whilst hire thereafter to be payable on a monthly basis with
58  remittance value date to be the 20th of a month. Payment of said hire to be made in Hamburg as per Clause 77 in cash in United States Currency, see Clause 32, and for the
59  last half month or part of same the approximate amount of hire, and should same not cover the actual time, hire is to be paid for the balance day by day, as it becomes due, if
60  so required by Owners, unless bank guarantee or deposit is made by the Charterers, otherwise failing the punctual and regular payment of the hire, or bank guarantee, or on
61  any breach of this Charter Party, the Owners shall be at liberty to withdraw the vessel from the service of the Charterers, without prejudice to any claim they (the Owners) may
62  otherwise have on the Charterers. ~~Time to count from 7 a.m. on the working day~~
63  ~~following that on which written notice of readiness has been given to Charterers or their Agents before 4 p.m., but if required by Charterers, they~~
64  ~~to have the privilege of using vessel at once, such time used to count as hire.~~
65  Cash for vessel's ordinary disbursements at any port may be advanced as required by the Captain, by the Charterers or their Agents, subject to 2½% commission
66  and such advances shall be deducted from the hire. The Charterers, however, shall in no way be responsible for the application of such advances.
67  6. That the cargo or cargoes be laden and/or discharged in any dock or at any wharf or place that Charterers or their Agents may direct, provided the vessel can
68  safely lie always afloat at any time of  tide except ~~at such places where it is customary for similar size vessels to~~
69  ~~safely lie aground.~~
70  7. That the whole reach of the Vessel's Hold, Decks, and usual places of loading (not more than she can reasonably stow and carry), also
71  accommodations for Supercargo, if carried, shall be at the Charterers' disposal, reserving only proper and sufficient space for Ship's officers, crew, tackle, apparel, furniture,
72  provisions, stores and fuel.  ~~Charterers have the privilege of passengers as far as accommodations allow. Charterers~~
73  ~~paying Owners.....US$............per day per passenger for accommodations and meals. However, it is agreed that in case any fines or extra expenses are~~
74  ~~incurred in the consequence of the carriage of passengers, Charterers are to bear such risk and expense.~~
75  8. That the Captain shall prosecute his voyages with the utmost despatch, with due regard to the slow steaming clause if so instructed by Charterers' and
76  shall render all customary assistance with ship's crew and boats. The Captain (although appointed by the Owners), shall be under the orders and directions of the Charterers
77  as regards employment and agency; and Charterers are to load, stow, trim, lash, secure, unlash, unsecure, tally, and discharge, the cargo at their expense under the
78  supervision and responsibility of the Master, (as far as vessel seaworthiness is concerned, but without prejudice to Charterers responsibility to properly load,
79  stow, lash etc.) who is to sign Bills of Lading for cargo as presented, in conformity with Mate's and or Tally Clerk's receipts. See Clause 52 and Clause 70.
80  9. That if the Charterers shall have reason to be dissatisfied with the conduct of the Captain, Officers, or Engineers, the Owners shall on receiving particulars of the
81  complaint, investigate the same, and, if necessary, make a change in the appointments.
82  10. That the Charterers shall have permission to appoint a Supercargo, who shall accompany the vessel and see that voyages are prosecuted with the utmost despatch with



HPL-USOT 00202

83   *due regard to the slow steaming clause if so instructed by Charterers'.* He is to be furnished with free and suitable accommodation, and same fare as provided for
84   Captain's table, Charterers paying at the rate of U̶S̶ ▨▨▨▨ ̶e̶r̶ day. Owners to victual Pilots and Customs Officers, and when authorized by Charterers or their Agents to victual
85   T̶a̶l̶l̶y̶ ̶C̶l̶e̶r̶k̶s̶,̶ ̶S̶t̶e̶v̶e̶d̶o̶r̶e̶s̶ ̶F̶o̶r̶e̶m̶a̶n̶,̶ ̶e̶t̶c̶,̶ ̶C̶h̶a̶r̶t̶e̶r̶e̶r̶s̶ ̶p̶a̶y̶i̶n̶g̶ ̶a̶y̶ ̶t̶h̶e̶ ̶c̶u̶r̶r̶e̶n̶t̶ ̶r̶a̶t̶e̶ ̶p̶e̶r̶ ̶m̶e̶a̶l̶,̶ ̶f̶o̶r̶ ̶a̶l̶l̶ ̶s̶u̶c̶h̶ ̶v̶i̶c̶t̶u̶a̶l̶l̶i̶n̶g̶.̶ **See Clause 101**

86      11. That the Charterers shall furnish the Captain from time to time with all requisite instructions and sailing directions, in writing, *in writing*, and the Captain shall
87   keep a full and correct Log of the voyage or voyages. which are to be patent to the Charterers or their Agents, and furnish the Charterers, their Agents or Supercargo, when
88   required, with a true copy of daily Logs. showing the course of the vessel and distance run and the consumption of fuel.

89      1̶2̶.̶ ̶T̶h̶a̶t̶ ̶t̶h̶e̶ ̶C̶a̶p̶t̶a̶i̶n̶ ̶s̶h̶a̶l̶l̶ ̶u̶s̶e̶ ̶d̶i̶l̶i̶g̶e̶n̶c̶e̶ ̶i̶n̶ ̶c̶a̶r̶i̶n̶g̶ ̶f̶o̶r̶ ̶t̶h̶e̶ ̶v̶e̶n̶t̶i̶l̶a̶t̶i̶o̶n̶ ̶o̶f̶ ̶t̶h̶e̶ ̶c̶a̶r̶g̶o̶ ̶h̶o̶l̶d̶s̶ ̶a̶s̶ ̶i̶n̶s̶t̶r̶u̶c̶t̶e̶d̶ ̶b̶y̶ ̶t̶h̶e̶ ̶C̶h̶a̶r̶t̶e̶r̶e̶r̶s̶.̶

90      13.That the Charterers shall have the option of continuing this charter for a *further period of minimum 8 / maximum 12 months, +/- 15 days more or less in*
91   *Charterers option, which to be nominated latest September 3rd, 2015.* Hire rate for the optional period USD 15500 per day or pro rata, including overtime.
92   o̶n̶ ̶g̶i̶v̶i̶n̶g̶ ̶w̶r̶i̶t̶t̶e̶n̶ ̶n̶o̶t̶i̶c̶e̶ ̶t̶h̶e̶r̶e̶o̶f̶ ̶t̶o̶ ̶t̶h̶e̶ ̶O̶w̶n̶e̶r̶s̶ ̶o̶r̶ ̶t̶h̶e̶i̶r̶ ̶A̶g̶e̶n̶t̶s̶................................................d̶a̶y̶s̶ ̶p̶r̶e̶v̶i̶o̶u̶s̶ ̶t̶o̶ ̶t̶h̶e̶ ̶e̶x̶p̶i̶r̶a̶t̶i̶o̶n̶ ̶o̶f̶ ̶t̶h̶e̶ ̶f̶i̶r̶s̶t̶ ̶n̶a̶m̶e̶d̶ ̶t̶e̶r̶m̶,̶ ̶o̶r̶ ̶a̶n̶y̶ ̶d̶e̶c̶l̶a̶r̶e̶d̶ ̶o̶p̶t̶i̶o̶n̶.̶
93      1̶4̶.̶ ̶T̶h̶a̶t̶ ̶i̶f̶ ̶r̶e̶q̶u̶i̶r̶e̶d̶ ̶b̶y̶ ̶C̶h̶a̶r̶t̶e̶r̶e̶r̶s̶,̶ ̶t̶i̶m̶e̶ ̶n̶o̶t̶ ̶t̶o̶ ̶c̶o̶m̶m̶e̶n̶c̶e̶ ̶b̶e̶f̶o̶r̶e̶....................................................................a̶n̶d̶ ̶s̶h̶o̶u̶l̶d̶ ̶v̶e̶s̶s̶e̶l̶
94   n̶o̶t̶ ̶h̶a̶v̶e̶ ̶g̶i̶v̶e̶n̶ ̶w̶r̶i̶t̶t̶e̶n̶ ̶n̶o̶t̶i̶c̶e̶ ̶o̶f̶ ̶r̶e̶a̶d̶i̶n̶e̶s̶s̶ ̶o̶n̶ ̶o̶r̶ ̶b̶e̶f̶o̶r̶e̶.............................
95   b̶u̶t̶ ̶n̶o̶t̶ ̶l̶a̶t̶e̶r̶ ̶t̶h̶a̶n̶ ̶4̶ ̶p̶.̶m̶.̶ ̶C̶h̶a̶r̶t̶e̶r̶e̶r̶s̶ ̶o̶r̶ ̶t̶h̶e̶i̶r̶ ̶A̶g̶e̶n̶t̶s̶ ̶t̶o̶ ̶h̶a̶v̶e̶ ̶t̶h̶e̶ ̶o̶p̶t̶i̶o̶n̶ ̶o̶f̶ ̶c̶a̶n̶c̶e̶l̶l̶i̶n̶g̶ ̶t̶h̶i̶s̶ ̶C̶h̶a̶r̶t̶e̶r̶ ̶a̶t̶ ̶a̶n̶y̶ ̶t̶i̶m̶e̶ ̶n̶o̶t̶ ̶l̶a̶t̶e̶r̶ ̶t̶h̶a̶n̶ ̶t̶h̶e̶ ̶d̶a̶y̶ ̶o̶f̶ ̶v̶e̶s̶s̶e̶l̶'̶s̶ ̶r̶e̶a̶d̶i̶n̶e̶s̶s̶.̶

96      15. That in the event of the loss of time from deficiency and/or default and / or strike of officers and crew of men or deficiency of stores, fire, breakdown or damages
97   to hull, machinery or equipment grounding, detention by average accidents to ship or cargo, dry-docking for the purpose of examination or painting bottom, or by any other
98   cause preventing the full working of the vessel *unless this has been caused by Charterers and / or Charterers' servants*, the payment of hire shall cease for the time
99   thereby lost; and if upon the voyage the speed be reduced by defect in or breakdown of any part of her hull, machinery or equipment, *unless this has been caused by*
100  *Charterers, and / or Charterers' servants*, the time so lost, and the cost of any extra fuel consumed in consequence thereof, and all *direct* unavoidable extra expenses shall
101  be deducted from the hire. See also Clauses 35 / 40 / 41 / 52 / 54 / and 70

102     16. That should the Vessel be lost, money paid in advance and not earned (reckoning from the date of loss or being last heard of) shall be returned to the
103  Charterers *within 3 banking days*. The act of God, enemies, fire, restraint of Princes, Rulers and People, and all dangers and accidents of the Seas, Rivers, machinery,
104  Boilers and Steam Navigation, and errors of Navigation throughout this Charter Party, always mutually excepted. The vessel shall have the liberty to sail with or without pilots,
105  to tow and to be towed, to assist vessels in distress, and to deviate for the purpose of saving life and property.

