# **Exhibit 21**



U.S. OIL TRADING LLC
3001 MARSHALL AVE (98421)
P. O. BOX 2255 (98401)
TACOMA, WA 98421
(253) 383-1651

**INVOICE**

Number:  BWTD    83450
Date:  10/16/2014
Due:  11/17/2014

| | |
|---|---|
| Shipping Point: | Tacoma, WA |
| Destination: | Tacoma, WA |
| Cont/PO#: | SEASPAN HAMBURG |
| Freight: | Prepaid |
| F.O.B.: | Destination |

Customer #:      C06551400

Past Due Accounts are
Subject To Interest

**Account:**
OW BUNKER & TRADING A/S
STIGSBORGVEJ 60

NOERRESUNBY, DL-9400 DENMARK,

**Customer License/Registration #'s:**
State:          EXEMPT
Federal:        EXEMPT
Reseller:       EXEMPT

| B/L # | Carr. | Product | Metric Tons | Price | Amount |
|---|---|---|---|---|---|
| 012819 | BETSY | RMK-700 | 2,900.21 | 519.0000 | 1,505,208.99 |
| | | Boom Charge | | 0.0000 | 2,200.00 |

Invoice Total  $1,507,408.99

Exempt WA Sales & Use Tax

A security interest in and an assignment of proceeds from this transaction have been granted to
Credit Agricole. You are directed to make payment without offset, deduction or
counterclaim via FED. WIRE TRANSFER to: Wells Fargo Bank, NA,
ABA No. 121000248,
Further Credit: U. S. Oil Trading LLC, AC No. 4122063720.

Questions regarding this invoice: Billing Discrepancies: Billing Dept. Payments: Treasury

USOT 000170

# **Exhibit 22**



M/V SOFIA EXPRESS
AND/OR OWNERS/CHARTERERS

Hapag-Lloyd AG
8300 Accounting
Ballindamm 25
D-20095 Hamburg
Germany

| | |
|---|---|
| DATE OF INVOICE | : 01, November 2014 |
| INVOICE NO | : 119-29521 |
| ORDER NO. | : 119-28301 |
| DATE OF SUPPLY | : 01, November 2014 |
| DUE DATE | : 01, December 2014 |

PORT: TACOMA
YOUR REFERENCE: 029/4504078460

| Quantity supplied | Quality/description | Price/per | Invoice amount |
|---|---|---|---|
| 2.680,220 MT | Fueloil 700 CST 3,5% | 492,00 MT | 1,318.668,24 |
| 1,000 LPS | Booming fee | LPS | |
| | Nicht steuerbare Lieferung im Ausland / Non-taxable delivery abroad | | |

*Re: damage reg.*
*Claim*
*nicht gebucht*
*worden*

*1,26660*

| | | | |
|---|---|---|---|
| Your VAT No. | DE 813960018 | VAT Amount | USD | 0,00 |
| Our VAT No. | DE814847085 | Total | USD | 1,318.668,24 |

The prices are excl. all taxes and/or other fees.

TERMS OF PAYMENT 30 days from date of delivery With value date not later than DUE DATE or previous working day
when it is a holiday. In case of delays in payment interest will be charged in accordance with our valid General Terms and Conditions

| | | |
|---|---|---|
| BANK: | ING Bank N.V. | |
| ACCOUNT: | IBAN: NL36 INGB 0020 1180 31 | USD and all other currencies |
| | IBAN: NL10 INGB 0651 3696 81 | EUR |
| | SWIFT: INGBNL2A | |

Per telegraphic transfer directly to our account without deduction
of bank charges which are for buyers account.

O.W. BUNKER GERMANY GMBH
Neumühlen 11
tr-22763 Hamburg

Phone: +49 40 3256000
Fax: +49 40 325471

Tax No. / Steuer Nr. 41/760/03460

E-Mail: trading@owbunker.de
Internet: http://www.owbunker.com

Managing director: Gerd Lohsten
HRB 100000

GESAMTSEITEN 01

HPL-USOT 00078

# Exhibit 23



**M/V  SOFIA EXPRESS**
AND/OR OWNERS/CHARTERERS

O.W. Bunker Germany GmbH - WW          **DATE OF INVOICE :  01. November 2014**
Neumühlen 11
D-22763 Hamburg                        **INVOICE NO         :  172-13467**
Germany
                                       ORDER NO.           :  172-13191

                                       DATE OF SUPPLY      :  29. October 2014

PORT:  TACOMA                          **DUE DATE           :  28. November 2014**
YOUR REFERENCE:

| Quantity supplied | Quality/description | Price/per | Invoice amount |
|---|---|---|---|
| 2,680.220  MT | Fueloil 700 CST 3,5% | 490.36  MT | 1,314,272.68 |
| 1.000  LPS | Booming fee | 2,200.00  LPS | 2,200.00 |

| Your VAT No. | DE814847085 | VAT Amount | USD | 0.00 |
|---|---|---|---|---|
| Our VAT No. | 99-0373556 | Total | USD | 1,316,472.68 |

The prices are excl. all taxes and/or other fees.

**TERMS OF PAYMENT** 30 days from date of delivery With value date not later than DUE DATE or previous working day
when it is a holiday. In case of delays in payment interest will be charged in accordance with our valid General Terms and Conditions

**INTERCOMPANY COUNTERPART: Vendor 1685**
**O.W. BUNKER USA INC.**

| **BANK:** | ING Bank N.V. | | 2603 Augusta Drive |
| | | | Suite 440 |
| **ACCOUNT:** | IBAN: NL26 INGB 0020 1180 31 | USD and all other currencies | USA-TX 77057  Houston |
| | IBAN: NL10 INGB 0651 3696 81 | EUR | |

SWIFT: INGBNL2A

Phone: +1 281 946 2300
Fax: +1 281 946 2301

Internet: http://www.owbunker.com

Per telegraphic transfer directly to our account without deduction
of bank charges which are for buyers account.

