# EXHIBIT 7

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------x
HAPAG-LLOYD AKTIENGESELLSCHAFT,

               Plaintiff,

                         Case No.
     -against-         14-cv-9949 (VEC)

U.S. OIL TRADING LLC, O.W. BUNKER
GERMANY GMBH, O.W. BUNKER & TRADING
A/S, ING BANK N.V., CREDIT AGRICOLE
S.A.,

               Defendants.
--------------------------------x

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------x
HAPAG-LLOYD AKTIENGESELLSCHAFT,

               Plaintiff,

                         Case No.
     -against-         14-cv-10027 (VEC)

O'ROURKE MARINE SERVICES, L.P.,
L.L.P., O.W. BUNKER GERMANY GMBH,
O.W. BUNKER USA, INC., ING BANK N.V.,

               Defendants.
--------------------------------x

                   January 19, 2016
                   10:05 a.m.

        DEPOSITION of RULE 30(b)(6) WITNESS

             NORBERT KOCK

## Page 2

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   --------------------------------x
     U.S. OIL TRADING LLC,
 3            Plaintiff,
 4            -against-        Case No.
                              15-cv-6718 (VEC)
 5
     M/V VIENNA EXPRESS, her tackle,
 6   boilers, apparel, furniture,
     engines, appurtenances, etc.,
 7   in rem:  M/V SOFIA EXPRESS, her
     tackle, boilers, apparel, furniture,
 8   engines, appurtenances, etc., in rem,
              Defendants.
 9   --------------------------------x
     HAPAG-LLOYD AKTIENGESELLSCHAFT, as
10   Claimant to the M/V VIENNA EXPRESS,
11        Counter-Claimant and
              Third-Party Plaintiff,
12
13        - against -
     U.S. OIL TRADING LLC,
14
              Counter-Defendant and
15
     O.W. BUNKER GERMANY GMBH, O.W. BUNKER
16   & TRADING A/S, ING BANK N.V., and CREDIT
     AGRICOLE CORPORATE AND INVESTMENT BANK
17   a division or arm of CREDIT AGRICOLE S.A.,
18            Third-Party Defendant.
     --------------------------------x
19
20        Deposition of Rule 30(b)(6) Witness,
21   NORBERT KOCK, pursuant to Notice, held at the
22   offices of Freehill Hogan & Mahar LLP, 80 Pine
23   Street, New York, New York, before Roberta
24   Caiola, a Shorthand Reporter and Notary Public
25   within and for the State of New York.
```

## Page 3

```
 1   A P P E A R A N C E S :
 2
 3   Attorneys for Defendant ING Bank N.V.,
 4   as Security Agent:
 5   SEWARD & KISSEL LLP
 6       One Battery Park Plaza
 7       New York, New York 10004
 8   BY:  BRIAN P. MALONEY, ESQ.
 9   AND:  MICHAEL W. BROZ, ESQ.
10
11
12   Attorneys for Hapag-Lloyd Aktiengesellschaft:
13   FREEHILL HOGAN & MAHAR LLP
14       80 Pine Street
15       New York, New York 10005
16   BY:  MICHAEL FERNANDEZ, ESQ.
17   AND:  MICHAEL DEHART, ESQ.
18
19
20
21
22
23
24
25
```

## Page 4

```
 1   A P P E A R A N C E S :
 2
 3   Attorneys for U.S. Oil Trading LLC:
 4   CLYDE & CO. US LLP
 5       405 Lexington Avenue
 6       New York, New York 10174
 7   BY:  CASEY BURLAGE, ESQ.
 8   AND:  JOHN KEOUGH, ESQ.
 9
10   Attorneys for O.W. Bunker Germany GMBH:
11   HILL RIVKINS LLP
12       45 Broadway, Suite 1500
13       New York, New York 10006-3739
14   BY:  JUSTIN M. HEILIG, ESQ.
15
16   Attorneys for O'Rourke Marine Services L.P.:
17   SIMMS SHOWERS LLP
18       201 International Circle, Suite 250
19       Hunt Valley, Maryland 21030
20   BY:  CASEY L. BRYANT, ESQ.
21       (Appearing Telephonically)
22
23   ALSO PRESENT:
24   Andrew Rona, The Interpreter
25
```

## Page 5

