# EXHIBIT 8

Page 1

```
IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA
----------------------------------x
HAPAG-LLOYD AKTIENGESELLSCHAFT,
              Plaintiff,

     -against-                      14 Civ. 9949

U.S. OIL TRADING LLC, O.W. BUNKER
GERMANY GMBH, O.W. BUNKER & TRADING
A/S, ING BANK N.V., CREDIT AGRICOLE
S.A.,
              Defendants.
----------------------------------x
IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA
----------------------------------x
U.S. OIL TRADING LLC,
              Plaintiff,

     -against-                      Case No. 15-6718

M/V VIENNA EXPRESS, her tackle,
boilers, apparel, furniture, engines,
appurtenances, etc., in rem, and
M/V SOFIA EXPRESS, her tackle,
boilers, apparel, furniture, engines,
appurtenances, etc., in rem,
              Defendants.
----------------------------------x
```

                    January 7, 2016
                    12:00 p.m.


    Videoconference Deposition of THOR

NIELSEN, held at the offices of Seward & Kissel

LLP, One Battery Park Plaza, New York, New York,

before Roberta Caiola, a Shorthand Reporter and

Notary Public within and for the State of New

York.

Page 2

```
 1   APPEARANCES:
 2
 3   Attorneys for Defendant ING Bank N.V.,
 4   as Security Agent:
 5   SEWARD & KISSEL LLP
 6   BRIAN P. MALONEY, ESQ.
 7   CELINDA J. METRO, ESQ.
 8       One Battery Park Plaza
 9       New York, New York 10004
10
11   Attorneys for U.S. Oil Trading LLC:
12   CLYDE & CO. US LLP
13   JOHN KEOUGH, ESQ.
14   CASEY BURLAGE, ESQ.
15       405 Lexington Avenue
16       New York, New York 10174
17       (Present via videoconference)
18
19   Attorneys for Hapag-Lloyd Aktiengesellschaft
20   and COSCO Defendants:
21   FREEHILL HOGAN & MAHAR LLP
22   GINA M. VENEZIA, ESQ.
23   MICHAEL DEHART, ESQ.
24       80 Pine Street
25       New York, New York 10005
```

Page 3

```
 1   APPEARANCES:
 2
 3   Attorneys for O.W. Bunker Germany GMBH:
 4   McDERMOTT WILL & EMERY
 5   DARREN AZMAN, ESQ.
 6       340 Madison Avenue
 7       New York, New York 10173-1922
 8       (Present Telephonically)
 9
10   Attorneys for O.W. Bunker Germany GMBH:
11   HILL RIVKINS LLP
12   JUSTIN M. HEILIG, ESQ.
13       45 Broadway, Suite 1500
14       New York, New York 10006-3739
```

Page 4

```
 1                 INDEX
 2   Witness       Examination By        Page
 3   Thor          Mr. Maloney            7
 4   Nielsen       Mr. Heilig            63
 5                 Ms. Venezia           79
 6                 Mr. Heilig           108
 7                 Ms. Metro            112
 8                 Ms. Venezia          115
 9
10               EXHIBITS
11   Nielsen       Description          Page
12   Exhibit 1  Notice of Deposition in case   32
13              14 CV 9949
14   Exhibit 2  Notice of Deposition in case   32
15              15-6718, U.S. Oil Trading
16              against VIENNA EXPRESS
17   Exhibit 3  U.S. Oil Trading's production  39
18              in the 9949 action, Bates
19              numbered USOT 000001 through
20              USOT 000347
21   Exhibit 4  Production made by U.S. Oil    40
22              Trading in the VIENNA EXPRESS
23              matter, Case Number 15-6718,
24              Bates numbered USOT 000001
25              through USOT 000107
```

Page 5

```
 1               EXHIBITS
 2   Nielsen       Description          Page
 3   Exhibit 5  Deposition Notice to           64
 4              Mr. Nielsen in his individual
 5              capacity
 6   Exhibit 6  Rule 30(b)(6) Deposition       64
 7              Notice issued by O.W. Germany
 8   Exhibit 7  Declaration, Docket No. 52-2   66
 9   Exhibit 8  Verified Complaint filed by    69
10              U.S. Oil Trading
11   (Original exhibits retained by the Court
12   Reporter to accompany the transcript)
```

Page 26

Thor Nielsen (1-7-16)

1
2  A. Sorry, can you say that again?
3  Q. Sure. Which individuals' files
4  were collected?
5      MR. KEOUGH: Objection to the form.
6  A. We have a file that we call our
7  bunker files. They are essentially all the
8  movement on our docks and each movement has its
9  own file, and so all the documents related to
10 each movement are contained in that file. So
11 the information that I pulled was the six files
12 that related to O.W. Bunker.
13 Q. Were those organized by each fuel
14 delivery to each vessel involved in these cases?
15 A. Yeah, they're dated, so each file
16 has a date and that's the date of delivery.
17 Q. Were emails and instant messages
18 also searched in connection with the production
19 in this matter?
20 A. Yes.
21 Q. What were the criteria used to
22 determine which emails and instant messages
23 should be produced?
24 A. The criteria for that was any
25 emails or IMs that related to O.W. Bunker.

