# EXHIBIT 9

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

BONNY GAS TRANSPORT LIMITED, as owner of the LNG FINIMA (IMO No.7702401),

Plaintiff,

-against-

O.W. BUNKER GERMANY GMBH, NUSTAR TERMINALS MARINE SERVICES, N.V., NUSTAR ENERGY SERVICES, INC., ING BANK N.V.,

Defendants.

CASE NO. 14-cv-9542 (VEC)

---

HAPAG-LLOYD AKTIENGESELLSCHAFT,

Plaintiff,

-against-

U.S. OIL TRADING LLC, O.W. BUNKER GERMANY GMBH, O.W. BUNKER & TRADING A/S, ING BANK N.V., CREDIT AGRICOLE S.A.,

Defendants.

CASE NO. 14-cv-9949 (VEC)

---

HAPAG-LLOYD AKTIENGESELLSCHAFT,

Plaintiff,

-against-

O'ROURKE MARINE SERVICES, L.P., L.L.P., O.W. BUNKER GERMANY GMBH, O.W. BUNKER USA, INC., ING BANK N.V.,

Defendants.

CASE NO. 14-cv-10027 (VEC)

---

February 23, 2016
9:05 a.m.

DEPOSITION OF GOTZ LEHSTEN

- GOTZ LEHSTEN -

UNITED STATES DISTRICT COURT )
SOUTHERN DISTRICT OF NEW YORK )
----------------------------------x )
U.S. OIL TRADING LLC, ) CASE NO.
) 15-cv-6718 (VEC)
Plaintiff, )
)
-against- )
)
M/V VIENNA EXPRESS, her tackle, )
boilers, apparel, furniture, )
engines, appurtenances, etc., )
in rem: M/V SOFIA EXPRESS, her )
tackle, boilers, apparel, )
furniture, engines, appurtenances, )
etc., in rem, )
)
Defendants. )
----------------------------------x )
HAPAG-LLOYD AKTIENGESELLSCHAFT, as ) CASE NO.
Claimant to the M/V VIENNA EXPRESS, )
)
Counter-Claimant and )
Third-Party Plaintiff, )
)
- against - )
)
U.S. OIL TRADING LLC, )
)
Counter-Defendant and )
)
O.W. BUNKER GERMANY GMBH, O.W. )
BUNKER TRADING A/S, ING BANK N.V., )
and CREDIT AGRICOLE CORPORATE AND )
INVESTMENT BANK, a division or arm )
of CREDIT AGRICOLE S.A.,
Third-Party Defendant.
----------------------------------x

DATE: February 23, 2016
TIME: 9:05 a.m.

- GOTZ LEHSTEN -

TELECONFERENCE DEPOSITION OF GOTZ LEHSTEN, a 30(b)(6) witness, held at the offices of McDermott Will & Emery, 340 Madison Avenue, New York, New York, pursuant to Notice, before Hope Menaker, a Shorthand Reporter and Notary Public of the State of New York.

- GOTZ LEHSTEN -

A P P E A R A N C E S

KIESLICH & PARTNER RECHTSANWALTE
Attorneys for the Witness
Moorfuhrtweg 15
22301 Hamburg, Germany
BY: MARTIN KIESLICH, ESQ. (via teleconference)

SEWARD & KISSEL LLP
Attorneys for Defendant ING Bank N.V., as Security Agent:
One Battery Park Plaza
New York, New York 10004
BY: BRIAN P. MALONEY, ESQ.
LAURA E. MILLER, ESQ.

FREEHILL HOGAN & MAHAR LLP
Attorneys for Hapag-Lloyd Aktiengesellschaft
80 Pine Street
New York, New York 10005
BY: MICHAEL FERNANDEZ, ESQ.
MICHAEL DEHART, ESQ.

CLYDE & CO. US LLP
Attorneys for U.S. Oil Trading LLC
405 Lexington Avenue
New York, New York 10174
BY: CASEY D. BURLAGE, ESQ.