106     17. T̶h̶a̶t̶ ̶s̶h̶o̶u̶l̶d̶ ̶a̶n̶y̶ ̶d̶i̶s̶p̶u̶t̶e̶ ̶a̶r̶i̶s̶e̶ ̶b̶e̶t̶w̶e̶e̶n̶ ̶O̶w̶n̶e̶r̶s̶ ̶a̶n̶d̶ ̶t̶h̶e̶ ̶C̶h̶a̶r̶t̶e̶r̶e̶r̶s̶,̶ ̶t̶h̶e̶ ̶m̶a̶t̶t̶e̶r̶ ̶i̶n̶ ̶d̶i̶s̶p̶u̶t̶e̶ ̶s̶h̶a̶l̶l̶ ̶b̶e̶ ̶r̶e̶f̶e̶r̶r̶e̶d̶ ̶t̶o̶ ̶t̶h̶r̶e̶e̶ ̶p̶e̶r̶s̶o̶n̶s̶ ̶a̶t̶ ̶N̶e̶w̶ ̶Y̶o̶r̶k̶,̶ ̶o̶n̶e̶ ̶t̶o̶ ̶b̶e̶ ̶a̶p̶p̶o̶i̶n̶t̶e̶d̶
107  b̶y̶ ̶e̶a̶c̶h̶ ̶o̶f̶ ̶t̶h̶e̶ ̶p̶a̶r̶t̶i̶e̶s̶ ̶h̶e̶r̶e̶t̶o̶,̶ ̶a̶n̶d̶ ̶t̶h̶e̶ ̶t̶h̶i̶r̶d̶ ̶b̶y̶ ̶t̶h̶e̶ ̶t̶w̶o̶ ̶s̶o̶ ̶c̶h̶o̶s̶e̶n̶;̶ ̶t̶h̶e̶i̶r̶ ̶d̶e̶c̶i̶s̶i̶o̶n̶ ̶o̶r̶ ̶t̶h̶a̶t̶ ̶o̶f̶ ̶a̶n̶y̶ ̶t̶w̶o̶ ̶o̶f̶ ̶t̶h̶e̶m̶,̶ ̶s̶h̶a̶l̶l̶ ̶b̶e̶ ̶f̶i̶n̶a̶l̶,̶ ̶a̶n̶d̶ ̶f̶o̶r̶
108  t̶h̶e̶ ̶p̶u̶r̶p̶o̶s̶e̶ ̶o̶f̶ ̶e̶n̶f̶o̶r̶c̶i̶n̶g̶ ̶a̶n̶y̶ ̶a̶w̶a̶r̶d̶,̶ ̶t̶h̶i̶s̶ ̶a̶g̶r̶e̶e̶m̶e̶n̶t̶ ̶m̶a̶y̶ ̶b̶e̶ ̶m̶a̶d̶e̶ ̶a̶ ̶r̶u̶l̶e̶ ̶o̶f̶ ̶t̶h̶e̶ ̶C̶o̶u̶r̶t̶.̶ ̶T̶h̶e̶ ̶A̶r̶b̶i̶t̶r̶a̶t̶o̶r̶s̶ ̶s̶h̶a̶l̶l̶ ̶b̶e̶ ̶c̶o̶m̶m̶e̶r̶c̶i̶a̶l̶ ̶m̶e̶n̶.̶ *See Clause 68*

109     18. That the Owners shall have a lien upon all cargoes, and all sub-freights *and sub hires* for any amounts due under this Charter, including General Average
110  contributions, and the Charterers to have a lien on the Ship for all monies paid in advance and not earned, and any overpaid hire or excess deposit to be returned at once;
111  Charterers will not suffer, nor permit to be continued, any lien or encumbrance incurred by them or their agents, which might have priority over the title and interest of the
112  owners in the vessel. See Clause 65

113     19. That all derelicts and salvage shall be for Owners' and Charterers' equal benefit after deducting Owners' and Charterers' expenses and Crew's proportion.
114  *General Average shall be adjusted, stated and settled, according* t̶o̶ to Rules 1 to 15, inclusive, 1̶7̶ ̶t̶o̶ ̶2̶2̶,̶ ̶i̶n̶c̶l̶u̶s̶i̶v̶e̶,̶ ̶a̶n̶d̶ ̶R̶u̶l̶e̶ ̶F̶ ̶o̶f̶ York-Antwerp Rules 1994, *in London.* i̶n̶
115  t̶h̶e̶ ̶U̶n̶i̶t̶e̶d̶ ̶S̶t̶a̶t̶e̶s̶ ̶a̶s̶ ̶m̶a̶y̶ ̶b̶e̶ ̶s̶e̶l̶e̶c̶t̶e̶d̶ ̶b̶y̶ ̶t̶h̶e̶ ̶c̶a̶r̶r̶i̶e̶r̶,̶ ̶a̶n̶d̶ ̶a̶s̶ ̶t̶o̶ ̶m̶a̶t̶t̶e̶r̶s̶ ̶n̶o̶t̶ ̶p̶r̶o̶v̶i̶d̶e̶d̶ ̶f̶o̶r̶ ̶b̶y̶ ̶t̶h̶e̶s̶e̶ ̶R̶u̶l̶e̶s̶,̶ ̶a̶c̶c̶o̶r̶d̶i̶n̶g̶ ̶t̶o̶ ̶t̶h̶e̶ ̶l̶a̶w̶s̶ ̶a̶n̶d̶ ̶u̶s̶a̶g̶e̶s̶ ̶a̶t̶ ̶t̶h̶e̶ ̶p̶o̶r̶t̶ ̶o̶f̶ ̶N̶e̶w̶ ̶Y̶o̶r̶k̶.̶ ̶I̶n̶ ̶s̶u̶c̶h̶
116  a̶d̶j̶u̶s̶t̶m̶e̶n̶t̶ ̶d̶i̶s̶b̶u̶r̶s̶e̶m̶e̶n̶t̶s̶ ̶i̶n̶ ̶f̶o̶r̶e̶i̶g̶n̶ ̶c̶u̶r̶r̶e̶n̶c̶i̶e̶s̶ ̶s̶h̶a̶l̶l̶ ̶b̶e̶ ̶e̶x̶c̶h̶a̶n̶g̶e̶d̶ ̶i̶n̶t̶o̶ ̶U̶n̶i̶t̶e̶d̶ ̶S̶t̶a̶t̶e̶s̶ ̶m̶o̶n̶e̶y̶ ̶a̶t̶ ̶t̶h̶e̶ ̶r̶a̶t̶e̶ ̶p̶r̶e̶v̶a̶i̶l̶i̶n̶g̶ ̶o̶n̶ ̶t̶h̶e̶ ̶d̶a̶t̶e̶s̶ ̶m̶a̶d̶e̶ ̶a̶n̶d̶ ̶a̶l̶l̶o̶w̶a̶n̶c̶e̶s̶ ̶f̶o̶r̶ ̶d̶a̶m̶a̶g̶e̶ ̶t̶o̶ ̶c̶a̶r̶g̶o̶
117  c̶l̶a̶i̶m̶e̶d̶ ̶i̶n̶ ̶f̶o̶r̶e̶i̶g̶n̶ ̶c̶u̶r̶r̶e̶n̶c̶y̶ ̶s̶h̶a̶l̶l̶ ̶b̶e̶ ̶c̶o̶n̶v̶e̶r̶t̶e̶d̶ ̶a̶t̶ ̶t̶h̶e̶ ̶r̶a̶t̶e̶ ̶p̶r̶e̶v̶a̶i̶l̶i̶n̶g̶ ̶o̶n̶ ̶t̶h̶e̶ ̶l̶a̶s̶t̶ ̶d̶a̶y̶ ̶o̶f̶ ̶d̶i̶s̶c̶h̶a̶r̶g̶e̶ ̶a̶t̶ ̶t̶h̶e̶ ̶p̶o̶r̶t̶ ̶o̶r̶ ̶p̶l̶a̶c̶e̶ ̶o̶f̶ ̶f̶i̶n̶a̶l̶ ̶d̶i̶s̶c̶h̶a̶r̶g̶e̶ ̶o̶f̶ ̶s̶u̶c̶h̶ ̶d̶a̶m̶a̶g̶e̶d̶ ̶c̶a̶r̶g̶o̶ ̶f̶r̶o̶m̶ ̶t̶h̶e̶ ̶s̶h̶i̶p̶.̶
118  A̶v̶e̶r̶a̶g̶e̶ ̶a̶g̶r̶e̶e̶m̶e̶n̶t̶ ̶o̶r̶ ̶b̶o̶n̶d̶ ̶a̶n̶d̶ ̶s̶u̶c̶h̶ ̶a̶d̶d̶i̶t̶i̶o̶n̶a̶l̶ ̶s̶e̶c̶u̶r̶i̶t̶y̶,̶ ̶a̶s̶ ̶m̶a̶y̶ ̶b̶e̶ ̶r̶e̶q̶u̶i̶r̶e̶d̶ ̶b̶y̶ ̶t̶h̶e̶ ̶c̶a̶r̶r̶i̶e̶r̶,̶ ̶m̶u̶s̶t̶ ̶b̶e̶ ̶f̶u̶r̶n̶i̶s̶h̶e̶d̶ ̶b̶e̶f̶o̶r̶e̶ ̶d̶e̶l̶i̶v̶e̶r̶y̶ ̶o̶f̶ ̶t̶h̶e̶ ̶g̶o̶o̶d̶s̶.̶ ̶S̶u̶c̶h̶ ̶c̶a̶s̶h̶ ̶d̶e̶p̶o̶s̶i̶t̶ ̶a̶s̶ ̶t̶h̶e̶ ̶c̶a̶r̶r̶i̶e̶r̶ ̶o̶r̶
119  h̶i̶s̶ ̶a̶g̶e̶n̶t̶s̶ ̶m̶a̶y̶ ̶d̶e̶e̶m̶ ̶s̶u̶f̶f̶i̶c̶i̶e̶n̶t̶ ̶a̶s̶ ̶a̶d̶d̶i̶t̶i̶o̶n̶a̶l̶ ̶s̶e̶c̶u̶r̶i̶t̶y̶ ̶f̶o̶r̶ ̶t̶h̶e̶ ̶c̶o̶n̶t̶r̶i̶b̶u̶t̶i̶o̶n̶ ̶o̶f̶ ̶t̶h̶e̶ ̶g̶o̶o̶d̶s̶ ̶a̶n̶d̶ ̶f̶o̶r̶ ̶a̶n̶y̶ ̶s̶a̶l̶v̶a̶g̶e̶ ̶a̶n̶d̶ ̶s̶p̶e̶c̶i̶a̶l̶ ̶c̶h̶a̶r̶g̶e̶s̶ ̶t̶h̶e̶r̶e̶o̶n̶,̶ ̶s̶h̶a̶l̶l̶,̶ ̶i̶f̶ ̶r̶e̶q̶u̶i̶r̶e̶d̶,̶ ̶b̶e̶ ̶m̶a̶d̶e̶ ̶b̶y̶ ̶t̶h̶e̶
120  g̶o̶o̶d̶s̶,̶ ̶s̶h̶i̶p̶p̶e̶r̶s̶,̶ ̶c̶o̶n̶s̶i̶g̶n̶e̶e̶s̶ ̶o̶r̶ ̶o̶w̶n̶e̶r̶s̶ ̶o̶f̶ ̶t̶h̶e̶ ̶g̶o̶o̶d̶s̶ ̶t̶o̶ ̶t̶h̶e̶ ̶c̶a̶r̶r̶i̶e̶r̶ ̶b̶e̶f̶o̶r̶e̶ ̶d̶e̶l̶i̶v̶e̶r̶y̶.̶ ̶S̶u̶c̶h̶ ̶d̶e̶p̶o̶s̶i̶t̶ ̶s̶h̶a̶l̶l̶,̶ ̶a̶t̶ ̶t̶h̶e̶ ̶o̶p̶t̶i̶o̶n̶ ̶o̶f̶ ̶t̶h̶e̶ ̶c̶a̶r̶r̶i̶e̶r̶,̶ ̶b̶e̶ ̶p̶a̶y̶a̶b̶l̶e̶ ̶i̶n̶ ̶U̶n̶i̶t̶e̶d̶ ̶S̶t̶a̶t̶e̶s̶ ̶m̶o̶n̶e̶y̶ ̶a̶n̶d̶ ̶b̶e̶
121  r̶e̶m̶i̶t̶t̶e̶d̶ ̶t̶o̶ ̶t̶h̶e̶ ̶a̶d̶j̶u̶s̶t̶e̶r̶.̶ ̶W̶h̶e̶n̶ ̶s̶o̶ ̶r̶e̶m̶i̶t̶t̶e̶d̶ ̶t̶h̶e̶ ̶d̶e̶p̶o̶s̶i̶t̶ ̶s̶h̶a̶l̶l̶,̶ ̶b̶e̶ ̶h̶e̶l̶d̶ ̶i̶n̶ ̶a̶ ̶s̶p̶e̶c̶i̶a̶l̶ ̶a̶c̶c̶o̶u̶n̶t̶ ̶a̶t̶ ̶t̶h̶e̶ ̶p̶l̶a̶c̶e̶ ̶o̶f̶ ̶a̶d̶j̶u̶s̶t̶m̶e̶n̶t̶ ̶i̶n̶ ̶t̶h̶e̶ ̶n̶a̶m̶e̶ ̶o̶f̶ ̶t̶h̶e̶ ̶a̶d̶j̶u̶s̶t̶e̶r̶ ̶p̶e̶n̶d̶i̶n̶g̶ ̶s̶e̶t̶t̶l̶e̶m̶e̶n̶t̶ ̶o̶f̶ ̶t̶h̶e̶
122  G̶e̶n̶e̶r̶a̶l̶ ̶A̶v̶e̶r̶a̶g̶e̶ ̶a̶n̶d̶ ̶r̶e̶f̶u̶n̶d̶s̶ ̶o̶r̶ ̶c̶r̶e̶d̶i̶t̶ ̶b̶a̶l̶a̶n̶c̶e̶s̶,̶ ̶i̶f̶ ̶a̶n̶y̶,̶ ̶s̶h̶a̶l̶l̶ ̶b̶e̶ ̶p̶a̶i̶d̶ ̶i̶n̶
123  U̶n̶i̶t̶e̶d̶ ̶S̶t̶a̶t̶e̶s̶ ̶m̶o̶n̶e̶y̶;̶
124     I̶n̶ ̶t̶h̶e̶ ̶e̶v̶e̶n̶t̶ ̶o̶f̶ ̶a̶c̶c̶i̶d̶e̶n̶t̶,̶ ̶d̶a̶n̶g̶e̶r̶,̶ ̶d̶a̶m̶a̶g̶e̶,̶ ̶o̶r̶ ̶d̶i̶s̶a̶s̶t̶e̶r̶,̶ ̶b̶e̶f̶o̶r̶e̶ ̶o̶r̶ ̶a̶f̶t̶e̶r̶ ̶c̶o̶m̶m̶e̶n̶c̶e̶m̶e̶n̶t̶ ̶o̶f̶ ̶t̶h̶e̶ ̶v̶o̶y̶a̶g̶e̶ ̶r̶e̶s̶u̶l̶t̶i̶n̶g̶ ̶f̶r̶o̶m̶ ̶a̶n̶y̶ ̶c̶a̶u̶s̶e̶ ̶w̶h̶a̶t̶s̶o̶e̶v̶e̶r̶,̶ ̶w̶h̶e̶t̶h̶e̶r̶ ̶d̶u̶e̶ ̶t̶o̶ ̶n̶e̶g̶l̶i̶g̶e̶n̶c̶e̶
125  o̶r̶ ̶n̶o̶t̶,̶ ̶f̶o̶r̶ ̶w̶h̶i̶c̶h̶,̶ ̶o̶r̶ ̶f̶o̶r̶ ̶t̶h̶e̶ ̶c̶o̶n̶s̶e̶q̶u̶e̶n̶c̶e̶ ̶o̶f̶ ̶w̶h̶i̶c̶h̶,̶ ̶t̶h̶e̶ ̶c̶a̶r̶r̶i̶e̶r̶ ̶i̶s̶ ̶n̶o̶t̶ ̶r̶e̶s̶p̶o̶n̶s̶i̶b̶l̶e̶,̶ ̶b̶y̶ ̶s̶t̶a̶t̶u̶t̶e̶,̶ ̶c̶o̶n̶t̶r̶a̶c̶t̶,̶ ̶o̶r̶ ̶o̶t̶h̶e̶r̶w̶i̶s̶e̶,̶ ̶t̶h̶e̶ ̶g̶o̶o̶d̶s̶,̶ ̶t̶h̶e̶ ̶s̶h̶i̶p̶p̶e̶r̶ ̶a̶n̶d̶ ̶t̶h̶e̶ ̶c̶o̶n̶s̶i̶g̶n̶e̶e̶,̶ ̶j̶o̶i̶n̶t̶l̶y̶ ̶a̶n̶d̶