EIN: 99-0373556

**ING HL49 0055**

# **<u>Exhibit 24</u>**



U.S. OIL TRADING LLC
3001 MARSHALL AVE (98421)
P. O. BOX 2255 (98401)
TACOMA, WA 98421
(253) 383-1651

Shipping Point:    Tacoma, WA
Destination:       Tacoma, WA
Cont/PO#:          SOFIA EXPRESS
Freight:           Prepaid
F.O.B.:            Destination

INVOICE

Number:  BWTD      83463
Date:    10/29/2014
Due:     11/28/2014

Customer #:     C06551400

Past Due Accounts are
Subject To Interest

Account:
OW BUNKER & TRADING A/S
STIGSBORGVEJ 60

NOERRESUNBY, DL-9400 DENMARK,

Customer License/Registration #'s:
State:        EXEMPT
Federal:      EXEMPT
Reseller:     EXEMPT

| B/L # | Carr | Product | Metric Tons | Price | Amount |
|-------|------|---------|-------------|-------|--------|
| 012829 | BETSY | RMK-700 | 2,680.22 | 490.0000 | 1,313,307.80 |
| | | Boom Charge | | 0.0000 | 2,200.00 |

Invoice Total  $1,315,507.80

Exempt WA Sales & Use Tax

A security interest in and an assignment of proceeds from this transaction have been granted to
Credit Agricole. You are directed to make payment without offset, deduction or
counterclaim via FED. WIRE TRANSFER to: Wells Fargo Bank, NA,
ABA No. 121000248,
Further Credit: U. S. Oil Trading LLC, AC No. 4122063720.

Questions regarding this invoice: Billing Discrepancies: Billing Dept. Payments: Treasury

USOT 000060

# Exhibit 25

5M99LH963
(SIM99546)

**W Bunker**

gebucht
2 9. Okt. 2014
M. Sakowski

M/V VIENNA EXPRESS
AND/OR OWNERS/CHARTERERS

Kawol

Hapag-Lloyd AG
8300 Accounting
Ballindamm 25
D-20095 Hamburg
Germany

| | |
|---|---|
| DATE OF INVOICE | : 18. October 2014 |
| INVOICE NO | : 119-29447 |
| ORDER NO. | : 119-28229 |
| DATE OF SUPPLY | : 18. October 2014 |
| DUE DATE | : 17. November 2014 |

PORT: TACOMA
YOUR REFERENCE: 029/4504073073

| Quantity supplied | Quality/description | Price/per | Invoice amount |
|---|---|---|---|
| 2,710,930 MT | Fueloil 700 CST 3,5% | 528,00 MT | 1,431,371,04 |
| 1,000 LPS | Booming fee | LPS | |

HL00100187510740

1,28140

| Our VAT No. | DE814847085 | Total | USD | 1,431,371,04 |
|---|---|---|---|---|

The prices are excl. all taxes and/or other fees.

TERMS OF PAYMENT 30 days from date of delivery with value date not later than DUE DATE or previous working day
when it is a holiday. In case of delays in payment interest will be charged in accordance with our valid General Terms and Conditions

| BANK: | ING Bank N.V. | |
|---|---|---|
| ACCOUNT: | IBAN: NL26 INGB 0020 1180 31 | USD and all other currencies |
| | IBAN: NL10 INGB 0651 3696 81 | EUR |
| | SWIFT: INGBNL2A | |

O.W. BUNKER GERMANY GMBH
Neumühlen 11
D-22763 Hamburg

Phone: +49 40 8260900
Fax: +49 40 330471

Tax No. / Steuer Nr. 41/789/03469

E-mail: trading@owbunker.de
Internet: http://www.owbunker.com

Managing director Götz Lehsten
HR B 100080

Per telegraphic transfer directly to our account without deduction
of bank charges which are for buyer's account.

HPL-USOT 00079

# Exhibit 26



**M/V  VIENNA EXPRESS**
AND/OR OWNERS/CHARTERERS

| | | |
|---|---|---|
| O.W. Bunker Germany GmbH - WW | **DATE OF INVOICE** : | **18. October 2014** |
| Neumühlen 11 | | |
| D-22763 Hamburg | **INVOICE NO** : | **172-13396** |
| Germany | | |
| | ORDER NO. : | 172-13121 |
| | DATE OF SUPPLY : | 18. October 2014 |
| PORT: TACOMA | **DUE DATE** : | **17. November 2014** |
| YOUR REFERENCE: | | |

| Quantity supplied | Quality/description | Price/per | Invoice amount |
|---|---|---|---|
| 2,710.930  MT | Fueloil 700 CST 3,5% | 522.86  MT | 1,417,428.73 |
| 1.000  LPS | Booming fee | 2,200.00  LPS | 2,200.00 |

| | | | |
|---|---|---|---|
| Your VAT No. | DE814847085 | VAT Amount    USD | 0.00 |
| Our VAT No. | 99-0373556 | Total    USD | 1,419,628.73 |

The prices are excl. all taxes and/or other fees.

**TERMS OF PAYMENT** 30 days from date of delivery With value date not later than DUE DATE or previous working day
when it is a holiday. In case of delays in payment interest will be charged in accordance with our valid General Terms and Conditions

**INTERCOMPANY COUNTERPART: Vendor 1685**
**O.W. BUNKER USA INC.**

| | |
|---|---|
| **BANK:** | ING Bank N.V. |
2603 Augusta Drive
Suite 440
USA-TX 77057  Houston

| | | |
|---|---|---|
| **ACCOUNT:** | IBAN: NL26 INGB 0020 1180 31 | USD and all other currencies |
| | IBAN: NL10 INGB 0651 3696 81 | EUR |
| | SWIFT: INGBNL2A | |

Phone: +1 281 946 2300
Fax: +1 281 946 2301

Internet: http://www.owbunker.com

Per telegraphic transfer directly to our account without deduction
of bank charges which are for buyers account.

EIN: 99-0373556

**ING HL49 0075**

# Exhibit 27



**U.S. OIL TRADING LLC**
3001 MARSHALL AVE (98421)
P. O. BOX 2255 (98401)
TACOMA, WA 98421
(253) 383-1651

**INVOICE**

Number:  BWTD     83451
Date:  10/18/2014
Due:  11/17/2014

Shipping Point:     Tacoma,  WA
Destination:        Tacoma,  WA
Cont/PO#:           VIENNA EXPRESS
Freight:            Prepaid
F.O.B.:             Destination

Customer #:     C06551400

Past Due Accounts are
Subject To Interest

**Account:**
OW BUNKER & TRADING A/S
STIGSBORGVEJ 60

NOERRESUNBY, DL-9400 DENMARK,

**Customer License/Registration #'s:**
State:        EXEMPT
Federal:      EXEMPT
Reseller:     EXEMPT

| B/L# | Carr | Product | Metric Tons | Price | Amount |
|------|------|---------|-------------|-------|--------|
| 012818 | BETSY | RMK-700 | 2,710.93 | 521.0000 | 1,412,394.53 |
| | | Boom Charge | | 0.0000 | 2,200.00 |

Invoice Total  $1,414,594.53

Exempt WA Sales & Use Tax

A security interest in and an assignment of proceeds from this transaction have been granted to
Credit Agricole. You are directed to make payment without offset, deduction or
counterclaim via FED. WIRE TRANSFER to  Wells Fargo Bank, NA,
ABA No. 121000248.
Further Credit: U. S. Oil Trading LLC, AC No. 4122063720.