```
 1              INDEX
 2   Witness      Examination By        Page
 3   Norbert Kock   Mr. Maloney          12
 4              Mr. Heilig      120
 5              Mr. Keough      165
 6              Ms. Bryant      216
 7              Mr. Maloney     220
 8
 9        E X H I B I T S
10   Kock       Description        Page
11   Exhibit 1  Notice of Rule 30(b)(6)   12
12       Deposition
13   Exhibit 2  Notice of Rule 30(b)(6)   12
14       Deposition
15   Exhibit 3  Document Bates stamped USOT   24
16       000101 through USOT 107
17   Exhibit 4  Document Bates stamped      41
18       HPL-USOT page 131
19   Exhibit 5  Document Bates stamped      43
20       HPL-USOT 135 and HPL-USOT 136
21   Exhibit 6  Document Bates stamped      49
22       HPL-USOT 137 and HPL-USOT 138
23   Exhibit 7  Document Bates stamped      50
24       HPL-USOT 139 and HPL-USOT 140
25
```

Elisa Dreier Reporting Corp., a U.S. Legal Support Company  (212) 557-5558
950 Third Avenue, New York, NY  10022

Page 14

Norbert Kock (1-19-16)

1    interpreter here today and we'll do that.  Does
2    that make sense?
3        A.    That makes sense.
4        MR. FERNANDEZ:  Brian, at the
5    beginning, are we reserving all objections but
6    for form and foundation, federal stips or usual
7    stips?
8        MR. KEOUGH:  That's fine with me.
9    The witness will sign before any notary if he so
10   chooses.
11       MR. MALONEY:  Okay.
12       Q.    By whom are you employed?
13       A.    I'm employed by Hapag-Lloyd AG in
14   Hamburg.
15       Q.    That's the entity that's the named
16   party in this case?
17       A.    Yes.
18       Q.    Are there any other parent
19   companies or subsidiaries that you're employed
20   by?
21       A.    No.
22       Q.    What's your title?
23       A.    My title is Director of Purchasing
24   and Supply.
25

Page 15

Norbert Kock (1-19-16)

1        Q.    What are your job responsibilities
2    as the director of purchasing and supply?
3        A.    I am responsible for providing the
4    fleet of Hapag-Lloyd's owned and chartered
5    containers with fuel oil and lubricants, and
6    some selected chemicals, marine chemicals
7    worldwide.
8        Q.    You mentioned that Hapag-Lloyd has
9    a fleet.  Does it own many vessels?
10       A.    Hapag-Lloyd owns a good number of
11   vessels, but also chartered a good number of
12   vessels.  The total capacity at the moment is
13   about 175 vessels operated.
14       Q.    So Hapag-Lloyd operates about 175
15   vessels?
16       A.    Yes.
17       Q.    That's either owned or chartered?
18       A.    Yeah.
19       Q.    I'm going to show you documents
20   that we've marked as Exhibits 1 and 2.  It's the
21   Notice of 30(b)(6) Deposition that we've issued
22   in two of these three cases.  I believe the
23   understanding is that you're here for a third
24   case as well, case number 15-cv-6718.
25

Page 16

Norbert Kock (1-19-16)

1        I'll ask you to take a look at the
2    documents that we've marked as Exhibits 1 and 2?
3        MR. FERNANDEZ:  Are there extra
4    copies, Brian?
5        MR. MALONEY:  Absolutely.  So
6    Exhibit 1 for the record is the Notice of
7    Deposition in case number 14-cv-9949, which is
8    Hapag-Lloyd against U.S. Oil Trading and others.
9    Exhibit Number 2 is 14 CV 10027, Hapag-Lloyd
10   against O'Rourke Marine Services, and others.
11       Q.    Sir, have you seen these documents
12   before?
13       A.    No.
14       Q.    What did you do to prepare for
15   today's deposition?
16       A.    For today's preparation we had a
17   brief meeting yesterday, because I've never been
18   part of such a deposition neither here nor
19   Germany, nor anywhere else in the world, and the
20   gentlemen explained to me a bit about the
21   procedure here and what it is all about.
22       Q.    Could you turn to page 3 of the
23   document that we've marked as Exhibit 1.  Have
24   you seen any of these topics before here on page
25

Page 17

Norbert Kock (1-19-16)

1    3?
2        MR. FERNANDEZ:  Objection to form.
3        A.    Some of this has been part of the
4    declaration I had given earlier this year.
5        Q.    You understand that you're
6    appearing here today as the corporate
7    representative of Hapag-Lloyd, and you prepared
8    yourself to answer questions about topics, such
9    as the topics that are listed here on page 3?
10       A.    Yes.
11       Q.    Who at Hapag-Lloyd is authorized to
12   procure fuel bunkers for the vessels?
13       A.    The Hapag-Lloyd purchasing
14   department.
15       Q.    Who is in the Hapag-Lloyd
16   purchasing department?
17       A.    As it's my department, I'm leading
18   that department as a director and I'm leading a
19   team of purchasing managers.  This team is
20   entitled also to order fuel oil -- we are
21   entitled and authorized to order and purchase
22   fuel oil.
23       Q.    And about how long have you been
24   the director of the fuel purchasing department
25

Elisa Dreier Reporting Corp., a U.S. Legal Support Company  (212) 557-5558
950 Third Avenue, New York, NY  10022

Page 18

Norbert Kock (1-19-16)

1  Norbert Kock (1-19-16)
2  at Hapag-Lloyd?
3      A.    As a director, they put me into
4  that position I think it was in October 2007.
5      Q.    About how long have you been
6  working for Hapag-Lloyd?
7      A.    I started my career at Hapag-Lloyd
8  in 1990.
9      Q.    Were you employed by any other
10 companies previous to that?
11     A.    Yes.
12     Q.    Where were you employed prior to
13 1990?
14     A.    Prior to 1990 I have been employed
15 by a company called Sachs-Dolmar, which is a
16 chain saw manufacturer.
17     Q.    Would you mind spelling that for
18 the record?
19     A.    At that time the company's name
20 was --
21           THE INTERPRETER:  Spell just the
22 name.
23     A.    S-a-c-h-s then hyphen D-o-l-m-a-r.
24     Q.    What was your first position at
25 Hapag-Lloyd?

Page 19

Norbert Kock (1-19-16)

1  Norbert Kock (1-19-16)
2      A.    A purchasing manager for technical
3  spare parts and tools.
4      Q.    And you came to that position in
5  1990?
6      A.    Yes.
7      Q.    What did you do after that?
8      A.    They lifted me into the position of
9  a director.
10     Q.    So you were the purchasing --
11     A.    Between May 1990 and 1992 I was a
12 technical purchasing manager, and then I moved
13 over into the position of a fuel oil purchaser
14 in 1992, and stayed in this position until 2007.
15     Q.    Could you describe what your
16 responsibilities were as a fuel oil purchaser
17 during that time period, between 1992 and 2007?
18     A.    I was physically doing the
19 purchasing, there was no team.  I mean there was
20 a small team, the team was only limited to, when
21 I started, to two persons.
22     Q.    Was Hapag-Lloyd a smaller company
23 back in the 1990s?
24     A.    Yes.  At that time, yes.
25     Q.    About how large was Hapag-Lloyd in

Page 20

Norbert Kock (1-19-16)

1  Norbert Kock (1-19-16)
2  the 1990s?
3      A.    At that time we operated about 35,
4  40 vessels.
5      Q.    So by the time of about 2007,
6  Hapag-Lloyd had grown and you needed more
7  purchasers on the team?
8      A.    Yes.
9      Q.    So you've been director of the fuel
10 purchasing team from 2007 to the present?
11     A.    Right.
12     Q.    In about 2013 and 2014, about how
13 large was the bunker purchasing team at
14 Hapag-Lloyd?
15     A.    At that time we had a total team of
16 five persons, including me.  There was me as a
17 director and four purchasing managers.
18     Q.    Who were the purchasing managers on
19 your team?
20     A.    The purchasing manager on my team
21 at that time was Lukas Gaus.
22     Q.    L-u-k-a-s?
23     A.    Yes.  Then Gaus, G-a-u-s.  Nikolai
24 Doerner.
25     Q.    Would you mind spelling that?

Page 21

Norbert Kock (1-19-16)

1  Norbert Kock (1-19-16)
2      A.    Nikolai, N-i-k-o-l-a-i, and the
3  family name Doerner, it's D-o-e-r-n-e-r.  Then
4  we have Mrs. Niemeyer, Dorit Niemeyer.
5      Q.    N-i-e-m-e-y-e-r?
6      A.    Yeah, Niemeyer.  We had Ana Dubois.
7           THE INTERPRETER:  D-u-b-o-i-s.
8      Q.    So those individuals report to you,
9  correct?
10     A.    Yes.
11     Q.    Who do you report to?
12     A.    I report to the senior director of
13 purchasing and supply.  The name?
14     Q.    Yes.  Please.
15     A.    Ulf Naujeck.  U-l-f, then the
16 family name Naujeck, N-a-u-j-e-c-k.
17     Q.    Is the bunker purchasing team
18 located in Hamburg?
19     A.    Yes.
20     Q.    That is where Hapag-Lloyd is
21 headquartered?
22     A.    Yes.
23     Q.    About how many employees does
24 Hapag-Lloyd have in total today?
25           MR. FERNANDEZ:  Is this in Hamburg

6 (Pages 18 to 21)

Page 22

Norbert Kock (1-19-16)

1  or worldwide?
2      A.   I think worldwide about 12,000.
3  I'm not sure.  We have a lot of seafarers, we
4  have a lot of land-based people, we have a lot
5  of offices around worldwide.
6      Q.   So worldwide, ballpark, about
7  12,000 people?
8      A.   I would assume that, yes.
9      Q.   And in Hamburg, about how many
10  people in the headquarters?
11      A.   In Hamburg, I think about a
12  thousand.  This is also an estimation, I don't
13  have the actual figures.
14      Q.   Do you understand that the cases
15  that you're appearing here in connection as
16  Hapag-Lloyd's corporate representative today
17  involve certain bunker purchasing transactions
18  with vessels that involved Hapag-Lloyd,
19  including the SANTA ROBERTA, the SEASPAN
20  HAMBURG, the VIENNA EXPRESS, the SOFIA EXPRESS,
21  the DERBY D and SIDNEY EXPRESS?
22      A.   Yes.
23      Q.   Did Hapag-Lloyd own or charter
24  those vessels?

Page 23

Norbert Kock (1-19-16)

1      A.   The VIENNA EXPRESS is an owned
2  vessel.
3      Q.   We'll take them one by one as we go
4  through.  In connection with those vessels that
5  I just mentioned, did Hapag enter into a
6  contract with anyone whereby they purchased fuel
7  for those vessels?
8          MR. FERNANDEZ:  Objection to the
9  form.
10      A.   The purchasing is done by
11  Hapag-Lloyd's purchasing department.  We are not
12  entitling any other party to do the purchasing
13  for us, we are the responsible purchasers.
14      Q.   Understood.  So in connection with
15  those vessels that I mentioned, those six
16  vessels, who did Hapag-Lloyd's bunker purchasing
17  department purchase the fuel from?
18      A.   We purchased the fuel from O.W.
19  Bunker in Germany.
20      Q.   O.W. Bunker Germany, GMBH?
21      A.   Yes.
22      Q.   Did you enter into any agreements
23  with O.W. Bunker Germany about the price of fuel
24  that you would purchase from them?

Page 24

Norbert Kock (1-19-16)

1      A.   Yes.
2      Q.   Let me show you a document with
3  Bates numbers USOT 000101 through 107.  This is
4  a document that's attached to Hapag-Lloyd's
5  complaint that was filed December 17, 2014.
6          MR. MALONEY:  We'll mark it as
7  Exhibit 3.
8          (Kock Exhibit 3, Document Bates
9  stamped USOT 000101 through USOT 107, marked for
10  identification.)
11      Q.   Sir, have you seen this document
12  before?
13      A.   Yes.
14      Q.   What is this document?
15      A.   This is a contract pamphlet
16  covering our requirements, our fuel oil
17  requirements in the Ports of Antwerp and
18  Rotterdam during the period of January 1st and
19  December 31, 2014.
20      Q.   And the --
21      A.   For the below mentioned fuel oil
22  grades and expected quantities.
23      Q.   What does ARA mean at the top?
24      A.   ARA is the abbreviation for the

Page 25

Norbert Kock (1-19-16)

1  Ports of Hamburg, Rotterdam and Amsterdam.
2      Q.   This contract appears to relate to
3  fuel deliveries during the year 2014?
4      A.   Yes.
5      Q.   And the seller is listed as O.W.
6  Bunker Germany?
7      A.   Yes.
8      Q.   And the buyer is Hapag-Lloyd AG in
9  Hamburg?
10      A.   Yes.
11      Q.   Does this contract relate to
12  particular fuel deliveries, or is it a pricing
13  agreement that's used prior to particular
14  transactions being entered into?
15          MR. FERNANDEZ:  Objection to the
16  form.
17      A.   This is a pricing agreement on
18  expected annual quantities which we provided
19  here in column 3 and 4, because we contracted
20  some different fuel oil grades here in this
21  contract.  RMG, RMK 700, RMK 500 low sulfur, RMG
22  380 low sulfur, and distillate fuel like DMZ and
23  DMA, also low sulfur.
24          MR. FERNANDEZ:  For the record, the

Elisa Dreier Reporting Corp., a U.S. Legal Support Company  (212) 557-5558
950 Third Avenue, New York, NY  10022

Norbert Kock (1-19-16)

1   Norbert Kock (1-19-16)
2   witness is referring to USOT 101, the first page
3   of the document.
4       Q.   Was this agreement for one
5   transaction or more than one transaction?
6       A.   More than one transaction.
7       Q.   Were you involved or was a member
8   of your team involved in negotiating this
9   document?
10      A.   Yeah.  I was involved, team members
11  were involved, as well as the senior director of
12  purchasing and supply.
13      Q.   When was the first time that you
14  worked with O.W. Bunker Germany or other
15  entities in the O.W. Bunker Group?
16      A.   We started working with O.W. in
17  2007.
18      Q.   Did you often purchase fuel from
19  O.W. Bunker Germany?
20          MR. FERNANDEZ:  Objection to the
21  form.  Go ahead, you can answer.
22      A.   Yes.
23      Q.   Did you deal with any other
24  entities in the O.W. Bunker Group?
25      A.   No.

1   Norbert Kock (1-19-16)
2       Q.   Only with O.W. Germany?
3       A.   Yes.  There was a time in between
4   when they were -- when the company was named
5   Wrist Bunker.
6       Q.   Wrist, W-r-i-s-t?
7       A.   Yes.  This was the same people.
8       Q.   About how long did it take to
9   negotiate this document here, USOT page 101?
10      A.   This contract was negotiated for
11  the total requirements of that specific -- these
12  products during the period of 2014, though it
13  has been negotiated between October to
14  December 2013.
15      Q.   Did you have a pricing agreement in
16  place for the year 2013 with O.W. Germany?
17          MR. FERNANDEZ:  Objection to the
18  form.
19      A.   Might be.  I don't have access to
20  my records here.  So it could be that we had
21  selected products agreements also in 2013 also
22  in other areas, not only in Rotterdam and
23  Antwerp.
24      Q.   The line below the chart reads:
25          "The above mentioned quantities are

1   Norbert Kock (1-19-16)
2   indicative and the buyer is allowed to exceed or
3   reduce the quantities, along with buyer's
4   requirements, in the above mentioned ports by
5   plus or minus 20%."
6           Do you have an understanding of
7   what that means?
8       A.   In case of unexpected changes of
9   services there is a good chance that we will be
10  not able to take the expected quantities as
11  given in this contract here.  Or in case of
12  vessel sales, there might be a good chance to
13  buy less than previously agreed upon.  Or it's
14  the other way around, it could be even more
15  sometimes.
16          This is just a requirement to
17  secure that there is some kind of flexibility in
18  these quantities, that we are not bound to these
19  quantities, to have a flexibility of some plus
20  or minus 20 percent.
21      Q.   In case the vessel needs more or
22  less?
23      A.   In case the vessel needs more or
24  less, or in case we are just changing service
25  volumes from one area to another area.

1   Norbert Kock (1-19-16)
2   Sometimes it could happen that we will buy less
3   fuel oil in Northwest Europe and shift
4   quantities, more quantities to Asia; because
5   also maybe the price levels in Asia could drop
6   below Northwest Europe and we could take more in
7   Asia; to have that flexibility.
8       Q.   In the event you needed to make
9   those changes, you would communicate with
10  persons at O.W. Germany?
11      A.   Yes.
12      Q.   Under the heading marked
13  "Pre-Planning" the document reads "Monthly
14  pre-planning schedule to be sent in advance for
15  the following month."
16          Did Hapag-Lloyd send a schedule to
17  O.W. Germany?
18      A.   Yes.
19      Q.   What was the purpose of the monthly
20  pre-planning schedule?
21      A.   To give them an idea about the
22  estimated quantities which will be taken in that
23  month.  Plus, they have also to take care to
24  have enough product available for us.
25      Q.   Could you tell me what the line

8 (Pages 26 to 29)

Norbert Kock (1-19-16)

1 in this version of our terms and conditions.
2 Q. Looking at page 102 --
3 A. Claims. This is paragraph 13 on
4 page 106 on top, any claim to the quality or the
5 description of this fuel oil must be notified in
6 writing promptly after the circumstances giving
7 rise to such claim have been discovered, if the
8 buyer do not notify the seller of such claim
9 within 60 calendar days of the date of delivery
10 for term contracted low sulfur fuel oil supplies
11 in Antwerp or Rotterdam.
12 So this mentioned here means we
13 have a special agreement on the -- or we have
14 had a special agreement on the quality claim of
15 60 days only for low sulfur fuel oils in Antwerp
16 and Rotterdam. Then the next sentence says 30
17 days of the date of delivery for supplies of oil
18 in remaining ports worldwide. So this pamphlet
19 here is not a standard Hapag -Lloyd pamphlet,
20 this pamphlet here has been negotiated with O.W.
21 Q. So these terms and conditions apply
22 to purchases and sales with O.W. Bunker Germany,
23 is that your position?
24 A. Yes.

Norbert Kock (1-19-16)

1 MR. FERNANDEZ: Objection as to
2 form.
3 MR. KEOUGH: Could you read back
4 the last question, I didn't hear the end of the
5 question.
6 (Record read.)
7 MR. FERNANDEZ: In relation to the
8 vessels we're discussing here? These are pretty
9 broad statements that are being made and I don't
10 think you've asked him about the vessels that
11 we're looking at here.
12 MR. MALONEY: We'll get to it
13 vessel by vessel.
14 Q. The document at pages 101 and 102
15 is on O.W. Bunker's letterhead, but the document
16 from pages 103 to 107 is on Hapag-Lloyd's
17 letterhead.
18 Do you understand the reason for
19 the difference?
20 A. Because these negotiated terms and
21 conditions has been originally based upon our
22 terms and conditions. There was some
23 corrections made to bring this into an
24 acceptable version, which also could be accepted

Norbert Kock (1-19-16)

1 by O.W. Bunker Germany, because they didn't
2 accept our required claim period of 60 days at
3 that time.
4 Q. So is it fair to say that the
5 document at 101 and 102 was prepared by O.W.
6 Bunker Germany?
7 A. Yes.
8 Q. And that the terms and conditions
9 at pages 103 to 107 were prepared by
10 Hapag-Lloyd?
11 A. Yes.
12 Q. The SANTA ROBERTA, that's one of
13 the vessels at issue here today, was that on
14 time charter in 2014?
15 A. It was a charter vessel. I don't
16 know whether it was a time charter. It was a
17 charter vessel at that time.
18 Q. Do you know whether the
19 relationship was governed by a Charter Party
20 agreement?
21 A. Yes, it must be a Charter Party.
22 Q. Was it Hapag-Lloyd that was
23 responsible for purchasing the fuel for the
24 SANTA ROBERTA?

Norbert Kock (1-19-16)

1 A. Yes.
2 Q. Do you know who owned that vessel
3 in 2014?
4 A. No.
5 Q. How does the order come into the
6 bunker purchasing department, is it communicated
7 to your department by the vessel?
8 MR. FERNANDEZ: Objection to the
9 form.
10 A. There is no order coming into our
11 department. There is a requisition coming from
12 the vessel into our department.
13 MR. MALONEY: Let's mark this
14 document as Exhibit 4, it's HPL-USOT page 131.
15 (Kock Exhibit 4, Document Bates
16 stamped HPL-USOT page 131, marked for
17 identification.)
18 Q. Have you seen this document before?
19 A. Yes.
20 Q. What is this document?
21 A. This is a requisition of the SANTA
22 ROBERTA for 3,000 tons of heavy fuel oil and
23 100 tons of diesel oil at the U.S. East Coast or
24 West Coast, I don't know, and Canada.

11 (Pages 38 to 41)

Page 42

Norbert Kock (1-19-16)

1
2      Q.   This email is coming from the
3 vessel --
4      A.   Sorry, sorry.  For me this looks
5 more than a pre-communication between the vessel
6 and the vessel's stowage center, because these
7 guys say, "Please note vessel intends to raise
8 the requisition for 3,000 tons."  So this has to
9 be coordinated with the responsible stowage
10 center.
11      Q.   Do you know any of the recipients
12 on this email?
13      A.   Yep.
14      Q.   Who is Harry Moran?
15      A.   I don't know Harry, but the next
16 address, Marine NONGA, this is TPA, at that time
17 was the stowage center.  I think Harry Moran was
18 part of the team.  The Marine NONGA was a big
19 branch of a centralized email address of a big
20 number of individuals, and just was putting
21 Harry Moran up front of it to be sure that he is
22 taking care to give his okay for 3,000 tons of
23 fuel oil.
24      Q.   What does TPA stand for?
25      A.   Tampa.  At that time this was the

Page 43

Norbert Kock (1-19-16)

1
2 location where these guys were sitting.
3      Q.   Is NONGA an acronym, N-O-N-G-A?
4      A.   Yeah, but I can't explain it.
5      Q.   What is Fleet 4?
6      A.   Fleet 4 is also a -- possibly
7 related to a stowage center, to another part.  I
8 can't really give a clear definition here
9 because I do not have the codes really here they
10 used at that time.
11      Q.   I have the same question about the
12 other persons copied on this email?
13      A.   Vpillai, I don't know that.
14 Michael Nigmann is known, he is one of the
15 controlling guys in our company.  Then we have
16 the RQMT-Section 4 mailbox included, but this is
17 more an informal message for these guys at that
18 time.
19      MR. MALONEY:  Let's take a look at
20 a document Bates labeled HPL-USOT page 135 and
21 136.
22      (Kock Exhibit 5, Document Bates
23 stamped HPL-USOT 135 and HPL-USOT 136, marked
24 for identification.)
25      Q.   This is an email dated

Page 44

Norbert Kock (1-19-16)

1
2 September 26, 2014 from the SANTA ROBERTA to
3 RQMT-Section 4 and others?
4      A.   Yes.
5      Q.   Have you seen this email before?
6      A.   Yes.
7      Q.   What does this document refer to?
8      A.   This document refers to the bunker
9 requisition form which should be attached to
10 this email here.
11      Q.   On page 136, is that the bunker
12 requisition form?
13      A.   Yes.
14      Q.   Is this a request from the vessels,
15 the stem bunkers, at Tacoma, Washington?
16      MR. FERNANDEZ:  Objection to the
17 form.
18      A.   This is a bunker requisition asking
19 Hapag-Lloyd fuel purchasing to deliver the
20 mentioned quantities and qualities.
21      Q.   Who is iocdo@nrcc.com in the cc
22 line of this email?
23      A.   I don't know.  It's not known to
24 me.  Maybe it's one of the owner's addresses,
25 the owner of the vessel, because SANTA ROBERTA

Page 45

Norbert Kock (1-19-16)

1
2 is a charter vessel, or was a charter vessel at
3 that time.  It's an MSC vessel, we can see it on
4 the email here above the vessel's name.  We also
5 can identify the email address, VP line is also
6 MSC, so it's the owner, but the IOCDO email, I
7 have no idea what this is.
8      Q.   What is "RQMT-Section 4"?
9      A.   This is the mailbox of our
10 department for that bunker section.
11      Q.   Your bunker purchasing department?
12      A.   This is our purchasing department.
13 We have a couple of mailboxes available, the
14 service is divided.
15      Q.   Would you receive emails at this
16 address?
17      A.   Pardon?
18      Q.   Would you receive emails at this
19 RQMT address?
20      A.   Not me personally.  This is an
21 email address of one of our purchasing managers
22      Q.   Which person is that?
23      A.   I can't remember who was taking
24 care for the section 4 in 2014.
25      Q.   Did section 4 --

Elisa Dreier Reporting Corp., a U.S. Legal Support Company  (212) 557-5558
950 Third Avenue, New York, NY  10022

Page 46

1          Norbert Kock (1-19-16)
2      A.   I can remember Lukas Gaus was
3  taking care of section 1 in that year.  I can
4  remember Mr. Doerner was taking care of section
5  2.  Ms. Niemeyer was taking care of section 3,
6  I'm not really sure.  So Mrs. Dubois should be
7  responsible for section 4 at that time.
8      Q.   What's your level of confidence in
9  that recollection?
10     A.   75 percent.
11         MR. KEOUGH:  Object.
12         MR. FERNANDEZ:  Let's not speculate
13 or guess, if you know something you know
14 something.  If you don't know you don't know.
15     A.   That's two years ago.
16     Q.   Would there be a document that
17 would refer to which persons of your team were
18 responsible for which sections?
19     A.   Yes.
20     Q.   Would that document be in your
21 files back in Hamburg?
22     A.   Yes.
23     Q.   What did the sections relate to?
24 Were they geographic designations?
25     A.   That's how it started.  That's how

Page 47

1          Norbert Kock (1-19-16)
2  it started.  We had a strict geographically --
3         THE INTERPRETER:  Limitation.
4      A.   -- limitation that each section was
5  taking care just for a specific geographic
6  region.  It started with section 1 responsible
7  for U.S. and South Americas.  Section 2
8  responsible for North West Europe, section 3 was
9  responsibilities for Asia Pacific area, and then
10 we added at that time a section 4 responsible
11 for the Mediterranean area, and also certain
12 parts of the U.S.
13         This was always handled also kind
14 of flexible in case of somebody was going on
15 vacation or being absent, on sick leave.  Also,
16 the discipline of the vessels, taking care to
17 direct the emails into the correct requirement
18 section was not 100 percent.
19     Q.   Was there a reorganization at a
20 certain point as to these sections?
21     A.   Yes.
22     Q.   When was that?
23     A.   This was the hiring of Mrs. Dubois
24 and Mr. Gaus.
25     Q.   So sometime in 2014?

Page 48

1          Norbert Kock (1-19-16)
2      A.   Yes.  2013-2014.
3      Q.   Could you tell me just generally
4  how were the sections reorganized?
5      A.   We came to the conclusion that it
6  would not be longer feasible to just have the
7  strict geographical limitation, but also to look
8  more into the services.  So there was a more
9  service-oriented pattern brought forward.
10     Q.   What's the next step for the bunker
11 purchasing department at Hapag-Lloyd after a
12 bunker requisition form comes in from the
13 vessel?
14     A.   To confirm it.  To confirm the
15 receipt of that document.
16     Q.   After the bunker purchasing
17 department at Hapag-Lloyd confirms receipt of a
18 bunker requisition form, what do members of your
19 team do next?
20     A.   Next they are looking whether the
21 requisition makes sense.  Whether there are
22 ports around this port which has been named
23 here, Tacoma, on the vessel schedule which might
24 be more economic to buy fuel oil, for example.
25 Then to communicate with the vessel to check

Page 49

1          Norbert Kock (1-19-16)
2  whether it would be possible for the vessel to
3  maybe go also to another port to buy it more
4  economically.
5      Q.   Let's take a look at the next
6  exhibit.
7         (Kock Exhibit 6, Document Bates
8  stamped HPL-USOT 137 and HPL-USOT 138, marked
9  for identification.)
10     Q.   I'm handing you a document that's
11 been marked as Exhibit 6, Bates labeled HPL-USOT
12 137 and 138.  Have you seen this document
13 before?
14     A.   Yes.
15     Q.   What is this document?
16     A.   This is the confirmation of the
17 responsible section manager, which was Lukas
18 Gaus here at that time.  That he received the
19 vessel's requirement and that he would suggest
20 to not only concentrate on Tacoma, but also do
21 it for all those agents in Oakland with an
22 inquiry.
23         This is generally being done for
24 all bunker requisitions coming from vessels to
25 make sure the guys onboard know that we received

13 (Pages 46 to 49)

Page 50

Norbert Kock (1-19-16)

1
2 the requirement, otherwise they are not sure.
3 They might be asking us or picking on us.
4        (Kock Exhibit 7, Document Bates
5 stamped HPL-USOT 139 and HPL-USOT 140, marked
6 for identification.)
7     Q.   I'm handing you a document that
8 we've marked as Exhibit 7, pages 139 to 140
9 HPL-USOT 139 to 140.
10       So after you've confirmed receipt
11 of the bunker requisition, what is the next step
12 for the bunker purchase department?
13    A.   To investigate the local markets to
14 start a tender process, an inquiry.
15    Q.   The email that I've placed in front
16 of you that's stamped pages 139 to 140, is that
17 a tender or inquiry?
18    A.   Yes.
19    Q.   Is this an email blast to multiple
20 participants?
21    A.   Pardon?
22    Q.   Is this an email that's sent out to
23 your counterparties?
24    A.   Yes.
25    Q.   About how many counterparties did

Page 51

Norbert Kock (1-19-16)

1
2 the bunker purchasing department have in 2014?
3    A.   In total?
4        MR. FERNANDEZ:  Objection to the
5 form.
6     Q.   Was it more than ten?
7     A.   Yes, about 50; 40, 50.
8     Q.   Around the world?
9     A.   Yes.
10    Q.   Would Mr. Gaus send this to a
11 selection of those counterparties only in the
12 ports, the applicable ports?
13    A.   Yeah.
14       MR. FERNANDEZ:  Objection to the
15 form.
16    Q.   After this inquiry is sent out,
17 would the bunker purchasing department receive
18 quotes for the supply?
19    A.   Yes.
20    Q.   Would that be from entities like
21 the O.W. Bunker Group?
22    A.   Yes.
23    Q.   Anyone else?
24    A.   Traders.  I mean specifically here
25 for this region at the U.S. West Coast there's

Page 52

Norbert Kock (1-19-16)

1
2 no other -- at that time there was no other
3 chance for us but to go to traders.
4     Q.   Would you have any preference to
5 use O.W. Bunker as opposed to another trader?
6     A.   No.
7     Q.   Would your primary consideration be
8 price or something else?
9     A.   Price is one of the considerations,
10 yes, but also the product quality which is
11 offered by the trader.
12       (Kock Exhibit 8, Document Bates
13 stamped HPL-USOT 144 to HPL-USOT 146, marked for
14 identification.)
15    Q.   We have marked as the next exhibit,
16 Exhibit 8, a document Bates labeled HPL-USOT 144
17 to 146.
18       This is an email chain between
19 Mr. Gaus and Andre Maierhofer,
20 M-a-i-e-r-h-o-f-e-r?
21    A.   Yes.
22    Q.   Do you know Mr. Maierhofer?
23    A.   Yes.
24    Q.   Who is he?
25    A.   He is one of the salespersons of

Page 53

Norbert Kock (1-19-16)

1
2 Peninsula Petroleum.
3     Q.   What is Peninsula Petroleum?
4     A.   Peninsula Petroleum is a, in
5 certain areas of the world a physical supplier,
6 in other areas acting as a trader.
7     Q.   Were they in competition with O.W.
8 Germany?
9     A.   Yes.
10    Q.   Were they providing a quote here to
11 fuel the SANTA ROBERTA?
12    A.   Yes.
13    Q.   At the top of the email
14 Mr. Maierhofer says, "Hi Lukas, any feedback on
15 this one, are we in the ballpark?"
16       Do you understand what he means by
17 that sentence?
18    A.   He demanded for a feedback from
19 Lukas Gaus whether his quotation is favorable or
20 not that he possibly could --
21       (Discussion between interpreter and
22 the witness.)
23       MR. KEOUGH:  The witness is
24 conferring with the interpreter and I'm not sure
25 what's being discussed while the question is

14 (Pages 50 to 53)

Page 54

Norbert Kock (1-19-16)

1    pending. I would ask respectfully that the
2    witness speak on the record.
3
4            If you need to use the interpreter
5    perhaps you could tell Mr. Maloney and they can
6    discuss it with your lawyer. I think the record
7    should -- to keep the record accurate we need to
8    have some order in that respect, if that's okay.
9    I'm sorry to interrupt.
10       Q.   Did you understand my question,
11   sir?
12       A.   Could you please ask your question
13   again?
14           (Record read.)
15       A.   Yes. This was part of the
16   negotiation process between Lukas Gaus and
17   Andreas Maierhofer. Andreas Maierhofer offered
18   product and he wanted to get a feedback whether
19   the price levels and the product quality was
20   favorable for us or not.
21       Q.   Okay. Thank you. Did Peninsula
22   Petroleum get the contract for the supply to the
23   SANTA ROBERTA?
24       A.   No.
25           MR. MALONEY: Let's take a look at

Page 55

Norbert Kock (1-19-16)

1    a document I'll mark as Exhibit 9.
2            (Kock Exhibit 9, Document Bates
3    stamped HPL-USOT 142, marked for
4    identification.)
5            MR. MALONEY: It's Bates labeled
6    HPL-USOT page 142.
7        Q.   This is an email from Karl Heinz
8    Selmer to Mr. Gaus. Have you seen this document
9    before?
10       A.   Yes.
11       Q.   What are typicals?
12       A.   Typicals are naming the
13   specifications of the fuel oil which are
14   allowing us to calculate the specific energy of
15   the offered product, and to see the ignition
16   purposes of the fuel oil.
17       Q.   Do you have an understanding what
18   Mr. Selmer is referring to under Tacoma, Oakland
19   and LA in this email?
20       A.   Yeah, he is mentioning the required
21   parameters to calculate the energy. He is
22   informing us about the product viscosity, the
23   API, which is the density of the product, the
24   weight, the water content, the ash content, the

Page 56

Norbert Kock (1-19-16)

1    sulfur content. This is the basic requirement
2    from us, to have this information.
3        Q.   Would there be additional
4    communications, other than by email, with
5    traders like O.W. Bunker?
6        A.   Yes.
7        Q.   What would those communications be?
8        A.   Telephone, it's telephone
9    communications. Most of the negotiation stuff
10   was done by telephone. So if a seller cannot
11   reach the responsible purchaser he will write an
12   email.
13           MR. MALONEY: We've been going for
14   about an hour and a half, would you like to take
15   a five-minute break?
16           THE WITNESS: Yes.
17           (Short recess taken.)
18   BY MR. MALONEY:
19       Q.   We've been talking about the fuel
20   supply to the SANTA ROBERTA. Who received the
21   nomination for the fuel supply after the traders
22   put in their offers to the bunker purchasing
23   department of Hapag-Lloyd?
24           MR. FERNANDEZ: Objection to the

Page 57

Norbert Kock (1-19-16)

1    form.
2        A.   O.W. Germany.
3            MR. MALONEY: I'm going to mark as
4    Exhibit 10 a document Bates labeled HPL-USOT 147
5    through 150.
6            (Kock Exhibit 10, Document Bates
7    stamped HPL-USOT 147 through HPL-USOT 150,
8    marked for identification.)
9        Q.   Do you recognize this document,
10   sir?
11       A.   Yes.
12       Q.   What is this document?
13       A.   This is the formal order
14   confirmation sent by Mr. Karl Heinz Selmer to
15   Mr. Lukas Gaus, to confirm the order they had
16   received from us.
17       Q.   Page 148, the attachment to this
18   email, is this the sales order confirmation that
19   was sent from O.W. Bunker Germany to Hapag-Lloyd
20   AG?
21       A.   Yes.
22       Q.   The seller in this document is
23   listed as O.W. Bunker Germany GMBH?
24       A.   Yes.

Elisa Dreier Reporting Corp., a U.S. Legal Support Company  (212) 557-5558
950 Third Avenue, New York, NY  10022

Page 58

Norbert Kock (1-19-16)

1
2     Q.    And it's for the supply of fuel to
3  the SANTA ROBERTA?
4     A.    The supplier has been mentioned as
5  U.S. Oil.  U.S. Oil has been mentioned as their
6  physical supplier.
7     Q.    Did Hapag-Lloyd have any control
8  over the selection of the physical supplier?
9     A.    No.
10     Q.    Did Hapag-Lloyd direct O.W. Germany
11  to use U.S. Oil for the supply of fuel in
12  Tacoma?
13     A.    No.
14     Q.    What is Norton Lilly?
15     A.    Norton Lilly is the local agency of
16  Hapag-Lloyd in this area.
17     Q.    Can you explain what a port agent
18  is?
19     A.    The agent is responsible to
20  coordinate also bunker supplies or lubricant
21  supplies between the local vendors and the
22  vessel; and in case of fuel oil supplies also
23  the engaged quality control, which is normally a
24  bunker surveyor engaged by us.
25     Q.    Was there a bunker surveyor engaged

Page 59

Norbert Kock (1-19-16)

1
2  in connection with this supply?
3     A.    Yes.
4     Q.    Who was that, if you recall?
5     A.    Oiltest.
6     Q.    Does a port agent such as Norton
7  Lilly, or a bunker surveyor such as Oiltest, do
8  they have any responsibility for purchasing
9  fuel?
10     A.    No.
11     Q.    They are not authorized by
12  Hapag-Lloyd to purchase fuel?
13     A.    No.
14     Q.    It's fair to say that they're
15  involved in the logistics of coordinating the
16  delivery after the order is placed?
17     A.    Yes.
18     Q.    Under remarks there's a designation
19  that says "HALO GTC2007 shall apply."  What does
20  that mean?
21     A.    They are referring to an earlier
22  accepted set of terms and conditions of
23  Hapag-Lloyd, which has been created in 2006, but
24  the business condition between O.W. Bunker
25  Germany and Hapag-Lloyd were begun or started in

Page 60

Norbert Kock (1-19-16)

1
2  2007.  This was a year when O.W. Bunker accepted
3  our terms and conditions of 2006.
4     What they are mentioning here is
5  that they are delivering or that they will
6  deliver based on our GTCs of 2007, but 2007 was
7  the date of the signature.  The date, the year
8  of the start between the business relationship
9  of Hapag-Lloyd and O.W. Bunker Germany.
10     Q.    Is it correct that Hapag-Lloyd had
11  terms and conditions in 2007, a prior version
12  from the document you reviewed earlier, or am I
13  misunderstanding your response?
14     A.    The valid version at that time when
15  the business connection was established was
16  based on 2006.  There's no version available
17  from 2007.
18     Q.    Do you know whether the 2006
19  version of the terms and conditions has been
20  produced in this case?
21     A.    Yeah.
22     MR. FERNANDEZ:  It has.
23     Q.    This confirmation memorializes the
24  agreement between O.W. Germany and Hapag for the
25  purchase of fuel bunkers for the SANTA ROBERTA?

Page 61

Norbert Kock (1-19-16)

1
2     A.    Yes.
3     Q.    On page 149 there is a paragraph
4  marked "Terms," and that reads that "the sale
5  and delivery of the marine fuels described above
6  are subject to the O.W. Bunker Group's terms and
7  conditions of sale for marine bunkers," and it
8  refers to Hapag-Lloyd as buyer and O.W. Bunker
9  Germany as seller.
10     What's your understanding of this
11  paragraph?
12     A.    This is a -- this is a standard
13  term in their pamphlet.
14     Q.    Did the O.W. Bunker Group's terms
15  and conditions apply to this fuel transaction?
16     A.    No.
17     Q.    Is the basis for your statement the
18  remarks that are listed on page 148?
19     MR. FERNANDEZ:  Objection to the
20  form.
21     A.    In the sales order confirmation
22  they confirmed that the Hapag-Lloyd terms and
23  conditions shall apply.
24     Q.    Was it always the case that
25  Hapag-Lloyd's terms and conditions applied to

Page 62

Norbert Kock (1-19-16)

1 agreements with O.W. Germany?
2 A. Yes.
3 Q. In every fuel transaction that you
4 conducted with them?
5 A. Yes.
6 Q. Were there ever any conflicts
7 between the Hapag-Lloyd Group's terms and
8 conditions and the O.W. Bunker Group's terms and
9 conditions?
10 A. Yes.
11 Q. Were there any disputes with O.W.
12 Germany about that?
13 MR. FERNANDEZ: Objection to the
14 form.
15 A. No, because our requirement when we
16 started the business relationship was to accept
17 our terms and conditions of purchasing. That's
18 the same with any other supplier working for us,
19 everybody has to accept our terms and conditions
20 for purchasing, otherwise we won't come into
21 business with these guys.
22 (Kock Exhibit 11, Document Bates
23 stamped HPL-USOT 151 through HPL-USOT 153
24 marked for identification.)

Page 63

Norbert Kock (1-19-16)

1 Q. What's been marked as Exhibit 11 is
2 a document labeled HPL-USOT 151 through 153,
3 it's an email from Mr. Gaus dated October 1,
4 2014.
5 Have you seen this email before?
6 A. Yes.
7 Q. What is this email?
8 A. This is our written order
9 confirmation to O.W. Bunker Germany.
10 Q. Is this order confirmation
11 automatically generated by your system?
12 A. Yes.
13 Q. Does Mr. Gaus have to fill in any
14 of the information?
15 A. Yes.
16 Q. How does it work?
17 A. It's an infrastructure available
18 showing all these different paragraphs here
19 which comes along with delivery, survey,
20 sampling, payment, invoicing; but the individual
21 order quantity, product quality, the estimated
22 date of arrival of the vessel, this has to be
23 included manually into this infrastructure. The
24 infrastructure we are working with is an SAP

Page 64

Norbert Kock (1-19-16)

1 system.
2 Q. So Mr. Gaus has to fill in the
3 information next to reference number, account,
4 seller in the middle of the page here on page
5 151?
6 A. Yes.
7 Q. The information about the local
8 physical supplier that would be used by O.W.
9 Germany, is that information that Mr. Gaus would
10 have received from Mr. Selmer?
11 A. Yes, and it's needed for logistical
12 reasons.
13 Q. Would this purchase order be
14 generated before or after the order was agreed?
15 A. The order agreement has taken place
16 during a telephone call, this is the normal way
17 we are purchasing; and then the written order
18 would be processed later on, it could be the
19 same day or it could be the next day depending
20 on what time the order is placed.
21 Q. On page 152 there are additional
22 provisions as to quality and quantity of the
23 fuel relating to a survey and sampling of the
24 fuel, do you see that?

Page 65

Norbert Kock (1-19-16)

1 A. Um-hum.
2 Q. Those are obligations that O.W.
3 Germany took on?
4 A. This is a standard requirement of
5 Hapag-Lloyd. These procedures are standard
6 procedures from Hapag-Lloyd. Any vendor
7 supplier has to follow, or seller has to follow
8 these procedures.
9 Q. Do you know if Hapag-Lloyd made any
10 payment on the supply to O.W. to the SANTA
11 ROBERTA?
12 A. Yes.
13 Q. What's your understanding?
14 A. We make payment to the seller.
15 MR. MALONEY: Let me show you what
16 I will have marked as Exhibit 12.
17 (Kock Exhibit 12, Document Bates
18 stamped HPL-USOT 80, marked for identification.)
19 Q. This is a document Bates labeled
20 HPL-USOT 80. Have you seen this document
21 before?
22 A. Yes.
23 Q. What is this document?
24 A. This is the sales invoice of O.W.

17 (Pages 62 to 65)

Page 66