Page 27

Thor Nielsen (1-7-16)

1
2  Q. Were search terms employed or did
3  you look at all of the emails; how was it done?
4  A. I did not do those myself. The
5  person that would have had those interactions
6  with them did those and then provided them to
7  me.
8  Q. Was that an employee at U.S. Oil?
9  A. It was.
10 Q. Who was that?
11 A. His name, the main person would
12 have been a gentleman by the name of Lee Weber.
13 Q. Who is Mr. Weber?
14 A. Mr. Weber is our logistics planner.
15 Q. What department does he work in at
16 U.S. Oil?
17 A. He is in the marketing group and
18 would report to Cameron Proudfoot, the VP of
19 supply and marketing.
20 Q. You mentioned that Mr. Weber was a
21 logistics planner. What do you understand that
22 job to include, what responsibilities do you
23 understand that job to include?
24 A. Well, one of his responsibilities
25 is he coordinates all of the deliveries and

Page 28

Thor Nielsen (1-7-16)

1
2  sells the products across our dock. He is the
3  one that schedules them, makes sure that any
4  adjustments that need to occur if some
5  offloading takes longer. He works with the
6  companies to plan for the vessels and the
7  delivery of products to those vessels.
8      He was also the guy that would
9  receive the request for the purchase of product,
10 marine fuel, and he would respond to those with
11 a quote. Then he would process the paperwork
12 associated with making that transaction happen.
13 Q. Are you familiar with the fuel
14 deliveries that are at issue in this case, just
15 generally speaking?
16 A. I am.
17 Q. Do you recall which vessels are
18 involved in these matters?
19 A. Off the top of my head there is the
20 VIENNA EXPRESS, the SOFIA EXPRESS, the ROBERTA,
21 I can't think of the second name on that.
22 There's also the M/V LONG LUCKY, the GARDENIA
23 ACE, and then it looks like there's one more
24 vessel that I can't remember.
25 Q. The vessels that we have here in

Page 29

Thor Nielsen (1-7-16)

1
2  matters 9949 and 14-9949 and 15-6718 are the
3  SANTA ROBERTA, the SEASPAN HAMBURG, the VIENNA
4  EXPRESS and the SOFIA EXPRESS.
5      I guess the question I have is, if
6  you know, who purchased the fuel from U.S. Oil
7  Trading; was it O.W. Bunker USA?
8  A. Our customer was the Danish entity.
9  How the quotes or requests came, you know,
10 doesn't really matter to me, our customer was
11 the Danish entity.
12 Q. What do you base that statement on?
13 A. Because that's the company that we
14 provided credit for. It's their financial
15 statements for which the credit was provided.
16 Q. Were there any supply contracts or
17 pricing agreements or trading agreements entered
18 into with the Danish entity?
19 A. I am not aware of any agreements.
20 Q. Were there any communications
21 between individuals over in Denmark and persons
22 out in Tacoma about the specific fuel deliveries
23 in this matter?
24 A. I am not aware of any necessarily,
25 but it doesn't mean that there wasn't. I think

Page 38

1         Thor Nielsen (1-7-16)
2    You can answer.
3        A.   You know, I again am not a lawyer,
4    but what I see the bunker receipt as is like a
5    bill of lading, it is the main billing document.
6        Q.   Did you issue any invoice to the
7    vessel interests, to the vessels or to their
8    owners or charterers after the fuel was
9    delivered?
10       A.   No, we did not.
11       Q.   Who did you issue your invoices to?
12       A.   We issued them to O.W. Bunker &
13   Trading AG.
14       Q.   Did you receive any purchase order
15   confirmations from O.W. Bunker & Trading I think
16   it's A/S?
17       A.   My recollection is that those came
18   from the USA entity.
19       Q.   You mentioned your understanding of
20   the contractual relationship and other documents
21   that might have been signed in your files.
22           Is that the extent of the
23   relationship with the vessels or their owners or
24   charterers?
25           MR. KEOUGH:  Objection to the form

Page 39

1         Thor Nielsen (1-7-16)
2    of the question.
3        A.   I'm not aware of any others.
4        Q.   Topic 2 requests U.S. Oil's
5    understanding of the communications had with the
6    vessels or the vessel interests in this action.
7    Do you see that topic?
8        A.   I do.
9        Q.   Were there communications between
10   U.S. Oil and the vessels, or their owners or
11   charterers?
12       A.   Just to the extent of the
13   documentation that has been signed.
14       Q.   We can put Exhibits 1 and 2 aside
15   for now.  I have a couple of questions about the
16   documents produced by U.S. Oil Trading in this
17   action.
18           MR. MALONEY:  What I would like to
19   do is mark U.S. Oil Trading's production in the
20   9949 action as Exhibit Number 3.
21           (Nielsen Exhibit 3, U.S. Oil
22   Trading's production in the 9949 action, Bates
23   numbered USOT 000001 through USOT 000347, marked
24   for identification.)
25           MR. MALONEY:  Those are documents