McDERMOTT WILL & EMERY
Attorneys for O.W. Bunker Germany GMBH
340 Madison Avenue
New York, New York 10173
BY: DARREN AZMAN, ESQ.
MICHAEL GALEN, ESQ.
ULRIKE WITT, ESQ. (via teleconference)
-and-
HILL RIVKINS LLP
45 Broadway, Suite 1500
New York, New York 10006
BY: JUSTIN M. HEILIG, ESQ. (via teleconference)

SIMMS SHOWERS LLP
Attorneys for O'Rourke Marine Services L.P.
201 International Circle, Suite 250
Hunt Valley, Maryland 21030
BY: MARIOS J. MONOPOLIS, ESQ. (via teleconference)

- GOTZ LEHSTEN -

APPEARANCES: (cont'd)

BLANK ROME LLP
Attorneys for NuStar
717 Texas Avenue, Suite 1400
Houston, Texas 77002
BY: KEITH B. LETOURNEAU, ESQ.

ALSO PRESENT:
Ms. A.J. Elterman, Interpreter

Page 34

- GOTZ LEHSTEN -

the executive vice presidents, the CEO, the CFO and so on, they were what we call -- what you call group management within the head office.

That would have been the Danish entity; is that correct?

MR. HEILIG: Same objection.

A. No, no. It's not the same company. I think I'm not -- it's getting very complicated now and we probably need hours to explain the structure of the company.

O.W. Bunker & Trading of course also had reselling business in Denmark. They had a unit in Copenhagen, and they had a unit in Warborg. That was part of my responsibility, but O.W. Bunker & Trading was not the O.W. Bunker Group.

Q. So, is it fair to say that with regard to your area, the reselling area, being an executive vice president you had that responsibility throughout the group, meaning all the ï

A. All reselling activities -- all reselling activities in the group.

Q. The group then consisted ï

Page 35

- GOTZ LEHSTEN -

A. O.W. Bunker.

Q. That group starting in 2000 -- 2000 consisted of how many different entities worldwide?

A. I don't have an exact number.

Q. Just roughly?

A. But how many -- somewhere between 25 and 30 to my best knowledge.

Q. In 2014, at the time of the collapse ï

A. Sorry. Sorry. You asked for the number at 2000.

Q. Yes, sir. Sorry. Sorry.

A. That probably has been something around -- I don't know -- eight to ten. The number I just gave before the number in 2014.

Q. Okay. I understand. Thank you.

MR. FERNANDEZ: Can we take make like a five-minute break? Can we take a five-minute break, guys?

THE WITNESS: That's fine. Thank you.

(Whereupon, there was a brief recess in the proceedings.)

Page 36

- GOTZ LEHSTEN -

(Whereupon, Exhibit 5 was marked at this time.)

MR. FERNANDEZ: We have marked for purposes of identification Exhibit 5 which is the Hapag notice of the Rule 30(b)(6) deposition of O.W. Bunker Germany. That same notice has been served and applies to all three cases that are currently before Judge Caproni in the Southern District of New York.

MR. HEILIG: I just wanted to show you the document that he's talking about.

MR. FERNANDEZ: Are you guys ready to go?

MR. HEILIG: Ready.

Q. Mr. Lehsten, just generally, can you describe for us what the business of O.W. was prior to its insolvency?

MR. HEILIG: Objection. Are you talking O.W. Germany? You just said O.W.

Q. The O.W. group and then we're going to talk about O.W. Germany.

A. Okay. I'm a bit surprised about the question. O.W. Bunker Group, as I mentioned before, O.W. Bunker was one of the biggest players

Page 37

- GOTZ LEHSTEN -

in the global bunker market.

They provided all kind of services to the bunker industry, mainly on the physical side where they were acting as physical suppliers in various areas, and secondly, the reselling business where they have sold deliveries to clients and bought from physical suppliers ï third-party physical suppliers to provide the delivery.

That was the two main business activities. So that was also, as I mentioned, cargo trading for the supplier or resupplier, replenishment of their own physical division, but also trading cargo for third party. Another area was hedging or risk management department selling risk management products to clients but also to suppliers.