HPL-USOT 00203

126 ~~severally, shall contribute with the carrier in general average to the payment of any sacrifices, losses, or expenses of a general average nature that may be made or incurred,~~
127 ~~and shall pay salvage and special charges incurred in respect of the goods. If a salving ship is owned or operated by the carrier, salvage shall be paid for as fully and in the~~
128 ~~same manner as if such salving ship or ships belonged to strangers.~~ *Hire not to contribute to General Average.* On a without prejudice basis, Owners agree to discuss with
129 Charterers possible commercial solution prior to declaring a General Average. Provisions as to General Average in accordance with the above are to be included in all bills of
130 lading issued hereunder.
131     20. Fuel used by the vessel while off hire, ~~also for cooking, condensing water, or for grates and stoves~~ to be agreed to as to quantity, and the cost of replacing same,
132 to be allowed by Owners.
133     21. ~~That as the vessel may be from time to time employed in tropical waters during the term of this Charter, Vessel is to be docked at a convenient place, bottom~~
134 ~~cleaned and painted whenever Charterers and Captain think necessary, at least once in every six months, reckoning from time of last painting,~~
135     ~~and payment of the hire to be suspended until she is again in proper state for the service.~~
136     *No Dry docking unless in case of emergency.*
137     22. ~~Owners shall maintain the gear of the ship as fitted, providing gear (for all derricks) capable of handling lifts up to three tons, also providing ropes, falls, slings~~
138 ~~and blocks. If vessel is fitted with derricks capable of handling heavier lifts, Owners are to provide necessary gear for same as on board, otherwise equipment and gear for~~
139 ~~heavier lifts shall be for Charterers' account. Owners also to provide on the vessel sufficient lights as fitted onboard for night works, in holds and to maintain same in efficient~~
140 ~~working order and vessel to give use of electric light when so fitted, but any additional lights over those on board to be at Charterers' expense.~~
141     ~~The Charterers to have the use of any gear on board.~~
142     23. ~~Vessel to work night and day, if required by Charterers, and all winches to be at Charterers' disposal during loading and discharging; steamer to provide one~~
143 ~~winchman per hatch to work winches day and night, as required. Charterers agreeing to pay officers, engineers, winchmen, deck hands and donkeymen for overtime work~~
144 ~~done in accordance with the working hours and rates stated in the ship's articles. If the rules of the port, or labor unions, prevent crew from driving winches, shore winchmen~~
145 ~~to be paid by Charterers. In the event of a disabled winch or winches, or insufficient power to operate winches, Owners to pay for shore engine, or engines, in lieu thereof, if~~
146 ~~required, and pay any loss of time occasioned thereby.~~
147     See Clause 33
148     24. ~~It is also mutually agreed that this Charter is subject to all the terms and provisions of and all the exemptions from liability contained in the Act of Congress of the~~
149 ~~United States approved on the 13th day of February, 1893, and entitled "An Act relating to Navigation of Vessels" etc.,"~~
150     ~~in respect of all cargo shipped under this charter to or from the United States of America. It is further subject to the following clauses, both of which are to be~~
151 ~~included in all bills of lading issued hereunder:~~
152                       U.S.A. Clauses Paramount
153 ~~This bill of lading shall have effect subject to the provisions of the Carriage of Goods by Sea Act of the United States, approved April 16, 1936, which shall be deemed to be~~
154 ~~incorporated herein, and nothing herein contained shall be deemed a surrender by the carrier of any of its rights or immunities or~~
155 ~~an increase of any of its responsibilities or liabilities under said Act. If any term of this bill of lading be repugnant to said~~
156 ~~Act to any extent, such term shall be void to that extent, but no further.~~
157                   Both to Blame Collision Clause
158 ~~If the ship comes into collision with another ship as a result of the negligence of the other ship and any act, neglect or default of the Master, mariner, pilot or the servants of the~~
159 ~~Carrier in the navigation or in the management of the ship, the owners of the goods carried hereunder will indemnify the Carrier against all loss or liability to the other or non-~~
160 ~~carrying ship or her owners in so far as such loss or liability represents loss of, or damage to, or any claim whatsoever of the owners of said goods, paid or payable by the~~
161 ~~other or non-carrying ship or her owners to the owners of said goods and set off, recouped or recovered by the other or non-carrying ship or her owners as part of their claim~~
162 ~~against the carrying ship or carrier.~~
163 See Clause 36/37 and Rider Clauses
164     25. ~~The vessel shall not be required to enter any ice-bound port or area, or any port or area where lights or light ships have been or are about to be withdrawn by~~
165 ~~reason of ice, or where there is risk that in the ordinary course of things the vessel will not be able on account of ice to safely enter the port or area, or to get out after having~~
166 ~~completed loading or discharging.~~
167     26. Nothing herein stated is to be construed as a demise of the vessel to the Time Charterers. The owners to remain responsible for the navigation of the vessel,
168 insurance, crew as well as physical control and operations of the vessel at all times, acts of pilot and tugboats and linesmen, except in case of strike and / or lockout and / or



HPL-USOT 00204

169   other circumstances beyond Owner's control, and all other matters, same as when trading for their own account.
170       27. A commission of 2½ per cent is payable by the Vessel and Owners to ,on hire earned and paid under this Charter, and also upon any continuation or extension
171   of this Charter.
172       28.No address commission of 2½ per cent payable to _____ on the hire earned and paid under this Charter
173
174       *Clause 29 to 102 and additional Clauses as attached hereto and deemed to form part of this Charter Party*

This Charter Party is a computer generated copy of the NYPE(Revised 3rd October 1946) form printed under license from the Association of Ship Brokers & Agents (U.S.A.), Inc., using software which is the copyright of Strategic Software Limited.

It is a precise copy of the original document which can be modified, amended or added to only by the striking out of original characters, or the insertion of new characters, such characters being clearly highlighted by underlining or use of color or use of a larger font and marked as having been made by the licensee or end user as appropriate and not by the author

*For the Owners*                                                    *For the Charterers*

**Hapag-Lloyd**
Hapag-Lloyd AG • Chartering

**Tim Petersen**

*Gerry Wang*
*Chief Executive Officer*

**Glenn R. Hards**

HPL-USOT 00205

# **<u>Exhibit 2</u>**





*Charter Party drawn up with two originals*

# Time Charter
### GOVERNMENT FORM
*Approved by the New York Produce Exchange*
November 6th, 1913 - Amended October 20th, 1921; August 6th, 1931; October 3rd, 1946

1  **This Charter Party,** made and concluded in ..........Hamburg............................................25ᵗʰ day of **July**...............~~19~~ 2013

2  Between **Kommanditgesellschaft MS "Santa Roberta" Offen Reederei GmbH & Co., Hamburg, Germany**..............................................

3  as Owners of the good ..**Liberian Flag**................ ~~Steamship/~~Motorship **"Santa Roberta" - for description see Clause 62**...... of...................

4  ~~of .......................... tons gross register, and ...................... tons net register, having engines of ................................ indicated horse power~~

5  ~~and with hull, machinery and equipment in a thoroughly efficient state, and classed ..........................................................................~~

6  ~~at .......................... of about ............... cubic feet bale capacity, and about ...................................... tons of 2240 lbs.~~

7  ~~deadweight capacity (cargo and bunkers, including fresh water and stores not exceeding one and one-half percent of ship's deadweight capacity,~~

8  allowing a minimum of fifty tons) on a draft of ......... feet ........... inches on ............ Summer freeboard, inclusive of permanent bunkers,

9  ~~which are of the capacity of about .......................................................... tons of fuel, and capable of steaming, fully laden, under good weather~~

10 ~~conditions about ............ knots on a consumption of about ...................... tons of best Welsh coal - best grade fuel oil - best grade Diesel oil,~~

11 now......**trading**.........................................................................................................................................

12 ............................ and ...**Hapag-Lloyd Aktiengesellschaft**..............................as Charterers of the City of ....**Hamburg, Germany**.......

13     **Witnesseth,** That the said Owners agree to let, and the said Charterers agree to hire the said vessel, from the time of delivery, for

14 ~~about~~ **a timecharter period of minimum 22 / maximum 26 months – exact period in Charterers' option** .........................

15 ...........................................................................................................within below mentioned trading limits.

16 **Subject to Charterers' pre-advice to the Owners,** Charterers to have the liberty to sublet the vessel for all or any part of the time covered by this

   Charter, **vessel not to be subletted to any party which have a blacklisting or sanction by other countries as consequence,** but Charterers remaining responsible for

17 the fulfillment of this Charter Party.