Questions regarding this invoice: Billing Discrepancies: Billing Dept. Payments: Treasury

USOT 000008

# **Exhibit 28**

IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA
--------------------------------x
HAPAG-LLOYD AKTIENGESELLSCHAFT,

                    Plaintiff,


        -against-                14 Civ. 9949

U.S. OIL TRADING LLC, O.W. BUNKER
GERMANY GMBH, O.W. BUNKER & TRADING
A/S, ING BANK N.V., CREDIT AGRICOLE
S.A.,

                    Defendants.
--------------------------------x
IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA
--------------------------------x
U.S. OIL TRADING LLC,

                    Plaintiff,


        -against-                Case No. 15-6718

M/V VIENNA EXPRESS, her tackle,
boilers, apparel, furniture, engines,
appurtenances, etc., in rem, and
M/V SOFIA EXPRESS, her tackle,
boilers, apparel, furniture, engines,
appurtenances, etc., in rem,
             Defendants.
--------------------------------x

                         January 7, 2016
                         12:00 p.m.



        Videoconference Deposition of THOR

NIELSEN, held at the offices of Seward & Kissel

LLP, One Battery Park Plaza, New York, New York,

before Roberta Caiola, a Shorthand Reporter and

Notary Public within and for the State of New

York.

1                    Thor Nielsen (1-7-16)

2    issues?

3         A.      One of the employees assisted me on

4    the tax side and then the other two, I guess two

5    and a half I would say would have been involved

6    in the treasury and credit side of the business.

7         Q.      How would you describe the treasury

8    and credit side of the business?

9         A.      Well, they're responsible for the

10   movement of cash, investments.  We're also

11   responsible for collections, following up,

12   establishing credit lines with customers, and

13   also dealing with any of our suppliers and their

14   credit-related issues.

15        Q.      How does someone become a customer

16   of U.S. Oil?

17        A.      They contact us or we make contact

18   with them and they go through the credit process

19   of review and provide the appropriate paperwork

20   that we require in order to be able to sell

21   within the State of Washington.

22        Q.      So what types of things does a

23   customer have to submit?

24        A.      There's a credit application that

25   they complete, there's financial statements for

 1                    Thor Nielsen (1-7-16)

 2    the past three years, and then the year-to-date

 3    current year financial statements.  Generally,

 4    there's always credit references that we get.

 5    I'm probably forgetting something, but generally

 6    that covers it for the most part.

 7         Q.     About how long does that credit

 8    process take?

 9         A.     It takes a little bit of time

10    because we have to do -- I mean when we go

11    through and review the financial statements we

12    also pull D&B reports and things like that.  If

13    there is an international company we'll pull a

14    bunker report on them, things like that.

15                It could be done, it just really

16    depends on how complicated the company is, what

17    the deal is.  It could be done probably in a

18    couple of days or it could take a couple of

19    weeks, it just depends upon how complicated the

20    transaction might be.

21         Q.     So how long did you sit in that

22    role?

23         A.     I sat in that role until 2011 when

24    I was promoted to treasurer.  I still had those

25    responsibilities, but was promoted to a

Page 17

1                    Thor Nielsen (1-7-16)

2   treasurer, which was an officer position.

3        Q.      So in 2011 you were promoted to

4   treasury, which was an officer position at U.S.

5   Oil & Refining Co.?

6        A.      And U.S. Oil Trading LLC.

7        Q.      And in that role you were

8   supervising the corporate tax and treasury

9   personnel that we just described?

10       A.      Correct.

11       Q.      Is that the role that you hold

12   today?

13       A.      No, I was promoted in April of 2015

14   to the CFO, VP of finance, secretary, and I

15   continue to hold the treasurer title too.

16       Q.      Congratulations.

17       A.      Thank you.

18       Q.      The transactions at issue in this

19   matter occurred back in 2014, so you would have

20   been -- that would have been prior to your

21   promotion, correct?

22       A.      Yes.  I was treasurer of the

23   company when this happened.

24       Q.      How many people reported to you at

25   the time of the transactions at issue in 2014?

Page 19

1                    Thor Nielsen (1-7-16)

2    been Carmen Montero.

3         Q.    What are some of the things that

4    the credit department looks for when they're

5    reviewing credit of potential customers?

6         A.    Well, we looked at their D&B to see

7    if there are any issues there and what their

8    rating is.  We looked at their balance sheet and

9    do an analysis on it.  We have a scoring system

10   that we use to do that and so each company is

11   given a score based upon the credit analysis

12   that is done.

13              We're looking at, you know, are

14   there physical assets, what's their debt

15   situation, what has been pledged to the banks or

16   to their creditors, what's their payment

17   history.  We send out when we get the credit, I

18   can't think of the word I'm looking for.

19              When we get a referral in terms of

20   someone to talk to about their credit, we send

21   out a form and get information back from their

22   other folks that they do business with that

23   indicates, you know, how much -- what's the

24   balance on their account outstanding, what kind

25   of payment history do they have with them.

Page 20

1                    Thor Nielsen (1-7-16)

2                    To confirm, you know, to get

3    confirmation of the things that we're finding

4    out through our review and through the D&B

5    request, or even a monthly report, or whatever

6    the case may be.  So I think that's for the most

7    part what we're looking for there.

8         Q.     Is there a file prepared on each

9    customer or documents that reflect the score

10   under the scoring system, that sort of thing?

11        A.     Yes, there is.

12        Q.     Does each customer have an account

13   number, is it managed centrally?

14        A.     It is.  Each customer has its own

15   unique account number and we have a credit file

16   on every customer.

17        Q.     Are you familiar with the O.W.

18   Bunker Group?

19        A.     Yes, I am.

20        Q.     Was the O.W. Bunker Group, or some

21   entity within the O.W. Bunker Group, a customer

22   of U.S. Oil & Refining Co.?

23        A.     Yes.

24        Q.     Did they have a unique account

25   number and credit file?

1                    Thor Nielsen (1-7-16)

2          A.      They do.

3          Q.      Did they undergo that credit

4    process prior to becoming a customer of U.S. Oil

5    Trading?

6          A.      Yes.

7          Q.      Did they get a score under the

8    scoring system you mentioned?