```
 1          Norbert Kock (1-19-16)
 2   Germany to Hapag-Lloyd.
 3       Q.    Do you see there that the date of
 4   the invoice was October 9th of 2014?
 5       A.    Yes.
 6       Q.    With a due date of November 8,
 7   2014?
 8       A.    Yes.
 9       Q.    This invoice was paid?
10       A.    Yes.
11       Q.    What is the box in the middle on
12   the top, it says October 20, 2014?
13       A.    This is the booking date our
14   accounting department booked this invoice into
15   the system.  Mrs. Sakowski is an employee at the
16   accounting department.
17       Q.    There is some handwriting and there
18   is also a bar code on this version of the
19   document, I would like to take those marks one
20   at a time.
21          What's the handwriting in the upper
22   right-hand corner, if you know?
23       A.    I don't know.
24       Q.    In the middle right below the
25   accounting department's stamp, do you know what
```

Page 67

```
 1          Norbert Kock (1-19-16)
 2   this is?
 3       A.    This is the name of the team leader
 4   of our accounting department, Mrs. Kargel.
 5          THE INTERPRETER:  K-a-r-g-e-l.
 6       Q.    Do you have an understanding of
 7   what the bar code refer to?
 8       A.    This could be the invoicing system
 9   at that time was read automatically into our SAP
10   system, and I think this bar code assisted the
11   system to read the invoice specifics, or the
12   invoice details.
13       Q.    Do you have any understanding of
14   what the numbers refer to there?
15       A.    No.  That's a code.
16       Q.    The handwritten numerals to the
17   left?
18       A.    For me it looks like the euro U.S.
19   dollar cost at that time.
20       Q.    If the O.W. Bunker Group had not
21   gone bankrupt in early November, would these
22   transactions as to these six vessels all have
23   taken place in the same manner, which is to say
24   bunker requisition form, offers to sellers,
25   nomination to a particular seller, delivery,
```

Page 68

```
 1          Norbert Kock (1-19-16)
 2   invoice and payment to that seller?
 3       A.    Yes.
 4          MR. FERNANDEZ:  Objection to the
 5   form.
 6       Q.    Is there anything about the other
 7   five transactions involving the SEASPAN HAMBURG,
 8   the VIENNA EXPRESS, SOFIA EXPRESS, the DERBY D
 9   or the SIDNEY EXPRESS that would be different
10   from the transaction we just reviewed relating
11   to the SANTA ROBERTA?
12          MR. FERNANDEZ:  Objection to the
13   form.
14          MR. KEOUGH:  Objection to the form.
15       A.    If O.W. not had gone bust, no.
16          (Kock Exhibit 13, Document Bates
17   stamped HPL-USOT page 38, marked for
18   identification.)
19       Q.    We have marked as Exhibit 13 a
20   document Bates labeled HPL-USOT 38.  Have you
21   seen this document before?
22       A.    Yes.
23       Q.    Was this a document produced from
24   Hapag-Lloyd's own files?
25       A.    No.
```

Page 69