Page 40

1         Thor Nielsen (1-7-16)
2    that have been numbered USOT 000001 through 347.
3    I'm also going to mark at this time the
4    production made by U.S. Oil Trading in the
5    VIENNA EXPRESS matter, that's case number
6    15-6718, I'll mark that as Exhibit 4.  Those
7    documents have been numbered USOT 000001 through
8    107.
9            (Nielsen Exhibit 4, Production made
10   by U.S. Oil Trading in the VIENNA EXPRESS
11   matter, Case Number 15-6718, Bates numbered USOT
12   000001 through USOT 000107, marked for
13   identification.)
14       Q.   Do you have those document
15   productions there with you in Washington, sir?
16       A.   I do.
17       Q.   To short circuit some of this.  The
18   documents that have been numbered 1 through 107
19   that we've marked as Exhibit 4, are those a
20   subset of the documents that were produced in
21   the 9949 case?
22           MR. KEOUGH:  Objection to the form.
23       Q.   In other words, are you generally
24   familiar that the documents that were produced
25   as Exhibit 4 related to the VIENNA EXPRESS?

Page 41

1         Thor Nielsen (1-7-16)
2        A.   Yes, I am.
3        Q.   And do you know, are there any
4    documents in this production that are not in the
5    production that was marked as Exhibit 3?
6        A.   I haven't compared them, so I don't
7    know specifically.  They look similar.
8        Q.   I believe that's the case, and I
9    don't know if counsel for U.S. Oil Trading can
10   confirm that.
11           MR. KEOUGH:  I believe so, but I'm
12   not here to testify.  Yes, I think that's
13   correct.
14           MR. MALONEY:  Okay.
15       Q.   I'm going to focus on the documents
16   in Exhibit 3, which I understand to contain
17   documents concerning the VIENNA EXPRESS and the
18   other vessels.
19           MR. KEOUGH:  Excuse me Brian, just
20   so it's clear.  We believe that the documents
21   numbered 1 through 107 are the same in Exhibits
22   3 and 4.
23           MR. MALONEY:  Okay.  Thanks for
24   that clarification.
25       Q.   I want to ask you to take a look at

|  | Page 50 |
|---|---|
| 1 | Thor Nielsen (1-7-16) |
| 2 | delivered to O.W.? |
| 3 | A.   It was definitely delivered to |
| 4 | O.W..  Whether it was done by paper or |
| 5 | electronically, I do not recall. |
| 6 | Q.   There's a box at the bottom that |
| 7 | refers to security interest, and it mentions |
| 8 | Credit Agricole.  Do you have any information |
| 9 | about that? |
| 10 | MR. KEOUGH:  Objection to the form. |
| 11 | A.   Yeah.  That is -- the account is |
| 12 | our main account at Wells Fargo that it is being |
| 13 | deposited into.  Credit Agricole has disclaimed |
| 14 | any rights to these receivables and they are not |
| 15 | currently funding under the facility related to |
| 16 | these receivables.  They are specifically |
| 17 | excluded. |
| 18 | Q.   At the bottom of the page there are |
| 19 | some designations.  Do you know what BWTD refers |
| 20 | to? |
| 21 | A.   Yeah, that is -- B refers to a |
| 22 | billing document, W is Washington and the D -- |
| 23 | each one of those has a designation |
| 24 | specifically, but it's basically referencing |
| 25 | that this is a movement in Washington across the |

|  | Page 51 |
|---|---|
| 1 | Thor Nielsen (1-7-16) |
| 2 | dock. |
| 3 | Q.   There's a customer number below |
| 4 | that.  Is that the customer number for O.W. |
| 5 | Bunker? |
| 6 | A.   It is. |
| 7 | Q.   Back up a little bit.  A little |
| 8 | ways up the page it says, "Past due accounts are |
| 9 | subject to interest." |
| 10 | Is there any agreement about that |
| 11 | between U.S. Oil and O.W. Bunker? |
| 12 | A.   Yeah, that's included in our credit |
| 13 | agreement.  In other words, the credit |
| 14 | application that they complete allows us to |
| 15 | charge interest on past due. |
| 16 | Q.   Are there any other agreements, |
| 17 | aside from the credit application or the credit |
| 18 | agreement, with O.W. Bunker and U.S. Oil? |
| 19 | A.   I'm not aware of any other |
| 20 | agreement. |
| 21 | Q.   The columns in this invoice, do you |
| 22 | know what "BETSY" refers to under that second |
| 23 | column? |
| 24 | A.   Yeah, that is our barge that we use |
| 25 | to deliver the marine fuel to the vessels. |

|  | Page 52 |
|---|---|
| 1 | Thor Nielsen (1-7-16) |
| 2 | Q.   Do you know in the case of the |
| 3 | SANTA ROBERTA whether that is a barge that was |
| 4 | owned by U.S. Oil or by some third party? |
| 5 | A.   I don't understand your question. |
| 6 | Q.   Did you use a barging service like |
| 7 | a Harley Marine or some other company to deliver |
| 8 | fuel, do you have details on that? |
| 9 | A.   Yes, I do. |
| 10 | Q.   So the record is clear.  You do use |
| 11 | third parties sometimes to deliver fuel? |
| 12 | A.   The vessels -- the vessel is |
| 13 | controlled by us.  We have a, I think it's a |
| 14 | five-year term with Olympic Tug & Barge, they |
| 15 | operate the vessel but we control it. |
| 16 | Q.   I want to turn to pages 3 and 4. |
| 17 | Could you take a look at that? |
| 18 | A.   I have it. |
| 19 | Q.   Have you seen this document before? |
| 20 | A.   Yes.  This is one of the documents |
| 21 | that's in our bunker files. |
| 22 | Q.   Is this an example of the kinds of |
| 23 | purchase order confirmations you would receive |
| 24 | from O.W. Bunker USA in connection with these |
| 25 | fuel deliveries? |