Q. Out of those general categories insofar as O.W. Germany was concerned, what responsibilities or what involvement did O.W. Germany have in the marketplace?

MR. HEILIG: Objection to form. Go ahead.

A. O.W. Germany had two divisions, one

- GOTZ LEHSTEN -

reselling division and one physical division. The physical division was handling providing, offering physical supplies in all German ports, while the reselling division was mainly responsible to find local clients in Germany, but also in northern Europe and also to handle all inquiries from the rest of the group for Germany.

Q. Okay. Insofar as O.W. Germany's interaction with my client, Hapag-Lloyd, would you -- how would you describe the services that O.W. Germany provided to Hapag?

A. O.W. -- Hapag-Lloyd and O.W. Bunker Germany had two main business. One was the contract business. One was spot business for ï ja.

MR. HEILIG: Mike, just a brief objection. We've designated Mr. Gronenberg to testify about Topic Number 1 so just to clarify that. He's our designee under the rules for that subject.

Q. Is it fair to say that O.W. Germany acted as traders in the bunker market?

MR. LETOURNEAU: Objection to form.

A. Basically it's a definition.

- GOTZ LEHSTEN -

Basically we call ourselves resellers. Others may call it trading. Resellers is by definition basically where you value X in your own name, where you sell it to somebody in your own name and you purchase from a third party for your own account.

So, many different words for bunker traders, right? In U.S., I think they're called marketers, whatever that means. I have no clue.

Q. Okay. But the bottom line, whether you call it a reseller or trader, you were -- O.W. Germany was acting in its own name and it was purchasing bunkers for its own account?

A. Yes.

MR. HEILIG: Objection. Form.

MR. FERNANDEZ: I'm trying to move it along.

Q. I want to talk to you next about the credit lines that the O.W. Bunker Group had in place at various points in time. Is that something you're familiar with, credit lines from outside investors?

MR. HEILIG: Note my objection pursuant to our written objection to the

- GOTZ LEHSTEN -

deposition topic.

A. The only part I have been involved when it comes to credit lines was that I have been part of the credit committee in the group, deciding about credit given to customers.

MR. FERNANDEZ: Just off the record.

(Whereupon, a brief discussion was held off record.)

Q. Sir, are you aware in your capacity as executive vice president, and whatever other roles you were appointed to as of December of 2013, that the O.W. group had entered into a security agreement with what I'll describe as a consortium of banks, but I'll refer to it as the ING Security Agreement.

MR. MALONEY: Objection to form.

MR. HEILIG: Object to form.

A. Of course, to some extent, I have been informed by the CFO and Treasury at that time that they have been in negotiations with the bank's syndicate but that -- those informations were -- I didn't have very deep insight into those discussions; only that the agreement has been fixed in a certain time. But don't ask me about

- GOTZ LEHSTEN -

details of particulars about that agreement.

Q. Okay. Do you know if the O.W. Bunker Group prior to 2013 had any type of credit or security agreement that was in place by any lending institution? This was -- this is prior to 2013.

MR. HEILIG: Object to form.

A. I couldn't -- I can't reply.

Q. You don't know?

A. I have never been involved in the finance issues of the group.

Q. All right. But you were in charge of the trading or the reselling and the profits and losses generated in that division; is that correct?

MR. HEILIG: Object to form.

A. I don't understand your question.

Q. I'm just trying to understand what information you would have provided and what involvement you would have had with regard to a decision by the O.W. Bunker Group to go out and seek a credit line.

MR. MALONEY: Objection to form.

Q. Let me just back up a little bit.

- GOTZ LEHSTEN -

So it's a reseller's day-to-day business that they take business in and then based on market circumstances, believe or whatever reason the market is soft or whatever to get a better buying price from the distributor -- from the local distributor.

That's part of reseller's business, to sell to the customers first and then later on buy best possible from the distributor.

Q. Mr. Lehsten, would you agree with me, sir, that this margin information that's being shared between O.W. Germany and O.W. U.S.A. they are sharing margin information?