18 Vessel to be placed at the disposal of the Charterers, ~~at~~ **on arrival first sea pilot station Genoa any time, day or night, Saturdays, Sundays and**

19 **holidays included**..........................................................................................................................

20 ~~in such dock or at such wharf or place (where she may safely lie, always afloat, at all times of tide, except as otherwise provided in clause No. 6), as~~

21 ~~the Charterers may direct. If such dock, wharf or place be not available time to count as provided for in clause No. 5.~~  Vessel on her delivery to be

22 ready to receive **container cargo with clean-**~~swept~~ holds **to Charterers' satisfaction (in case of discrepancies mutual agreed independent official**
   **surveyor's report to be final for both parties)** and tight, staunch, strong and in every way fitted **and fit for the ISO-containers (including ISO-**
   **flatracks/platforms)** service, having water ballast, winches and

23 donkey boiler with sufficient steam power, or if not equipped with donkey boiler, then other power sufficient to run all the winches at one and the same

24 time (and with full complement of officers, seamen, engineers and firemen for a vessel of her tonnage), to be employed, in carrying lawful merchan-

25 dise **in ISO standard containers (including ISO-flatracks/platforms),** including **dangerous goods in accordance with IMDG-Code as amended**
   **and vessel's Certificate of Compliance for the Carriage of Dangerous Goods – see also Clause 63 -** ~~petroleum or its products, in proper containers,~~
   ~~excluding~~ ..................................................................................................................................

26 (vessel is not to be employed in the carriage of Live Stock)~~, but Charterers are to have the privilege of shipping a small number on deck at their risk,~~

CONFIDENTIAL

HPL-USOT 00242



FIRST ORIGINAL

27 ~~all necessary fittings and other requirements to be for account of Charterers)~~, in such lawful trades, between safe port and/or ports ~~in British North~~
28 ~~America, and/or United States of America, and/or West Indies, and/or Central America, and/or Caribbean Sea, and/or Gulf of Mexico, and/or~~
29 ~~Mexico, and/or South America~~ ................................................................................................................ ~~and/or Europe,~~
30 ~~and/or Africa, and/or Asia, and/or Australia, and/or Tasmania, and/or New Zealand, but excluding Magdalena River, River St. Lawrence between~~
31 ~~October 31st and May 15th, Hudson bay and all unsafe ports; also excluding, when out of season, White Sea, Black Sea and the Baltic,~~
32 **trading exclusions see Clause 67**..................................................................................................................
33 ..................................................................................................................................................
34 ..................................................................................................................................................
35 as the Charterers or their Agents shall direct, on the following conditions:
36     1.   That the Owners shall provide and pay for all provisions, wages and consular shipping and discharging fees of the Crew; shall pay for the
37 insurance of the vessel, also for all the cabin, deck, engine-room and other necessary stores, including boiler water, **non-compulsory garbage removal**
**(not resulting from cargo carried), gangway hire, unless compulsory, in which case for Charterers' account** and maintain her class and keep
38 the vessel in a thoroughly efficient state in hull, machinery and equipment for and during the service.
39     2.   That **whilst on hire** the Charterers shall provide and pay for all the fuel except as otherwise agreed, Port Charges, **customary and**
**compulsory** Pilotages, Agencies, Commissions,
40 Consular Charges (except those pertaining to the Crew), and all other usual expenses except those before stated, but when the vessel puts into
41 a port for causes for which vessel is responsible, then all such charges incurred shall be paid by the Owners. Fumigations ordered because of
42 illness of the crew to be for Owners account. Fumigations ordered because of cargoes carried or ports visited while vessel is employed under this
43 charter to be for Charterers account. ~~All other fumigations to be for Charterers account after vessel has been on charter for a continuous period~~
44 ~~of six months or more.~~
45     Charterers are to provide necessary dunnage and shifting boards, also any extra fittings requisite for a special trade or unusual cargo, but
46 Owners to allow them the use of any dunnage and shifting boards already aboard vessel. Charterers to have the privilege of using shifting boards
47 for dunnage, they making good any damage thereto.
48     3.   **See Clause 61** ~~That the Charterers, at the port of delivery, and the Owners, at the port of re-delivery, shall take over and pay for all fuel~~
~~remaining on~~
49 ~~board the vessel at the current prices in the respective ports, the vessel to be delivered with not less than ................ tons and not more than~~
50 ~~.................... tons and to be re-delivered with not less than ..................... tons and not more than ............... tons.~~
51     4.   That the Charterers shall pay for the use and hire of the said Vessel at the rate of ▉▉▉▉▉ ~~er~~ day/pro rata including overtime...........
52 ...................... ~~United States Currency per ton on vessel's total deadweight carrying capacity, including bunkers and~~
53 ~~stores, on ............................. summer freeboard, per Calendar Month,~~ commencing on and from the ~~day~~ time of her delivery, as aforesaid, and at
54 and after the same rate for any part of a ~~month~~ day **hire computation to be based on UTC**; hire to continue until the hour of the day of her re-
delivery in like good order and condition, ordinary
55 wear and tear excepted, to the Owners (unless lost) ~~at~~ **upon dropping last outward sea pilot one safe port Hamburg/Passero range or**
**Singapore/South Japan range, including Port Kelang, full People's Republic of China, Taiwan, Thailand, Vietnam, Indonesia (not east of**
**Jakarta), Malaysia mainland, Philippines and South Korea - always in Charterers' option, any time, day or night, Saturdays, Sundays and**
56 **holidays included**............................unless otherwise mutually agreed. Charterers are to give Owners not less than **30/20/10** days **approximate**
57 ~~notice of vessels~~ and 7/4/1 day(s) definite notice of ~~expected~~ date of re-delivery, and ~~probable~~ port.
58     5.   Payment of said hire to be made **(see Clause 77)** ~~in New York in cash in United States Currency, semi-~~ monthly **on the 20**[th] **of each**
**calendar month** ~~in advance,~~ and for the last ~~half~~ month or
59 part of same the approximate amount of hire, and should same not cover the actual time, hire is to be paid for the balance day by day, as it becomes
60 due, if so required by Owners, unless bank guarantee or deposit is made by the Charterers, otherwise failing the punctual and regular payment of the



HPL-USOT 00243

FIRST ORIGINAL

61  hire, or bank guarantee, or on any breach of this Charter Party, the Owners shall be at liberty to withdraw the vessel **or to withhold the vessel or any part of vessel's performance, when Owners not to be responsible for any claims, delays, consequences, extra expenses resulting therefrom** from the service of the Char-

62  terers, without prejudice to any claim they (the Owners) may otherwise have on the Charterers. ~~Time to count from 7 a.m. on the working day~~
63  ~~following that on which written notice of readiness has been given to Charterers or their Agents before 4 p.m., but if required by Charterers, they~~
64  ~~to have the privilege of using vessel at once, such time used to count as hire.~~

65  Cash for vessel's ordinary disbursements at any port may be advanced as required by the Captain, by the Charterers or their Agents, subject
66  to 2 ½ % commission and such advances shall be deducted from the hire.  The Charterers, however, shall in no way be responsible for the application
67  of such advances.

68  6.  That the cargo or cargoes be laden and/or discharged in any **safe** dock or at any **safe** wharf or place **including double banking – see also Clause 78 -** that Charterers or their Agents may

69  direct, provided the vessel can safely lie always afloat at any time of tide, except at such places where it is customary for similar size vessels to safely
70  lie aground **(however, see Clause 94).**

71  7.  That the whole reach of the Vessel's Hold, Decks, and usual places of loading (not more than she can reasonably stow and carry), also
72  accommodations for Supercargo, if carried, shall be at the Charterers' disposal, reserving only proper and sufficient space for Ship's officers, crew,
73  tackle, apparel, furniture, provisions, stores and fuel.  **Supercargo to be carried only under his and/or Charterers' sole responsibility.** ~~Charterers~~
~~have the privilege of passengers as far as accommodations allow, Charterers~~
74  ~~paying Owners ............. per day per passenger for accommodations and meals.  However, it is agreed that in case any fines or extra expenses are~~
75  ~~incurred in the consequence of the carriage of passengers, Charterers are to bear such risk and expense.~~ **See Clause 84.**

76  8.  That the Captain shall prosecute his voyages with the utmost despatch, and shall render all customary assistance with ship's crew and
77  boats.  The Captain (although appointed by the Owners), shall be under the orders and directions of the Charterers as regards employment and
78  agency; and Charterers are to load, stow, ~~and~~ trim, **discharge and lash/unlash** the cargo at their expense under the supervision of the Captain, who, **if requested by Charterers and/or their agents,** is to sign Bills of Lading for

79  cargo ~~as presented~~, in conformity with Mate's or Tally Clerk's receipts.

80  9.  That if the Charterers shall have reason to be dissatisfied with the conduct of the Captain, Officers, or Engineers, the Owners shall on
81  receiving particulars of the complaint, investigate the same, and, if necessary, make a change in the appointments.

82  10.  That the Charterers shall have permission to appoint ~~a Supercargo~~ **one or two Supercargoes**, who shall accompany the vessel **subject to sufficient space for 2ⁿᵈ Supercargo and Supercargo(es) to be carried under their Charterers' sole responsibility** and see that voyages are prosecuted

83  with the utmost despatch.  **They are** ~~He is~~ to be furnished with free accommodation, and same fare as provided for Captain's table, Charterers paying at the

84  rate of ~~$1.00~~ **USD 10.00** per **Supercargo** per day.  ~~Owners to victual Pilots and Customs Officers, and also, when authorized by Charterers or their~~
~~Agents, to victual Tally~~
85  ~~Clerks, Stevedore's Foreman, etc., Charterers paying at the current rate per meal, for all such victualling.~~ **All representation and all communication expenses to be compensated by Charterers at US$ 1,000.00 per month/pro rata for c/v/e together with hire due.**

86  11.  That the Charterers shall furnish the Captain from time to time with all requisite instructions and sailing directions, in writing, and the
87  Captain shall keep a full and correct Log of the voyage or voyages, which are to be patent to the Charterers or their Agents, and furnish the Char-
88  terers, their Agents or Supercargo, when required, with a true copy of daily Logs, **deck and engine, both in English,** showing the course of the vessel
and **speed**/distance run and the con-
89  sumption of fuel.