9          A.      Yes.

10         Q.      Did your department review

11   financial statements or other financial

12   information about the O.W. Bunker Group prior to

13   their becoming a customer?

14         A.      Yes.

15         Q.      Did the O.W. Bunker Group, or some

16   entity within it, have a credit line with U.S.

17   Oil?

18         A.      They did.

19         Q.      They no longer have that credit

20   line?

21         A.      No.

22         Q.      Do you know what the amount of the

23   credit line was?

24         A.      I do not off the top of my head.

25         Q.      Do you know when the O.W. Bunker

Page 22

1                 Thor Nielsen (1-7-16)

2    Group, or some entity within the group became a

3    customer of U.S. Oil?

4         A.     Not off the top of my head.  That

5    would be in the credit file.

6         Q.     Where would that credit file be

7    located?

8         A.     Here in Tacoma.

9         Q.     Would it be maintained

10   electronically or in paper form?

11        A.     Paper form.

12        Q.     About how large would that file be;

13   would it be a box of documents, would it be more

14   like a file folder or a Redweld?

15        A.     It's a file folder.  It's probably,

16   I mean because of the size of O.W. Bunker I

17   would guess it's probably 2 or 3 inches thick.

18   In that file we keep about, I think we keep 2 or

19   3 years of information.

20        Q.     Do you maintain that file or is it

21   someone on your team who's the custodian of

22   those records?

23        A.     Someone on my team is the

24   custodian.

25        Q.     Do you know who that is?

1                    Thor Nielsen (1-7-16)

2          A.       Yeah, Carmen Montero.

3          Q.       Do you know if O.W. Bunker's credit

4  line was ever increased after the inception of

5  their relationship with U.S. Oil Trading?

6          A.       You know, to be honest, I do not

7  recall whether it was increased or decreased, I

8  just don't recall that.

9          Q.       Would that information be in the

10 credit file?

11         A.       You would probably have to see if

12 there were any adjustments that were made.

13         Q.       You mentioned D&B, is that Dun &

14 Bradstreet?

15         A.       It is.

16         Q.       So that's a third-party credit

17 reporting service?

18         A.       Correct.

19         Q.       Does U.S. Oil --

20         A.       The other third-party credit is

21 Experian that we use.

22         Q.       Experian?

23         A.       Yes.

24         Q.       Do you know if U.S. Oil ran a Dun &

25 Bradstreet report on the O.W. Bunker Group?

Page 24

1                    Thor Nielsen (1-7-16)

2          A.      Because we were looking at the

3    Danish entity we may have done like a, like went

4    and got an international report, a bunker

5    report.

6          Q.      What was that international bunker

7    report?

8          A.      To be honest, I don't know the term

9    of it, but my recollection is it's called a

10   bunker report and I'm not sure who -- I can't

11   remember who produces that; but again, it would

12   be in the credit file.

13         Q.      Just so the record is clear.  Are

14   you referring to a specific document?

15         A.      Yes, I am.

16         Q.      Okay.  About how long is that

17   document?

18         A.      They can vary but, I mean, my

19   recollection is those are generally anywhere

20   from 5 to maybe 12 to 15 pages long.  It's a

21   pretty thorough report that provides information

22   on the company's history and management team and

23   their business.

24         Q.      So there was one of those prepared

25   for the O.W. Bunker Group?

Page 25

1                    Thor Nielsen (1-7-16)

2                    MR. KEOUGH:  Objection to the form

3      of the question.

4           A.     There was one pulled.  We didn't

5      prepare that report, but we would have went out

6      and purchased it.  I just can't remember who we

7      were purchasing it for off the top of my head.

8           Q.     Got it.  Did U.S. Oil have any

9      other agreements with entities in the O.W.

10     Bunker Group?

11                   MR. KEOUGH:  Objection to the form.

12                   MR. MALONEY:  I'll rephrase.

13          Q.     Did U.S. Oil have any agreements

14     with entities in the O.W. Bunker Group?

15          A.     No, not that I'm -- no.

16          Q.     Mr. Nielsen, were you involved in

17     the documents that were collected or produced,

18     or the process of collection and production in

19     response to document requests prepared in these

20     actions?

21          A.     Yes.

22          Q.     What was your involvement?

23          A.     I was the guy that pulled them all

24     together.

25          Q.     Whose files were collected?

Page 29

1                    Thor Nielsen (1-7-16)

2    matters 9949 and 14-9949 and 15-6718 are the

3    SANTA ROBERTA, the SEASPAN HAMBURG, the VIENNA

4    EXPRESS and the SOFIA EXPRESS.

5                    I guess the question I have is, if

6    you know, who purchased the fuel from U.S. Oil

7    Trading; was it O.W. Bunker USA?

8         A.     Our customer was the Danish entity.

9    How the quotes or requests came, you know,

10   doesn't really matter to me, our customer was

11   the Danish entity.

12        Q.     What do you base that statement on?

13        A.     Because that's the company that we

14   provided credit for.  It's their financial

15   statements for which the credit was provided.

16        Q.     Were there any supply contracts or

17   pricing agreements or trading agreements entered

18   into with the Danish entity?

19        A.     I am not aware of any agreements.

20        Q.     Were there any communications

21   between individuals over in Denmark and persons

22   out in Tacoma about the specific fuel deliveries

23   in this matter?

24        A.     I am not aware of any necessarily,

25   but it doesn't mean that there wasn't.  I think

 1                   Thor Nielsen (1-7-16)

 2    the emails and IMs may provide some information

 3    on that.  I don't have firsthand knowledge.

 4         Q.    Were there any policies or

 5    procedures or any documents exchanged between

 6    those entities at the outset of the relationship

 7    with the Danish entity that would inform on what

 8    the agreement was between those entities?

 9              MR. KEOUGH:  Objection to the form.

10    You said those entities, I don't know which

11    entities you mean.

12         Q.    Between the Danish entity and U.S.

13    Oil & Refining Co.?

14         A.    The only -- the only agreements or

15    documents that were there were the establishment

16    of credit.  As these deals are done there's I

17    guess outreaches.  If there's product that a

18    ship needs we provide a quote, that quote is

19    either accepted or rejected.  If it's accepted

20    then the paperwork behind that, the

21    confirmation, the sales authorization, those

22    things are all processed at that time.

23         Q.    It's fair to say that entities

24    within the O.W. Bunker Group wouldn't be able to

25    complete purchase orders or sales orders until

 1                     Thor Nielsen (1-7-16)

 2    an account is established with U.S. Oil, is that

 3    right?