```
 1          Norbert Kock (1-19-16)
 2       Q.    How did Hapag-Lloyd come into
 3   possession of this document?
 4       A.    This has been shown to me during
 5   the preparation of this event.
 6       Q.    Was that the first time you saw a
 7   copy of this document?
 8       A.    Yeah.
 9       Q.    Did U.S. Oil Trading have an
10   account with Hapag-Lloyd?
11       A.    No.
12       Q.    And this is not an invoice that was
13   sent to Hapag-Lloyd?
14       A.    No.
15          (Kock Exhibit 14, Document Bates
16   stamped HPL-USOT pages 170 and HPL-USOT 171,
17   marked for identification.)
18       Q.    We have marked as Exhibit 14 a
19   document Bates labeled HPL-USOT pages 170 to
20   173.  Have you seen this email and its
21   attachments before?
22       A.    This is the confirmation of the
23   SANTA ROBERTA advising us about the received
24   fuel oil.
25       Q.    And on page 172 what does this
```

18 (Pages 66 to 69)

Page 70

Norbert Kock (1-19-16)

1    attachment refer to?
2        A.    This is a payment advice that
3    Hapag-Lloyd is going to pay the different
4    amounts for the different stamps to O.W. Bunker
5    Germany.
6        Q.    Payment advice, is that what
7    Zahlungsbeleg refers to?
8        A.    Yes.
9        MR. FERNANDEZ: Just note my
10   objection. You marked Exhibit 14 which is
11   numbered 170 through 173, I think that may have
12   been marked in error. You have 170 and 171 seem
13   to be standalone documents. Then 172 and 173 I
14   don't believe are affixed to the bunker delivery
15   note. You can certainly ask the witness that,
16   but please note my objection to the way this
17   exhibit has been marked.
18       MR. MALONEY: So noted. I agree
19   with your characterization, Mr. Fernandez.
20       Q.    So is it the case, Mr. Kock, that
21   the bunker delivery note at page 171 is the
22   attachment to page 170?
23       A.    Yes.
24       Q.    And then the next pages 172 and 173

Page 71

Norbert Kock (1-19-16)

1    refer to a separate document?
2        A.    Yes. So this payment advice is
3    normally not going through our department. It's
4    done by our accounting department, and our
5    accounting department is sending it out to the
6    different vendors they are paying.
7        MR. FERNANDEZ: Are we able to
8    break these apart so the record is clear and
9    mark the two pages 14?
10       MR. MALONEY: I'm happy to mark
11   pages 172 and 173 as Exhibit 15.
12       MR. FERNANDEZ: Thank you.
13       (Kock Exhibit 15, Document Bates
14   stamped HPL-USOT 172 and HPL-USOT 173, marked
15   for identification.)
16       Q.    Just to clear up the record. How
17   does the bunker purchasing department at
18   Hapag-Lloyd use the bunker delivery note that
19   was communicated to it here in Exhibit 14?
20       A.    The quantity stated on the bunker
21   delivery note, the metric tons, will be booked
22   as a stop receipt into our SAP system against
23   the existing purchase order.
24       Q.    If, for example, there was a

Page 72

Norbert Kock (1-19-16)

1    dispute about the quantity or the quality of the
2    fuel listed on the bunker delivery note, who
3    would Hapag-Lloyd deal with as to that dispute?
4        A.    The responsible purchaser.
5        Q.    So is that O.W. Bunker Germany?
6        MR. FERNANDEZ: Could you reframe
7    the question please.
8        MR. MALONEY: Sure.
9        Q.    So once the bunker purchasing
10   department receives a bunker delivery note, they
11   check the quantity and quality against the
12   original purchase order placed with the seller,
13   is that fair?
14       A.    Yes.
15       Q.    And if there were any disputes
16   would Hapag-Lloyd go to its seller to resolve
17   those?
18       A.    Yes.
19       Q.    In this case that would be O.W.
20   Bunker Germany?
21       A.    Yes.
22       Q.    Do you know if there were any such
23   disputes about this particular transaction?
24       A.    I can't remember. I don't think

Page 73

Norbert Kock (1-19-16)

1    there was a dispute here in this respect.
2        Q.    Now turning to Exhibit 15 which is
3    Bates labeled HPL-USOT 172 to 173. It appears
4    there are seven separate fuel transactions with
5    different vessels, is that correct?
6        A.    Yes.
7        Q.    One of those vessels is the SANTA
8    ROBERTA?
9        A.    Yes.
10       Q.    This document reflects payment made
11   to O.W. Germany on the SANTA ROBERTA and other
12   transactions?
13       A.    Yes.
14       Q.    Would you mind translating for the
15   record what the German text reads after "ladies
16   and gentlemen"?
17       A.    This is separate -- there is a
18   separate payment of the below mentioned items.
19   We did --
20       THE INTERPRETER: On advisement of
21   the correctness.
22       A.    Of the supplies.
23       THE INTERPRETER: Of the supplies
24   or.

Elisa Dreier Reporting Corp., a U.S. Legal Support Company  (212) 557-5558
950 Third Avenue, New York, NY  10022

Page 74

Norbert Kock (1-19-16)

1
2    A.    Or performance.
3          THE INTERPRETER:  Performance and
4    its calculation.
5    A.    And its calculation we paid.
6    Q.    Who is Frau Bolgow?
7    A.    Frau Bolgow is a manager, a worker
8    in the accounting department.
9    Q.    This document was dated
10   November 6th of 2014?
11   A.    Yes.
12         (Kock Exhibit 16, Document Bates
13   stamped HPL-USOT 87 through HPL-USOT 89, marked
14   for identification.)
15   A.    May I say something?
16   Q.    Absolutely.
17   A.    There is something wrong here
18   because the attachments are Hapag-Lloyd's crew
19   lists, and the first page here is referring to
20   an invoice and bunker delivery note coming from
21   O.W. Bunker Germany.
22   Q.    We've marked as Exhibit 16
23   documents that have been Bates labeled HPL-USOT
24   87 through 89.  The witness has referenced that
25   page 87 refers to an invoice and bunker delivery

Page 75

Norbert Kock (1-19-16)

1
2    note from O.W. Bunker Germany, but the following
3    pages appear to refer to an unrelated document.
4          MR. MALONEY:  I would just ask
5    counsel to follow up on whether the correct
6    attachments have been produced at page 87.
7          MR. FERNANDEZ:  Okay.
8    Q.    I would like to turn to the SEASPAN
9    HAMBURG.
10         (Kock Exhibit 17, Document labeled
11   "Time Charter," Bates stamped HPL-USOT 201 to
12   HPL-USOT 205, marked for identification.)
13   Q.    Was the SEASPAN HAMBURG on time
14   charter by Hapag-Lloyd in 2014?
15   A.    That's what the pamphlet says.
16   It's a time charter contract.
17   Q.    We've marked as Exhibit 17 a
18   document labeled "Time Charter," it's marked
19   HPL-USOT pages 201 to 205.
20         Is this the time charter for the
21   SEASPAN HAMBURG?
22         MR. KEOUGH:  Objection to the form.
23         MR. FERNANDEZ:  Objection.
24   Q.    Have you seen this document before,
25   sir?

Page 76

Norbert Kock (1-19-16)

1
2    A.    No.
3    Q.    Do you know who owns the SEASPAN
4    HAMBURG?
5    A.    SEASPAN, but SEASPAN is a -- I
6    don't know where the SEASPAN is here.  I can't
7    confirm this.
8    Q.    Is this a document produced from
9    Hapag-Lloyd's files?
10   A.    This is a document which is
11   produced between our chartering department and
12   the vessel's manager or owner.  We are not
13   involved in that business, or our department,
14   our purchasing department is not involved in
15   that business.
16   Q.    Do you see under line 37 of this
17   document, on page 201, the passage that reads
18   that the charterers shall provide and pay for
19   all fuel and MDO, with certain exceptions stated
20   there in the clause?
21   A.    I see it.
22   Q.    Do you have an understanding
23   whether that was the case for the SEASPAN
24   HAMBURG, that the Hapag-Lloyd was the
25   responsible party for purchasing fuel?

Page 77

Norbert Kock (1-19-16)

1
2    A.    Yes.
3    Q.    That's the case?
4    A.    Yes.
5    Q.    Who would be the person in the
6    chartering department responsible for
7    negotiating that?
8    A.    Mr. Tim Petersen.
9    Q.    Tim Petersen?
10   A.    Tim Petersen, he was assigned
11   together with his manager director, Mr. Glen
12   Hards.
13   Q.    So you recognize those signatures
14   there on page 205 as Mr. Petersen and Mr. Hards?
15   A.    Yes.
16         (Kock Exhibit 18, Document Bates
17   stamped HPL-USOT 90 through HPL-USOT 91, marked
18   for identification.)
19   Q.    We've marked as Exhibit 18 a
20   document Bates labeled HPL-USOT 90 through 91.
21   Have you seen this document before?
22   A.    Yes.
23   Q.    What is this document?
24   A.    This is another bunker requisition
25   form sent by the SEASPAN HAMBURG to our

Elisa Dreier Reporting Corp., a U.S. Legal Support Company  (212) 557-5558
950 Third Avenue, New York, NY  10022

Page 78

Norbert Kock (1-19-16)

1 department.
2    Q.   Does RQMT stand for requirement?
3    A.   Yes.
4    Q.   What is TIW in the subject line?
5    A.   This is the abbreviation of the
6 port.
7    Q.   Tacoma Washington?
8    A.   This is a -- I think this is a
9 code.  This is a UN code -- no, this is not a UN
10 code.  For me this is a self-created
11 abbreviation from the vessel.
12    Q.   Is there any physical supplier
13 specified in this email or its attachment?
14    A.   No.
15        (Kock Exhibit 19, Document Bates
16 stamped HPL-USOT 92 through HPL-USOT 94, marked
17 for identification.)
18    Q.   We've marked as Exhibit 192 emails
19 and attachments that have been Bates labeled
20 HPL-USOT 92, 93 and 94, and it appears that
21 there are two emails and then a document behind
22 that; is that fair to say?
23    A.   There's also some hiccup here I
24 see, because the covering page is referring to

Page 79

Norbert Kock (1-19-16)

1 an inquiry Mr. Lukas Gaus placed into the market
2 for this vessel calling for Tacoma, Oakland and
3 Los Angeles in a row, and behind there is
4 communication between Karl Heinz Selmer and O.W.
5 Bunker and Lukas Gaus about the typical
6 specifications of the ordered product, and
7 another attachment referring to our price
8 comparison we are doing.
9        So the first page here has nothing
10 to do with the attachments and behind.  I would
11 have expected here a copy of the inquiry from
12 Mr. Lukas Gaus, like we had it for the previous
13 vessel.
14    Q.   Noted.
15        MR. FERNANDEZ:  The top page, is
16 that what you're referring to?
17    A.   This is the top page for our
18 inquiry.
19    Q.   Page 92 refers to the inquiry that
20 was sent into the marketplace by Hapag-Lloyd,
21 correct?
22    A.   Yes.
23    Q.   Then page 93, is that a response
24 from O.W. Bunker Germany?

Page 80

Norbert Kock (1-19-16)

1    A.   Yes.
2    Q.   Page 94 is a separate document?
3    A.   Yes.
4    Q.   What does the heading mean on page
5 94?
6    A.   This is a price comparence (sic)
7 showing --
8    Q.   Is it a price comparison?
9    A.   The meaning here is
10 Preisvereinbarungen.
11        THE INTERPRETER:  Agreement.
12    A.   Which means agreement.
13    Q.   It says for HFO and MDO?
14    A.   Yes.
15    Q.   What is HFO and MDO?
16    A.   HFO is heavy fuel, a heavy fuel
17 oil, and MDO means marine distillate oil.
18    Q.   This chart refers to the vessel,
19 the SEASPAN HAMBURG?
20    A.   Yes.
21    Q.   Who fills out a chart like this?
22    A.   The responsible purchaser.
23    Q.   This appears to be a document
24 filled out by Karl Heinz Selmer, is that

Page 81

Norbert Kock (1-19-16)

1 correct?
2        MR. KEOUGH:  Objection.
3    A.   This document has been filled out
4 by the responsible purchaser.
5    Q.   Who is the responsible purchaser?
6    A.   At that time it looks like Lukas
7 Gaus was working on this vessel here, and he's
8 using this piece of paper here to compare all
9 the incoming orders to evaluate which offer is
10 best, most favorable for Hapag-Lloyd.
11        So I call it price comparence sheet
12 because it's not an agreement.  After we find an
13 agreement here and it states with whom Mr. Gaus
14 was making this agreement here, with O.W. Bunker
15 Germany and Karl Heinz Selmer.
16    Q.   In the lower right, does that refer
17 to the price that was agreed with O.W. Germany?
18    A.   In the lower right, the
19 1.5 million?
20    Q.   Yes.
21    A.   This is the total, the total U.S.
22 dollar order amount based on the order quantity
23 multiplied with the price O.W. Bunker Germany
24 gave us.

21 (Pages 78 to 81)

Page 82

Norbert Kock (1-19-16)

1
2    Q.   Do you know why O.W. Bunker is
3    listed twice over there on the left, in the
4    first column entitled "Anbieter"?
5         MR. KEOUGH: Objection.
6    A.   Because they offered twice. They
7    offered us $520 in Oakland and they offered us
8    $523 in Tacoma. Although it looks like the $523
9    is more expensive than the other ones, we picked
10   it because it was representing the highest
11   energy contents.
12        So for us it lowers energy costs,
13   and also a very good ignition product, the CCAI
14   value gives you some kind of knowledge about the
15   ignition quality of the offered fuel oil, and
16   825 is very good.
17   Q.   So because the fuel had a higher
18   quality at a lower price O.W. Bunker got the
19   nomination?
20   A.   Yes. You can see there's a column
21   here under "Bestellkombination," there is the
22   first column here.
23        MR. KEOUGH: You can say it in
24   English please.
25   A.   This is the total cost weighted on

Page 83

Norbert Kock (1-19-16)

1
2    energy contents.
3         MR. KEOUGH: Which column are you
4    referring to, sir?
5         THE INTERPRETER: The one before
6    last.
7         MR. KEOUGH: Mr. Interpreter, since
8    we haven't sworn you in yet --
9         MR. MALONEY: He has been sworn.
10        MR. KEOUGH: Okay. Please go
11   ahead, sir.
12        THE INTERPRETER: The one before
13   last, it says IFO/MFO.
14        THE INTERPRETER: The total cost by
15   weight/energy.
16   A.   Sorry to correct you. It's not by
17   weight, the energy is weighted in this cost
18   here.
19        THE INTERPRETER: Considered,
20   listed weighted.
21   A.   No, weighted, because we do an
22   energy calculation here. We have an Energlewert
23   here also. This Energlewert will be weighted in
24   the total cost. So this offer here, the second
25   offer by O.W. was for us the most economic

Page 84

Norbert Kock (1-19-16)

1
2    offer. You can see it on the weighted U.S.
3    dollar amount.
4    Q.   Do you know what is GEFO in the
5    first column of the persons who offered?
6    A.   GEFO is a Hamburg-based trader, who
7    is also working based on our terms and
8    conditions. As any other parties here mentioned
9    as well.
10   Q.   And Peninsula refers to Peninsula
11   Petroleum?
12   A.   Yes.
13   Q.   This document is dated October 10,
14   2014, is that correct?
15   A.   This was the date of the fixing
16   here, right, October 10th.
17        (Kock Exhibit 20, Document Bates
18   stamped HPL-USOT 95 through HPL-USOT 98, marked
19   for identification.)
20        MR. FERNANDEZ: Off the record.
21        (Off-the-record discussion held.)
22   Q.   We've marked as Exhibit 20 a
23   document Bates labeled HPL-USOT 95 through 98.
24   Have you seen this document before, sir?
25   A.   Yes.

Page 85

Norbert Kock (1-19-16)

1
2    Q.   What is this document?
3    A.   This is an order confirmation
4    coming from O.W. Bunker Germany to Hapag-Lloyd
5    confirming the bunker deal for the SEASPAN
6    HAMBURG at Tacoma.
7    Q.   Just like with the SANTA ROBERTA,
8    O.W. Bunker Germany is the seller?
9    A.   Yes.
10   Q.   And Hapag-Lloyd AG is the buyer?
11   A.   Yes.
12   Q.   The same remarks "HALO GCT2007
13   shall apply" are listed on page 96?
14   A.   Yes.
15   Q.   Norton Lilly is being used as a
16   port agent?
17   A.   Right.
18   Q.   On page 95 Mr. Selmer writes to
19   Mr. Gaus "Dear Lukas, thank you for your
20   support."
21        Do you have an understanding of
22   what he means by that?
23   A.   To receive the offer. Sorry, to
24   receive the order.
25        (Kock Exhibit 21, Document Bates

22 (Pages 82 to 85)

Page 86

Norbert Kock (1-19-16)

1             Norbert Kock (1-19-16)
2   stamped HPL-USOT pages 105 and HPL-USOT 106,
3   marked for identification.)
4      Q.   We've marked as Exhibit 21 an email
5   Bates stamped HPL-USOT pages 105 to 106.  Have
6   you seen this email before?
7      A.   Yes.
8      Q.   What is this email?
9      A.   This is an information back to the
10  local agent, Norton Lilly, and the vessel, and
11  the people in the stowage center, as well as to
12  the bunker surveyor informing them about the
13  done stem, that there will be 2,900 for the
14  SEASPAN HAMBURG and at Tacoma to coordinate the
15  supplier.
16       (Kock Exhibit 22, Document Bates
17  stamped HPL-USOT 113 and HPL-USOT 114, marked
18  for identification.)
19     Q.   Marked as Exhibit 22 an email with
20  attachment, Bates labeled HPL-USOT 113 and 114.
21  Have you seen this document before?
22     A.   Yes.
23     Q.   What is this document?
24     A.   This is an email from the SEASPAN
25  HAMBURG after sending to the responsible

Page 87

Norbert Kock (1-19-16)

1             Norbert Kock (1-19-16)
2   purchaser confirming the receipt of 2900 tons
3   fuel oil at Tacoma on the 16th of October 2014.
4      Q.   This email went to the Hapag-Lloyd
5   bunker purchasing department?
6      A.   Yes, as well as to the technical
7   department.  I think it might be a
8   superintendent department of SEASPAN had been
9   copied.
10     Q.   On the face of the page, on page
11  114, what is the attachment?
12     A.   This is the attachment to that
13  email.
14     Q.   Do you have any understanding of
15  the large stamp marked "SEASPAN HAMBURG Bunker
16  Receipt"?
17     A.   No, this stamp has not been created
18  by our department.  It looks like this stamp has
19  been created by the vessel's owner or manager.
20     Q.   It reads that, "Bunkers are
21  received onboard and taken into custody for and
22  on behalf of Charterers only for the account of
23  the Charterer.  No lien" it's illegible for the
24  next two words "or accountability for the supply
25  and/or payment is accepted by the Owner or

Page 88

Norbert Kock (1-19-16)

1             Norbert Kock (1-19-16)
2   Manager, Master, Officers or crew or agents for
3   the Owner Or Manager."
4        Have you seen stamps like this
5   before in the course of your work at
6   Hapag-Lloyd?
7      A.   Occasionally.
8      Q.   What is the effect of a stamp like
9   this?
10       MR. KEOUGH:  Objection.
11       MR. FERNANDEZ:  Objection.
12     A.   For our department, I don't see
13  any.
14       (Kock Exhibit 23, Document Bates
15  stamped HPL-USOT 24, marked for identification.)
16     Q.   We have marked as Exhibit 23 a
17  document Bates labeled HPL-USOT 24.  Have you
18  seen this document before?
19     A.   Yes.
20     Q.   What is this document?
21     A.   This is the invoice from O.W.
22  Hamburg to Hapag-Lloyd for the supply of fuel
23  oil at Tacoma.
24     Q.   The invoice from O.W. Germany to
25  Hapag-Lloyd?

Page 89

Norbert Kock (1-19-16)

1             Norbert Kock (1-19-16)
2      A.   Right.
3      Q.   There are again some stamps on the
4   invoice.  Was this booked by Hapag-Lloyd's
5   accounting department in October 28th of 2014?
6      A.   Yes.  You like the name.  It has
7   been booked by the accounting manager,
8   Mrs. Yaylaoglu.  I think she's coming from
9   Turkey.
10     Q.   Do you know whether this invoice
11  was paid by Hapag-Lloyd to O.W. Germany?
12     A.   Yes.
13     Q.   Yes, it was paid?
14     A.   No.  Wait.  Due date November 15th.
15  I strongly believe we have stopped it.
16     Q.   Ordinarily the terms of payment are
17  within 30 days from the date of delivery listed
18  there on the invoice?
19     A.   Right, providing the invoice is
20  coming within 14 days or 15 days after supply.
21  If not, we are paying 15 days after receipt of
22  the invoice.
23       MR. MALONEY:  I think it's a good
24  time for a lunch break.
25       (Lunch recess taken at 12:54 p.m.)

23 (Pages 86 to 89)

Page 90

1           Norbert Kock (1-19-16)
2           (Resumed 1:48 p.m.)
3           (Kock Exhibit 24, Document Bates
4    stamped HPL-USOT 00115, marked for
5    identification.)
6           (Kock Exhibit 25, Document Bates
7    stamped HPL-USOT pages 58 through HPL-USOT 60,
8    marked for identification.)
9           (Kock Exhibit 26, Document Bates
10   stamped HPL-USOT pages 128 to HPL-USOT 129,
11   marked for identification.)
12          (Kock Exhibit 27, Document Bates
13   stamped HPL-USOT page 78, marked for
14   identification.)
15          (Kock Exhibit 28, Document Bates
16   stamped HPL-USOT 126, marked for
17   identification.)
18          (Kock Exhibit 29, Document Bates
19   stamped HPL-USOT 189 to HPL-USOT 192, marked for
20   identification.)
21          (Kock Exhibit 30, Document Bates
22   stamped, marked for identification.)
23          (Kock Exhibit 31, Document Bates
24   stamped HPL-USOT 199 through HPL-USOT 200,
25   marked for identification.)