|  | Page 53 |
|---|---|
| 1 | Thor Nielsen (1-7-16) |
| 2 | A.   Yes, it is. |
| 3 | Q.   There's a purchase order number |
| 4 | issued on this document.  Is that something that |
| 5 | you would need for your files or is that an O.W. |
| 6 | Bunker purchase order number? |
| 7 | A.   That is their number.  We don't -- |
| 8 | to be honest with you, we may or may not have |
| 9 | used that number in our system; but it is their |
| 10 | number, not ours. |
| 11 | Q.   The purchase order includes the |
| 12 | quantity and price of the fuel that O.W. Bunker |
| 13 | USA is purchasing? |
| 14 | MR. KEOUGH:  Objection to the form |
| 15 | of the question, misstates his testimony. |
| 16 | A.   It is the quantity and price of the |
| 17 | product that we are selling to O.W. Bunker & |
| 18 | Trading AG. |
| 19 | How this comes to us is -- they're |
| 20 | one of the entities underneath the Danish court, |
| 21 | so in all of these dealings we are dealing with |
| 22 | our customer. |
| 23 | Q.   At the bottom of the purchase order |
| 24 | it's signed off "Kind Regards Kai Zhou."  Do you |
| 25 | see that, sir? |

Elisa Dreier Reporting Corp., a U.S. Legal Support Company  (212) 557-5558
950 Third Avenue, New York, NY  10022

Page 54

Thor Nielsen (1-7-16)
1
2    A.   I do.
3    Q.   Would you agree with me that those
4  phone numbers there for his direct line and his
5  cell phone are U.S. numbers?
6    A.   They look like it.
7    Q.   Do you see that his office email
8  address is houston@owbunker.com?
9    A.   I see that.
10   Q.   Do you know if U.S. Oil received
11 any purchase order confirmations from any O.W.
12 Bunker entity, other than O.W. Bunker USA Inc.?
13   A.   My recollection is that these all
14 came from O.W. Bunker USA.
15   Q.   Do you know a person by the name of
16 Mads Buchwald?
17   A.   The name sounds familiar, but I
18 don't -- I don't recall it.
19       MR. MALONEY:  I think it's a good
20 time to take a 5-minute break, if that's okay
21 with you?
22       MR. KEOUGH:  Sure.
23       (Short recess taken.)
24       MR. MALONEY:  Is everybody back?
25       MR. KEOUGH:  We're good.  Ready to

Page 55

1           Thor Nielsen (1-7-16)
2  go.
3        MR. MALONEY:  All right.
4  BY MR. MALONEY:
5    Q.   Mr. Nielsen, I just have a handful
6  of topics to cover.  We talked about the credit
7  department, the tax and treasury services
8  department and the individuals in that.
9            I believe you mentioned earlier
10 that Mr. Weber reported to Mr. Proudfoot in the
11 sales and trading department, is that correct?
12   A.   The supply and marketing
13 department, yeah.
14   Q.   Could you describe, what is the
15 supply and marketing department?
16   A.   The supply and marketing
17 department, that group is responsible for crude
18 acquisitions, as well as the sale of all of our
19 products.
20   Q.   How large is that department?
21   A.   Currently I think there's ten
22 people in that department, and there's
23 one person that they use as a contracted
24 employee from time to time.
25   Q.   Was Mr. Weber responsible for the

Page 56

1           Thor Nielsen (1-7-16)
2  O.W. Bunker account?
3    A.   He would have been the main
4  contact, yes.
5    Q.   Was anyone else in the supply and
6  marketing department responsible for the O.W.
7  Bunker account?
8    A.   Well, just Cameron Proudfoot
9  himself, he's the person that manages that, so
10 he would have responsibility.
11   Q.   Do you know if anyone else worked
12 with O.W. Bunker in 2014, other than Mr. Weber
13 or Mr. Proudfoot?
14   A.   I am not aware of anybody else that
15 would have been involved.
16   Q.   In the supply and marketing
17 department?
18   A.   Correct.
19   Q.   Mr. Nielsen, do you know if U.S.
20 Oil engages in any hedging or risk management
21 for exposure to the fuel that it purchases and
22 sells?
23   A.   We do, but we do not do any for
24 what I would refer to as the bottom of the
25 barrel, which would be asphalt and marine fuel.