A. Yes, they do, because it was according to the terms and policy that they have an open book principle.

Q. If these two companies were acting as separate companies doing an arm's-length transaction, you would agree with me that they would never share margin information, right?

MR. FERNANDEZ: Objection.

MR. HEILIG: Objection to form.

A. It was difficult to hide because they had access to the same IT software.

- GOTZ LEHSTEN -

Q. But if they were acting in an arm's-length transaction between each other, O.W. U.S.A. and O.W. Germany would never share their margins, would they, sir?

MR. HEILIG: Objection.

MR. FERNANDEZ: Objection to form.

Q. They did in this case. But if they were acting in an arm's-length transaction, you would agree with me they would never share their margins.

MR. FERNANDEZ: Objection to form.

MR. HEILIG: Same objection.

You can answer.

A. Sorry. I couldn't get you. That's very theoretical question, isn't it?

Q. Well, no, it's not. It's how you do business with parties with whom you engage in an arm's-length transaction.

You don't share your margins with parties with whom you maintain arm's-length transactions, do you?

MR. FERNANDEZ: Objection.

MR. HEILIG: I'll object. This question has become argumentative.

- GOTZ LEHSTEN -

To the best you can answer the questions, the witness can proceed.

A. We had a business model that we had an open book principle where the units have shared margins. That how it is. So ï

Q. If O.W. U.S.A. had not been part of the O.W. Bunker Group, you would agree with me that you would never have shared that margin with them.

Isn't that true?

MR. HEILIG: Objection to form.

MR. FERNANDEZ: Objection. Form.

A. That question is too hypothetical. I don't want to answer that one.

Q. Are you not -- are you refusing to answer my question, sir?

A. I'm not refusing because I simply don't know, because that's the way we worked internally at O.W. Bunker.

Q. I'm not asking internally. I'm asking an arm's-length transaction with a third party with whom you're doing business, you would never share your margin information with such a party, would you, sir?

- GOTZ LEHSTEN -

MR. FERNANDEZ: Objection.

MR. HEILIG: Objection.

A. You asked about my opinion.

Q. No. I'm asking you about your business practices.

Are you telling me that you would share your margins with a third party with whom you're not affiliated?

MR. FERNANDEZ: Objection to form.

MR. HEILIG: Objection.

A. We probably had seen that even out in the bunker industry with companies that are not part of the group that there's sort of an open book principle.

Q. Is it your testimony that O.W. as a business practice would share its margins with parties who are not affiliated with O.W.?

MR. HEILIG: Objection. Form.

MR. FERNANDEZ: Objection to form.

A. I don't know where we're going here. Sorry. I don't understand.

MR. HEILIG: To the extent you can answer the question, you can proceed.

A. Of course I mean all kind of

- GOTZ LEHSTEN -

MR. BURLAGE: I'll follow up after you are done, Marios.

EXAMINATION BY MR. MONOPOLIS:

Q. My name is Marios Monopolis. I'm an attorney for 0'Rourke Marine Services, and my questions are in reference to the case filed by Hapag-Lloyd against O'Rourke, O.W. Germany, O.W. U.S.A. and ING Bank. I presume given your earlier testimony, are you familiar with that case generally?

A. I think I have seen it somewhere in the notes, yes.

Q. Are you familiar with the role of O.W. Germany played with respect to the physical supply or the general supply of the vessels the DERBY D and the SYDNEY EXPRESS?

A. No. It's the first time I hear those vessels' names.

Q. Are you familiar with the role O.W. Germany played with the supply of bunkers to any Hapag-Lloyd vessels?

A. No. As I mentioned earlier, when it comes to day-to-day business and reselling day-to-day business Hapag-Lloyd, then it's best to

- GOTZ LEHSTEN -

talk to Mr. Gronenberg. I have nothing to do with day-to-day reselling business and of O.W. Bunker Germany.

Q. But O.W. Germany was involved on some level with the -- with the supply to the DERBY D and the SYDNEY EXPRESS, wasn't it?

MR. HEILIG: Object to form.

You can answer if you know.