90  12.  ~~That the Captain shall use diligence in caring for the ventilation of the cargo.~~

HPL-USOT 00244

FIRST ORIGINAL

91     13. ~~That the Charterers shall have the option of continuing this charter for a further period of~~ ...............................................................
92 ~~.......................................................................................................................................................................................~~
93 ~~on giving written notice thereof to the Owners or their Agents ........... days previous to the expiration of the first named term, or any declared option.~~
94     14. That if required by Charterers, time not to commence before....**15**ᵗʰ **August 2013 - 00:01 hours local time**....................and should vessel
95 not have ~~given written notice of readiness~~ **been delivered** on or before **15**ᵗʰ **August 2013 - 23:59 hours local time** ~~but not later than 4 p.m.~~ Charterers or
96 their Agents to have the option of cancelling this Charter at any time not later than the day of vessel's readiness.
97     15. That in the event of the loss of time ~~from~~ **pursuant to** deficiency **and/or default** of men or stores, fire, breakdown or damages to hull, machinery or equipment,
98 grounding, detention by average accidents to ship or cargo, drydocking for the purpose of examination or painting bottom, or by any other cause
99 preventing the full working of the vessel, the payment of hire shall cease for the **actual** time ~~thereby~~ lost; and if upon the voyage the speed be reduced by
100 defect in or breakdown of any part of her hull, machinery or equipment, the **actual** time so lost, and the cost of any extra fuel consumed in consequence
101 thereof, and all **direct resulting** extra expenses shall be deducted from the hire. **In case of vessel's crane breakdown, vessel to be partial off-hire for the number of cranes affected, unless the broken down crane is the only crane required by Charterers for discharging/loading operation (in which case the vessel is fully off-hire).**
102     16. That should the Vessel be lost, money paid in advance and not earned (reckoning from the date of loss or being last heard of) shall be
103 returned to the Charterers at once. The act of God, enemies, fire, restraint of Princes, Rulers and People, and all dangers and accidents of the Seas,
104 Rivers, Machinery, Boilers and Steam Navigation, and errors of Navigation throughout this Charter Party, always mutually excepted.
105     The vessel shall have the liberty to sail with or without pilots, to tow and to be towed, to assist vessels in distress, and to deviate for the
106 purpose of saving life and property.
107     17. That should any dispute arise between Owners and the Charterers, the matter in dispute shall be referred to **GMAA at Hamburg. Procedure according to GMAA rules. The Arbitrators shall be familiar with shipping practice. This Charter Party to be governed by and construed in accordance with English law.** ~~three persons at New York,~~
108 ~~one to be appointed by each of the parties hereto, and the third by the two so chosen; their decision or that of any two of them, shall be final, and for~~
109 ~~the purpose of enforcing any award, this agreement may be made a rule of the Court. The Arbitrators shall be commercial men.~~
110     18. That the Owners shall have a lien upon all cargoes, ~~and~~ all sub-freights **and sub-hires (as far as belonging to Time-Charterers)** for any amounts due under this Charter, including General Aver-
111 age contributions, and the Charterers to have a lien on the Ship for all monies paid in advance and not earned, and any overpaid hire or excess
112 deposit to be returned at once. Charterers will not suffer, nor permit to be continued, any lien or encumbrance incurred by them or their agents, which
113 might have priority over the title and interest of the owners in the vessel.
114     19. That all derelicts and salvage shall be for Owners' and Charterers' equal benefit after deducting Owners' and Charterers' expenses and
115 Crew's proportion. ~~General Average shall be adjusted, stated and settled, according to Rules 1 to 15, inclusive, 17 to 22, inclusive, and Rule F of~~
116 ~~York-Antwerp Rules 1924, at such port or place in the United States as may be selected by the carrier, and as to matters not provided for by these~~
117 ~~Rules, according to the laws and usages at the port of New York. In such adjustment disbursements in foreign currencies shall be exchanged into~~
118 ~~United States money at the rate prevailing on the dates made and allowances for damage to cargo claimed in foreign currency shall be converted at~~
119 ~~the rate prevailing on the last day of discharge at the port or place of final discharge of such damage cargo from the ship. Average agreement or~~
120 ~~bond and such additional security, as may be required by the carrier, must be furnished before delivery of the goods. Such cash deposit as the carrier~~
121 ~~or his agents may deem sufficient as additional security for the contribution of the goods and for any salvage and special charges thereon, shall, if~~
122 ~~required, be made by the goods, shippers, consignees or owners of the goods to the carrier before delivery. Such deposit shall at the option of the~~
123 ~~carrier, be payable in United States money and be remitted to the adjuster. When so remitted the deposit shall be held in a special account at the~~

HPL-USOT 00245



124  place of adjustment in the name of the adjuster pending settlement of the General Average and refunds or credit balances, if any, shall be paid in
125  United States money.
126      In the event of accident, danger, damage, or disaster, before or after commencement of the voyage resulting from any cause whatsoever,
127  whether due to negligence or not, for which, or for the consequence of which, the carrier is not responsible, by statute, contract, or otherwise, the
128  goods, the shipper and the consignee, jointly and severally, shall contribute with the carrier in general average to the payment of any sacrifices,
129  losses, or expenses of a general average nature that may be made or incurred, and shall pay salvage and special charges incurred in respect of the
130  goods.  If a salving ship is owned or operated by the carrier, salvage shall be paid for as fully and in the same manner as if such salving ship or
131  ships belonged to strangers.
132      Provisions as to General Average in accordance with the above are to be included in all bills of lading issued hereunder.
133      20.  Fuel used by the vessel while off hire, also for cooking, condensing water, or for grates and stoves to be agreed to as to quantity, and the
134  cost of replacing same, to be allowed by Owners.
135      21.  That as the vessel may be from time to time employed in tropical waters during the term of this Charter, Vessel is to be docked at a
136  convenient place, bottom cleaned and painted whenever Charterers and Captain think necessary, at least once in every six months, reckoning from
137  time of last painting, and payment of the hire to be suspended until she is again in proper state for the service.
138  **Vessel not to drydock during currency of this Charter Party, except in case of emergency (next drydock is due in August 2017)** ....................
139  ............................................................................................................................................................................................................
140      22.  Owners shall maintain the gear of the ship as fitted, provided gear (for all **cranes** derricks) capable of handling lifts **as per vessel's
     description** up to three tons, also
141  providing ropes, falls, slings and blocks.  If vessel is fitted with derricks capable of handling heavier lifts, Owners are to provide necessary gear for
142  same, otherwise equipment and gear for heavier lifts shall be for Charterers' account.  Owners also to provide on the vessel **and in holds** lanterns and
     oil for
143  night work, and vessel to give use **sufficient** of electric light **as on board** when so fitted, but any additional lights over those on board to be at
     Charterers' expense.  The
144  Charterers to have the use of any gear on board the vessel.
145      23.  Vessel to work night and day, if required by Charterers.  , and all winches to be at Charterers' disposal during loading and discharging;
146  steamer to provide one winchman per hatch to work winches day and night, as required.  Charterers agreeing to pay officers, engineers, winchmen,
147  deck hands and donkeymen for overtime work done in accordance with the working hours and rates stated in the ship's articles. If the rules of the
148  port, or labour unions, prevent crew from driving winches, shore Winchmen to be paid by Charterers.  In the event of a disabled winch or winches, or
149  insufficient power to operate winches, Owners to pay for shore engine, or engines, in lieu thereof, if required, and pay any loss of time occasioned
150  thereby. **Compulsory watchmen and watchmen for cargo to be for Charterers' account, all other watchmen for account of the party ordering
     same.**
151      24.  It is also mutually agreed that this Charter is subject to all the terms and provisions of and all the exemptions from liability contained
152  in the Act of Congress of the United States approved on the 13th day of February, 1893, and entitled "An Act relating to Navigation of Vessels,
153  etc.," in respect of all cargo shipped under this charter to or from the United States of America.  It is further subject to the following clauses, both
154  of which are to be included in all bills of lading issued hereunder:
155      U.S.A. Clause Paramount
156  This bill of lading shall have effect subject to the provisions of the Carriage of Goods by Sea Act of the United States, approved April
157  16, 1936, which shall be deemed to be incorporated herein, and nothing herein contained shall be deemed a surrender by the carrier of
158  any of its rights or immunities or an increase of any of its responsibilities or liabilities under said Act.  If any term of this bill of lading
159  be repugnant to said Act to any extent, such term shall be void to that extent, but no further.
160      Both to Blame Collision Clause

HPL-USOT 00246

FIRST ORIGINAL

161  ~~If the ship comes into collision with another ship as a result of the negligence of the other ship and any act, neglect or default of the~~
162  ~~Master, mariner, pilot or the servants of the Carrier in the navigation or in the management of the ship, the owners of the goods carried~~
163  ~~hereunder will indemnify the Carrier against all loss or liability to the other or non-carrying ship or her owners in so far as such loss~~
164  ~~or liability represents loss of, or damage to, or any claim whatsoever of the owners of said goods, paid or payable by the other or non-~~
165  ~~carrying ship or her owners to the owners of said goods and set off, recouped or recovered by the other or non-carrying ship or her~~
166  ~~owners as part of their claim against the carrying ship or carrier.~~
167      25.  The vessel shall not be required to enter any ice-bound port, or any port where lights or light-ships have been or are about to be with-
168  drawn by reason of ice, or where there is risk that in the ordinary course of things the vessel will not be able on account of ice to safely enter the
169  port or to get out after having completed loading or discharging.
170      26.  Nothing herein stated is to be construed as a demise of the vessel to the Time Charterers.  The owners to remain responsible for the
171  navigation of the vessel, insurance, crew, and all other matters, same as when trading for their own account.
172      27.  A commission of ~~2 ½~~ ██████ r cent is payable by the Vessel and Owners to **Carl Bock & Co., Hamburg**
173  ================================================================================================
174  on hire earned and paid under this Charter, and also upon any continuation or extension of this Charter.
175      28.  ~~An address commission of 2 ½ per cent payable to ................................................. on the hire earned and paid under this Charter.~~

Clauses 29 to 95 and Appendix as attached hereto are deemed to be fully incorporated in this Charter Party.

THE OWNERS

For and on behalf of Owners
as per authority
CARL BOCK & CO.
(GMBH & CO.) KG

(as brokers only)

THE CHARTERERS

Hapag-Lloyd
Hapag-Lloyd AG
Chartering

ppa. gez. G. R. Hards

Tim Petersen

HPL-USOT 00247

# **Exhibit 3**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------x
HAPAG-LLOYD AKTIENGESELLSCHAFT,

               Plaintiff,

                           Case No.
    -against-             14-cv-9949 (VEC)

U.S. OIL TRADING LLC, O.W. BUNKER
GERMANY GMBH, O.W. BUNKER & TRADING
A/S, ING BANK N.V., CREDIT AGRICOLE
S.A.,

               Defendants.
--------------------------------x

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------x
HAPAG-LLOYD AKTIENGESELLSCHAFT,

               Plaintiff,

                           Case No.
    -against-             14-cv-10027 (VEC)

O'ROURKE MARINE SERVICES, L.P.,
L.L.P., O.W. BUNKER GERMANY GMBH,
O.W. BUNKER USA, INC., ING BANK N.V.,

               Defendants.
--------------------------------x

                     January 19, 2016
                     10:05 a.m.

         DEPOSITION of RULE 30(b)(6) WITNESS

                 NORBERT KOCK

```
 1                  Norbert Kock (1-19-16)
 2   or worldwide?
 3        A.     I think worldwide about 12,000.
 4   I'm not sure.  We have a lot of seafarers, we
 5   have a lot of land-based people, we have a lot
 6   of offices around worldwide.
 7        Q.     So worldwide, ballpark, about
 8   12,000 people?
 9        A.     I would assume that, yes.
10        Q.     And in Hamburg, about how many
11   people in the headquarters?
12        A.     In Hamburg, I think about a
13   thousand.  This is also an estimation, I don't
14   have the actual figures.
15        Q.     Do you understand that the cases
16   that you're appearing here in connection as
17   Hapag-Lloyd's corporate representative today
18   involve certain bunker purchasing transactions
19   with vessels that involved Hapag-Lloyd,
20   including the SANTA ROBERTA, the SEASPAN
21   HAMBURG, the VIENNA EXPRESS, the SOFIA EXPRESS,
22   the DERBY D and SIDNEY EXPRESS?
23        A.     Yes.
24        Q.     Did Hapag-Lloyd own or charter
25   those vessels?
```

Page 23

1                    Norbert Kock (1-19-16)

2        A.        The VIENNA EXPRESS is an owned

3    vessel.

4        Q.        We'll take them one by one as we go

5    through.  In connection with those vessels that

6    I just mentioned, did Hapag enter into a

7    contract with anyone whereby they purchased fuel

8    for those vessels?

9                    MR. FERNANDEZ:  Objection to the

10   form.

11       A.        The purchasing is done by

12   Hapag-Lloyd's purchasing department.  We are not

13   entitling any other party to do the purchasing

14   for us, we are the responsible purchasers.

15       Q.        Understood.  So in connection with

16   those vessels that I mentioned, those six

17   vessels, who did Hapag-Lloyd's bunker purchasing

18   department purchase the fuel from?

19       A.        We purchased the fuel from O.W.

20   Bunker in Germany.

21       Q.        O.W. Bunker Germany, GMBH?

22       A.        Yes.

23       Q.        Did you enter into any agreements

24   with O.W. Bunker Germany about the price of fuel

25   that you would purchase from them?

1                  Norbert Kock (1-19-16)

2          Q.      And it's for the supply of fuel to

3     the SANTA ROBERTA?

4          A.      The supplier has been mentioned as

5     U.S. Oil.  U.S. Oil has been mentioned as their

6     physical supplier.

7          Q.      Did Hapag-Lloyd have any control

8     over the selection of the physical supplier?