 4                     MR. KEOUGH:  Objection to the form.

 5         A.     They would not be able to do that

 6    unless there was an account established for O.W.

 7    Bunker.

 8         Q.     So you were relying on the credit

 9    of the overall parent in order to establish an

10    account, is that fair?

11                     MR. KEOUGH:  Objection to the form

12    of the question.

13         A.     I would say that that is a fair

14    statement.

15         Q.     You mentioned that your customer

16    was the Danish entity.  Do you know which entity

17    that was?

18         A.     It was O.W. Bunker & Trading AG.

19         Q.     Are there any documents that

20    evidence that relationship?

21         A.     Yeah, there would be a credit

22    application and financial statements.

23                     MR. MALONEY:  I want to mark for

24    the record the Notice of Deposition issued by

25    ING Bank in these matters.  We'll mark them as

```
 1                  Thor Nielsen (1-7-16)
 2   for today's deposition?
 3        A.    I looked through my files and we
 4   met yesterday with my attorney.
 5        Q.    Did you review any documents?
 6        A.    Yes, I did.
 7        Q.    Do you recall which documents you
 8   reviewed?
 9        A.    I reviewed all of the documents
10   that related to the bunker files of O.W. Bunker.
11        Q.    Calling your attention to page 3 of
12   the deposition notice.  I would like to ask you
13   about topic 7 which refers to any research,
14   investigation or analysis performed or reviewed
15   by you, the you is U.S. Oil Trading, concerning
16   the creditworthiness or financial viability of
17   the vessels or the vessel interests.  Do you see
18   that topic?
19        A.    I do.
20        Q.    Did U.S. Oil perform any research,
21   investigation or analysis of the
22   creditworthiness or financial viability of the
23   SANTA ROBERTA, the SEASPAN HAMBURG, the VIENNA
24   EXPRESS or the SOFIA EXPRESS?
25        A.    No, we did not.
```

1                    Thor Nielsen (1-7-16)

2        Q.     Did U.S. Oil perform any research,

3    investigation or analysis of the

4    creditworthiness or financial viability of the

5    owners or the charterers of those vessels?

6                    MR. KEOUGH:  Object to the form.

7        A.     We did not.

8        Q.     Do you know who the owners or the

9    charterers of those vessels were?

10       A.     I know who they are now.

11       Q.     U.S. Oil did not know who the

12   owners or the charterers of those vessels were

13   at the time of the transaction?

14       A.     Our commercial guys may have known,

15   but I didn't know, or anybody on my team.

16       Q.     That is your testimony as the

17   corporate representative of U.S. Oil, as to

18   topic number 7?

19                    MR. KEOUGH:  Objection to the form.

20       A.     We didn't do an analysis of them,

21   but we certainly relied upon the maritime lien

22   that's specifically stated on our bunker receipt

23   form.  That's been there for a long time and

24   we -- we've always took comfort in the fact that

25   we knew that there was a maritime lien on

Page 36

1                     Thor Nielsen (1-7-16)

2     supplies that were being delivered to these

3     vessels.

4          Q.     That's your legal position,

5     correct?

6                     MR. KEOUGH:  Objection to the form.

7          A.     I'm not an attorney.

8          Q.     Have you reviewed any of the

9     pleadings in this action, which is to say the

10    complaint filed by the customer or by U.S. Oil,

11    in the action that began out in Washington?

12                    MR. KEOUGH:  Objection to the form

13    of the question.

14         A.     I looked at them, you know, when

15    they came out, but I didn't do any current

16    review of them.

17         Q.     Calling your attention to topic 1.

18    Topic 1 asks for information from U.S. Oil about

19    the relationship, if any, between you and the

20    vessel interests or the contract supplier or

21    intermediaries concerning the fuel delivery at

22    issue in this action.

23                    Do you see that topic?

24         A.     I do.

25         Q.     Did you have any contractual

1                        Thor Nielsen (1-7-16)

2    relationship with the vessels that we've been

3    discussing?

4                    MR. KEOUGH:   Objection to the form

5    of the question.   You can answer.

6            A.      The only contractual relationship

7    that I can think of is that the vessel captain

8    or official signed the bunker receipt document

9    indicating that, you know, that the volume, the

10   quantity of the fuels that were delivered to

11   them and also all of our disclosures that are

12   listed on there.

13           Q.      Is there any other relationship

14   that you can think of?

15           A.      There are other documents --

16                   MR. KEOUGH:   Objection to the form.

17           A.      There are other documents that are

18   signed by an official of the vessel or the

19   captain that are in our files, but those are the

20   only things that may generally relate to taxes

21   and things of that nature, but those are the

22   only things that I can think of.

23           Q.      Are those bunker receipts required

24   by law or regulation, if you know?

25                   MR. KEOUGH:   Objection to the form.

Page 38

1                    Thor Nielsen (1-7-16)

2   You can answer.

3        A.     You know, I again am not a lawyer,

4   but what I see the bunker receipt as is like a

5   bill of lading, it is the main billing document.

6        Q.     Did you issue any invoice to the

7   vessel interests, to the vessels or to their

8   owners or charterers after the fuel was

9   delivered?

10        A.     No, we did not.

11        Q.     Who did you issue your invoices to?

12        A.     We issued them to O.W. Bunker &

13   Trading AG.

14        Q.     Did you receive any purchase order

15   confirmations from O.W. Bunker & Trading I think

16   it's A/S?

17        A.     My recollection is that those came

18   from the USA entity.

19        Q.     You mentioned your understanding of

20   the contractual relationship and other documents

21   that might have been signed in your files.

22              Is that the extent of the

23   relationship with the vessels or their owners or

24   charterers?

25              MR. KEOUGH:  Objection to the form

1                    Thor Nielsen (1-7-16)

2   of the question.

3          A.     I'm not aware of any others.

4          Q.     Topic 2 requests U.S. Oil's

5   understanding of the communications had with the

6   vessels or the vessel interests in this action.

7   Do you see that topic?

8          A.     I do.

9          Q.     Were there communications between

10  U.S. Oil and the vessels, or their owners or

11  charterers?

12         A.     Just to the extent of the

13  documentation that has been signed.

14         Q.     We can put Exhibits 1 and 2 aside

15  for now.  I have a couple of questions about the

16  documents produced by U.S. Oil Trading in this

17  action.

18                MR. MALONEY:  What I would like to

19  do is mark U.S. Oil Trading's production in the

20  9949 action as Exhibit Number 3.

21                (Nielsen Exhibit 3, U.S. Oil

22  Trading's production in the 9949 action, Bates

23  numbered USOT 000001 through USOT 000347, marked

24  for identification.)