Page 91

1           Norbert Kock (1-19-16)
2           MR. MALONEY:  We're back from
3    lunch.
4       Q.   I'm going to hand you a document
5    marked as Kock Exhibit 24, document Bates
6    labeled HPL-USOT 00115.
7           Is this email and attachment from
8    the SOFIA EXPRESS?
9       A.   Yes.
10      Q.   What does this document refer to?
11      A.   It's a bunker requisition for the
12   Port of Tacoma on the 29th of October, coming
13   from the vessel's master.
14      Q.   Do you know, was the SOFIA EXPRESS
15   owned by Hapag-Lloyd?
16      A.   This is a Hapag-Lloyd vessel.
17      Q.   Was Hapag also operating that
18   vessel?
19      A.   Yes.
20      Q.   In October of 2014?
21      A.   Yes.
22      Q.   This email went to the bunker
23   purchasing department?
24      A.   Yes.  To the requirement section,
25   3.

Page 92

1           Norbert Kock (1-19-16)
2       Q.   I hand you a document that we've
3    marked as Exhibit 25, it's labeled HPL-USOT
4    pages 58 through 60.
5           Have you seen this document before?
6       A.   Yes.
7       Q.   What is this document?
8       A.   This is the written purchase order
9    to our product center at O.W. Bunker Germany
10   GMBH.
11      Q.   Is this document generated in the
12   ordinary course of Hapag-Lloyd's business?
13      A.   Yes.
14      Q.   Was it generated at or near the
15   time that the order was placed?
16      A.   Yes.
17      Q.   Is it the regular practice of the
18   bunker purchasing department to generate
19   purchase orders such as these?
20      A.   Yes.
21      Q.   I'm handing you a document that
22   I've marked as Exhibit 26, it's labeled HPL-USOT
23   pages 128 to 129.  Have you seen this document
24   before?
25      A.   Yes.

Page 93

1           Norbert Kock (1-19-16)
2       Q.   What is this document?
3       A.   This is the bunker receipt the
4    SOFIA EXPRESS sent us after receiving the bunker
5    replenishment at Tacoma on October 29, 2014.
6       Q.   The email is directed to Ship
7    Management Fuel.  What is Ship Management Fuel?
8       A.   Ship Management Fuel is our ship
9    management department.
10      Q.   At Hapag-Lloyd?
11      A.   At Hapag-Lloyd.
12      Q.   Is that different from the bunker
13   requirement department?
14      A.   It's a neighbor department of our
15   purchasing department.
16      Q.   I'm going to hand you a document
17   that I've marked as Exhibit 27, it's labeled
18   HPL-USOT page 78.
19          My question again is have you seen
20   this document before?
21      A.   Yes.
22      Q.   And what is this document?
23      A.   This is an invoice issued by O.W.
24   Bunker to Hapag-Lloyd AG for the supply of fuel
25   oil in the Port of Tacoma to the SOFIA EXPRESS.

24 (Pages 90 to 93)

Page 94

Norbert Kock (1-19-16)

2    Q.  It's dated November 1st of 2014?
3    A.  Yes.
4    Q.  This copy is a little bit hard to
5  read.  Underneath the line items for quantity
6  supplied and quality there's a notation that
7  it's a "non-taxable delivery abroad."
8        Do you have an understanding of
9  what that means?
10    A.  No.
11    Q.  I can't read the handwriting on the
12  right.  Do you have any understanding of what
13  that notation refers to?
14    A.  It looks like that a claim has been
15  issued on this supplier and the payment, the
16  normal payment run has been stopped due to this
17  claim.
18    Q.  Are you referring to a claim with
19  respect to the quantity or quality of fuel
20  delivered, or something else?
21    A.  In this specific case I can't
22  remember.
23    Q.  It's your understanding that this
24  invoice has not been paid, correct?
25    A.  Yes.

Page 95

Norbert Kock (1-19-16)

2    Q.  I hand you a document that I've
3  marked as Exhibit 28, Bates labeled HPL-USOT
4  126.  This is an email from Dorit Niemeyer to
5  Mr. Selmer, dated November 5th of 2014, and the
6  exhibit goes on to page 127 with its attachment.
7        I'll just ask you to take a look at
8  that document?
9    A.  Mrs. Niemeyer issued a claim.
10    Q.  Does the --
11    A.  Based on a different analyzed
12  product density compared to the given density on
13  the bunker delivery receipt, so we had a short
14  delivery.
15    Q.  What is a short delivery?
16    A.  A product density, I mean, the
17  delivered metric tons will be calculated based
18  on a delivered volume, which has a delivery
19  temperature and a specific product density.
20  Based on these three items you can calculate
21  metric tons which will be invoiced from a
22  volume, because the bunker barge while alongside
23  the vessel can be weighted.
24        You cannot only do a volume
25  measurement, you measure the barrels or gallons

Page 96

Norbert Kock (1-19-16)

2  or liters or cubic meters, and if the product
3  density is analyzed lighter than the given
4  density on the bunker delivery receipt, you will
5  calculate a loss to the shipowner because this
6  is a pure commercial claim.
7    Q.  Would the bunker purchasing
8  department ever send a claim like this to the
9  local physical supplier?
10    A.  No.  We have no relation to this
11  physical supplier, we have no contract with
12  them.
13    Q.  The information on page 127 details
14  the claim that Ms. Niemeyer made?
15    A.  Yes.  This is the fuel survey
16  report we received from the attending surveyor
17  who was at the scene witnessing the quantity
18  determination onboard of the bunker barge, and
19  witnessing also the sample drawing, and then
20  arranging later on the analysis here.
21    Q.  Does the review of that email
22  refresh your recollection as to whether that
23  refers to the claim that's indicated on the
24  invoice?
25    A.  It looks like, yes.

Page 97

Norbert Kock (1-19-16)

2    Q.  I'm going to hand you a document
3  that I've marked as Exhibit 29, it's Bates
4  labeled HPL-USOT 189 to 192.
5        This is an email from Mr. Selmer to
6  Ms. Niemeyer concerning the VIENNA EXPRESS.  Do
7  you see that?
8    A.  Yes.
9    Q.  The email is in German.  Does it
10  read, in sum and substance, "Thank you for the
11  nomination.  Have a beautiful sunny day"?
12    A.  Right.
13    Q.  Does this email attach the sales
14  order confirmation between Hapag-Lloyd and O.W.
15  Germany?
16    A.  Yes.
17    Q.  O.W. Germany got the nomination for
18  the VIENNA EXPRESS?
19    A.  Yes.
20    Q.  O.W. Germany is listed here as the
21  seller on the transaction?
22    A.  Yes.
23    Q.  The payment terms and terms and
24  conditions remarks are the same as the previous
25  transactions we've reviewed?

25 (Pages 94 to 97)

Page 98

Norbert Kock (1-19-16)

1    A.   Yes.
2
3    Q.   I hand you a document that I've
4  marked as Exhibit 30, Bates labeled HPL-USOT
5  pages 182 to 184.  Have you seen this document
6  before?
7    A.   Yes.
8    Q.   What is this document?
9    A.   This is the official written order
10  from Hapag-Lloyd to O.W. Bunker Germany
11  confirming the order for VIENNA EXPRESS,
12  2,700 tons of fuel oil at the Port of Tacoma on
13  October 16, 2014.
14    Q.   I hand you a document that I've
15  marked as Exhibit 31, Bates labeled HPL-USOT 199
16  through 200.
17       Do you know who Victoria Bohn is?
18    A.   I don't know Victoria Bohn.  It
19  looks like she's working in or she worked at the
20  O.W. Bunker Hamburg department for issuing
21  invoices, though she's addressing this mail here
22  to our accounting department, Mrs. Sakowski:
23       "Good morning, Mrs. Sakowski.
24  Attached you received invoice and delivery note
25  for the bunker delivery of VIENNA EXPRESS in

Page 99

Norbert Kock (1-19-16)

1
2  Tacoma on October 18, 2014.  The original
3  documents will follow by courier."
4    Q.   The attachment to this email on
5  page 200, is that the invoice from O.W. Germany
6  to Hapag-Lloyd?
7    A.   Yes.
8    Q.   Again, it was booked on October 29,
9  2014 by Hapag-Lloyd's accounting department?
10    A.   Yes.
11    Q.   This invoice also was not paid?
12    A.   Not paid, the security was issued.
13       (Kock Exhibit 32, Document Bates
14  stamped HPL-USOT 197 to HPL-USOT 198, marked for
15  identification.)
16    Q.   We have marked as Exhibit 32 a
17  document Bates labeled HPL-USOT 197 to 198.
18  Have you seen this document before, sir?
19    A.   Yes.
20    Q.   What is this document?
21    A.   This is an email to our requirement
22  section 3, as well as to our ship management
23  department, confirming the bunker delivery at
24  Tacoma on 18/10/2014.
25       MR. MALONEY:  Let's go off the

Page 100

Norbert Kock (1-19-16)

1
2  record.
3       (Off the record.)
4       (Exhibit 33, Hapag-Lloyd Terms and
5  Conditions of Purchasing, Bates stamped HPL-OMS
6  1 through HPL-USOT 5, marked for
7  identification.)
8       (Exhibit 34, Email and attachments
9  Bates stamped HPL-OMS 00057 through HPL-OMS
10  00058, marked for identification.)
11       (Exhibit 35, Document Bates stamped
12  ING HL 2718 through ING HL 20, marked for
13  identification.)
14       (Exhibit 36, Document Bates stamped
15  HPL-OMS 28 through HPL-OMS 30, marked for
16  identification.)
17       (Exhibit 37, Document Bates stamped
18  ING HL 32 and ING HL 33, marked for
19  identification.)
20       (Exhibit 38, Document Bates stamped
21  HPL-OMS 63 through HPL-OMS 69, marked for
22  identification.)
23       (Exhibit 39, Document Bates stamped
24  HPL-OMS 42 and HPL-OMS 43, marked for
25  identification.)

Page 101

Norbert Kock (1-19-16)

1
2       MR. MALONEY:  We've taken a short
3  break just to get some additional documents
4  marked, and we're going to turn now to the
5  SIDNEY EXPRESS and DERBY D.
6    Q.   I'm handing you a document, sir,
7  that I've marked as Exhibit 33, it's HPL-OMS
8  pages 1 through 5.  Do you recognize this
9  document?
10    A.   This is a set of Hapag-Lloyd Terms
11  and Conditions of Purchasing.
12    Q.   This was produced in connection
13  with the O'Rourke Marine Services action, case
14  number 14-cv-10027.
15       Do you have any understanding of
16  whether there were different terms and
17  conditions that applied to the SIDNEY EXPRESS
18  and the DERBY D as to the other four vessels we
19  have just reviewed?
20    A.   No.
21    Q.   What is your understanding?
22    A.   We had a set of terms and
23  conditions negotiated with O.W. Bunker for the
24  supply of fuel oil and distillates in Rotterdam
25  and Antwerp in the late 2013, which was also

26 (Pages 98 to 101)

Page 106

1        Norbert Kock (1-19-16)
2  securance (sic) has been issued.
3        Q.   Security has been issued in the
4  court in these actions?
5        A.   Yes.
6        Q.   Was the DERBY D a vessel that was
7  owned by Hapag-Lloyd or chartered, on charter to
8  Hapag?
9        A.   This was a charter to Hapag-Lloyd.
10       Q.   Do you know who owned the DERBY D
11 in 2014?
12       A.   No.
13       Q.   Do you know whether the charter was
14 governed by a Charter Party?
15       A.   It must be governed by a Charter
16 Party, because a Charter Party is a contract
17 between the vessel's owner and the charterer.
18       Q.   I show you a document that I have
19 marked as Exhibit 38, it's labeled HPL-OMS 63
20 through 69.
21       MR. MALONEY:  I'll note for the
22 record that there is a designation, an entire
23 Bates stamped document number HPL-OMS 63 through
24 122 is hereby deemed confidential.
25       MR. DEHART:  Under the terms of the

Page 107

1        Norbert Kock (1-19-16)
2  confidentiality agreement it applies to all
3  these actions?
4        Q.   Have you seen this document before,
5  sir?
6        A.   I can't remember.
7        Q.   Is this a document that would have
8  been negotiated by your chartering department?
9        A.   Yes.
10       Q.   There on page 69, the last page of
11 the document, are those Mr. Petersen and
12 Mr. Hards' signatures?
13       A.   Yes.
14       Q.   Did you know or do you know who
15 owns the DERBY D?
16       A.   No.
17       Q.   On page 1 of this document it says
18 the Charter Party was made and concluded in
19 Hamburg between Containers Lines Inc., Monrovia,
20 and Hapag-Lloyd.
21       Do you have any reason to doubt
22 whether Containers Lines Inc. are the owners of
23 this vessel, the DERBY D?
24       MR. FERNANDEZ:  Objection.
25       A.   This is not our business.  This is

Page 108

1        Norbert Kock (1-19-16)
2  not our department's business, so I'm not in
3  that stuff.
4        Q.   On page 64 at line 39, is it fair
5  to say that the charterers were responsible for
6  the purchasing of fuel while it was on charter?
7        A.   Based on this definition here in
8  this contract, yes.
9        MR. FERNANDEZ:  Objection to --
10 just objection.
11       Q.   I'm going to hand you a document
12 that I've marked as Exhibit 39, and it's labeled
13 HPL-OMS pages 42 and 43.  Have you seen this
14 document before?
15       A.   Yes.
16       Q.   Is this another inquiry to the
17 market?
18       A.   Yes.
19       Q.   None of the recipients are
20 identified.  Is there a reason why these
21 inquiries are sent without a listing of who is
22 to receive them?
23       A.   Yeah.  The recipients will be only
24 blank carbon copied to not allow them who is
25 participating in this inquiry.

Page 109

1        Norbert Kock (1-19-16)
2        Q.   To not --
3        A.   We are not interested to allow them
4  to know who is competing to maybe contact each
5  other to manipulate prices.
6        Q.   There's no reference to any local
7  physical suppliers on page 42 and 43, is there?
8        A.   No.
9        Q.   Do you know if this inquiry was
10 sent directly to O'Rourke Marine Services?
11       A.   This inquiry has not been sent to
12 O'Rourke.
13       Q.   Did Hapag-Lloyd have any
14 relationship with O'Rourke Marine Services
15 directly?
16       A.   No, no relationship directly.  We
17 only have relationship to sellers accepting our
18 terms and conditions of purchasing.
19       Q.   O.W. Germany accepted Hapag-Lloyd's
20 terms and conditions?
21       A.   Yes.
22       Q.   Did U.S. Oil Trading accept
23 Hapag-Lloyd's terms and conditions?
24       MR. KEOUGH:  Objection.
25       A.   We had no contact with these guys.

28 (Pages 106 to 109)

Page 110

Norbert Kock (1-19-16)

1
2    Q.   Did O'Rourke Marine Services accept
3   the terms and conditions?
4    A.   We had no direct contact to this
5   company.
6    Q.   You can put that aside.
7        (Kock Exhibit 40, Document Bates
8   stamped HPL-OMS 21 through HPL-OMS 22, marked
9   for identification.)
10    Q.   I have marked as Exhibit 40 a
11   document labeled HPL-OMS pages 21 through 22.
12   Do you recognize this document?
13    A.   Yes.
14    Q.   What is it?
15    A.   This is a sales order confirmation
16   coming from O.W. Bunker Germany confirming the
17   sale of 50 tons of marine gas oil, 0.1 percent
18   sulfur, at the Port of Houston, delivery on
19   November 5, 2014.
20    Q.   And again, the seller is O.W.
21   Bunker Germany in this document?
22    A.   Yes.
23    Q.   And the purchaser is Hapag-Lloyd
24   AG?
25    A.   Yes.

Page 111

Norbert Kock (1-19-16)

1
2    Q.   Under your remarks it says "HALO
3   GTC2005(E) shall apply"?
4    A.   It looks like a typo to me.
5    Q.   Why do you say that?
6    A.   Because in all previous order
7   confirmations were relating to the GTCs of 2007,
8   which was in fact 2006.
9    Q.   That was when the relationship with
10   O.W. Bunker Germany commenced?
11    A.   Yes.
12    Q.   The line above says "All per ISO
13   8217 2005(E)."  Is it possible that someone
14   transposed the quality standard and the terms
15   and conditions?
16    A.   It looks like because the E is --
17        THE INTERPRETER:  In parentheses.
18    A.   Yeah.
19    Q.   Does the quality standard
20   designation look correct to you?
21    A.   Yes.  The ISO 8217 2005 exists,
22   it's an old version.
23        (Kock Exhibit 41, Document Bates
24   stamped HPL-OMS 18 through HPL-OMS 20, marked
25   for identification.)

Page 112

Norbert Kock (1-19-16)

1
2    Q.   I've marked as Exhibit 41 a
3   document labeled HPL-OMS pages 18 through 20.
4   Have you seen this document before?
5    A.   Yes.
6    Q.   What is this document?
7    A.   This is a written order from
8   Hapag-Lloyd, Mr. Lukas Gaus, to O.W. Bunker
9   Germany GMBH, confirming the purchase of 50 tons
10   of marine distillate DMA 0.1 percent sulfur at
11   the Port of Houston, delivery to take place on
12   November 5, 2014.
13    Q.   Do you see in the second paragraph
14   it says that "All fuel delivered to Hapag-Lloyd
15   AG as well as to Hapag-Lloyd Kreuzfahrten ISO
16   8217 Fourth Edition 2010," it says 2010(E)?
17    A.   Right.
18    Q.   Is it the 2010(E) quality standard
19   that applies to this transaction?
20    A.   This is a standard text in this
21   contract.  In this case the purchaser did not
22   correct down to 2005 spec that O.W. was
23   confirming to us.
24    Q.   So would the sales order
25   confirmation govern that question?

Page 113

Norbert Kock (1-19-16)

1
2    A.   Yes.
3    Q.   Because this document is
4   automatically generated by Hapag-Lloyd's
5   systems?
6    A.   Yes.
7    Q.   Do you know how many physical
8   suppliers are based in Houston, Texas, physical
9   suppliers of fuel?
10    A.   No.
11        (Kock Exhibit 42, Document Bates
12   stamped HPL-OMS page 45, marked for
13   identification.)
14    Q.   Marked as Exhibit 42 a document
15   labeled HPL-OMS page 45.  Have you seen this
16   document before?
17    A.   Yes.
18    Q.   And do you know what it refers to?
19    A.   It refers to the delivery of the
20   order of Mr. Jonas Hanke to O.W. Germany for
21   arrange to supply of marine distillates to the
22   DERBY D in Houston on November 5th.
23        I think this is the covering email
24   here to that document number 40 we discussed
25   earlier.  This is a covering email here for the

29 (Pages 110 to 113)

Norbert Kock (1-19-16)

1  order confirmation for the Exhibit Number 40.

2      Q.    What you're saying is that the
3  second email below in this email chain from
4  Mr. Selmer refers to a sales order confirmation,
5  and that sales order confirmation appears to be
6  the document we've marked as Exhibit 40?

7      A.    Yeah, because also this says order
8  number of O.W. similar.  They are referring to
9  the sales order confirmation number 1980-28364.
10  which is similar to this one here.

11      Q.    So it's your testimony that the
12  sales order number on Exhibit 40 is 119-28364?

13      A.    Yes.

14      Q.    The sales order confirmation number
15  on Exhibit 42 also refers to number 119-283364?

16      A.    Yes.

17      Q.    Mr. Selmer writes to Mr. Hanke
18  "supply by truck, do you know what that refers
19  to"?

20      A.    To the supply of the ordered
21  50 metric tons of marine distillates or marine
22  gas oil at Houston.  So the supply has been
23  arranged by tank trucks and not by barge.

24      Q.    Hapag-Lloyd also received an

Norbert Kock (1-19-16)

1  invoice for this supply from O.W. Germany, is
2  that right?

3      A.    Yes.

4          (Kock Exhibit 43, Document Bates
5  stamped ING HL 270015, marked for
6  identification.)

7      Q.    I would like to hand you a document
8  that we've marked as Exhibit 43 labeled ING HL
9  270015.  Are you familiar with this document?

10      A.    No.  No.  I can't remember.

11      Q.    This document is not from
12  Hapag-Lloyd's files, is it?  It was produced by
13  ING Bank N.V..

14      A.    I don't know.  This looks strange
15  to me because of that Danish stamp here,
16  "BOGFORT."  I've never seen this before, I can't
17  remember.

18      Q.    Okay.  You can put that aside.  Do
19  you know whether O.W. Germany was paid for the
20  fuel supplied to the DERBY D?

21      A.    No, I don't know.

22      Q.    When did you become aware that O.W.
23  Germany, or the O.W. Bunker Group, was
24  experiencing any financial distress?

Norbert Kock (1-19-16)

1      A.    It was the beginning of November
2  when it was in the newspaper.

3      Q.    What do you remember about that?

4      A.    That we received a newspaper
5  article announcing that there will be trouble,
6  they might have problems to maintain supplies.
7  That's when we contacted O.W. Germany and there
8  it was they sold the assets of Singapore, the
9  Singapore products company.

10      Q.    Did you have a call with someone at
11  O.W. Germany?

12      A.    We tried to make several calls with
13  O.W. Germany, but it was difficult at that time
14  to get through to reach somebody giving us clear
15  information.

16      Q.    Did you have at least one
17  discussion with them where they discussed
18  Singapore?

19      A.    This was not kind enough of a
20  discussion, it was always a very fast speak
21  because they were not really involved also in
22  Hamburg, they had problems to really disclose or
23  explain what's going on.

24      Q.    What happened next?

Norbert Kock (1-19-16)

1      A.    We stopped, we stopped paying
2  invoices and we tried to, because we understand
3  at that time that they were no longer able to
4  deliver also our contracts in Rotterdam and
5  Antwerp, so we immediately tried to find other