Page 57

1           Thor Nielsen (1-7-16)
2    Q.   So do you know if there were any
3  hedging operations at U.S. Oil that might have
4  mitigated or offset any exposure to O.W.
5  Bunker's nonpayment in this case?
6    A.   No, there would not be.
7    Q.   When was the first time that U.S.
8  Oil learned of financial distress at O.W.
9  Bunker?
10   A.   When it was announced.
11   Q.   So sometime in early November of
12 2014?
13   A.   Maybe late October, early November.
14   Q.   Do you have any personal
15 recollections of hearing about it?
16   A.   I recall hearing about a rogue
17 trader and some potential issue with having to
18 take a hit on their balance sheet, but it didn't
19 seem as though there was -- it wasn't something
20 that was going to knock them off their feet, but
21 then two weeks later you heard the bad news.
22   Q.   Did you have any conversations with
23 Mr. Proudfoot after hearing about the news?
24   A.   I'm sure we talked about it, and
25 our concern about it.  My recollection of all

15 (Pages 54 to 57)

Page 66

1     Thor Nielsen (1-7-16)
2  behalf of U.S. Oil in the action commenced in
3  Washington and subsequently transferred to New
4  York, the docket number is 52-2.
5          MR. HEILIG:  We'll mark this as
6  Exhibit Number 7.
7          (Nielsen Exhibit 7, Declaration,
8  Docket No. 52-2, marked for identification.)
9          MR. KEOUGH:  It's before the
10 witness.
11    Q.   Mr. Nielsen, do you recall
12 executing this document?
13    A.   I do.
14    Q.   Did you prepare this document or
15 was this prepared for you for your review and
16 execution?
17    A.   It was prepared for me and I
18 executed it.
19    Q.   But you reviewed its contents
20 before doing so?
21    A.   I did.
22    Q.   And they're accurate, to the best
23 of your knowledge?
24    A.   It is.
25    Q.   Let's take a look at paragraph 17,

Page 67

1     Thor Nielsen (1-7-16)
2  it's on page 4.  Paragraph 17 says:
3          "USOT did not enter into contracts
4  with HLag" meaning Hapag-Lloyd "for the subject
5  deliveries of bunkers by USOT to the M/V VIENNA
6  EXPRESS and M/V SOFIA EXPRESS."
7          Is that still your position,
8  Mr. Nielsen?
9     A.   Yes.
10    Q.   And that's the position of USOT
11 still?
12    A.   Yes.
13    Q.   What about the two other vessels,
14 the SOFIA EXPRESS and -- or, I'm sorry, the
15 SEASPAN HAMBURG and the SANTA ROBERTA, would
16 that be the same for those two vessels?
17    A.   Yes.
18    Q.   Okay.  If U.S. Oil did not enter
19 into contracts with Hapag, is it also U.S. Oil's
20 position that none of the O.W. entities were
21 acting as agents of Hapag for purposes of
22 purchasing bunker fuel from U.S. Oil?
23         MR. KEOUGH:  Objection to the form.
24    A.   Can you ask that question again,
25 please?

Page 68

1     Thor Nielsen (1-7-16)
2          MR. HEILIG:  Sure.  Will you read
3  back the question please.
4          (Question read.)
5          MR. KEOUGH:  Objection.
6     A.   My understanding of this is that --
7  or I guess my look at this is that O.W. Bunker
8  was essentially acting as a broker or trader in
9  this market, they don't own anything here, and
10 we delivered the product to the vessel.
11    Q.   Did U.S. Oil have any
12 communications with Hapag in which Hapag
13 indicated that one or more O.W. entities were
14 acting as agents of Hapag-Lloyd with respect to
15 these transactions?
16         MR. KEOUGH:  Objection to the form.
17    A.   Can you repeat the question again,
18 please?
19    Q.   Sure.  Did U.S. Oil have any
20 communications with Hapag-Lloyd in which
21 Hapag-Lloyd indicated that one or more O.W.
22 entities were acting as agents of Hapag for
23 purposes of these transactions and bunker
24 purchases?
25         MR. KEOUGH:  Same objection.

Page 69

1     Thor Nielsen (1-7-16)
2     A.   When I -- when I look at the
3  interaction with Lee it seemed like, if I
4  recall, that there was some communication that
5  was attached to an email from Hapag-Lloyd to
6  O.W. Bunker instructing them to acquire the
7  fuel.  That's my only -- I mean that wasn't a
8  direct communication to us, that was attached to
9  an email.
10    Q.   My question was, were there any
11 direct communications from Hapag to U.S. Oil in
12 which Hapag indicated that one or more O.W.
13 entities were acting as its agents?
14         MR. KEOUGH:  Same objection.
15    A.   The answer is no.
16    Q.   Okay.  Mr. Nielsen, I would like
17 you to take a look at the Verified Complaint
18 filed by U.S. Oil Trading in the action
19 commenced in Washington and transferred to New
20 York.
21         MR. HEILIG:  We will mark that as
22 Exhibit 8.
23         (Nielsen Exhibit 8, Verified
24 Complaint filed by U.S. Oil Trading, marked for
25 identification.)

Page 70

1           Thor Nielsen (1-7-16)
2           MR. KEOUGH: It's in front of the
3     witness.
4        Q. Mr. Nielsen, do you recognize this
5     document?
6        A. I do.
7        Q. On page 8, is that your signature
8     under the verification?
9        A. It is.
10       Q. So you verified the accuracy of the
11    contents of this pleading?
12       A. Correct.
13       Q. Mr. Nielsen, let's take a look at
14    paragraph 9 on page 2. Do you see paragraph 9,
15    Mr. Nielsen?
16       A. I do.
17       Q. What's the basis for this
18    statement?
19       A. The basis for the statement is that
20    we issued those sales authorizations and
21    confirmation related to the sale of marine fuel
22    to O.W. Bunker.
23       Q. Mr. Nielsen, let's go back quickly
24    to Exhibit 7, your declaration. Paragraph 15 is
25    what I want to look at.