A. I cannot answer that question. I mean if it's to who belongs that vessel. Is it Hapag-Lloyd vessel?

Q. Yes. Those vessels were chartered by ï

A. Okay. Then I can say that if O.W. Bunker Germany did the sales to Hapag-Lloyd and if it's a delivery in the U.S., then they have done the purchase through O.W. Bunker Houston.

Q. O.W. Bunker Houston, is that O.W. U.S.A. or is that another O.W. entity based in the U.S.?

A. O.W. Bunker Houston was what we called the sourcing center or purchase center for all U.S. ports.

Q. I apologize that this is repetitive

- GOTZ LEHSTEN -

and so this might go to Mr. Gronenberg's testimony tomorrow, but I'm looking at Topic 12, "the understanding by O.W. Germany of the role that O.W. Germany played with respect to the supply of bunkers to the vessels."

Mr. Lehsten, is it your testimony that you don't have an understanding of what role O.W. Germany played?

MR. HEILIG: Objection to form.

A. Okay. I think that you need to clarify which part you believe I said that I ï

Q. That you didn't have an understanding?

A. Yes.

Q. I asked you about the names of the vessels and you told me, I believe you told me ï please correct me if I'm wrong -- you didn't know what the vessels were.

A. No. These ships' names are not familiar to me and so if you say it's Hapag-Lloyd's two ships, I then, of course, I know that O.W. Bunker Germany did sales to Hapag-Lloyd and explained to you in which way we have handled those transactions.

- GOTZ LEHSTEN -

Whether those ships have been involved, I don't know and suggest you ask Mr. Gronenberg.

There have been probably many, many involved every day from Hapag-Lloyd and different other customers.

Q. Okay. Would you say, taking into account your response just now, would you say that O.W. Germany likely played the same role with respect to the two vessels I've identified, the DERBY D and the SYDNEY EXPRESS, that it played with the other vessels implicated in today's deposition?

MR. FERNANDEZ: Objection.

MR. HEILIG: Objection to form.

MR. FERNANDEZ: Objection to form. Lack of foundation. Calls for speculation.

A. The role of a reseller is basically always the same as I understood your question correctly.

Q. Okay.

MR. MONOPOLIS: That's -- I think that's it for O'Rourke, but like the others, I'm going to reserve our rights with respect

- GOTZ LEHSTEN -

global sales director.

Q. About what time did all of those events you just described take place?

A. Those tendering could take a month or two.

Q. Understood. My question wasn't about the duration of the negotiations. It was when they took place.

Was it in, for example, 2013/'14? When did those negotiations take place?

A. That's why I tried to find a date here on the contract, and the negotiations for the following year were normally taking place in the first quarter of the year before.

Q. Before what?

A. For contracts. As I mentioned earlier, there were two kind of businesses. Hapag-Lloyd, there was a contract business where we entered into supply contracts with Hapag-Lloyd in different ports and there was the so-called spot business where basically we offered on their specific inquiries with deliveries, the shortened orders for the next week or the week after.

Q. Understood.

- GOTZ LEHSTEN -

So, as far as you understand, this contract did not deal with spot transactions or did deal with spot transactions?

A. Yes. This contract was a one-year contract to supply all their demand in ARA.

Q. Can you please take a look at Page 17 of 76, which is the second page, and do you see on the left-hand side where it says, "max claim notice period"?

A. Yes.

Q. Can you take a moment just to read the entry to the right of that and what it says there?

A. Yes. I'm aware of that clause. Please ask the question.

Q. So just so I can make the record clear, what it states is "Sixty calendar days of the date of delivery for term contracted low sulphur fuel oil supplied in Antwerp or Rotterdam. Thirty calendar days of the date of delivery for supplies in all remaining ports worldwide."

So Mr. Lehsten, is there -- to your understanding is there a reason why there is a separate calendar date period for claims for ports

- GOTZ LEHSTEN -

in Antwerp or Rotterdam from other ports worldwide?

A. The reason, it's actually very simple issue here. When they take the low sulphur fuel, for example, in '14 which they only had to use in certain so-called SECA areas -- areas SECA. You are familiar with SECA?