9          A.      No.

10          Q.      Did Hapag-Lloyd direct O.W. Germany

11     to use U.S. Oil for the supply of fuel in

12     Tacoma?

13          A.      No.

14          Q.      What is Norton Lilly?

15          A.      Norton Lilly is the local agency of

16     Hapag-Lloyd in this area.

17          Q.      Can you explain what a port agent

18     is?

19          A.      The agent is responsible to

20     coordinate also bunker supplies or lubricant

21     supplies between the local vendors and the

22     vessel; and in case of fuel oil supplies also

23     the engaged quality control, which is normally a

24     bunker surveyor engaged by us.

25          Q.      Was there a bunker surveyor engaged

1                    Norbert Kock (1-19-16)

2    in connection with this supply?

3          A.      Yes.

4          Q.      Who was that, if you recall?

5          A.      Oiltest.

6          Q.      Does a port agent such as Norton

7    Lilly, or a bunker surveyor such as Oiltest, do

8    they have any responsibility for purchasing

9    fuel?

10         A.      No.

11         Q.      They are not authorized by

12   Hapag-Lloyd to purchase fuel?

13         A.      No.

14         Q.      It's fair to say that they're

15   involved in the logistics of coordinating the

16   delivery after the order is placed?

17         A.      Yes.

18         Q.      Under remarks there's a designation

19   that says "HALO GTC2007 shall apply."  What does

20   that mean?

21         A.      They are referring to an earlier

22   accepted set of terms and conditions of

23   Hapag-Lloyd, which has been created in 2006, but

24   the business condition between O.W. Bunker

25   Germany and Hapag-Lloyd were begun or started in

Page 64

1                     Norbert Kock (1-19-16)

2       system.

3            Q.     So Mr. Gaus has to fill in the

4       information next to reference number, account,

5       seller in the middle of the page here on page

6       151?

7            A.     Yes.

8            Q.     The information about the local

9       physical supplier that would be used by O.W.

10      Germany, is that information that Mr. Gaus would

11      have received from Mr. Selmer?

12           A.     Yes, and it's needed for logistical

13      reasons.

14           Q.     Would this purchase order be

15      generated before or after the order was agreed?

16           A.     The order agreement has taken place

17      during a telephone call, this is the normal way

18      we are purchasing; and then the written order

19      would be processed later on, it could be the

20      same day or it could be the next day depending

21      on what time the order is placed.

22           Q.     On page 152 there are additional

23      provisions as to quality and quantity of the

24      fuel relating to a survey and sampling of the

25      fuel, do you see that?

1                    Norbert Kock (1-19-16)

2          A.        Um-hum.

3          Q.        Those are obligations that O.W.

4    Germany took on?

5          A.        This is a standard requirement of

6    Hapag-Lloyd.  These procedures are standard

7    procedures from Hapag-Lloyd.  Any vendor

8    supplier has to follow, or seller has to follow

9    these procedures.

10         Q.        Do you know if Hapag-Lloyd made any

11   payment on the supply to O.W. to the SANTA

12   ROBERTA?

13         A.        Yes.

14         Q.        What's your understanding?

15         A.        We make payment to the seller.

16                   MR. MALONEY:  Let me show you what

17   I will have marked as Exhibit 12.

18                   (Kock Exhibit 12, Document Bates

19   stamped HPL-USOT 80, marked for identification.)

20         Q.        This is a document Bates labeled

21   HPL-USOT 80.  Have you seen this document

22   before?

23         A.        Yes.

24         Q.        What is this document?

25         A.        This is the sales invoice of O.W.

Page 69

1                    Norbert Kock (1-19-16)

2        Q.      How did Hapag-Lloyd come into

3   possession of this document?

4        A.      This has been shown to me during

5   the preparation of this event.

6        Q.      Was that the first time you saw a

7   copy of this document?

8        A.      Yeah.

9        Q.      Did U.S. Oil Trading have an

10  account with Hapag-Lloyd?

11       A.      No.

12       Q.      And this is not an invoice that was

13  sent to Hapag-Lloyd?

14       A.      No.

15               (Kock Exhibit 14, Document Bates

16  stamped HPL-USOT pages 170 and HPL-USOT 171,

17  marked for identification.)

18       Q.      We have marked as Exhibit 14 a

19  document Bates labeled HPL-USOT pages 170 to

20  173.  Have you seen this email and its

21  attachments before?

22       A.      This is the confirmation of the

23  SANTA ROBERTA advising us about the received

24  fuel oil.

25       Q.      And on page 172 what does this

1                    Norbert Kock (1-19-16)

2    there was a dispute here in this respect.

3         Q.    Now turning to Exhibit 15 which is

4    Bates labeled HPL-USOT 172 to 173.  It appears

5    there are seven separate fuel transactions with

6    different vessels, is that correct?

7         A.    Yes.

8         Q.    One of those vessels is the SANTA

9    ROBERTA?

10        A.    Yes.

11        Q.    This document reflects payment made

12   to O.W. Germany on the SANTA ROBERTA and other

13   transactions?

14        A.    Yes.

15        Q.    Would you mind translating for the

16   record what the German text reads after "ladies

17   and gentlemen"?

18        A.    This is separate -- there is a

19   separate payment of the below mentioned items.

20   We did --

21             THE INTERPRETER:  On advisement of

22   the correctness.

23        A.    Of the supplies.

24             THE INTERPRETER:  Of the supplies

25   or.

Page 89

1                    Norbert Kock (1-19-16)

2          A.     Right.

3          Q.     There are again some stamps on the

4    invoice.  Was this booked by Hapag-Lloyd's

5    accounting department in October 28th of 2014?

6          A.     Yes.  You like the name.  It has

7    been booked by the accounting manager,

8    Mrs. Yaylaoglu.  I think she's coming from

9    Turkey.

10         Q.     Do you know whether this invoice

11   was paid by Hapag-Lloyd to O.W. Germany?

12         A.     Yes.

13         Q.     Yes, it was paid?

14         A.     No.  Wait.  Due date November 15th.

15   I strongly believe we have stopped it.

16         Q.     Ordinarily the terms of payment are

17   within 30 days from the date of delivery listed

18   there on the invoice?

19         A.     Right, providing the invoice is

20   coming within 14 days or 15 days after supply.

21   If not, we are paying 15 days after receipt of

22   the invoice.

23                    MR. MALONEY:  I think it's a good

24   time for a lunch break.

25                    (Lunch recess taken at 12:54 p.m.)

1                    Norbert Kock (1-19-16)

2                    MR. MALONEY:  We're back from

3     lunch.

4          Q.     I'm going to hand you a document

5     marked as Kock Exhibit 24, document Bates

6     labeled HPL-USOT 00115.

7                    Is this email and attachment from

8     the SOFIA EXPRESS?

9          A.     Yes.

10         Q.     What does this document refer to?

11         A.     It's a bunker requisition for the

12    Port of Tacoma on the 29th of October, coming

13    from the vessel's master.

14         Q.     Do you know, was the SOFIA EXPRESS

15    owned by Hapag-Lloyd?

16         A.     This is a Hapag-Lloyd vessel.

17         Q.     Was Hapag also operating that

18    vessel?

19         A.     Yes.

20         Q.     In October of 2014?

21         A.     Yes.

22         Q.     This email went to the bunker

23    purchasing department?

24         A.     Yes.  To the requirement section,

25    3.

Page 94

1                    Norbert Kock (1-19-16)

2          Q.      It's dated November 1st of 2014?

3          A.      Yes.

4          Q.      This copy is a little bit hard to

5   read.  Underneath the line items for quantity

6   supplied and quality there's a notation that

7   it's a "non-taxable delivery abroad."

8                  Do you have an understanding of

9   what that means?

10         A.      No.

11         Q.      I can't read the handwriting on the

12  right.  Do you have any understanding of what

13  that notation refers to?

14         A.      It looks like that a claim has been

15  issued on this supplier and the payment, the

16  normal payment run has been stopped due to this

17  claim.

18         Q.      Are you referring to a claim with

19  respect to the quantity or quality of fuel

20  delivered, or something else?

21         A.      In this specific case I can't

22  remember.

23         Q.      It's your understanding that this

24  invoice has not been paid, correct?

25         A.      Yes.

Page 96

1                 Norbert Kock (1-19-16)

2    or liters or cubic meters, and if the product

3    density is analyzed lighter than the given

4    density on the bunker delivery receipt, you will

5    calculate a loss to the shipowner because this

6    is a pure commercial claim.

7         Q.    Would the bunker purchasing

8    department ever send a claim like this to the

9    local physical supplier?

10         A.    No.  We have no relation to this

11    physical supplier, we have no contract with

12    them.

13         Q.    The information on page 127 details

14    the claim that Ms. Niemeyer made?

15         A.    Yes.  This is the fuel survey

16    report we received from the attending surveyor

17    who was at the scene witnessing the quantity

18    determination onboard of the bunker barge, and

19    witnessing also the sample drawing, and then

20    arranging later on the analysis here.

21         Q.    Does the review of that email

22    refresh your recollection as to whether that

23    refers to the claim that's indicated on the

24    invoice?

25         A.    It looks like, yes.

1                    Norbert Kock (1-19-16)

2      Tacoma on October 18, 2014.  The original

3      documents will follow by courier."

4           Q.     The attachment to this email on

5      page 200, is that the invoice from O.W. Germany

6      to Hapag-Lloyd?

7           A.     Yes.

8           Q.     Again, it was booked on October 29,

9      2014 by Hapag-Lloyd's accounting department?

10          A.     Yes.

11          Q.     This invoice also was not paid?

12          A.     Not paid, the security was issued.

13                 (Kock Exhibit 32, Document Bates

14     stamped HPL-USOT 197 to HPL-USOT 198, marked for

15     identification.)

16          Q.     We have marked as Exhibit 32 a

17     document Bates labeled HPL-USOT 197 to 198.

18     Have you seen this document before, sir?

19          A.     Yes.

20          Q.     What is this document?

21          A.     This is an email to our requirement

22     section 3, as well as to our ship management

23     department, confirming the bunker delivery at

24     Tacoma on 18/10/2014.

25                 MR. MALONEY:  Let's go off the

Page 109

1                    Norbert Kock (1-19-16)

2          Q.     To not --

3          A.     We are not interested to allow them

4    to know who is competing to maybe contact each

5    other to manipulate prices.

6          Q.     There's no reference to any local

7    physical suppliers on page 42 and 43, is there?

8          A.     No.

9          Q.     Do you know if this inquiry was

10   sent directly to O'Rourke Marine Services?

11         A.     This inquiry has not been sent to

12   O'Rourke.

13         Q.     Did Hapag-Lloyd have any

14   relationship with O'Rourke Marine Services

15   directly?

16         A.     No, no relationship directly.  We

17   only have relationship to sellers accepting our

18   terms and conditions of purchasing.

19         Q.     O.W. Germany accepted Hapag-Lloyd's

20   terms and conditions?

21         A.     Yes.

22         Q.     Did U.S. Oil Trading accept

23   Hapag-Lloyd's terms and conditions?

24                MR. KEOUGH:  Objection.

25         A.     We had no contact with these guys.

1                    Norbert Kock (1-19-16)

2    and that's a reference to this ARA contract.

3                    So if I understand you correctly,

4    the ARA contract does not have any relevance to

5    bunker transactions at U.S. ports.  So my

6    question is, is this still correct, that in the

7    normal course of business Hapag would remit

8    payment to O.W. Germany for bunker transactions

9    taking place at U.S. ports?

10                   MR. KEOUGH:  Objection to the form.

11                   MR. FERNANDEZ:  Objection.

12        A.    Yes.

13        Q.    So even though this contract in

14   Exhibit 3 might not be relevant, payment would

15   still be remitted from Hapag to O.W. Germany for

16   bunker transactions for which O.W. Germany

17   received the nomination?

18                   MR. FERNANDEZ:  Objection to the

19   form.

20                   MR. KEOUGH:  Objection.

21        Q.    In other words, Hapag would not pay

22   a physical supplier directly?

23        A.    No.

24        Q.    Never.  Okay.  Did Hapag ever

25   receive invoices directly from the physical

1                    Norbert Kock (1-19-16)

2     suppliers for bunker nominations awarded to O.W.