25                MR. MALONEY:  Those are documents

Page 54

1                    Thor Nielsen (1-7-16)

2        A.      I do.

3        Q.      Would you agree with me that those

4   phone numbers there for his direct line and his

5   cell phone are U.S. numbers?

6        A.      They look like it.

7        Q.      Do you see that his office email

8   address is houston@owbunker.com?

9        A.      I see that.

10       Q.      Do you know if U.S. Oil received

11  any purchase order confirmations from any O.W.

12  Bunker entity, other than O.W. Bunker USA Inc.?

13       A.      My recollection is that these all

14  came from O.W. Bunker USA.

15       Q.      Do you know a person by the name of

16  Mads Buchwald?

17       A.      The name sounds familiar, but I

18  don't -- I don't recall it.

19               MR. MALONEY:  I think it's a good

20  time to take a 5-minute break, if that's okay

21  with you?

22               MR. KEOUGH:  Sure.

23               (Short recess taken.)

24               MR. MALONEY:  Is everybody back?

25               MR. KEOUGH:  We're good.  Ready to

```
 1                    Thor Nielsen (1-7-16)

 2    behalf of U.S. Oil in the action commenced in

 3    Washington and subsequently transferred to New

 4    York, the docket number is 52-2.

 5                    MR. HEILIG:  We'll mark this as

 6    Exhibit Number 7.

 7                    (Nielsen Exhibit 7, Declaration,

 8    Docket No. 52-2, marked for identification.)

 9                    MR. KEOUGH:  It's before the

10    witness.

11         Q.    Mr. Nielsen, do you recall

12    executing this document?

13         A.    I do.

14         Q.    Did you prepare this document or

15    was this prepared for you for your review and

16    execution?

17         A.    It was prepared for me and I

18    executed it.

19         Q.    But you reviewed its contents

20    before doing so?

21         A.    I did.

22         Q.    And they're accurate, to the best

23    of your knowledge?

24         A.    It is.

25         Q.    Let's take a look at paragraph 17,
```

 1                   Thor Nielsen (1-7-16)

 2    it's on page 4.  Paragraph 17 says:

 3                   "USOT did not enter into contracts

 4    with HLag" meaning Hapag-Lloyd "for the subject

 5    deliveries of bunkers by USOT to the M/V VIENNA

 6    EXPRESS and M/V SOFIA EXPRESS."

 7                   Is that still your position,

 8    Mr. Nielsen?

 9        A.     Yes.

10        Q.     And that's the position of USOT

11    still?

12        A.     Yes.

13        Q.     What about the two other vessels,

14    the SOFIA EXPRESS and -- or, I'm sorry, the

15    SEASPAN HAMBURG and the SANTA ROBERTA, would

16    that be the same for those two vessels?

17        A.     Yes.

18        Q.     Okay.  If U.S. Oil did not enter

19    into contracts with Hapag, is it also U.S. Oil's

20    position that none of the O.W. entities were

21    acting as agents of Hapag for purposes of

22    purchasing bunker fuel from U.S. Oil?

23                   MR. KEOUGH:  Objection to the form.

24        A.     Can you ask that question again,

25    please?

Page 69

1                Thor Nielsen (1-7-16)

2      A.    When I -- when I look at the

3  interaction with Lee it seemed like, if I

4  recall, that there was some communication that

5  was attached to an email from Hapag-Lloyd to

6  O.W. Bunker instructing them to acquire the

7  fuel.  That's my only -- I mean that wasn't a

8  direct communication to us, that was attached to

9  an email.

10     Q.    My question was, were there any

11  direct communications from Hapag to U.S. Oil in

12  which Hapag indicated that one or more O.W.

13  entities were acting as its agents?

14           MR. KEOUGH:  Same objection.

15     A.    The answer is no.

16     Q.    Okay.  Mr. Nielsen, I would like

17  you to take a look at the Verified Complaint

18  filed by U.S. Oil Trading in the action

19  commenced in Washington and transferred to New

20  York.

21           MR. HEILIG:  We will mark that as

22  Exhibit 8.

23           (Nielsen Exhibit 8, Verified

24  Complaint filed by U.S. Oil Trading, marked for

25  identification.)

Page 71

```
 1              Thor Nielsen (1-7-16)

 2     A.      Okay.

 3     Q.      Paragraph 15 says:

 4             "USOT negotiated its agreements

 5     with O.W. Denmark for the subject deliveries

 6     bunkers by USOT to the M/V VIENNA EXPRESS and

 7     M/V SOFIA EXPRESS at USOT's principal place of

 8     business in Tacoma, Washington."

 9             What's the basis for this

10     statement, Mr. Nielsen?

11     A.      The basis for this statement is

12     that our customer is the O.W. Denmark entity,

13     and that our sales authorization and

14     confirmation indicate that.

15     Q.      Did USOT actually negotiate with

16     O.W. Denmark with respect to these transactions,

17     or was it negotiating with O.W. USA?

18             MR. KEOUGH:  Objection to the form.

19     A.      The entity in the O.W. Bunker

20     family that was operating was irrelevant to us,

21     we were dealing -- who we were dealing with from

22     a credit and sales standpoint was the Denmark

23     entity.

24     Q.      Okay.  In terms of the actual

25     communications though, the actual communications
```

Page 72

1                  Thor Nielsen (1-7-16)

2     were with O.W. USA; isn't that correct?

3                  MR. KEOUGH:  Objection to the form.

4         A.     That's correct.

5         Q.     Okay.  We won't actually have to

6     look at the document, so we'll save some time.

7                  Earlier Mr. Maloney asked you some

8     questions about the instant messenger

9     communications.  Just one follow-up question.

10    Are those communications, are they capable of

11    being produced in the native or an original

12    format?

13        A.     I don't know the answer to that.

14        Q.     Okay.  Do you know who would know

15    the answer to that at U.S. Oil?

16        A.     Either our IT guys, Lee Weber may

17    know.

18        Q.     Earlier we also looked at purchase

19    order confirmations issued to U.S. Oil with

20    respect to these transactions, so why don't we

21    take a look at one of them.  If you would look

22    at USOT Document 110?

23                 MS. METRO:  This would be

24    Exhibit 3?

25                 MR. HEILIG:  This would be part of

Page 94

1                    Thor Nielsen (1-7-16)

2    operate the vessels.

3        Q.    Okay.  As you were describing it

4    you also referred to them, O.W. Bunker, acting

5    as agent.  I just want to make sure I understand

6    the factual basis for that assertion, that they

7    act as agent.