6  sellers to deliver instead.

7      Q.    Did you receive any communications
8  from local physical suppliers?

9          MR. FERNANDEZ:  Objection.

10      A.    I can't remember.

11      Q.    Did you receive any threats to
12  arrest vessels owned or chartered by
13  Hapag-Lloyd?

14      A.    Could you please repeat it?

15      Q.    Did Hapag-Lloyd receive any threats
16  to arrest vessels owned or chartered by
17  Hapag-Lloyd after the insolvency?

18          MR. FERNANDEZ:  Objection.

19      A.    At that time, no, I can't remember.
20  It was later.

21      Q.    Did you receive any communications
22  later from local physical suppliers in that
23  vein?

24      A.    Later on we had demands from

Page 118

Norbert Kock (1-19-16)

1
2     physical suppliers in Antwerp and Rotterdam.
3          Q.    Only in Rotterdam and Antwerp or
4     elsewhere as well?
5          MR. FERNANDEZ:  Objection.
6          A.    There was a lot of communication
7     going on at that time, I do not have this exact
8     amount of communication now, I can't remember
9     it.  It's in the records, but I can't remember
10    it.
11         Q.    How about with respect to the cases
12    that you're appearing for here today, did you
13    have any communications with O'Rourke Marine
14    Services after the bankruptcy of the O.W. Bunker
15    Group?
16         MR. FERNANDEZ:  Objection.
17         A.    I can't remember.
18         Q.    The same question for U.S. Oil
19    Trading.  Did Hapag-Lloyd have any
20    communications with U.S. Oil Trading after the
21    bankruptcy of the O.W. Bunker Group?
22         MR. FERNANDEZ:  Objection.
23         A.    It could be done via our legal or
24    insurance department.
25         Q.    To your knowledge, no one in the

Page 119

Norbert Kock (1-19-16)

1
2     bunker purchasing department received
3     communications from U.S. Oil Trading or O'Rourke
4     Marine Services after the insolvency of the O.W.
5     Bunker Group in early November 2014?
6          MR. FERNANDEZ:  Objection.
7          MR. KEOUGH:  Objection.
8          A.    I don't remember.
9          Q.    So you have no recollection
10    whatsoever of any communications with either
11    O'Rourke Marine or U.S. Oil Trading after the
12    bankruptcy, is that your testimony?
13         MR. FERNANDEZ:  Objection.
14         A.    I would have been or I should have
15    been able to look at my records because maybe
16    there's something in it if it had been passed to
17    our legal department, our insurance department
18    to take care of that.
19         MR. MALONEY:  Those are all the
20    questions that I have for you at this time,
21    Mr. Kock.  Thank you for your time and I'll pass
22    the witness.
23         (Short recess taken.)
24         MR. HEILIG:  Mark these as the next
25    exhibits.

Page 120

Norbert Kock (1-19-16)

1
2          (Kock Exhibit 44, Notice of Rule
3     30(b)(6) Deposition, marked for identification.)
4          (Kock Exhibit 45, Notice of Rule
5     30(b)(6) Deposition, marked for identification.)
6          (Kock Exhibit 46, First Amended
7     Complaint For Interpleader and Declaratory
8     Judgment, marked for identification.)
9          (Kock Exhibit 47, Declaration of
10    Norbert Kock, marked for identification.)
11    EXAMINATION BY MR. HEILIG:
12         Q.    Good afternoon, sir.  My name is
13    Justin Heilig.  I represent O.W. Bunker Germany
14    in three of the actions pending in New York
15    which involve the vessels VIENNA EXPRESS, SOFIA
16    EXPRESS, the SANTA ROBERTA, SEASPAN HAMBURG, as
17    well as the SIDNEY EXPRESS and the DERBY D.
18         Please note that when I refer to
19    the vessels, plural, I'm referring to those six
20    specific vessels unless otherwise noted, okay?
21         A.    Okay.
22         Q.    When I refer to the bunker
23    transactions I'm speaking about the supply of
24    bunker fuel to those six vessels in October of
25    2014, okay?

Page 121

Norbert Kock (1-19-16)

1
2          A.    Okay.
3          Q.    When I refer to USOT I'm referring
4     to U.S. Oil Trading, one of the parties to two
5     of those actions.  When I refer to OMS I'm
6     speaking about O'Rourke Marine Services, a party
7     to one of those actions, all right?
8          A.    Um-hum.
9          Q.    We've been discussing those names
10    and vessels throughout the day today, so you
11    should already be familiar with them.
12         First let me thank you for coming
13    all this way from Hamburg to testify today, we
14    appreciate it.  I'm going to first have you look
15    at documents that have been marked as exhibits
16    44 and 45, they are the notices of deposition
17    issued by O.W. Germany in these actions.
18         Sir, have you seen these documents
19    before today?
20         A.    I'm not sure.
21         Q.    Do you understand that you've been
22    designation by Hapag-Lloyd as the corporate
23    representative to testify about the topics
24    listed in Annex A of both notices?
25         A.    Yes.

Elisa Dreier Reporting Corp., a U.S. Legal Support Company  (212) 557-5558
950 Third Avenue, New York, NY  10022

Norbert Kock (1-19-16)

1
2      Q.   You can put them aside, we're done
3  with them.  Earlier I believe you testified that
4  Hapag-Lloyd began doing business with O.W.
5  Germany in 2007, is that correct?
6      A.   That's correct.
7      Q.   So Hapag didn't have any dealings
8  with O.W. Germany before 2007?
9      A.   No.
10     Q.   Was Hapag aware of O.W. Germany's
11 presence in the market before 2007?
12     A.   Yes.
13     Q.   Is there a reason why you didn't do
14 business with O.W. Germany before that time?
15     A.   Before that time we've done no
16 business with O.W. because the reputation of
17 O.W. was a poor reputation in the local market.
18     Q.   Okay.  So by 2007 then, is it fair
19 to say O.W. Germany's reputation improved in the
20 local market?
21     A.   For me personally, not really.
22     Q.   Okay.
23     A.   But this was different to my
24 management.
25     Q.   So it was management's decision to

Norbert Kock (1-19-16)

1
2  begin doing business in 2007 with O.W. Germany?
3      A.   Yes, because O.W. at that time
4  reached a position at the market which could not
5  be an oversight.  They really grow up to real
6  big oil trader, bunker trader.
7      Q.   Okay.  I believe you testified
8  earlier that as a condition of doing business
9  with O.W. Germany, O.W. Germany had to accept
10 Hapag's terms and conditions?
11     A.   Right.  This was the kind of my
12 personal securant, or securing that we have a
13 real plain and sound business case with O.W.
14 Germany.
15     Q.   Okay.  So if I understand you
16 correctly, the acceptance of Hapag's terms by
17 O.W. Germany gave Hapag some feeling of comfort
18 or some level of security that they could do
19 business --
20     A.   Confidence.
21     Q.   Confidence that they could do
22 business with O.W. Germany?
23     A.   Yes.
24     Q.   Let's take a look at a document
25 that has been marked as Exhibit 46, it's the

Norbert Kock (1-19-16)

1
2  First Amended Complaint filed by Hapag-Lloyd in
3  action 14-cv-9949.
4           MR. HEILIG:  I should clarify for
5  the record that this is the pleading without
6  exhibits.
7      Q.   Sir, have you seen this document
8  before today?
9      A.   I've seen a lot of documents today.
10 I'm not sure.  I don't think so.
11     Q.   Did you review any documents to be
12 filed by Hapag in these lawsuits before they
13 were filed?
14          In other words, did you review any
15 of the pleadings before they were submitted by
16 Hapag's U.S. attorneys to the court?
17     A.   I was doing testimonies last year
18 in writing and I had to review them earlier.
19     Q.   So you reviewed them for factual
20 accuracy?
21          MR. FERNANDEZ:  Objection.  I think
22 we're talking about different things, just to be
23 fair to the witness.  We're on pleadings and I
24 think he's referring to maybe his declaration.
25 I think you have to be careful with the words

Norbert Kock (1-19-16)

1
2  you have.
3           MR. HEILIG:  Fair enough.
4      Q.   Let's just take a look at the
5  document then.  Would you mind looking at page
6  5, and specifically paragraph 17?
7      A.   Yes.
8      Q.   In reviewing this document now,
9  does this refresh your recollection as to
10 whether you've seen this document prior to
11 today?
12     A.   Yes.  This was the contract we have
13 discussed earlier today.
14     Q.   If we look at the document
15 previously marked as Exhibit Number 3, the ARA
16 contract.  Is this the document that you're
17 referring to?
18     A.   Right.
19          MR. FERNANDEZ:  Just note my
20 continued line of objection with regard to
21 pleadings and legal issues.  He's in the fuel
22 department, so I'm going to have a continuing
23 line of objections relative to pleadings and
24 anything relative to that type of issue.
25     A.   In fact, just to make it clear, I

Page 126

Norbert Kock (1-19-16)

1   have no understanding about what is a pleading.
2        THE WITNESS:  Maybe you could
3   translate this for me, what is a pleading?
4        (Interpreter conferring with the
5   witness)
6        MR. FERNANDEZ:  A lawsuit.
7        Q.    This document was filed by Hapag
8   with the court specifying what their allegations
9   are as to the facts and to the relationships of
10  the parties, as well as to the relief sought by
11  Hapag?
12       A.    I was not engaged in it.
13       Q.    Okay.  But you understand the
14  reference in paragraph 17 is to this ARA
15  contract in Exhibit 3?
16       A.    Yes.
17       Q.    I believe you testified earlier the
18  ARA contract dealt with the Ports of Antwerp,
19  Rotterdam, and was it Amsterdam as well?
20       A.    Amsterdam.  May I interrupt?
21       Q.    Sure.
22       A.    Because this contract is clearly
23  stating Antwerp and Rotterdam, so Amsterdam is
24  not included.  This is the abbreviation, this is

Page 127

Norbert Kock (1-19-16)

1   a common abbreviation in North Europe or
2   Northwest Europe to say we are talking about
3   Antwerp, Rotterdam and Amsterdam, but the
4   contract we have been agreed upon was only based
5   in Antwerp and Rotterdam.
6        Q.    So perhaps a better title for the
7   document would be AR contract?
8        A.    Right.
9        Q.    What relevance does Exhibit 3, the
10  ARA contract, what relevance does it have to
11  bunker transactions that took place at U.S.
12  ports?
13       A.    No relevance.
14       Q.    Okay.  So that contract does not
15  govern the transactions that we've been
16  discussing today with respect to the vessels?
17       MR. KEOUGH:  Objection.
18       A.    This was the contract based on
19  Rotterdam and Antwerp supplies.
20       Q.    Paragraph 1 the on the same page
21  says, "In the normal course of business
22  Hapag-Lloyd" and it's abbreviated HLag "would
23  remit payment to O.W. Germany for bunker
24  supplied under the Hapag Marine Fuel Contract,"

Page 128

Norbert Kock (1-19-16)

1   and that's a reference to this ARA contract.
2        So if I understand you correctly,
3   the ARA contract does not have any relevance to
4   bunker transactions at U.S. ports.  So my
5   question is, is this still correct, that in the
6   normal course of business Hapag would remit
7   payment to O.W. Germany for bunker transactions
8   taking place at U.S. ports?
9        MR. KEOUGH:  Objection to the form.
10       MR. FERNANDEZ:  Objection.
11       A.    Yes.
12       Q.    So even though this contract in
13  Exhibit 3 might not be relevant, payment would
14  still be remitted from Hapag to O.W. Germany for
15  bunker transactions for which O.W. Germany
16  received the nomination?
17       MR. FERNANDEZ:  Objection to the
18  form.
19       MR. KEOUGH:  Objection.
20       Q.    In other words, Hapag would not pay
21  a physical supplier directly?
22       A.    No.
23       Q.    Never.  Okay.  Did Hapag ever
24  receive invoices directly from the physical

Page 129

Norbert Kock (1-19-16)

1   suppliers for bunker nominations awarded to O.W.
2   Germany?
3        A.    There is a chance that this has
4   been done in the course of bankruptcy when we
5   had to cover on a very short notice bunker
6   deliveries in the Port of Antwerp and Rotterdam.
7        Q.    Prior to the bankruptcy did that
8   ever occur?
9        A.    No, not prior.
10       Q.    Let's look at what has been marked
11  as Exhibit 47, and this is Mr. Kock's
12  Declaration from action 15-cv-6718, which was
13  transferred from the U.S. District Court of the
14  Western District of Washington to the Southern
15  District of New York.
16       Sir, do you recognize this
17  document?
18       A.    Yes.
19       Q.    This is a declaration that you
20  signed on behalf of Hapag-Lloyd?
21       A.    Yes.
22       Q.    I take it then that you reviewed
23  this document for the accuracy of its contents
24  before signing?

33 (Pages 126 to 129)

Page 130

Norbert Kock (1-19-16)

1
2     A.    Yes.
3     Q.    And it's accurate, to the best of
4  your knowledge and belief?
5     A.    Yes.
6     Q.    Let's take a look at page 2,
7  paragraphs 4 and 5; well really 4, 5 and 6.  It
8  appears that these paragraphs discuss the
9  submission of bunker requisitions via email from
10 the vessels and then the fuel department, your
11 department evaluating those requisitions.
12       Does this declaration essentially
13 summarize the bunkering process that we
14 discussed earlier with Mr. Maloney, ING's
15 counsel?
16    A.    Yes.
17    Q.    Can you tell me a bit more about
18 what goes into the evaluation process discussed
19 in paragraph 5 after receipt of a bunker
20 requisition from a vessel?
21    A.    In general, we try to supply on the
22 most economic basis our fleet of container
23 vessels.  We are always trying to have advantage
24 of local price differences.  So if vessels comes
25 to the U.S. East Coast we do not concentrate on

Page 131

Norbert Kock (1-19-16)

1
2  only one port, for example New York, we will
3  always include other ports in the chain of the
4  vessel's schedule which could be then Halifax,
5  North Fork, Savannah.
6        We will tender all these ports
7  together in one go and then select the most
8  economic offer at the specific port, which could
9  be then New York or even Halifax or North Fork
10 or Savannah, that's what we are evaluating.
11    Q.    I believe we saw documents earlier
12 in which the physicals or the fuel specs were
13 provided by O.W. Germany to Hapag-Lloyd for
14 Tacoma, Oakland and Los Angeles on the West
15 Coast?
16    A.    Yes.
17    Q.    That would be the same?
18    A.    It's the same pattern.  It's the
19 same pattern in Northwest Europe where we are
20 also trying to compare in between Rotterdam,
21 Antwerp and Hamburg sometimes.
22    Q.    If I understand your earlier
23 testimony correctly, Hapag will evaluate both
24 the price as well as the fuel specs.  If it's a
25 better fuel spec it might agree to accept a

Page 132

Norbert Kock (1-19-16)

1
2  worse price term, because the energy content of
3  the fuel is better for the vessels?
4     A.    Yes, right.
5     Q.    Would Hapag also take into
6  consideration whether a trader would be able to
7  supply at multiple ports, as opposed to just one
8  port?
9     A.    This is not our preference.
10    Q.    In paragraph 5 of your declaration
11 you discuss beginning the process of soliciting
12 bids for the supply of fuel from various
13 traders, and there's a footnote, footnote 1,
14 which discusses the distinction between a trader
15 and a bunker broker.
16       I was wondering if you could just
17 describe for me what that distinction is in a
18 bit of greater detail?
19    A.    Yeah, I mean --
20       MR. KEOUGH:  Objection.
21    A.    We have a clear understanding about
22 the role of a bunker broker and the bunker
23 trader, because the bunker broker is just
24 knowing a supplier and he's knowing a shipowner
25 requiring fuel oil, and he's bringing together

Page 133

Norbert Kock (1-19-16)

1
2  those parties.
3        And then he's cashing in his, what
4  is it, margin and stepping back and leaving the
5  shipowner together with the physical supplier to
6  arranging and agreeing on the business.  The
7  contract comes together or works together
8  between the shipowner, the buyer and the
9  physical supplier locally.
10       So this is not what we are after
11 because we are trying to secure not only the
12 quality of the product, but also the legal
13 status of the contract, that's why we are just
14 working with parties accepting our terms and
15 conditions of purchasing.
16       So this needs to be -- it could be
17 a physical supplier accepting them, but in most
18 cases, especially U.S.-based physical suppliers
19 are not interested to accept them because they
20 might be too sharp for them, so we are taking
21 advantage of the services of a bunker trader.
22 If the bunker trader is owing the product that's
23 what we are demanding, we are expecting that
24 he's owning the product.
25       MR. FERNANDEZ:  Owing?

34 (Pages 130 to 133)

Page 134

Norbert Kock (1-19-16)
1
2          THE WITNESS:  He owns.
3          THE INTERPRETER:  Owning.
4      A.   He owns the product and is selling
5  it to us on this risk, and based also on his
6  invoice.
7      Q.   Do you know whether it's customary
8  for a broker to simply invoice its commission
9  for the full selling invoice price for the
10 bunker fuel?
11     A.   What I was experiencing in the past
12 was that the invoice was always coming from the
13 physical supplier.  When we have been doing
14 business, we are brokers, long, long ago.
15     Q.   And the broker would issue its own
16 invoice for its commission?
17     A.   Yeah.
18     Q.   Let's pose a hypothetical.  If O.W.
19 Germany were acting as a broker in a transaction
20 in which U.S. Oil physically supplied the fuel,
21 again, if O.W. Germany were acting as a broker
22 U.S. Oil would have issued an invoice to
23 Hapag-Lloyd, and O.W. Germany would have issued
24 a separate invoice to Hapag-Lloyd for its
25 commission?

Page 135

Norbert Kock (1-19-16)
1
2          MR. KEOUGH:  Objection to the form.
3      A.   Probably, yes.
4      Q.   But that's not what occurred here?
5      A.   No.
6      Q.   In footnote 2 of your declaration
7  you say you completely disagree with U.S. Oil's
8  characterization of O.W. Denmark as a bunker
9  broker.
10         Again, I believe you've answered
11 this from your perspective.  From Hapag's
12 perspective O.W. Germany was its contractual
13 counterparty, correct?
14     A.   O.W. Germany was our contractual
15 counterparty.
16     Q.   Hapag-Lloyd did not contract with
17 O.W. Denmark in these transactions?
18     A.   Never.
19     Q.   And O.W. Germany was a trader in
20 part because it agreed to A, sell the bunker
21 fuel to Hapag-Lloyd; and B, agree to accept
22 Hapag-Lloyd's terms and conditions; and C,
23 assume the risk for that sale?
24     A.   That's right.
25         MR. KEOUGH:  Objection.

Page 136

Norbert Kock (1-19-16)
1
2      Q.   In paragraph 9, which starts on the
3  bottom of page 3 and goes to the top of page 4,
4  you discuss an incident where Hapag faced a
5  significant claim in the United States in the
6  1990s involving a foreign bunker broker.
7          Would you mind just explaining a
8  bit more about that, that claim and that issue,
9  explain its relevance to these transactions here
10 today?
11     A.   The relevance to this or to these
12 transactions is to try to explain why we are
13 changing the policy from using brokers to using
14 traders instead, because at that time we had a
15 claim, I think it was on the U.S. West Coast,
16 and the fuel was not stable so the vessel had
17 experienced severe operational problems.
18         They could manage to operate, but
19 it was taking additional manpower to clean out
20 the filters and to clean up the purification
21 plant of that vessel so the vessel could
22 maintain the voyage, but only with additional
23 manpower, as far as I can remember.
24         So we claimed the delivery with the
25 physical supplier, I do not recognize, it's too

Page 137

Norbert Kock (1-19-16)
1
2  long ago, and he did not answer our claim.  He
3  just stepped back and stopped communicating with
4  us.
5      Q.   Okay.  Had they been paid by that
6  time?
7      A.   They had been paid.
8      Q.   So essentially Hapag had no
9  recourse --
10     A.   The money was out and there was no
11 more trigger to motivate them to answer.
12     Q.   Okay.  Paragraph 7 on page 3 you
13 state, "O.W. Germany solicited business as
14 having the ability to serve as a one-stop shop
15 for the sales/supply of fuel to vessels, thereby
16 undertaking complete responsibility for all
17 aspects of the transaction, including inter alia
18 procurement delivery supply quality and
19 quantity."
20         What did you mean by a one-stop
21 shop?
22     A.   To have one party responsible for
23 supply to our vessel.
24     Q.   Is this --
25     A.   Not to interact with all these

35 (Pages 134 to 137)

Page 138