Page 71

1           Thor Nielsen (1-7-16)
2        A. Okay.
3        Q. Paragraph 15 says:
4            "USOT negotiated its agreements
5     with O.W. Denmark for the subject deliveries
6     bunkers by USOT to the M/V VIENNA EXPRESS and
7     M/V SOFIA EXPRESS at USOT's principal place of
8     business in Tacoma, Washington."
9            What's the basis for this
10    statement, Mr. Nielsen?
11       A. The basis for this statement is
12    that our customer is the O.W. Denmark entity,
13    and that our sales authorization and
14    confirmation indicate that.
15       Q. Did USOT actually negotiate with
16    O.W. Denmark with respect to these transactions,
17    or was it negotiating with O.W. USA?
18          MR. KEOUGH: Objection to the form.
19       A. The entity in the O.W. Bunker
20    family that was operating was irrelevant to us,
21    we were dealing -- who we were dealing with from
22    a credit and sales standpoint was the Denmark
23    entity.
24       Q. Okay. In terms of the actual
25    communications though, the actual communications

Page 72

1           Thor Nielsen (1-7-16)
2     were with O.W. USA; isn't that correct?
3           MR. KEOUGH: Objection to the form.
4        A. That's correct.
5        Q. Okay. We won't actually have to
6     look at the document, so we'll save some time.
7           Earlier Mr. Maloney asked you some
8     questions about the instant messenger
9     communications. Just one follow-up question.
10    Are those communications, are they capable of
11    being produced in the native or an original
12    format?
13       A. I don't know the answer to that.
14       Q. Okay. Do you know who would know
15    the answer to that at U.S. Oil?
16       A. Either our IT guys, Lee Weber may
17    know.
18       Q. Earlier we also looked at purchase
19    order confirmations issued to U.S. Oil with
20    respect to these transactions, so why don't we
21    take a look at one of them. If you would look
22    at USOT Document 110?
23          MS. METRO: This would be
24    Exhibit 3?
25          MR. HEILIG: This would be part of

Page 73

1           Thor Nielsen (1-7-16)
2     Exhibit 3.
3        A. Okay.
4        Q. Have you seen this document before,
5     Mr. Nielsen, or one like it?
6        A. Yes.
7        Q. Do you see that this document is
8     dated Houston 1, October 2014, toward the
9     right-hand side?
10       A. Yes.
11       Q. Okay. Do you see toward the left,
12    almost directly across, the delivery date is
13    October 9, 2014?
14       A. Right.
15       Q. This is for the delivery of bunkers
16    to the SANTA ROBERTA?
17       A. Right.
18       Q. The account stated is O.W. Bunker
19    USA Inc.?
20       A. Yes.
21       Q. It lists the quantities of fuel and
22    price per metric ton for that fuel?
23       A. Yes.
24       Q. Is it fair to say that at the time
25    of receiving this document on or about

19 (Pages 70 to 73)

Page 74

```
 1            Thor Nielsen (1-7-16)
 2   October 1st, that the terms of the sales
 3   agreement were finalized prior to the physical
 4   delivery of the bunker fuel to the vessel?
 5           MR. KEOUGH:  Objection to the form.
 6       A.    I would say that certainly the
 7   quantities and price were determined.
 8       Q.    Going back to Exhibit 8,
 9   Mr. Nielsen, which is the Verified Complaint.
10   Let's take a look at paragraph 10.  Have you
11   read that paragraph, Mr. Nielsen?
12       A.    Yes.
13       Q.    Okay.  I'll paraphrase the first
14   part, but it essentially says that U.S. Oil
15   delivered approximately 2,700 metric tons of
16   bunker fuel to the VIENNA EXPRESS at the Port of
17   Tacoma on October 18th, and then "which the
18   vessel accepted and acknowledged by stamping
19   U.S. Oil Trading's bunker delivery receipt for
20   the delivery."
21           Mr. Nielsen, who physically
22   presented the bunker delivery note to the
23   vessel?
24       A.    It would have been the -- the
25   documentation would have been there and it would
```

Page 75

```
 1            Thor Nielsen (1-7-16)
 2   have been presented by the barge representative.
 3   There's a packet that is delivered to each of
 4   the vessels.
 5       Q.    Okay.  That's delivered by a
 6   bargeman who's present at the time of the
 7   physical delivery?
 8       A.    Yes.
 9       Q.    I believe you said earlier that the
10   barges are on a five-year charter.  Olympic tug
11   provides the personnel, but you control or
12   operate the barge, is that correct?
13           MR. KEOUGH:  Objection to the form.
14       A.    Correct.
15       Q.    So would it then be an employee of
16   Olympic Tug & Barge who's presenting the
17   documents to the receiving vessel?
18       A.    Correct.
19       Q.    Does that bargeman have authority
20   to bind U.S. Oil, or to negotiate or alter
21   contractual terms on behalf of U.S. Oil?
22           MR. KEOUGH:  Objection.  Do you
23   want to break that down?
24           MR. HEILIG:  No.
25       A.    You're asking me if they have the
```