Q. Emission control areas?

A. Yes, exactly. In those areas, you have to use low sulphur fuel oil. So if you take bunkers in Rotterdam, then you only have to use a low sulphur fuel oil until you enter the Mediterranean. So until you use it, bunkers you have taken on board it may take the whole round trip through Asia to come back to the next low emission area.

So it will be difficult for customers like Hapag-Lloyd to ascertain quality issues here within 60 days and that's what we agreed. Okay. Since you're not going to use that on probably the next 30 days, we agree that you are still after 60 days you can file a claim against O.W. Bunker if you find that low sulphur fuel oil not within specification.

- GOTZ LEHSTEN -

Q. Understood. Understood.

Earlier do you recall your testimony and I believe it was Mr. Letourneau who had asked -- was asking you the question, but you had said that depending on certain customer demands the O.W. group would agree to other standard terms and conditions other than the O.W. Bunker Group's terms and conditions. Do you recall that testimony?

A. Yes.

Q. Can you please just take a look at where on the same page we were just looking at where it says, "Terms and conditions. Hapag-Lloyd AG standard terms and conditions. Version 2014 to apply."

And then after that it has an "(Version 7.11.3849.0015623934)."

Do you see that?

A. Yes, I do.

Q. Would this contract fall within your understanding of your testimony earlier that Hapag-Lloyd had demanded that O.W. agree to its terms, meaning Hapag-Lloyd's terms and conditions, for this contract?

Page 114

- GOTZ LEHSTEN -

A. That was a condition to -- to be reseller for them.

Q. Can you repeat that, please?

A. The condition dealing or selling to Hapag-Lloyd's was that we accept their terms and conditions; not only in contracts, on all deliveries.

Q. So Hapag-Lloyd -- in order to do business with Hapag-Lloyd, O.W. Germany was required to accept Hapag-Lloyd's conditions not only for spot deals, but also for contracts like these?

MR. HEILIG: Objection.

MR. FERNANDEZ: Objection to form.

A. For all deals. For all deals.

Q. For all deals. Okay.

Can you please turn to the last page of this document? It's Page 22 of 76.

A. Yes.

Q. Do you see in Clause 18 titled "Law and Arbitration." If you go towards the bottom, there's a sentence that begins, "German law shall apply on the 'fuel' contract."

Do you see that sentence?

Page 115

- GOTZ LEHSTEN -

A. There's "German law shall apply on the --"

Yes.

Q. What is your understanding of the "fuel contract" in quotation marks there?

A. Fuel contract is any contract. Could be part of -- on a contract sales, could be spot deal.

Q. So it's not limited to deals that have been consummated under this agreement, correct?

A. No. It's on all deals. All terms and conditions will apply.

Q. So your understanding is that fuel contract means all deals with Hapag by O.W. Germany?

A. Yes, exactly.

Q. Okay. And just to confirm, it is ï O.W. Germany has their place of business in Hamburg, Germany, correct, or did at the time that this was entered?

A. Yes.

Q. Okay. That was -- you said you did negotiate this -- had personal involvement

Page 116

- GOTZ LEHSTEN -

negotiating this contract, correct?

A. Yeah. All long-lasting contracts, right, I negotiate with Hapag-Lloyd but not the spot business.

Q. Not the spot business. Okay.

A. No, not the day-to-day spot business.

Q. Got it.

But again, those spot deals would fall within the fuel contract that -- as it's referred to in this -- on this page, correct? Is that your testimony?

A. I'm not sure I understand. The spot business was simply given to the spot inquiries were given to O.W. Bunker Germany salesperson and they were handling it day-to-day. The contract sales, right? They passed on the next delivery they required for the ship in ARA and that he had the supplies.

On the contract, you're basing not ï you have set the terms right, you have set the prices. You're not negotiating like on a spot deal. We're just performing the contract.

So that's more administration work you can say. And then you have the spot deals

Page 117

- GOTZ LEHSTEN -

where they ask you for particular delivery in a certain port and then, on that day, they will fix a deal or they lose it.