3     Germany?

4          A.     There is a chance that this has

5     been done in the course of bankruptcy when we

6     had to cover on a very short notice bunker

7     deliveries in the Port of Antwerp and Rotterdam.

8          Q.     Prior to the bankruptcy did that

9     ever occur?

10         A.     No, not prior.

11         Q.     Let's look at what has been marked

12    as Exhibit 47, and this is Mr. Kock's

13    Declaration from action 15-cv-6718, which was

14    transferred from the U.S. District Court of the

15    Western District of Washington to the Southern

16    District of New York.

17               Sir, do you recognize this

18    document?

19         A.     Yes.

20         Q.     This is a declaration that you

21    signed on behalf of Hapag-Lloyd?

22         A.     Yes.

23         Q.     I take it then that you reviewed

24    this document for the accuracy of its contents

25    before signing?

```
 1                    Norbert Kock (1-19-16)
 2                    MR. KEOUGH:  Objection to the form.
 3         A.         Probably, yes.
 4         Q.         But that's not what occurred here?
 5         A.         No.
 6         Q.         In footnote 2 of your declaration
 7    you say you completely disagree with U.S. Oil's
 8    characterization of O.W. Denmark as a bunker
 9    broker.
10                    Again, I believe you've answered
11    this from your perspective.  From Hapag's
12    perspective O.W. Germany was its contractual
13    counterparty, correct?
14         A.         O.W. Germany was our contractual
15    counterparty.
16         Q.         Hapag-Lloyd did not contract with
17    O.W. Denmark in these transactions?
18         A.         Never.
19         Q.         And O.W. Germany was a trader in
20    part because it agreed to A, sell the bunker
21    fuel to Hapag-Lloyd; and B, agree to accept
22    Hapag-Lloyd's terms and conditions; and C,
23    assume the risk for that sale?
24         A.         That's right.
25                    MR. KEOUGH:  Objection.
```

Page 138

                         Norbert Kock (1-19-16)

1
2    parties which could be an in between.
3         Q.     Is it fair so say then that Hapag
4    did not care what happened downstream of O.W.
5    Germany in terms of dealing with subcontractors,
6    physical suppliers?
7              MR. KEOUGH:  Objection.
8         A.     That's not our business.
9         Q.     If I understand correctly from what
10   you said a few minutes ago, O.W. Germany's
11   solicitation of business, as having the ability
12   to serve as a one-stop shop, satisfied Hapag's
13   upper management that they could begin doing
14   business with O.W. Germany in 2007, is that
15   correct?
16             MR. FERNANDEZ:  Objection to the
17   form.  You can answer the question.
18        A.     Yes, it seems so.
19        Q.     So if I understand sort of as a
20   synthesis of what you said already, Hapag-Lloyd
21   never authorized or pointed O.W. Germany as an
22   agent to order fuel on Hapag's behalf, is that
23   correct?
24             MR. KEOUGH:  Objection.
25        A.     Never.

Page 139

1                    Norbert Kock (1-19-16)

2        Q.      Did Hapag-Lloyd ever advise U.S.

3   Oil or O'Rourke Marine that O.W. Germany was

4   acting as an agent of Hapag-Lloyd?

5        A.      No.

6        Q.      Let's take a look at Exhibit H 1

7   which is attached to your declaration toward the

8   back.  I would also like you to take a look at

9   Exhibit 3, the third page of Exhibit 3 which is

10  Bates stamped USOT 000103 through 107.  I want

11  you to compare these two.

12              It seems like we have two sets of

13  terms and conditions used by Hapag-Lloyd.  The

14  version attached to Exhibit 3 appears to be

15  3 pages long, and the version appearing at

16  Exhibit H 1 of your declaration is 5 pages long.

17              Do you understand what the

18  difference is between these two versions?

19       A.      The first version here which was

20  dated 2006, this is the version we were

21  discussing earlier today, which has been always

22  mentioned by O.W. as the terms and conditions of

23  2007.

24       Q.      And that's the version attached as

25  Exhibit H 1 to your declaration?

Page 141

1                    Norbert Kock (1-19-16)

2      Germany?

3            A.      Yeah, but it has been also

4      confirmed by O.W. in their order.

5            Q.      In their sales order confirmations.

6      Even though Hapag's purchase order confirmations

7      refer to the latest edition, it's the sales

8      order confirmation and O.W. Germany's

9      identification of the 2006 version that apply?

10           A.      Yes.

11                   MR. KEOUGH:  Objection.

12           Q.      Correct me if I'm wrong, but I

13     believe you testified earlier that Hapag did not

14     control O.W. Germany's selection of a physical

15     supplier or a subcontractor for the purchase of

16     a bunker fuel that had been supplied to Hapag?

17                   MR. KEOUGH:  Objection.

18           A.      This is not our business.

19           Q.      So Hapag did not instruct O.W.

20     Germany to use certain physical suppliers at

21     various ports?

22           A.      No.

23                   MR. KEOUGH:  Objection.

24                   MR. HEILIG:  Let's take a 3-minute

25     break and mark some exhibits.

Page 154

1                    Norbert Kock (1-19-16)

2          Q.      I believe we discussed a bit about

3    Norton Lilly and Oiltest, is that correct?

4          A.      Yes.

5          Q.      If I understand correctly, Norton

6    Lilly was the local agent at the port?

7          A.      That's right.

8          Q.      And Oiltest was the surveyor

9    appointed to essentially run quality control on

10   the fuel specs?

11         A.      Yes, and quality.

12         Q.      What would be the purpose of the

13   email at pages 154 to 155?

14         A.      To inform the local agent, the

15   vessel, the stowage planners, as well as the

16   attending surveyor about this order we did.

17         Q.      So it's really logistics and

18   coordinating the physical supplier at the port?

19         A.      It's only logistics.

20         Q.      Neither Norton Lilly nor Oiltest

21   plays any part in the negotiation or the

22   formation of a contract for the purchase of fuel

23   oil?

24         A.      No.

25         Q.      Do you know whether Hapag's

Page 158

1                    Norbert Kock (1-19-16)

2     claim was valid, there would be an adjustment in

3     price to O.W. Germany's invoice to Hapag-Lloyd?

4          A.     That's right.

5          Q.     Irrespective of whether or not

6     there would be a corresponding reduction or

7     adjustment in price of the physical supplier's

8     invoice to O.W.?

9          A.     We have no relation to the physical

10    supplier.  We are just dealing with O.W.

11    Germany.

12         Q.     This all stems from that issue in

13    the '90s where you dealt with the broker who

14    simply washed his hands with the situation, and

15    left Hapag with the recourse?

16         A.     Yes.

17         Q.     Let's take a look at Exhibit 14.  I

18    believe this was an email from the vessel

19    attaching the bunker delivery note that was sent

20    directly to Hapag?

21         A.     Yes.

22         Q.     Would Hapag have also received a

23    copy of the bunker delivery note from O.W.

24    Germany at some point?

25         A.     It could have been done at some

Page 204

```
 1                    Norbert Kock (1-19-16)
 2          A.      I don't know.
 3                  MR. FERNANDEZ:   Let me just note
 4     he's already indicated that as far as in the
 5     30(b)(6) he wouldn't be comfortable on the lien
 6     issue, so it's not his area of expertise for
 7     purposes of the 30(b)(6).
 8          Q.      Would you turn to paragraph 12.
 9     Would you look at paragraph 12, it's on page 4
10     of 8.  Do you see that?
11          A.      Yes.
12          Q.      In that paragraph you describe that
13     the fuel department evaluated the request for
14     bunkers for the VIENNA EXPRESS, right?
15          A.      Yes.
16          Q.      You say, "Based upon pricing,
17     quality and energy content the fuel department
18     ordered the fuel to be delivered to the VIENNA
19     EXPRESS from O.W. Germany," correct?
20          A.      Yes.
21          Q.      You knew that for that order U.S.
22     Oil Trading was delivering the fuel to the
23     vessel in Tacoma, right?
24                  MR. FERNANDEZ:   Objection.
25          A.      You need to know who was delivering
```

Page 205

1                   Norbert Kock (1-19-16)

2    or who was going to deliver.

3          Q.     And in this case you knew it would

4    be U.S. Oil, right?

5          A.     It has to be coordinated, just for

6    logistical reasons.

7          Q.     Hapag-Lloyd has to do that

8    coordination, right?

9          A.     No.  The local agent, Norton Lilly.

10         Q.     For Hapag-Lloyd, right?

11         A.     Yes.

12         Q.     So you know that U.S. Oil is going

13   to be the party that's supplying the oil for

14   that order, correct?

15         A.     Yes.

16                MR. FERNANDEZ:  Objection.

17                MR. HEILIG:  Objection.

18         Q.     Now, in this paragraph 12 you did

19   not attach any of the price comparisons that

20   you've testified about here today, right?

21         A.     Um-hum.

22         Q.     Was there a reason that you didn't

23   include that price comparison as an exhibit to

24   paragraph 12?

25         A.     No.

# **Exhibit 4**

**O.W. Bunker Germany GmbH**
**WW Division**

((W)) **Bunker**

Hapag-Lloyd AG
Ballindamm 25
D-20095 Hamburg
Germany

Neumühlen 11
D-22763 Hamburg
Germany
Phone: +49 40 3255900
Fax: +49 40 330471
Tax No. / Steuer Nr. 41/768/03458
E-mail: trading@owbunker.de
Internet: http://www.owbunker.com
Managing director: Götz Lehsten
HR B 100089
ING Bank N.V.
IBAN: NL26 INGB 0020 1180 31
IBAN: NL10 INGB 0651 3696 81
SWIFT: INGBNL2A

## Sales Order Confirmation

Sales Order No.     119-28179

We are hereby pleased to acknowledge receipt of your order as follows :

| | |
|---|---|
| Vessel | SANTA ROBERTA (IMO: 9227326) |
| Port | TACOMA |
| Delivery date | 9. October 2014 |
| Seller | O.W. Bunker Germany GmbH |
| Your ref. | |
| Account | MASTER AND/OR OWNER AND/OR CHARTERERS AND/OR MV SANTA ROBERTA AND/OR HAPAG-LLOYD AG |

Hamburg   1. October 2014

| Quantity | Unit | Product / Quality | Curr | Price | Unit | Supplier |
|---|---|---|---|---|---|---|
| 2.700,00 | MT | Fueloil 700 CST 3,5% | USD | 554,00 | MT | US OIL |
| 1,00 | LPS | Booming fee | USD | 0,00 | LPS | US OIL |

| | |
|---|---|
| Agent | NORTON LILLY |
| Payment | WITHIN 30 DAYS FROM DATE OF DELIVERY UPON PRESENTATION OF INVOICE (ORIGINAL/TELEX/FAX). COPY OF DELIVERY RECEIPT WILL BE FORWARDED WHEN WE HAVE RECEIVED SAME. |
| Remarks | all per ISO8217 2005(E) HALO GTC2007 shall apply. |

We thank you for this nomination.

Kind Regards

**Karl Heinz Selmer**

| | |
|---|---|
| Direct | +49 4032 5590 12 |
| Mobile | +49 151 276 276 80 |
| Yahoo ID | khse_owbunker |
| E-Mail | khse@owbunker.de |
| Office E-Mail | trading@owbunker.de |

OWB SO V1.10_STAN     01.10.2014   11:16:20  (CET)

Seite 1 von 3

HPL-USOT 00074

## O.W. Bunker Germany GmbH
## WW Division



TERMS AND CONDITIONS.
--------------------------------

**SAMPLES:**

Measuring and sampling to be done at barge/tanktruck/shoreside manifold, and receiving Vessels crew is requested to witness and verify the measuring of quantity and the drawing and sealing of samples. These verified quantities as noted in the BDR aswell as these samples taken are the only ones deemed representative, and any dispute regarding quality to be settled by testing these retained samples by an independent laboratory at port/place of delivery, and result of this testing is deemed to be final and binding for both parties.