8                    Was it simply because you

9    understood that they did not own or operate

10   vessels or do the physical delivery, and hence

11   was the guy in the middle?

12                   MR. KEOUGH:  Objection to the form.

13       A.    Yeah, I would see them as the guy

14   in the middle.

15       Q.    So what else, if anything, and I'm

16   not trying to suggest that there should or

17   should not be something else, but I just want to

18   make sure I have a full understanding.

19                   What, if anything else, supports

20   the belief that OWB was acting as an agent?

21                   MR. KEOUGH:  Objection to the form.

22       A.    I -- I mean I can't think of

23   anything else off the top of my head.

24       Q.    Okay.  Looking still at paragraph

25   8, and I understand your position about OWB

# **Exhibit 29**

**From:**       Santa Roberta [santa.roberta@mscfleet.com]
**Sent:**       Friday, October 10, 2014 6:21 AM
**To:**         RQMT-SECTION4
**Cc:**         'Fleet4'; Nigmann, Michael; Moran, Harry
**Subject:**    SRB SANTA ROBERTA - BUNKERS AT Tacoma 9-Oct-14
**Attachments:** BDN Tacoma  9-Oct-14.pdf


Dear sirs good day,

Please find attached BDN for bunkers stemmed at Tacoma on 9-Oct-14


Best regards,
Girish K S Chaudhary / Mr.S Kumar
Master / Chief Engineer
M.V. "Santa Roberta"
FBB Tel : 870 773 152 401
CYPRUS NO : + 357 2503 0847
GENEVA NO : + 41 225 182 371
USA NO : + 1 210 610 1579
E-Mail : santa.roberta@mscfleet.com
SAT-C : 463791225
SAT-C : 463791226

1

HPL-USOT 00170

## U.S. OIL TRADING, LLC

MARINE BUNKER
RECEIPT FOR DELIVERY TO VESSEL

| TACOMA REFINERY | VESSEL NAME | IMO# | VESSEL AGENT: |
|---|---|---|---|
| P.O. BOX 2255 | SANTA ROBERTA | 9227326 | NORTON LILLY |
| TACOMA WA 98401-2255 | BARGE COMPANY: | BARGE NO.: | U.S. OIL S.A. NUMBER: |
| (253) 383-1651 | OLYMPIC TUG & BARGE | BETSY ARNTZ | 14-179 |
| | DELIVERY LOCATION (INCLUDE TERMINAL OR DOCK NAME) PCT | | |

### PRODUCT

| GRADE | DENSITY kg/m3 @ 15C | API GRAVITY | FLASH PMCC F | POUR POINT DEGREES C | SULFUR WT% | BS&W VOL% | VISCOSITY CST @ 50C | VANADIUM PPM | ALUMINUM PPM |
|---|---|---|---|---|---|---|---|---|---|
| RMK 700 | 975 | 13.5 | 212° | -6 | 2.767% | <0.05 | 696.00 | | |
| | | | | | | | | | |
| | | | | | | | | | |

THIS FUEL OIL COMPLIES WITH REGULATION 14 (1) OR (4) AND REGULATION 18 (1) OF MARPOL ANNEX VI.

REPRESENTATIVE SAMPLES TAKEN AND WITNESSED BY _____

PHYSICAL PROPERTY TEST RESULTS LISTED ON _____     SAMPLES DELIVERED TO AGENT BY _____

THIS SECTION TO BE COMPLETED BY BARGE COMPANY REPRESENTATIVE

### QUANTITY**

| | GRADE    RMK 700 | GRADE:    MGO | GRADE: |
|---|---|---|---|
| Total Gross Barrels Delivered By Barge | (18139.34) | 0.00 | 0.00 |
| Temp and Grav. Conversion Factor | 0.9614 | | |
| Total Net Barrels | -17439.16 | 0.00 | 0.00 |
| Conversion Factor - Bbl/M Ton | 0.15483 | | |
| Metric Tons Delivered | -2700.11 | 0.00 | 0.00 |

| DATE AND TIME ALONGSIDE AT LOADING TERMINAL | TIME STARTED PUMPING TO VESSEL | DATE AND TIME FINISHED PUMPING TO VESSEL | |
|---|---|---|---|
| October 9, 2014     7:13 | October 9, 2014     9:03 | October 9, 2014     13:48 |

**CERTIFICATION OF EXPORT.** Vessel certifies that it intends to use product delivered to barge at U.S. Oil's terminal for bunkers on a voyage leaving the U.S. Port.

**EXEMPTION FROM SALES AND USE TAX & AIR POLLUTION REGULATION:** The shipper vessel to which this product is delivered is engaged in operating as a private or common carrier by water in interstate or foreign commerce. The recipient certifies that the product purchased under this receipt is for use in connection with its business of operating as a private or common carrier by water in interstate or foreign commerce that, while the vessel is within the territorial boundaries of the State of Washington, it will not consume the product delivered hereunder, and that the sale is entitled to exemption from the retail sales and use tax of the State of Washington under the provisions of RCW 82.08.0261 and WAC 458-20-175, and exemption Section 9.07 (d) of PSAPCA Regulation 1.

**DISCLAIMERS:** No disclaimer stamp of any type or form will be accepted on this bunker certificate, nor should any such stamp be applied, nor will it alter, change or wave U.S. Oil's Maritime Lien against the vessel or wave the vessel's ultimate responsibility and liability for the debt incurred through this transaction.

**MARITIME LIENS:** All disputes arising out of this transaction shall be interpreted and enforced in accordance with the general maritime law of the United States of America and all statutes related thereto.

**DELIVERY POINT:** Title to and the risk of loss of oil passes to customer on delivery of oil to vessel at the vessels flange.

REMARKS:

### SURVEYOR SEAL NUMBERS
M-2212306    S-2212305    B-2212304
R 2212317-2212302    T 2212301-2212321

** ERRORS MADE BY THE BARGEMAN AND CORRECTED BY THE BARGING COMPANY WILL APPEAR AS CORRECTIONS ON THE WHITE COPY ONLY.

| PRODUCT DISCHARGED TO VESSEL LISTED ABOVE | THE FOREGOING RECEIVED ON BOARD VESSEL (SEE STATEMENT ABOVE) |
|---|---|
| A REPRESENTATIVE SAMPLE HAS BEEN TAKEN OF RECEIPT FOR VESSEL (IF SO INDICATED) | |
| SEAL N   Marpol(36822494)Ship(36822385) Barge(36822873) | SEAL # |
| (BARGE CO. REPRESENTATIVE)     9-Oct-14   (DATE) | X   MV SANTA ROBERTA     (TITLE)   10/9/14   (DATE) |
| | CHIEF ENGINEER |

HPL-USOT 00171

# Exhibit 30

| | |
|---|---|
| **From:** | SEASPAN HAMBURG [seaspan_hamburg.VRBH6@globeemail.com] |
| **Sent:** | Friday, October 17, 2014 12:51 PM |
| **To:** | RQMT-SECTION1 |
| **Cc:** | tech-e4@seaspanltd.ca |
| **Subject:** | Seaspan Hamburg - HFO BDN - Tacoma on 16.10.2014 |
| **Attachments:** | BDN HFO Tacoma 16.10.2014.pdf |

Good Day,

Please find attached BDN for 2900mt HFO delivered at Tacoma on 16.10.2014.