```
 1            Norbert Kock (1-19-16)
 2   parties which could be an in between.
 3        Q.   Is it fair so say then that Hapag
 4   did not care what happened downstream of O.W.
 5   Germany in terms of dealing with subcontractors,
 6   physical suppliers?
 7            MR. KEOUGH:  Objection.
 8        A.   That's not our business.
 9        Q.   If I understand correctly from what
10   you said a few minutes ago, O.W. Germany's
11   solicitation of business, as having the ability
12   to serve as a one-stop shop, satisfied Hapag's
13   upper management that they could begin doing
14   business with O.W. Germany in 2007, is that
15   correct?
16            MR. FERNANDEZ:  Objection to the
17   form.  You can answer the question.
18        A.   Yes, it seems so.
19        Q.   So if I understand sort of as a
20   synthesis of what you said already, Hapag-Lloyd
21   never authorized or pointed O.W. Germany as an
22   agent to order fuel on Hapag's behalf, is that
23   correct?
24            MR. KEOUGH:  Objection.
25        A.   Never.
```

Page 139

```
 1            Norbert Kock (1-19-16)
 2        Q.   Did Hapag-Lloyd ever advise U.S.
 3   Oil or O'Rourke Marine that O.W. Germany was
 4   acting as an agent of Hapag-Lloyd?
 5        A.   No.
 6        Q.   Let's take a look at Exhibit H 1
 7   which is attached to your declaration toward the
 8   back.  I would also like you to take a look at
 9   Exhibit 3, the third page of Exhibit 3 which is
10   Bates stamped USOT 000103 through 107.  I want
11   you to compare these two.
12            It seems like we have two sets of
13   terms and conditions used by Hapag-Lloyd.  The
14   version attached to Exhibit 3 appears to be
15   3 pages long, and the version appearing at
16   Exhibit H 1 of your declaration is 5 pages long.
17            Do you understand what the
18   difference is between these two versions?
19        A.   The first version here which was
20   dated 2006, this is the version we were
21   discussing earlier today, which has been always
22   mentioned by O.W. as the terms and conditions of
23   2007.
24        Q.   And that's the version attached as
25   Exhibit H 1 to your declaration?
```

Page 140