Page 76

```
 1            Thor Nielsen (1-7-16)
 2   authority to bind us?
 3       Q.    Yes.
 4       A.    They have the authority to sign
 5   this document, which is the main document that
 6   we viewed in billing.
 7       Q.    It's their responsibility to
 8   collect a signature on the document to complete
 9   the transaction?
10       A.    That's correct.
11       Q.    Do they review any of the terms of
12   the bunker delivery note with the vessel's
13   officer at the time of signature?
14       A.    I don't have actual knowledge of
15   that.
16       Q.    Well, I'm asking you as the court
17   representative of U.S. Oil?
18       A.    I don't know.
19       Q.    Are they instructed to review the
20   terms of the bunker delivery note with the
21   receiving vessel at the time of execution?
22       A.    They would have been instructed to
23   go through the paperwork and provide it to them,
24   so I would assume that they would have discussed
25   these things.
```

Page 77

```
 1            Thor Nielsen (1-7-16)
 2       Q.    Are there any policies or
 3   guidelines, written instructions directing the
 4   bargeman to go over the terms of the bunker
 5   delivery note with the receiving vessel at the
 6   time of execution?
 7       A.    I don't know for sure.
 8       Q.    Is it U.S. Oil's position that the
 9   language on the bunker delivery notes alone is
10   sufficient to create a maritime lien against
11   these vessels?
12           MR. KEOUGH:  Objection to the form;
13   calls for a legal conclusion.
14       A.    I'm not an attorney, but that's
15   what we think.
16       Q.    I'm sorry, were you going to
17   complete that thought or was that the end of
18   your answer?
19       A.    That was the end of my answer.
20       Q.    Okay.  So then do I understand
21   correctly U.S. Oil's position that the
22   relationships among the vessel interests in O.W.
23   entities and U.S. Oil is irrelevant, so long as
24   the bunker delivery note is executed that U.S.
25   Oil has a maritime lien against the vessels?
```

Page 86

1       Thor Nielsen (1-7-16)
2  that there's an approved transaction in
3  connection with the customer that's listed.
4       Q.   Okay.  I'm looking at the sales
5  authorization on Bates page 5.  If you look down
6  kind of the top third of the page you see it
7  says "Terms, wire transfer due 30 days from
8  COM."  Do you see that?
9       A.   Yes.
10      Q.   What is COM?
11      A.   I think that's the money.  The wire
12 is due 30 days from the date of delivery, and
13 I'm not sure if that COM stands for commencement
14 of delivery or not, but it is 30 days from the
15 date of delivery.
16      Q.   Okay.  Underneath that same line we
17 see "credit check required" and then there's
18 "yes," do you see that?
19      A.   I do.
20      Q.   What does that mean?
21      A.   That means that the credit check
22 had already been done in connection with O.W.
23 Bunker & Trading A/S.
24      Q.   That credit check was the process
25 you testified to earlier today?

Page 87

1       Thor Nielsen (1-7-16)
2       A.   Correct.
3       Q.   At the time of these transactions,
4  did U.S. Oil have a general standard terms and
5  conditions that applied to all bunker
6  transactions that it engaged in?
7            MR. KEOUGH:  Objection to the form.
8       A.   We did not.  I don't think any
9  general terms and conditions were issued in
10 connection with this.
11      Q.   If you turn now to the purchase
12 order confirmation from OWB to U.S. Oil, which
13 is Bates pages 3 and 4.  I'm going to direct
14 your attention to Bates page 4, the fourth
15 paragraph down where it begins:
16           "Please forward invoice and
17 delivery receipts duly signed and stamped by
18 relevant vessels, master/chief engineer right
19 after completion of bunkering."
20           Do you see that statement?
21      A.   Right.
22      Q.   Is it a fair statement that in
23 order to obtain payment from O.W., U.S. Oil
24 needed to tender to O.W. a completed and signed
25 bunker delivery receipt from the vessels?

Page 88

1       Thor Nielsen (1-7-16)
2            MR. KEOUGH:  Objection to the form.
3       A.   In order to be paid from O.W.
4  Bunker, yes, we had to submit an invoice and the
5  bunker delivery receipt.
6       Q.   Are you familiar with the term
7  Marpol, M-a-r-p-o-l?
8       A.   I've heard it, but I'm not familiar
9  with it.
10      Q.   I am assuming that in your realm of
11 responsibility, U.S. Oil's compliance with
12 environmental or pollution regulations does not
13 fall within your purview?
14           MR. KEOUGH:  Objection.
15      A.   We have a -- we have an
16 environmental manager on staff.
17      Q.   Who is that individual?
18      A.   His name is Ty Daub.
19      Q.   Ty, say again?
20      A.   Daub, D-a-u-b.
21      Q.   Do you, Mr. Nielsen, have an
22 understanding one way or another whether U.S.
23 Oil is required by environmental and pollution
24 regulations to issue a bunker delivery receipt
25 for every bunker supply it provides within U.S.