Q. But in either situation that you just described, the spot deal or the ARA deals, the ï O.W. Germany would be conducting business with Hapag -- basis Hapag-Lloyd's terms and conditions; is that correct?

A. Yes.

Q. And was it the intent of O.W. Germany to have German law apply to those contracts in those deals with Hapag?

A. No. We actually don't like German law here, but it was a tradition, right? And since adapt -- suppliers have accepted their terms and conditions, it was a matter of being competitive on the terms and conditions. So we agreed or accepted without really wanting it. If that makes sense. It was a commercial decision.

Q. Correct. So it was a commercial decision to get the business from Hapag to do the deals under their terms and conditions which require German law, correct?

A. Yes, that's correct.



**ERRATA SHEET**
S.D.N.Y. Civil Action Nos. 14-cv-9542, 14-cv-9949, 14-cv-10027, and 15-cv-6718 (VEC)
Witness: Götz Lehsten
Deposition Date: February 23, 2016

| Pages: Lines | Change | Reason |
|---|---|---|
| 34:15 | Change "Warborg" to "Aalborg" | Transcription error |
| 42:19-20 | Change "need to develop the business" to "wanted to grow the business and develop our market share" | Grammar/translation/ clarification |
| 42:20-22 | Change "And, of course … oil prices" to "Liquidity was key for volume growth and development, and oil prices had an influence on overall liquidity" | Transcription error/ grammar/translation/ clarification |
| 42:22 | Change "End" to "At the end" | Grammatical correction |
| 43:6-7 | Change "have probably used much less money as" to "employed much less capital compared to" | Grammar/translation/ clarification |
| 44:2 | Change "terminal" to "turnover" | Transcription error |
| 46:15 | Change "terminal" to "trading" | Transcription error |
| 46:16 | Change "terminal" to "trade" | Transcription error |
| 71:25 | Change "claim" to "client" | Transcription error |
| 73:8 | Change "Klaus" to "Claus" | Spelling error |
| 110:15 | Change "first" to "fourth" | Transcription error |
| 117:15 | Change "tradition" to "condition" | Transcription error |
| 125:17 | Change "Warborg" to "Aalborg" | Transcription error |
| 125:23 | Change "Warborg, that's W-A-R-B-O-R-G" to "Aalborg, that's A-A-L-B-O-R-G" | Transcription error |

Date: 15.4.16 Signature: [signature]

**Nr. 27 der Urk. Rolle für das Jahr 2016**

Vorstehende, vor mir vollzogene Namensunterschrift des

Götz Dieter Lehsten, geb. am 20.03.1962,
wohnhaft Am Hohen Ufer 21, 23730 Neustadt in Holstein
- ausgewiesen durch Personalausweis -

beglaubigte ich hiermit.

Der Notar fragte den Beteiligten, ob er oder eine Person, mit der sich der Notar zur gemeinsamen Berufsausführung verbunden hat in der Angelegenheit, die Gegenstand der Beglaubigung ist, außerhalb seiner Amtstätigkeit bereits tätig war oder ist, soweit sie nicht im Auftrag aller Beteiligten ausgeübt wurde. Der Beteiligte erklärte, dass dies nicht der Fall ist.

Neustadt in Holstein, den 15.04.2016



Notar



– LEERRAUM –
Landgericht Lübeck

– LEERSEITE –
Landgericht Lübeck

## APOSTILLE
### (Convention de La Haye du 5 octobre 1961)

1. Land: Bundesrepublik Deutschland

Diese öffentliche Urkunde

2. ist unterschrieben von

Dr. Hauke Seidel

3. in seiner Eigenschaft als Notar

4. sie ist versehen mit dem Siegel des

Notars Dr. Hauke Seidel in Neustadt i. H.

**Bestätigt**

5. in Lübeck 6. am 21. April 2016

7. durch den Präsidenten des Landgerichts Lübeck

8. unter Nr. 910 a – 504/2016

9. Siegel 10. Unterschrift

In Vertretung

Hartmut Schneider