**TERMS:**

The sale and delivery of the marine fuels described above are subject to the OW Bunker Group's Terms and Conditions of sale(s) for Marine Bunkers. The acceptance of the marine bunkers by the vessel named above shall be deemed to constitute acceptance of the said general terms applicable to you as 'Buyer' and to O.W. Bunker Germany GmbH as 'Seller'.
The fixed terms and conditions are well known to you and remain in your possession. If this is not the case, the terms can be found under the web address:
http://owbunker.com/wp-content/uploads/2013/12/OWB_GTC_ValidFrom01092013.pdf

**GUIDELINES FOR RECEIVING BUNKERS:**

We strongly urge you to forward the information regarding: General instructions and Guidelines for Bunkering, for Receiving Vessels, on page 3, soonest possible to your Chief Engineer onboard.Following the suggested Guidelines should minimize risk of quantity disputes.Please bear in mind that barge figures are the sole valid quantity determination, wherefore Chief Engineer's attendance onboard the barge is extremely important.

**OTHERWISE:**

Any errors or omissions in above Confirmation should be reported immediately.

PLEASE INFORM US BY RETURN IF ABOVE NOMINATION DETAILS ARE NOT IN ACCORDANCE WITH YOUR UNDERSTANDING.

## O.W. Bunker Germany GmbH
## WW Division



GENERAL INSTRUCTIONS AND GUIDELINES FOR BUNKERING, FOR RECEIVING VESSELS

BEFORE BUNKERING:

Please make sure to check all information given by the supplier on Bunker Requisition Form or such similar form as the supplier presents via the barge. If you notice changes in quantity or quality please urgently contact the relevant person in charge in your own operations to have same verified.

Make sure to witness and verify initial measurements and ullaging onboard the barge before, ALL tanks to be checked and measured including actual temperature of cargo -- also including those tanks said not to be included in the particular supply (idle tanks). Compare measurements and verify the quantities as per barge ullage tables. When in full agreement please sign the ullage/sounding report for Before Supply figures. If any disagreements with the measurements, temperature and thereby figures please advise this on the Sounding form or, if not allowed, on separate Letter of Protest (make sure to obtain signature and stamp from barge Master for receipt).

If surveyor attends please ensure the surveyor also participates in measuring all barge tanks before supply and verify the figures.

DURING BUNKERING:

Always place a watchman to witness safe operation including also proper and correct sampling. The watchman must ensure that sampling is done properly, as continuous drip sampling throughout the delivery, and that clean devices are used for sampling. Also the watchman must witness proper and correct division into minimum 4 (four) clean and new identical sample bottles, including proper labeling and sealing of ALL samples. Make sure original sample (cubitainer) is shaken vigorously for 3 minutes before splitting into the 4 sample bottles and that bottles are filled in several passes.  All seal numbers to be inserted into the Bunker Delivery Receipt (BDR). The MARPOL sample must be one of these samples drawn under witnessing.

The watchman must pay special attention to the bunker hose, and any un-agreed attempts to transfer air via same should cause immediate stoppage unless the use of air is caused by stripping of barge tanks, which stripping to be agreed in advance by both parties. If air is blown on continued basis, and stoppage on the supply not possible for any reason, the incident to be stated on a Letter of Protest, which should also contain the time (hours from/to) that airblow was notified.

It is known in some areas that the so-called Cappucino Effect may be used or attempted to be used during supply. Pay special attention hereto and take all necessary precautions to observe, which includes:
- During tank measurements before it should be notified whether there are signs of air on the measuring tape used for ullaging.
- Look carefully for any signs of bubbles or similar on the surface of the fuel when it is still onboard the barge.
- Agree with the barge when and if they are going to make stripping of their tanks.
- Check and note the draft fore, mid and aft on the barge before and after supply to compare.
- If any signs at all of cappuccino or similar (except eventual stripping, agreed in advance), please stop the supply immediately and compare supply quantities made so far.
- Contact vessel operator in charge and request notification to the Seller and Supplier immediately.
- If surveyor attending please ensure that the surveyor signs a Letter of Protest also.
- After stopping the bunker supply please wait minimum 1 hour to await bubbles to disappear and re-measure the barge jointly with barge Master.

AFTER COMPLETION:

Repeat the measurement, sounding and ullaging of the barge, including verification of temperature of each tank. Make sure also on completion to verify contents of ALL tanks, including those being idle.

Report (ullage) must be signed by all parties involved, including eventual nominated surveyor. If disagreements with the figures (mm, temperature) a Letter of Protest to be issued, but also such specific disagreements to be stated on the Ullage report covering "after" supply.

QUANTITY COMPLAINTS:

Receiving Vessel to inform discrepancies in writing latest upon completion of taking the bunkers.

HPL-USOT 00076

# **<u>Exhibit 5</u>**

**O.W. Bunker Germany GmbH**
**WW Division**

Hapag-Lloyd AG
Ballindamm 25
D-20095 Hamburg
Germany

(W) **Bunker**

Neumühlen 11
D-22763 Hamburg
Germany
Phone: +49 40 3255900
Fax: +49 40 330471
Tax No. / Steuer Nr. 41/768/03456
E-mail: trading@owbunker.de
Internet: http://www.owbunker.com
Managing director: Götz Lehsten
HR B 100089
ING Bank N.V.
IBAN: NL26 INGB 0020 1180 31
IBAN: NL10 INGB 0651 3696 81
SWIFT: INGBNL2A

## Sales Order Confirmation

Sales Order No.      119-28241

We are hereby pleased to acknowledge receipt of your order as follows:

| | |
|---|---|
| Vessel | SEASPAN HAMBURG (IMO: 9224300) |
| Port | TACOMA |
| Delivery date | 16. October 2014 |
| Seller | O.W. Bunker Germany GmbH |
| Your ref. | |
| Account | MASTER AND/OR OWNER AND/OR CHARTERERS AND/OR MV SEASPAN HAMBURG AND/OR HAPAG-LLOYD AG |

Hamburg   10. October 2014

| Quantity | Unit | Product / Quality | Curr | Price | Unit | Supplier |
|---|---|---|---|---|---|---|
| 2.900,00 | MT | Fueloil 700 CST 3,5% | USD | 523,00 | MT | US OIL |
| | | | | | | Delivery : Barge |
| 1,00 | LPS | Booming fee | USD | 0,00 | LPS | US OIL |

| | |
|---|---|
| Agent | NORTON LILLY |
| Payment | WITHIN 30 DAYS FROM DATE OF DELIVERY UPON PRESENTATION OF INVOICE (ORIGINAL/TELEX/FAX). COPY OF DELIVERY RECEIPT WILL BE FORWARDED WHEN WE HAVE RECEIVED SAME. |
| Remarks | all per ISO8217 2005(E) HALO GTC 2007 shall apply. |

We thank you for this nomination.

Kind Regards

Karl Heinz Selmer

| | |
|---|---|
| Direct | +49 4032 5590 12 |
| Mobile | +49 151 276 276 80 |
| Yahoo ID | khse_owbunker |
| E-Mail | khse@owbunker.de |
| Office E-Mail | trading@owbunker.de |

HPL-USOT 00068

**O.W. Bunker Germany GmbH
WW Division**



TERMS AND CONDITIONS,
-------------------------------------------

SAMPLES:

Measuring and sampling to be done at barge/tanktruck/shoreside manifold, and receiving Vessels crew is requested to witness and verify the measuring of quantity and the drawing and sealing of samples. These verified quantities as noted in the BDR aswell as these samples taken are the only ones deemed representative, and any dispute regarding quality to be settled by testing these retained samples by an independent laboratory at port/place of delivery, and result of this testing is deemed to be final and binding for both parties.

TERMS:

The sale and delivery of the marine fuels described above are subject to the OW Bunker Group's Terms and Conditions of sale(s) for Marine Bunkers. The acceptance of the marine bunkers by the vessel named above shall be deemed to constitute acceptance of the said general terms applicable to you as 'Buyer' and to O.W. Bunker Germany GmbH as 'Seller'.
The fixed terms and conditions are well known to you and remain in your possession. If this is not the case, the terms can be found under the web address:
http://owbunker.com/wp-content/uploads/2013/12/OWB_GTC_ValidFrom01092013.pdf

GUIDELINES FOR RECEIVING BUNKERS:

We strongly urge you to forward the information regarding: General Instructions and Guidelines for Bunkering, for Receiving Vessels, on page 3, soonest possible to your Chief Engineer onboard.Following the suggested Guidelines should minimize risk of quantity disputes.Please bear in mind that barge figures are the sole valid quantity determination, wherefore Chief Engineer's attendance onboard the barge is extremely important.

OTHERWISE:

Any errors or omissions in above Confirmation should be reported immediately.


PLEASE INFORM US BY RETURN IF ABOVE NOMINATION DETAILS ARE NOT IN ACCORDANCE WITH YOUR UNDERSTANDING.

**O.W. Bunker Germany GmbH**
**WW Division**



GENERAL INSTRUCTIONS AND GUIDELINES FOR BUNKERING, FOR RECEIVING VESSELS

BEFORE BUNKERING:

Please make sure to check all information given by the supplier on Bunker Requisition Form or such similar form as the supplier presents via the barge. If you notice changes in quantity or quality please urgently contact the relevant person in charge in your own operations to have same verified.

Make sure to witness and verify initial measurements and ullaging onboard the barge before. ALL tanks to be checked and measured including actual temperature of cargo -- also including those tanks said not to be included in the particular supply (idle tanks). Compare measurements and verify the quantities as per barge ullage tables. When in full agreement please sign the ullage/sounding report for Before Supply figures. If any disagreements with the measurements, temperature and thereby figures please advise this on the Sounding form or, if not allowed, on separate Letter of Protest (make sure to obtain signature and stamp from barge Master for receipt).

If surveyor attends please ensure the surveyor also participates in measuring all barge tanks before supply and verify the figures.

DURING BUNKERING:

Always place a watchman to witness safe operation including also proper and correct sampling. The watchman must ensure that sampling is done properly, as continuous drip sampling throughout the delivery, and that clean devices are used for sampling. Also the watchman must witness proper and correct division into minimum 4 (four) clean and new identical sample bottles, including proper labeling and sealing of ALL samples. Make sure original sample (cubitainer) is shaken vigorously for 3 minutes before splitting into the 4 sample bottles and that bottles are filled in several passes. All seal numbers to be inserted into the Bunker Delivery Receipt (BDR). The MARPOL sample must be one of these samples drawn under witnessing.

The watchman must pay special attention to the bunker hose, and any un-agreed attempts to transfer air via same should cause immediate stoppage unless the use of air is caused by stripping of barge tanks, which stripping to be agreed in advance by both parties. If air is blown on continued basis, and stoppage on the supply not possible for any reason, the incident to be stated on a Letter of Protest, which should also contain the time (hours from/to) that airblow was notified.

It is known in some areas that the so-called Cappucino Effect may be used or attempted to be used during supply. Pay special attention hereto and take all necessary precautions to observe, which includes:
- During tank measurements before it should be notified whether there are signs of air on the measuring tape used for ullaging.
- Look carefully for any signs of bubbles or similar on the surface of the fuel when it is still onboard the barge.
- Agree with the barge when and if they are going to make stripping of their tanks.
- Check and note the draft fore, mid and aft on the barge before and after supply to compare.
- If any signs at all of cappuccino or similar (except eventual stripping, agreed in advance), please stop the supply immediately and compare supply quantities made so far.
- Contact vessel operator in charge and request notification to the Seller and Supplier immediately.
- If surveyor attending please ensure that the surveyor signs a Letter of Protest also.
- After stopping the bunker supply please wait minimum 1 hour to await bubbles to disappear and re-measure the barge jointly with barge Master.

AFTER COMPLETION:

Repeat the measurement, sounding and ullaging of the barge, including verification of temperature of each tank. Make sure also on completion to verify contents of ALL tanks, including those being idle.

Report (ullage) must be signed by all parties involved, including eventual nominated surveyor. If disagreements with the figures (mm, temperature) a Letter of Protest to be issued, but also such specific disagreements to be stated on the Ullage report covering "after" supply.

QUANTITY COMPLAINTS:

Receiving Vessel to inform discrepancies in writing latest upon completion of taking the bunkers.

HPL-USOT 00070