Thanks & Best Regards,

Capt. Devjeet Basu
Master , Seaspan Hamburg
US Mobile :- + 1 508 237 5486
Ph: +870 7732 073 00
Ph: +870 7732 096 83
Fax:+870 7839 786 88


Received: from MPD at Globe Wireless;
Fri, 17 Oct 2014 17:17 UTC
Message-id: 322850335

1

HPL-USOT 00113

# U.S. OIL TRADING, LLC

**MARINE BUNKER**
RECEIPT FOR DELIVERY TO VESSEL

| | | |
|---|---|---|
| **TACOMA REFINERY**<br>P.O. BOX 2255<br>TACOMA, WA 98401-2255<br>(253) 383-1651 | **VESSEL NAME:**<br>SEASPAN HAMBURG | **IMO#**<br>924300 | **VESSEL AGENT:**<br>NORTON LILLY |

| VESSEL NAME: SEASPAN HAMBURG | IMO# 924300 | VESSEL AGENT: NORTON LILLY |
|---|---|---|
| BARGE COMPANY: OLYMPIC TUG & BARGE | BARGE NO.: BETSY ARNTZ | U.S. OIL S.A. NUMBER: 14-184 |
| DELIVERY LOCATION (INCLUDE TERMINAL OR DOCK NAME) PCT | | |

## PRODUCT

| GRADE | DENSITY kg/m3 @ 15C | API GRAVITY | FLASH PMCC_F | POUR POINT DEGREES_C | SULFUR WT% | BS&W VOL% | VISCOSITY CST @ 50C | VANADIUM PPM | ALUMINUM PPM |
|---|---|---|---|---|---|---|---|---|---|
| RMK-700 | 978 | 13.1 | 209º | -6 | 2.725% | <0.05 | 674.00 | | |
| | | | | | | | | | |
| | | | | | | | | | |

THIS FUEL OIL COMPLIES WITH REGULATION 14 (1) OR (4) (a) AND REGULATION 18 (1) OF MARPOL ANNEX VI.

REPRESENTATIVE SAMPLES TAKEN AND RETAINED BY _____

PHYSICAL PROPERTY TEST RESULTS LISTED BY _____   SAMPLES DELIVERED TO BARGE BY _____

THIS SECTION TO BE COMPLETED BY BARGE COMPANY REPRESENTATIVE

## QUANTITY**

| | GRADE: RMK 700 | GRADE: RMG 380 |
|---|---|---|
| Total Gross Barrels Delivered By Barge | (19376.18) | 0.00 |
| Temp. and Grav. Conversion Factor | 0.9641 | |
| Total Net Barrels | -18679.73 | 0.00 |
| Conversion Factor - Bbls/ M. Ton | 0.15526 | |
| Metric Tons Delivered | -2900.21 | 0.00 |

| DATE AND TIME ALL FAST AT LOADING TERMINAL | TIME STARTED PUMPING TO VESSEL | DATE AND TIME FINISHED PUMPING TO VESSEL |
|---|---|---|
| October 16, 2014   7:55 | October 16, 2014   10:12 | October 16, 2014   16:37 |

**CERTIFICATION OF EXPORT.** Vessel certifies that it intends to use product delivered to barge at U.S. Oil's terminal for bunkers on a voyage leaving the U.S. Port.

**EXEMPTION FROM SALES AND USE TAX & AIR POLLUTION REGULATION:** The shipper vessel to which this product is delivered is engaged in operating as a private or common carrier by water in interstate or foreign commerce. The recipient certifies that the product purchased under this receipt is for use in connection with its business of operating as a private or common carrier by water in interstate or foreign commerce; that while the vessel is within the territorial boundaries of the State of Washington, it will not consume the product delivered hereunder; and that the sale is entitled to exemption from the retail sales and use tax of the State of Washington under the provisions of RCW 82.08.0261 and WAC 458-20-175, and exemption from Section 9.07 (d) of PSAPCA Regulation 1.

**DISCLAIMERS:** No fuel claims stamp of any type or form will be accepted on this bunker certificate or receipt, any such stamp be applied, nor will it affect charge or claim. U.S. Oil reserves a Maritime Lien against the vessel or waiver of vessel's ultimate responsibility and liability for the debt incurred through this transaction.

**MARITIME LIENS:** All disputes arising out of this transaction shall be interpreted and enforced in accordance with the general maritime law of the United States of America and all statutes related thereto.

**DELIVERY POINT:** Title to and the risk of loss of oil passes to Customer on delivery of oil to vessel at the vessel's flange.

REMARKS:   VESSEL SAMPLE SEAL         SURVEYOR SEAL

LAB        8287135               2212354

Vessel     8287137               2212353

MARPOL     8287121               2212352

Supply     8287136               2212351

ERRORS MADE BY THE BARGEMAN AND CORRECTED BY THE BARGING COMPANY WILL APPEAR AS CORRECTIONS ON THE WHITE COPY ONLY.

| PRODUCT DISCHARGED TO VESSEL LISTED ABOVE | THE FOREGOING RECEIVED ON BOARD VESSEL (SEE STATEMENT ABOVE) |
|---|---|
| A REPRESENTATIVE SAMPLE HAS BEEN DELIVERED TO THE VESSEL REPRESENTATIVE.<br><br>SEAL #: Ship (36833773) Barge (36833729) Marpol (36833767) | M.V. "SEASPAN HAMBURG"<br>RMG 380 |
| BARGE COMPANY REPRESENTATIVE   By _____ 16 Oct 14<br>(BARGE CO. REPRESENTATIVE)   (DATE) | X _____<br>(AUTHORIZED VESSEL OFFICIAL)   (TITLE)   (DATE)<br>Chief Engineer |

HPL-USOT 00114