```
 1            Norbert Kock (1-19-16)
 2        A.   Yes.
 3        Q.   The 2006 version?
 4        A.   Yes.
 5        Q.   And the version attached to
 6   Exhibit 3?
 7        A.   This is the version which has been
 8   negotiated with O.W. Bunker during the process
 9   of negotiating the contract in Rotterdam and
10   Antwerp.
11        Q.   The ARA contract?
12        A.   The ARA contract.
13        Q.   Which has no relevance to the
14   transactions at issue here in these actions?
15            MR. KEOUGH:  Objection to the form.
16        A.   Right.
17        Q.   So really the version attached to
18   Exhibit H 1 are the terms that apply to the
19   contracts between Hapag-Lloyd and O.W. Germany
20   for these transactions?
21        A.   Yeah.
22            MR. KEOUGH:  Objection.
23        A.   This has been also confirmed by
24   O.W..
25        Q.   It's signed and stamped by O.W.
```

Page 141

```
 1            Norbert Kock (1-19-16)
 2   Germany?
 3        A.   Yeah, but it has been also
 4   confirmed by O.W. in their order.
 5        Q.   In their sales order confirmations.
 6   Even though Hapag's purchase order confirmations
 7   refer to the latest edition, it's the sales
 8   order confirmation and O.W. Germany's
 9   identification of the 2006 version that apply?
10        A.   Yes.
11            MR. KEOUGH:  Objection.
12        Q.   Correct me if I'm wrong, but I
13   believe you testified earlier that Hapag did not
14   control O.W. Germany's selection of a physical
15   supplier or a subcontractor for the purchase of
16   a bunker fuel that had been supplied to Hapag?
17            MR. KEOUGH:  Objection.
18        A.   This is not our business.
19        Q.   So Hapag did not instruct O.W.
20   Germany to use certain physical suppliers at
21   various ports?
22        A.   No.
23            MR. KEOUGH:  Objection.
24            MR. HEILIG:  Let's take a 3-minute
25   break and mark some exhibits.
```

36 (Pages 138 to 141)

Page 142

1           Norbert Kock (1-19-16)
2           (Kock Exhibit 48, Document Bates
3    stamped HPL-USOT 154 through 159, marked for
4    identification.)
5           (Kock Exhibit 49, Agency Agreement,
6    Bates stamped HPL-USOT 285 through 309, marked
7    for identification.)
8           (Kock Exhibit 50, Document Bates
9    stamped HPL-USOT 160 through 162, marked for
10   identification.)
11          (Kock Exhibit 51, Document Bates
12   stamped OWG-9949-230 through 233, marked for
13   identification.)
14      Q.   Earlier we walked through various
15   documents relating to the supply of bunkers to
16   the SANTA ROBERTA.  I just want to go back
17   through those as quickly as possible and look at
18   some of the previously marked exhibits for
19   clarification purposes, and also to look at some
20   new exhibits.  Like I said, I will try to go
21   through them as quickly as possible so that I'm
22   not rehashing the same issues.
23          I believe you testified earlier,
24   and correct me if I'm wrong, that these
25   transactions essentially transpired in the same

Page 143

1           Norbert Kock (1-19-16)
2    manner.  That the procedure of the requisition,
3    the soliciting bids, the nomination, the
4    exchange of order confirmations and the
5    invoicing were all essentially the same, is that
6    correct?
7       A.   Yes.
8       Q.   Let's first look at Exhibit
9    Number 4, an email from the vessel.  I believe
10   you said that this is essentially, to use an
11   American idiomatic expression, it's essentially
12   a heads-up.  It's just a notification from the
13   vessel saying at some point in the near future
14   we're going to issue a requisition form for
15   bunkers?
16      A.    Yes.  Our procedure says before a
17   vessel is raising a bunker requisition to our
18   department, they have to recheck that
19   requisition with the local stowage planner,
20   because bringing 3,000 metric tons of fuel oil
21   onboard of the vessel has an impact to the
22   vessel's operation, and this has to be
23   coordinated also with the stowage center not to
24   get in conflict with coming container freight in
25   that port or leaving container freight onboard

Page 144

1           Norbert Kock (1-19-16)
2    because those containers have a specific weight.
3           So the stowage planner needs to
4    know that there might be fuel oil coming, that's
5    the reason in this message here the vessel was
6    sending to the stowage guys.
7       Q.   So essentially --
8       A.   To get reconfirmed is it okay for
9    you.
10      Q.   It's replanning, it's looking ahead
11   to what will happen in the future?
12      A.   Yes.
13      Q.   If we look at Exhibit 5, the
14   document page 135 and the reverse side which is
15   136, this is the email from the vessel with the
16   actual requisition form, correct?
17      A.   Yes.
18      Q.   Does the master of a Hapag vessel
19   ever communicate directly with the physical
20   supplier or trader?
21      A.   No.
22          MR. KEOUGH:  Objection.
23      Q.   Does the master have authority from
24   Hapag to do so?
25      A.   No.

Page 145

1           Norbert Kock (1-19-16)
2           MR. KEOUGH:  Objection.
3       Q.   So then the master doesn't have any
4    authority to either negotiate or alter the terms
5    of a purchase contract that Hapag has entered
6    into with a physical supplier or trader?
7       A.   No.
8       Q.   The master's role is to simply
9    notify Hapag of what the vessel needs in terms
10   of fuel, right?
11      A.   Right.
12          MR. KEOUGH:  Objection.
13      Q.   That's the requisition form,
14   correct?
15      A.   Right.
16      Q.   And that form is not an order, the
17   order comes from Hapag, correct?
18      A.   Right.
19      Q.   And the order is placed by Hapag
20   with O.W. Germany, right?
21      A.   Right.
22      Q.   Okay.  So when we get down further
23   through the process by stamping a bunker
24   delivery note, the master is merely confirming
25   the receipt of fuel, right?

37 (Pages 142 to 145)

Page 146

Norbert Kock (1-19-16)

1
2    A.   Right.
3         MR. KEOUGH:  Objection to the form.
4    Q.   The master doesn't have authority
5    to bind Hapag to the terms that are on a bunker
6    delivery?
7         MR. KEOUGH:  Objection.
8    A.   No.
9    Q.   The master doesn't have authority
10   to deviate from Hapag's terms and conditions
11   which govern the purchase contract?
12        MR. KEOUGH:  Objection.
13   A.   They do not have an authorization
14   from Hapag-Lloyd.
15   Q.   If you look at Exhibit 6.  Again,
16   this is just Hapag's confirmation email to the
17   vessel indicating that the requisition form has
18   been received, and that Hapag will make
19   arrangements accordingly, correct?
20   A.   Yes.
21        MR. KEOUGH:  Objection.
22   Q.   If we look at the date on
23   Exhibit 6.  What's the date on the email?
24   A.   The date?
25   Q.   Yes.

Page 147

Norbert Kock (1-19-16)

1
2    A.   The date was September 30, 2014.
3    Q.   What's the date on the email with
4    the requisition form from the vessel?
5    A.   This was September 26th.  This was
6    sent on a Friday and has been answered on a
7    Tuesday.  There was a weekend in between.
8    Q.   Are there individuals in your team
9    in the office over the weekend who would be I
10   guess conducting the evaluation process?
11   A.   No.
12   Q.   So then on Monday morning, for
13   example, they would have looked on the valuation
14   process that we discussed earlier?
15   A.   Yes.
16   Q.   And by Tuesday they would get back
17   to the vessel?
18   A.   Yeah.  I would have been expected
19   to do it on Monday orally, but there might be a
20   reason that they couldn't do it so they did it
21   on a Tuesday morning.
22   Q.   Please do not admonish your
23   subordinates based on what we've said today.
24        Look at Exhibit 7.  The first page,
25   document number 139 and the reverse side, 140.

Page 148

Norbert Kock (1-19-16)

1
2    I believe you testified that this would be
3    Hapag's email to the market soliciting bids to
4    supply the SANTA ROBERTA, is that correct?
5    A.   Correct.
6    Q.   Okay.  On the reverse we have the
7    actual inquiry form, is that right?
8    A.   Yes.
9    Q.   Do you see a paragraph about
10   halfway down the page that begins "Please take
11   into consideration"?
12   A.   Yes.
13   Q.   This paragraph makes reference to
14   Hapag's terms and conditions?
15   A.   That's true.
16   Q.   And it's the latest edition?
17   A.   That's true.
18   Q.   So would this alter in any way your
19   earlier testimony about which version of Hapag's
20   terms applies to its contracts with O.W.
21   Germany?
22        MR. MALONEY:  Objection to the
23        form.
24   A.   This is a standard text here, and
25   what we can see in O.W.'s order confirmation is

Page 149

Norbert Kock (1-19-16)

1
2    that they were referring to the terms and
3    conditions from 2006, and we accepted that.
4    Q.   Okay.
5    A.   Because we did not protest.
6    Q.   So in other words, this doesn't
7    change your earlier testimony?
8    A.   No.
9    Q.   Okay.  Let's take a look at
10   Exhibits 8 and 9.  I just want you to look at
11   the first page of Exhibit 8 and Exhibit 9.  I
12   believe Exhibit 8 is one where we've put several
13   documents together that perhaps should not have
14   been together, but that's all right.
15        I believe you testified earlier
16   that what we have in Exhibit 8 is one of the
17   offers from Peninsula Petroleum, which is
18   another trader, is that correct?
19   A.   Right.
20   Q.   Exhibit 9 we have the typical
21   supply by O.W. Germany with the specifications
22   for the fuel?
23   A.   Right.
24   Q.   If you look at the third page of
25   Exhibit 8.  Am I correct that you described this

Elisa Dreier Reporting Corp., a U.S. Legal Support Company  (212) 557-5558
950 Third Avenue, New York, NY  10022

Page 150

Norbert Kock (1-19-16)

1  earlier as a price comparison?
2      A.   Yes.
3      Q.   Essentially, this shows
4  Hapag-Lloyd's process of evaluating the bids or
5  the offers that it received from various
6  traders?
7      A.   That's true.
8      Q.   One of which would be O.W. Bunker
9  Germany?
10      A.   Yes.
11      Q.   Is this an internal document?
12      A.   Yes.
13      Q.   So this would not have been shared
14  with O.W. Germany?
15      A.   No.
16      Q.   And would not have been shared with
17  the physical suppliers?
18      A.   Or anybody else.
19      Q.   Anybody else?
20      A.   Just internally, and if there is an
21  audit going on.
22      Q.   If we look at the furthest column
23  to the left we have the names of the various
24  traders that issued offers to Hapag-Lloyd, is

Page 151

Norbert Kock (1-19-16)

1  that correct?
2      A.   Right.
3      Q.   Remind me, did you identify GF or
4  GEFO before?
5      A.   Yes.
6      Q.   And who is that?
7      A.   This is a German-based or a
8  Hamburg-based trader we are using from time to
9  time.
10      Q.   So if we look at the next column to
11  the right, number 1, offer, we see that -- how
12  do you pronounce it?
13      A.   GEFO is the abbreviation for
14  Gesellschaft transport.
15      THE INTERPRETER:  Society for oil
16  transportation.
17      A.   This is a tanker owner operating in
18  the Baltic mainly and the North Sea coast area,
19  owning tankers and operate them, and having a
20  fuel oil purchasing department which were grown
21  into also a trading department offering their
22  services to external other shipowners.
23      Q.   Okay.  So it appears from this
24  document that GEFO's second offer was 553

Page 152

Norbert Kock (1-19-16)

1  presumably per metric ton, and O.W. Bunker's
2  first offer was 554 per metric ton?
3      A.   You have to be careful with the
4  last column here which is stating which port is
5  offered.  So could be please repeat your
6  question?
7      Q.   I'm not sure I had a pending
8  question.  It just appears that the offer stated
9  for GEFO is a dollar less than O.W. Bunker
10  Germany in that first column entitled "Offer"?
11      A.   That's true.
12      Q.   If I understand your earlier
13  testimony, the lowest price did not necessarily
14  win the nomination because the fuel quality
15  might be better?
16      A.   Yes.
17      Q.   And that's a factor that would be
18  taken into consideration which Hapag?
19      A.   The energy contents, right.
20      Q.   The energy contents, right.  If we
21  go over three columns it's again entitled "One
22  offer," but it appears to be for the marine
23  diesel oil header column?
24      A.   Yes.

Page 153

Norbert Kock (1-19-16)

1      Q.   We see GEFO's first offer was
2  better than O.W. Bunker Germany, then O.W.
3  Bunker Germany made a second bid at a lower
4  price, is that correct?
5      A.   Where are you at the moment?
6      Q.   Under the MDO O.W. Bunker 2 TE, it
7  looks like the price went from 895 to 885?
8      A.   Yes.
9      Q.   So at some point O.W. Bunker
10  Germany improved its offer to the MDO.  Do I
11  understand correctly that the negotiation of
12  pricing would have taken place likely over the
13  phone?
14      A.   Yes.
15      Q.   Okay.  Again, this is just an
16  internal document that would not have been
17  shared?
18      A.   That's correct.
19      Q.   Let's take a look at a document
20  that's been marked as Exhibit 48, this is Bates
21  number HPL-USOT 154 through 159.
22      Do you recall if you looked at an
23  email similar to this earlier on today?
24      A.   Yes.

Elisa Dreier Reporting Corp., a U.S. Legal Support Company  (212) 557-5558
950 Third Avenue, New York, NY  10022

Norbert Kock (1-19-16)

1
2     Q.    I believe we discussed a bit about
3  Norton Lilly and Oiltest, is that correct?
4     A.    Yes.
5     Q.    If I understand correctly, Norton
6  Lilly was the local agent at the port?
7     A.    That's right.
8     Q.    And Oiltest was the surveyor
9  appointed to essentially run quality control on
10 the fuel specs?
11    A.    Yes, and quality.
12    Q.    What would be the purpose of the
13 email at pages 154 to 155?
14    A.    To inform the local agent, the
15 vessel, the stowage planners, as well as the
16 attending surveyor about this order we did.
17    Q.    So it's really logistics and
18 coordinating the physical supplier at the port?
19    A.    It's only logistics.
20    Q.    Neither Norton Lilly nor Oiltest
21 plays any part in the negotiation or the
22 formation of a contract for the purchase of fuel
23 oil?
24    A.    No.
25    Q.    Do you know whether Hapag's

Norbert Kock (1-19-16)

1
2  relationship with Norton Lilly is governed by
3  written contracts?
4     A.    I'm not involved in that business,
5  but there must be a contract onboard, otherwise
6  they won't work for us.
7     Q.    Let's look at a document that has
8  been marked as Exhibit 49, Bates stamps HPL-USOT
9  285 through 309.
10          Sir, have you seen this document
11 before today?
12    A.    No.
13    Q.    I take it then it's fair to say you
14 did not play any part in drafting or negotiating
15 this document?
16    A.    That's correct.
17    Q.    And you're not familiar with its
18 terms?
19    A.    No.
20    Q.    Well then we'll move on.
21          MR. FERNANDEZ:  Just for the
22 record, what you marked as Exhibit 49 has been
23 marked confidential pursuant to the
24 confidentiality agreement.
25          MR. HEILIG:  They should have asked

Norbert Kock (1-19-16)

1
2  whether that was a preexisting stamp or if you
3  had done it.
4          MR. FERNANDEZ:  We had done it.
5          MR. HEILIG:  There's no testimony
6  to mark as confidential.
7     Q.    Earlier we discussed a bit about
8  what would happen if a claim were to arise in a
9  particular transaction.
10          Would a claim arise based on the
11 survey conducted by Oiltest, for example?
12    A.    For example, yes.
13    Q.    Let's take a look at a document
14 that's been marked as Exhibit Number 50, this is
15 Bates number HPL-USOT 160 through 162.  Do you
16 recognize these documents?
17    A.    Yes.
18    Q.    Page 161, is this a fuel survey
19 report submitted by Oiltest to Hapag-Lloyd for
20 the SANTA ROBERTA transaction?
21    A.    Yes.
22    Q.    So the fuel surveyor would have
23 completed the document on page 161?
24    A.    Yes.
25    Q.    Page 162 we have a photograph which

Norbert Kock (1-19-16)

1
2  appears to be a photograph of the samples taken?
3     A.    That's right.
4     Q.    From the fuel?
5     A.    Yes.
6     Q.    Does Hapag-Lloyd require a
7  photograph of the samples to I guess demonstrate
8  their existence?
9     A.    Their integrity, right.
10    Q.    Would these documents be the type
11 of documents to notify Hapag of a potential
12 claim based on the specifications of the fuel?
13    A.    Yes.
14    Q.    If a claim were presented by
15 Hapag-Lloyd, I believe you testified that it
16 would be presented to O.W. Germany?
17    A.    Yes.
18    Q.    And to no one else?
19    A.    Right.
20    Q.    And Hapag-Lloyd didn't care what
21 happened downstream of O.W. Germany with respect
22 to those claims, correct?
23    A.    That's right.
24    Q.    All right.  And if it were
25 determined or agreed by the parties that the

Page 158

Norbert Kock (1-19-16)

1   claim was valid, there would be an adjustment in
2   price to O.W. Germany's invoice to Hapag-Lloyd?
3       A.    That's right.
4       Q.    Irrespective of whether or not
5   there would be a corresponding reduction or
6   adjustment in price of the physical supplier's
7   invoice to O.W.?
8       A.    We have no relation to the physical
9   supplier.  We are just dealing with O.W.
10  Germany.
11      Q.    This all stems from that issue in
12  the '90s where you dealt with the broker who
13  simply washed his hands with the situation, and
14  left Hapag with the recourse?
15      A.    Yes.
16      Q.    Let's take a look at Exhibit 14.  I
17  believe this was an email from the vessel
18  attaching the bunker delivery note that was sent
19  directly to Hapag?
20      A.    Yes.
21      Q.    Would Hapag have also received a
22  copy of the bunker delivery note from O.W.
23  Germany at some point?
24      A.    It could have been done at some

Page 159

Norbert Kock (1-19-16)

1   point together with the invoice.
2       Q.    Okay.  Let's take a look at a
3   document that has been marked as Exhibit 51,
4   Bates number OWG-9949-230 through 233.
5           The email on page 230 is in German
6   so I will have to rely on you to translate, or
7   our trusted translator.  Can you describe this
8   email for me?
9       A.    Yeah.  This is a message from
10  Victoria Bohn who's an administrative worker at
11  O.W. at that time addressing this email to
12  Marion Sakowski, who is a manager in our
13  accounting department saying hello Frau Sakowski
14  or hello Mrs. Sakowski, attached you receive
15  invoice and bunker delivery note for the
16  bunkering of M/V, Motor Vessel SANTA ROBERTA in
17  Tacoma on October 9, 2014.  The original will
18  follow per courier.
19      Q.    So Hapag would receive copies of
20  the bunker delivery note and the invoice and the
21  original by mail?
22      A.    Yes.
23      Q.    If we look at the third page,
24  document number 232, we have a copy of O.W.

Page 160

Norbert Kock (1-19-16)

1   Germany's invoice to Hapag-Lloyd for the SANTA
2   ROBERTA transaction, correct?
3       A.    That's right.
4       Q.    This one is not stamped because it
5   has not yet been entered into Hapag's accounting
6   system?
7       A.    That's right.
8       Q.    Looking earlier we looked at the
9   stamped version of the invoice?
10      A.    Yes.
11      Q.    And it would have been entered in
12  the system?
13      A.    This is depending on where the
14  copies are coming from.  If the copies are
15  coming out of our system and they had been
16  booked into the system there is a stamp.  In
17  this case here, this is communication from O.W.
18  Bunker to our bookkeeping department, and at
19  that time the invoice has not been booked.
20      Q.    The stamp is Hapag's stamp?
21      A.    Yes.
22      Q.    Do you know whether Hapag would
23  have stamped the copy received by email or would
24  Hapag have waited for the original to arrive by

Page 161

Norbert Kock (1-19-16)

1   courier?
2       A.    At that time the accounting
3   department was not allowed to process invoices
4   coming by email.  The local taxing authorities
5   in German were demanding us just to process
6   original invoices received and not copies.
7       Q.    So it's fair to assume the stamped
8   version we looked at earlier was the hard copy
9   received by Hapag-Lloyd?
10      A.    Yes.
11      Q.    Let's take a look at Exhibit 15.
12  Just remind me again what the German word
13  translates to?
14      A.    This is the payment notice that
15  there is money in the pipeline.
16      Q.    We looked earlier and saw that the
17  SANTA ROBERTA is identified on this document?
18      A.    Yes.
19      Q.    How would Hapag-Lloyd make payment
20  to O.W. Germany, physical payment; was it by
21  check or wire payment?
22      A.    Wire payment.
23      Q.    Would this document be issued
24  before or after the actual wire payment was

Page 198

Norbert Kock (1-19-16)

1
2        MR. FERNANDEZ: Objection.
3        A.   It should have been Captain Grundel
4   if he was onboard at that time, yes.
5        Q.   According to the crew list he was
6   the captain?
7        A.   Yes.
8        Q.   At that time, right?
9        A.   Yes.
10       MR. FERNANDEZ: Objection.
11       Q.   Is the SOFIA EXPRESS still owned by
12   Hapag-Lloyd?
13       A.   Yes.
14       Q.   Is the VIENNA EXPRESS still owned
15   by Hapag-Lloyd?
16       A.   Yes.
17       Q.   I direct your attention to
18   Exhibit 32, to the second page which is marked
19   HPL-USOT 00198.  Would you look at the second
20   page please, sir?
21       Is that the bunker delivery receipt
22   for the VIENNA EXPRESS?
23       A.   Yes.
24       Q.   Is it your understanding that the
25   chief engineer of the VIENNA EXPRESS signed that

Page 199

Norbert Kock (1-19-16)

1
2   bunker delivery receipt?
3        MR. FERNANDEZ: Objection.
4        A.   Yeah, it has been signed by the
5   chief engineer.
6        Q.   And the chief engineer signed that
7   on behalf of the vessel?
8        MR. FERNANDEZ: Objection.
9        Q.   Using the stamp marked there?
10       MR. FERNANDEZ: Objection.
11       MR. MALONEY: Objection.
12       MR. HEILIG: Objection.
13       A.   He signed it on behalf of
14   Hapag-Lloyd.
15       Q.   And it bears the stamp also on the
16   right side, Hapag-Lloyd VIENNA EXPRESS, do you
17   see that?
18       A.   Yes.
19       Q.   In the course of your duties as the
20   director of purchasing, you're use to seeing
21   stamps of the vessel and Hapag-Lloyd on these
22   bunker delivery receipts?
23       MR. FERNANDEZ: Objection.
24       A.   When it was a Hapag-Lloyd vessel,
25   yes.

Page 200

Norbert Kock (1-19-16)

1
2        Q.   I'm showing you what's been
3   produced by your counsel as HPL-USOT page 89,
4   which appears to be a crew list for the VIENNA
5   EXPRESS, which I'm placing before you.
6        Do you recognize that the name of
7   the chief engineer depicted on that page -- do
8   you recognize whether the name of the chief
9   engineer is depicted on that page?
10       A.   It looks like the chief engineer,
11   Marek Sojda, was the responsible chief engineer
12   for the vessel at that time, and the signature
13   looks like Sojda.  I would agree.
14       Q.   Other than the document that you've
15   reviewed in Germany and here, the testimony that
16   you described, did you review any diaries or
17   calendar that you may have kept in October of
18   2014?
19       A.   No.
20       Q.   In preparation for your testimony
21   today?
22       A.   No.
23       Q.   At the time, in October of 2014,
24   did you have a practice of maintaining a
25   notebook or a diary of the work that was going

Page 201

Norbert Kock (1-19-16)

1
2   on in your department?
3        A.   No.
4        Q.   In the course of your experience as
5   the director of purchasing for Hapag-Lloyd, have
6   you come to learn that a supplier of fuel to a
7   vessel, a Hapag-Lloyd vessel, may have a right
8   to assert a lien against the vessel itself?
9        MR. FERNANDEZ: Objection.
10       MR. HEILIG: Objection.
11       MR. MALONEY: Objection.
12       A.   Maybe a seller, but a supplier, no.
13       Q.   You've developed some familiarity
14   that a seller might have a lien against a
15   Hapag-Lloyd vessel in some circumstances, is
16   that fair to say?
17       MR. FERNANDEZ: Objection.
18       A.   I think this is part also of our
19   terms and conditions.
20       Q.   Prior to the O.W. bankruptcy, did
21   you have any experience with any seller or
22   supplier claiming that they had a lien against a
23   Hapag-Lloyd vessel for non-payment?
24       A.   No.
25       MR. HEILIG: Objection.

51 (Pages 198 to 201)

Page 210

Norbert Kock (1-19-16)

1   Lilly to assist you with?
2
3           MR. FERNANDEZ:  Objection to the
4   form.
5           MR. MALONEY:  Objection to the
6   form.
7           MR. HEILIG:  Objection.
8       A.   Yes.
9       Q.   Would you look at paragraph 19.  Do
10  you see at the end of the second sentence in
11  that paragraph you say:
12           "Additionally, execution of the
13  bunker delivery receipt simply acknowledged
14  receipt of the fuel as to volume and delivery
15  temperature only and did not ratify performance
16  of USOT concerning delivery of fuel."
17           Do you see that?
18      A.   Yes.
19      Q.   What did you mean by "ratify
20  performance of USOT concerning delivery of
21  fuel"?
22      A.   That we just confirm the quality,
23  correction, the volume, the delivered volume and
24  the delivered temperature, and that the final
25  metric tons which will be invoiced later by the

Page 211

Norbert Kock (1-19-16)

1
2   seller, O.W., will be calculated based on the
3   analyzed product entity which comes later.
4       Q.   That quality analysis that you
5   described?
6       A.   Yes.
7           MR. KEOUGH:  Let's mark this as
8   Exhibit 53 and 54.
9           (Kock Exhibit 53, Time Charter with
10  attachments, Bates stamped HPL-USOT 201 through
11  241, marked for identification.)
12          (Kock Exhibit 54, Time Charter,
13  Bates stamped HPL-USOT 242 through 284, marked
14  for identification.)
15      Q.   I'm showing you what's been marked
16  as Exhibit 53.  Do you recognize that as the
17  time charter produced by your counsel in the
18  case that is similar to Exhibit 17, but it
19  contains the riders and additional pages that
20  are lacking from Exhibit 17?
21      A.   Our department is not involved in
22  negotiating charter parties.
23      Q.   I'm just asking you if you
24  recognize this exhibit as a more complete
25  document?

Page 212

Norbert Kock (1-19-16)

1       A.   Yes, it contains much more
2   paperwork.
3       Q.   Than Exhibit 17?
4
5           MR. FERNANDEZ:  Objection to the
6   form.
7       Q.   Does it contain the additional
8   pages of the time charter produced by your
9   attorneys, which are omitted from Exhibit 17?
10      A.   I don't know.
11          MR. FERNANDEZ:  Objection.
12      Q.   Would you look at the document
13  please?
14          MR. DEHART:  Can we note on the
15  record that this document has been designated as
16  confidential?
17          MR. KEOUGH:  Yes.
18      A.   That's a lot of paperwork in behind
19  stating clauses to the Charter Party.
20          MR. KEOUGH:  Off the record.
21          (Off the record.)
22      Q.   Is it correct that what's been
23  marked as Exhibit 53 contains the Bates numbers
24  HPL-USOT 201 through 241, is that right?
25      A.   Yes.

Page 213

Norbert Kock (1-19-16)

1
2       Q.   You understand this is a document
3   produced by your attorneys in this case for
4   Hapag-Lloyd?
5       A.   No.
6           MR. KEOUGH:  I'll ask counsel if
7   he's prepared to stipulate to that effect?
8           MR. FERNANDEZ:  I'll take it under
9   advisement.
10          MR. KEOUGH:  Thank you.
11      Q.   Would you please place Exhibit 54
12  in front of the witness.  Showing you that
13  document, do you recognize that as a copy of a
14  time charter produced by your counsel, which
15  bears the Bates numbers HPL-USOT 242 through
16  284?
17      A.   But I can't identify who was issued
18  this document here, because it's not my
19  business.
20          MR. KEOUGH:  That appears to be a
21  time charter for the SANTA ROBERTA.  Exhibit 53
22  was a time charter for the SEASPAN HAMBURG.
23          MR. FERNANDEZ:  Also marked
24  confidential for purposes of this litigation.
25          MR. KEOUGH:  Yes, I take it it is.

54 (Pages 210 to 213)