Page 89

1       Thor Nielsen (1-7-16)
2  waters?
3            MR. KEOUGH:  Objection to the form.
4       A.   I am not.
5       Q.   If you can turn to Bates pages 40,
6  41 and 42 please.  For the record, you'll see
7  that that is an email from a Dorit Niemeyer,
8  D-o-r-i-t, N-i-e-m-e-y-e-r, with an email
9  address at hlag.com, which is Hapag, and it's
10 sent to Mr. Niemeyer himself and two individuals
11 who have email addresses at owbunker.de, do you
12 see that?
13      A.   I do.
14      Q.   U.S. Oil is not copied on this
15 communication, correct?
16      A.   They are not.
17      Q.   Did U.S. Oil in the ordinary
18 course, meaning not in connection with this
19 litigation but in the ordinary course, did U.S.
20 Oil receive the document, the email that is
21 depicted in Bates pages 40-42?
22           MR. KEOUGH:  Objection to the form.
23      A.   No.
24      Q.   Do you know who the individuals are
25 with the email addresses reflected on page 40

23 (Pages 86 to 89)

Page 90

1       Thor Nielsen (1-7-16)
2  @owbunker.de?  I'm not asking you to guess, just
3  if you know?
4       A.   I do not.
5       Q.   If you turn to Bates pages 43, 44
6  and 45.  For the record, that is an O.W. Bunker
7  sales order confirmation from O.W. Bunker
8  Germany with respect to the VIENNA EXPRESS.  Do
9  you see that?
10      A.   I do.
11      Q.   Did U.S. Oil receive this document
12 in the ordinary course of these transactions?
13      A.   No, it did not.
14      Q.   Okay.  Thanks.  Before we move on,
15 turn to Bates page in the stack 94, 95 and 96,
16 which for the record I'll describe in general is
17 an email from Hapag regarding the SOFIA EXPRESS
18 to two individuals with email addresses at
19 owbunker.de, do you see that?
20      A.   I do.
21      Q.   The same questions as before.  Did
22 U.S. Oil receive this email communication in the
23 ordinary course with respect to the SOFIA
24 EXPRESS?
25           MR. KEOUGH:  Same objection.

Page 91

1       Thor Nielsen (1-7-16)
2       A.   We did not.
3       Q.   Just so we can be complete with
4  these, go to Bates pages 152 through 154.  For
5  the record, that is an email from a Lukas,
6  L-u-k-a-s, Gaus, G-a-u-s, at Hapag to two email
7  addresses with the address @owbunker.de
8  concerning the SANTA ROBERTA.
9            Do you see that, Mr. Nielsen?
10      A.   I do.
11      Q.   The same question.  Did U.S. Oil
12 receive this email communication in the ordinary
13 course with respect to the SANTA ROBERTA?
14           MR. KEOUGH:  Same objection.
15      A.   No, we did not.
16      Q.   If you turn to Bates page 155,
17 which is the sales order confirmation from O.W.
18 Bunker Germany to Hapag concerning the SANTA
19 ROBERTA.
20           Did U.S. Oil receive this document
21 in the ordinary course with respect to this
22 vessel?
23      A.   No, we didn't.
24           MR. KEOUGH:  Same objection.
25      Q.   The last one.  Turn to Bates pages

Page 92

1       Thor Nielsen (1-7-16)
2  208 through 210.  For the record, that's an
3  email communication from Lukas Gaus at Hapag to
4  two email addresses, with the email address
5  @owbunker.de, regarding the SEASPAN HAMBURG.
6            Do you see that Mr. Nielsen, at the
7  top?
8       A.   I do.
9       Q.   Did U.S. Oil receive this document
10 in the ordinary course with respect to the
11 SEASPAN HAMBURG?
12           MR. KEOUGH:  Objection.
13      A.   No.
14      Q.   Then flip to Bates page 211.  The
15 sales order confirmation from O.W. Bunker
16 Germany with respect to the SEASPAN HAMBURG.
17           Did U.S. Oil receive this document
18 in the ordinary course with respect to the
19 SEASPAN HAMBURG?
20      A.   No.  Can you pick up Exhibit 8,
21 which was the Verified Complaint.
22           MR. KEOUGH:  The witness has it.
23      Q.   Can you turn to paragraph 8.  Take
24 a moment to read that paragraph to yourself,
25 please.  What is the basis for the statement

Page 93

1       Thor Nielsen (1-7-16)
2  that:
3            "On or about October 15, 2014, the
4  Owners and/or Operators and/or Charterers and/or
5  Agents of the M/V VIENNA EXPRESS entered into an
6  agreement with brokers O.W. Bunker & Trading A/S
7  OWB to arrange for the delivery of bunker fuel
8  to the VIENNA EXPRESS at Tacoma on or about
9  October 18th"?
10           MR. KEOUGH:  Objection to the form.
11 You can answer.
12      A.   What I was saying here is that O.W.
13 Bunker was acting as a broker in this market
14 because they don't deliver to the vessels, we
15 deliver to the vessels, and so they were acting
16 as an agent for the VIENNA EXPRESS.
17      Q.   Let's break that apart.  First off,
18 when you talk about OWB not actually being
19 involved in the physical delivery to vessels.
20           Did USOT have an understanding as
21 to whether O.W. owned or operated vessels
22 themselves, the vessels that were to be
23 supplied?
24           MR. KEOUGH:  Objection to the form.
25      A.   We did not.  We knew they didn't

24 (Pages 90 to 93)