UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
HAPAG-LLOYD AKTIENGESELLSCHAFT,

                    Plaintiff,                         14 Civ. 9949 (VEC)


                -against-

U.S. OIL TRADING LLC, O.W. BUNKER
GERMANY GMBH, O.W. BUNKER & TRADING
A/S, O.W. BUNKER USA, INC., ING BANK N.V.,
CRÉDIT AGRICOLE CIB,

                    Defendants.
------------------------------------------------------------------X
U.S. OIL TRADING LLC,

                    Plaintiff,                         15 Civ. 6718 (VEC)


                -against-

M/V VIENNA EXPRESS, her tackle, boilers, apparel,
furniture, engines, appurtenances etc., *in rem*, and M/V
SOFIA EXPRESS, her tackle, boilers, apparel, furniture,
engines, appurtenances etc., *in rem*,

                    Defendants.
------------------------------------------------------------------X
HAPAG-LLOYD AKTIENGESELLSCHAFT, as
claimant to the M/V VIENNA EXPRESS,

        Counter-Claimant and Third-Party Plaintiff,


                -against-

U.S. OIL TRADING LLC,

                  Counter-Defendant and

O.W. BUNKER GERMANY GMBH, O.W. BUNKER
& TRADING A/S, ING BANK N.V., and CRÉDIT
AGRICOLE CORPORATE AND INVESTMENT
BANK,

                  Third-Party Defendants.
------------------------------------------------------------------X

**U.S. OIL TRADING LLC' S MEMORANDUM OF LAW IN
SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

**CLYDE & CO US LLP**
John R. Keough
Casey D. Burlage
Corey R. Greenwald
George G. Cornell
The Chrysler Building
405 Lexington Avenue, 16th Floor
New York, New York 10174
Tel.: (212) 710-3900
Fax: (212) 710-3950

*Attorneys for U.S. Oil Trading LLC*

# TABLE OF CONTENTS

Preliminary Statement.................................................................................................1

**STATEMENT OF FACTS**..........................................................................................4

   **A. M/V SANTA ROBERTA** ...............................................................................4

   **B. M/V VIENNA EXPRESS** .............................................................................6

   **C. M/V SEASPAN HAMBURG** .......................................................................7

   **D. M/V SOFIA EXPRESS** ...............................................................................9

**Argument**...............................................................................................................10

  **I.**   **THE LIEN ACT APPLIES TO USOT'S
MARITIME LIEN CLAIMS AGAINST THE
VESSELS *IN REM* AS A MATTER OF LAW** ...........................................10

      **A.**   **Standard for Summary Judgment** ...................................................10

      **B.**   **USOT's Maritime Liens Arise by Operation of Law** ..........................11

  **II.**   **STRONG CONGRESSIONAL POLICY UNDERPINNING
THE LIEN ACT SUPPORTS USOT'S SHOWING OF
A MARITIME LIEN; USOT HAD NO DUTY TO INQUIRE
WHETHER ANY O.W. BUNKER ENTITY WAS AUTHORIZED
TO INCUR MARITIME LIENS AGAINST HAPAG'S VESSELS
AS A MATTER OF LAW** ...........................................................................13

      **A.**   **USOT Had No Duty to Inquire Whether the
Person Ordering the Bunkers for Hapag's
Vessels Was Authorized To Do So As a Matter of Law** .......................13

      **B.**   **The Recent Decisions in *M/V COSCO
Haifa* and *Valero* Have No Application
Here and Ignore the Intent of Congress
in Amending the Lien Act to Remove
the Supplier's Duty of Inquiry.**.......................................................16

  **III.**  **NO GENUINE ISSUE OF MATERIAL FACT EXISTS:
THE UNDISPUTED RECORD SHOWS THAT USOT
(1) PROVIDED NECESSARIES; (2) TO THE VESSELS;
(3) ON THE ORDER OF THE VESSELS' OWNER OR
CHARTERER OR A PERSON AUTHORIZED BY THE
OWNER OR CHARTERER - - THUS USOT HOLDS
MARITIME LIENS AGAINST THE VESSELS AS A
MATTER OF LAW** ...................................................................................19

**A.   USOT Delivered the Subject Bunkers on the Order of Hapag and its Agents as a Matter of Law**............................................19

**B.   O.W. Germany and ING Have No Maritime Lien Against the Vessels as a Matter of Law**..........................................................23

**IV.   A BALANCE OF THE EQUITIES MILITATES IN FAVOR OF SUMMARY JUDGMENT FOR USOT; THE COURT SHOULD GRANT USOT'S MOTION FOR SUMMARY JUDGMENT APPLYING EQUITABLE PRINCIPLES OF INTERPLEADER AND ADMIRALTY**.......................................24

**CONCLUSION** .........................................................................................................25

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*American Oil Trading, Inc. v. M/V SAVA,*
47 F.Supp.2d 348 (E.D.N.Y. 1999) .................................................................2, 16, 23

*Atlantic & Gulf Stevedores, Inc. v. M/V Grand Loyalty,*
608 F.2d 197 (5th Cir. 1979) ...........................................................................19, 23

*Atlantic and Gulf Stevedores, Inc. v. M.V. Rosa Roth,*
587 F. Supp. 1033 (S.D.N.Y. 1984) ................................................................18, 19

*Belcher Co. of Alabama, Inc. v. M/V MARTHA MARINER,*
724 F.2d 1161 (5th Cir. 1984) ...............................................................................15

*Belcher Oil Co. v. M/V Gardenia,*
766 F.2d 1508 (11th Cir. 1985) .......................................................................14, 15

*Bominflot, Inc. v. M/V HENRICH S,*
465 F.3d 144 (4th Cir. 2006) .................................................................................23

*Ceres Marine Terminals, Inc. v. M/V HARMEN OLDENDORFF,*
913 F. Supp. 919 (D. Md. 1995) ............................................................................17

*Dampskibsselskabet Dannebrog v. Signal Oil & Gas Co. of California,*
310 U.S. 268 (1940) .................................................................................................2

*Farrell Lines, Inc. v. Ceres Terminals Inc.,*
161 F.3d 115 (2d Cir. 1998) ..................................................................................23

*Ferguson v. Ferrante,*
No. 13-CV-4468(VEC), 2015 WL 3404131 (S.D.N.Y. May 27, 2015) ...................10

*Gulf Oil Trading Co. v. M/V CARIBE MAR,*
757 F.2d 743 (5th Cir. 1985) .......................................................................14, 15, 23

*Gulf Trading & Transp. Co. v. Hoegh Shield,*
658 F.2d 363 (5th Cir. 1981), *cert. denied,* 457 U.S. 1119 (1982) .....................11, 12

*Gulf Trading & Transp. Co. v. M/V Tento,*
694 F.2d 1191 (9th Cir. 1982), *cert. denied,* 461 U.S. 929 (1983) ............................17

*Hapag-Lloyd Aktiengesellschaft v. U.S. Oil Trading LLC,*
814 F.3d 146 (2d Cir. 2016) ..........................................................................1, 19, 24

*Integral Control Sys. Corp. v. Consolidated Edison Co. of New York,*
990 F.Supp. 295 (S.D.N.Y. 1998) ................................................................18

*Itel Containers Int'l Corp. v. Atlanttrafik Exp. Service Ltd.,*
982 F.2d 765 (2d Cir. 1992)................................................................11, 13

*Lake Charles Stevedores, Inc. v. Professor Vladimir Popov MV,*
199 F.3d 220 (5th Cir. 1999) ................................................................18

*Marine Fuel Supply & Towing, Inc. v. M/V Ken Lucky,*
869 F.2d 473 (9th Cir. 1988) ........................................................... *passim*

*Nacirema Operating Co., Inc. v. S.S. Al Kulsum,*
407 F. Supp. 1222 (S.D.N.Y. 1975) ................................................14, 16, 20, 23

*O'Rourke Marine Services L.P., L.L.P. v. M/V COSCO Haifa,*
15-cv-2992(SAS), 2016 WL 1544742 (S.D.N.Y. April 8, 2016)............................15, 16

*Rainbow Line v. M/V TEQUILA,*
480 F.2d 1024 (2d Cir. 1973)................................................................11

*Reinholm Crane & Rigging Co., Inc. v. M/V Ocean Crown,*
484 F. Supp. 935 (W.D. Wash. 1979)................................................................24

*Tramp Oil and Marine Ltd. v. M/V Mermaid I,*
805 F.2d 42 (1st Cir. 1986)................................................................11, 12

*Trans-Tec Asia v. M/V HARMONY CONTAINER,*
518 F.3d 1120 (9th Cir. 2008), *cert. denied*, 555 U.S. 1062 (2008)....................15, 23

*Triton Marine Fuels Ltd. v. M/V PACIFIC CHUKOTKA,*
575 F.3d 409 (4th Cir. 2009) ................................................................23

*Valero Marketing and Supply Co. v. M/V Almi Sun,*
Civil Action No. 14-2712, 2016 WL 475905 (E.D. La. Feb. 8, 2016)....................15, 16

*Variblend Dual Dispensing Sys., LLC v. Seidel GmbH & Co., KG,*
970 F.Supp.2d 157 (S.D.N.Y. 2013) ................................................................23

*Wagner v. City of New York,*
No. 14-CV-2521(VEC), 2015 WL 5707326 (S.D.N.Y. Sept. 28, 2015)................................10, 11

**Statutes**

46 U.S.C. §§ 31341(a)(1)-(3)................................................................20

46 U.S.C. § 31341(a)(4)(B) ................................................................20

46 U.S.C. § 31342(a) ................................................................2, 19

Maritime Commercial Instruments and Liens Act, 46 U.S.C. §§ 31301, *et seq*.................... *passim*

U.S. Oil Trading LLC ("USOT"), by its attorneys, Clyde & Co US LLP, respectfully submits this memorandum of law in support of its motion for summary judgment enforcing maritime liens in favor of USOT against the M/V SANTA ROBERTA, M/V VIENNA EXPRESS, M/V SEASPAN HAMBURG and M/V SOFIA EXPRESS *in rem* (collectively, the "Vessels"), pursuant to Rule 56 of the Federal Rules of Civil Procedure.  For the reasons set forth below, USOT's motion should be granted in all respects.

### Preliminary Statement

On this record, USOT satisfies the requirements of the Maritime Commercial Instruments and Liens Act, 46 U.S.C. §§ 31301, *et seq*. (the "Lien Act"), and thus holds valid, statutory maritime liens against the Vessels for the amounts listed on USOT's invoices for the subject deliveries of bunkers to the Vessels at the port of Tacoma, Washington in October 2014. No genuine issue of material fact exists.  The Court should grant the instant motion for summary judgment enforcing USOT's maritime liens for the following reasons:

First, it is undisputed that the Lien Act applies to USOT's maritime lien claims against the Vessels.  USOT, a U.S. company, supplied the subject bunkers to the Vessels at the port of Tacoma, Washington in October 2014, and thus "provided necessaries" to the Vessels as a matter of law.  USOT 56.1 at ¶¶ 53, 84, 116 and 149;[1] s*ee also Hapag-Lloyd Aktiengesellschaft v. U.S. Oil Trading LLC*, 814 F.3d 146, 151 n.13 (2d Cir. 2016) ("For the purposes of § 31342, bunkers are 'necessaries.'") (citations omitted).

Second, contrary to arguments advanced by Hapag, O.W. Bunker Germany GmbH ("O.W. Germany") and its alleged assignee, ING Bank N.V. ("ING"), USOT is **not** required to show privity with Hapag to satisfy the Lien Act's requirement that USOT delivered

---

[1] References herein to "USOT 56.1 at ¶ __" are to USOT's Statement of Undisputed Facts Pursuant to Local Civil Rule 56.1(a).

the subject bunkers to Hapag's Vessels "on the order of the owner or a person authorized by the owner" as a matter of law.  *See* 46 U.S.C. § 31342(a).  Unlike in the repair or "subcontractor" line of cases, the U.S. Supreme Court and other federal courts have consistently recognized that suppliers of routine necessaries to vessels, such as bunkers, are entitled to rely on the statutory presumption that the party ordering bunkers had authority to incur maritime liens against the vessel.  *See*, *e.g.*, *Dampskibsselskabet Dannebrog v. Signal Oil & Gas Co. of California*, 310 U.S. 268, 273-80 (1940) (analyzing the Lien Act prior to 1971 amendments and recognizing that bunker suppliers are entitled to rely on the statutory presumption of authority); *see also Marine Fuel Supply & Towing, Inc. v. M/V Ken Lucky*, 869 F.2d 473, 478-79 (9th Cir. 1988) (recognizing that purported limitations on authority of party ordering necessaries are "not effective to rebut a statutory presumption of authority without proof of the supplier's actual knowledge" of the limitation).

USOT's showing of maritime liens on this record accords with the strong policy expressed by Congress in amending the Lien Act in 1971 to remove the U.S. suppliers' affirmative duty to inquire whether a person ordering bunkers had authority to incur maritime liens against a vessel.  Courts in this Circuit and elsewhere interpreting the 1971 amendments to the Lien Act have consistently recognized that the party seeking to bar a supplier's maritime lien now bears the burden to show "actual knowledge" of a limitation on authority.  *See*, *e.g.*, *American Oil Trading, Inc. v. M/V SAVA*, 47 F.Supp.2d 348, 352 (E.D.N.Y. 1999); *M/V Ken Lucky*, 869 F.2d at 479.

Third, under any applicable standard, the undisputed facts demonstrate that USOT provided the bunkers to Hapag's Vessels "on the order of the owner or a person authorized by the owner" as a matter of law.  *See* 46 U.S.C. § 31342(a).  For example, Hapag, as the Vessels'

owner or charterer, analyzed and compared the price and quality of the bunkers offered by USOT with the price and quality offered by other suppliers, and then ***selected USOT to deliver the bunkers to Hapag's Vessels***.    USOT 56.1 at ¶¶ 34-36, 67-69, 98-100 and 129-131.    The undisputed testimony of Hapag's Director of Purchasing and Supply confirms that Hapag selected USOT as the physical supplier (offered by O.W. Germany) to deliver the bunkers to the Vessels since the price and quality of USOT's bunkers represented the lowest energy cost to Hapag and its Vessels.  *Id*. at ¶¶ 34-35, 67-68, 98-99 and 129-30.  Additionally, Hapag's agent, Norton Lilly International, Inc. ("Norton Lilly"), confirmed to USOT Hapag's bunker orders days ***before*** the Vessels arrived at the port of Tacoma, and thus confirmed for the owner or charterer to USOT that it was authorized to deliver the bunkers to Hapag's Vessels.  *Id*. at ¶¶ 13-14, 48-50, 52, 80-82, 94-95, 111-13, 115, 141-46 and 148.  Moreover, Hapag specifically named USOT as the supplier of the bunkers on its price comparison sheets and purchase orders, which Hapag prepared well ***before*** each delivery.  *Id*. at ¶¶ 36, 69, 100 and 131.  The sales order confirmations prepared by O.W. Germany and sent to Hapag also name USOT as the supplier of the subject bunkers for each delivery.  *Id*. at ¶¶ 43, 75, 106 and 137.  Finally, it is undisputed that the Vessels' Masters or Chief Engineers, on behalf of the Vessels and Hapag, arranged to receive delivery of the bunkers, and accepted and acknowledged receipt of the orders by Hapag for deliveries of the bunkers by USOT.  *Id*. at ¶¶ 52, 54, 85, 115, 117, 148 and 150.

Fourth, O.W. Germany holds no maritime lien against Hapag's Vessels since (a) it is undisputed that German law governs Hapag's contract with O.W. Germany for the purchase and sale of the subject bunkers, *id*. at ¶¶ 45, 77, 108 and 139; and (b) German law does not recognize maritime liens for the supply of bunkers.

Fifth, a balancing of the equities supports USOT's recovery based on a maritime lien or otherwise.  It is undisputed that USOT is the only party who actually produced the value of the subject bunkers and delivered the bunkers to Hapag's Vessels in good faith, with the reasonable expectation to be paid the full value of its invoices.  Contrariwise, O.W. Germany expected to receive no more than its profit margin from Hapag on each of its invoices in the regular course of its business.  Now, O.W. Germany and ING seek to recover a windfall of the total amount invoiced by O.W. Germany to Hapag without paying USOT for its bunkers.

## STATEMENT OF FACTS

At all material times, Hapag was the registered owner of the M/V VIENNA EXPRESS and M/V SOFIA EXPRESS, *id*. at ¶¶ 60 and 122, and the charterer of the M/V SANTA ROBERTA and M/V SEASPAN HAMBURG.  *Id*. at ¶¶ 26 and 90.  Hapag selected USOT to deliver the subject bunkers to each of Hapag's Vessels at the port of Tacoma, Washington in October 2014.  *Id*. at ¶¶ 34-36, 67-69, 98-100 and 129-131.  Norton Lilly acted as local agent for Hapag and the Vessels at the port of Tacoma during the deliveries of bunkers to the Vessels by USOT.  *Id*. at ¶¶ 12 and 21.  Norton Lilly confirmed Hapag's order for the bunkers with USOT for each of the subject deliveries, and coordinated the logistics of those deliveries with USOT in accordance with Hapag's direction and orders.  *Id.* at ¶¶ 13-14, 48-50, 52, 80-82, 94-95, 111-13, 115, 141-46 and 148.

### A.   M/V SANTA ROBERTA

On October 1, 2014, after soliciting bids, Hapag's bunker purchasing department conducted an analysis of the price and quality of the offers Hapag received from O.W. Germany and others, and calculated which offer represented the lowest energy cost to Hapag for the subject delivery to the M/V SANTA ROBERTA.  *Id*. at ¶ 34.  Hapag selected USOT to deliver

4

the subject bunkers to the M/V SANTA ROBERTA based on Hapag's conclusion that the price and quality of USOT's bunkers represented the lowest energy cost to Hapag. *Id*. at ¶ 35. Hapag's price comparison sheet showing Hapag's analysis of the price and quality of USOT's bunkers for the subject delivery to the M/V SANTA ROBERTA lists USOT as the supplier. *Id*. at ¶ 36.

On or about October 1, 2014, Hapag sent its purchase order to O.W. Germany to arrange for the delivery of 2,700 metric tons of bunker fuel by USOT to the M/V SANTA ROBERTA at the port of Tacoma on or about October 9, 2014. *Id*. at ¶ 37. Hapag's purchase order expressly confirms that USOT will act as the supplier of the bunkers to the M/V SANTA ROBERTA. *Id*. at ¶ 38. The contract between Hapag and O.W. Germany for the purchase and sale of bunkers for the subject delivery to the M/V SANTA ROBERTA is subject to German law. *Id*. at ¶¶ 44-45.

On or about October 6, 2014, USOT issued its sales confirmation and sales authorization to O.W. Bunker & Trading A/S ("O.W. Denmark") for the subject delivery of 2,700 metric tons of bunkers to the M/V SANTA ROBERTA at the port of Tacoma on or about October 9, 2014. *Id*. at ¶ 51. On October 9, 2014, USOT delivered approximately 2,700.11 metric tons of bunker fuel to the M/V SANTA ROBERTA at Tacoma. *Id*. at ¶ 53. The M/V SANTA ROBERTA and Hapag accepted and acknowledged the delivery of bunkers by USOT to the M/V SANTA ROBERTA by stamping USOT's bunker delivery receipt. *Id*. at ¶ 54. USOT's bunker delivery receipt states in relevant part:

> DISCLAIMERS: No disclaimer stamp of any type or form will be accepted on this bunker certificate, nor should any such stamp . . . alter, change or waive U.S. Oil's Maritime Lien against the vessel or waive the vessel's ultimate responsibility and liability for the debt incurred through this transaction.

\*       \*       \*       \*

> MARITIME LIENS:  All disputes arising out of this transaction shall be interpreted and enforced in accordance with the general maritime law of the United States of America and all statutes related thereto.

*Id*. at ¶ 55.[2]

On or about October 9, 2014, USOT issued its Invoice No. BWTD 83441 to O.W. Denmark in the amount of $1,481,860.28 for the delivery of bunkers by USOT to the M/V SANTA ROBERTA.  *Id*. at ¶ 56.  Pursuant to Invoice No. BWTD 83441, payment was due to USOT on or before November 8, 2014.  *Id*. at ¶ 57.  Hapag paid O.W. Germany $1,495,860.94 for the subject delivery of fuel by USOT to the M/V SANTA ROBERTA.  *Id*. at ¶ 58.  USOT has not been paid for the amounts due under Invoice No. BWTD 83441.  *Id*. at ¶ 59.

## B.   M/V VIENNA EXPRESS

On or about October 9, 2014, after soliciting bids, Hapag's bunker purchasing department conducted an analysis of the price and quality of the offers Hapag received from O.W. Germany and others, and calculated which offer represented the lowest energy cost to Hapag for the subject delivery to the M/V VIENNA EXPRESS.  *Id*. at ¶ 67.  Hapag selected USOT to deliver the subject bunkers to the M/V VIENNA EXPRESS based on Hapag's conclusion that the price and quality of USOT's bunkers represented the lowest energy cost to Hapag.  *Id*. at ¶ 68.  Hapag's price comparison sheet showing Hapag's analysis of the price and quality of USOT's bunkers for the subject delivery to the M/V VIENNA EXPRESS lists USOT as the supplier.  *Id*. at ¶ 69.

---

[2] The terms in USOT's bunker delivery receipt for the subject deliveries of bunkers by USOT to the M/V VIENNA EXPRESS, M/V SEASPAN HAMBURG and M/V SOFIA EXPRESS are identical to the terms in USOT's bunker delivery receipt for the delivery to the M/V SANTA ROBERTA.  *Id*. at ¶¶ 86, 118 and 151.

On October 9, 2014, Hapag sent its purchase order to O.W. Germany to arrange for the delivery of 2,700 metric tons of bunker fuel to the M/V VIENNA EXPRESS at the port of Tacoma on or about October 16, 2014.  *Id*. at ¶ 70.  Hapag's purchase order expressly confirms that USOT will act as the supplier of the subject bunkers to the M/V VIENNA EXPRESS.  *Id*. at ¶ 71.  The contract between Hapag and O.W. Germany for the purchase and sale of bunkers for the subject delivery to the M/V VIENNA EXPRESS is subject to German law.  *Id*. at ¶¶ 76-77.

On or about October 15, 2014, USOT issued its sales confirmation and sales authorization to O.W. Denmark for the subject delivery of 2,700 metric tons of bunkers to the M/V VIENNA EXPRESS at the port of Tacoma on or about October 17, 2014.  *Id*. at ¶ 83.  On or about October 18, 2014, USOT delivered approximately 2,710.93 metric tons of bunker fuel to the M/V VIENNA EXPRESS at Tacoma.  *Id*. at ¶ 84.  The M/V VIENNA EXPRESS and Hapag accepted and acknowledged the delivery of bunkers by USOT to the M/V VIENNA EXPRESS by stamping USOT's bunker delivery receipt.  *Id*. at ¶ 85.

On or about October 18, 2014, USOT issued its Invoice No. BWTD 83451 to O.W. Denmark in the amount of $1,414,594.53 for the subject delivery of bunkers by USOT to the M/V VIENNA EXPRESS.  *Id*. at ¶ 87.  Pursuant to Invoice No. BWTD 83451, payment was due to USOT on or before November 17, 2014, but has not been made.  *Id*. at ¶¶ 88-89.

## C.   M/V SEASPAN HAMBURG

On October 10, 2014, after soliciting bids, Hapag's bunker purchasing department conducted an analysis of the price and quality of the offers Hapag received from O.W. Germany and others, and calculated which offer represented the lowest energy cost to Hapag for the subject delivery to the M/V SEASPAN HAMBURG.  *Id*. at 98.  Hapag selected USOT to deliver

the subject bunkers to the M/V SEASPAN HAMBURG based on Hapag's conclusion that the price and quality of USOT's bunkers represented the lowest energy cost to Hapag. *Id*. at ¶ 99. Hapag's price comparison sheet showing Hapag's analysis of the price and quality of USOT's bunkers for the subject delivery to the M/V SEASPAN HAMBURG lists USOT as the supplier. *Id*. at ¶ 100.

On October 10, 2014, Hapag sent its purchase order to O.W. Germany to arrange for the delivery of 2,900 metric tons of bunkers to the M/V SEASPAN HAMBURG at the port of Tacoma on or about October 16, 2014. *Id*. at ¶ 101. Hapag's purchase order expressly confirms that USOT will act as the supplier of the subject bunkers to the M/V SEASPAN HAMBURG. *Id*. at ¶ 102. The contract between Hapag and O.W. Germany for the purchase and sale of bunkers for the subject delivery to the M/V SEASPAN HAMBURG is subject to German law. *Id*. at ¶¶ 107-08.

On or about October 13, 2014, USOT issued its sales confirmation and sales authorization to O.W. Denmark for the subject delivery of 2,900 metric tons of bunkers to the M/V SEASPAN HAMBURG at the port of Tacoma on or about October 16, 2014. *Id*. at ¶ 114. On October 16, 2014, USOT delivered approximately 2,900.21 metric tons of bunkers to the M/V SEASPAN HAMBURG at Tacoma. *Id*. at ¶ 116. The M/V SEASPAN HAMBURG and Hapag accepted an acknowledged the subject delivery of bunkers by USOT to the M/V SEASPAN HAMBURG by stamping USOT's bunker delivery receipt. *Id*. at ¶ 117.

On or about October 16, 2014, USOT issued its Invoice No. BWTD 83450 to O.W. Denmark in the amount of $1,507,408.99 for the delivery of bunkers by USOT to the M/V SEASPAN HAMBURG. *Id*. at ¶ 119. Pursuant to Invoice No. BWTD 83450, payment was due to USOT on or before November 17, 2014, but has not been made. *Id*. at ¶¶ 120-21.

D.   **M/V SOFIA EXPRESS**

On October 23, 2014, after soliciting bids, Hapag's bunker purchasing department conducted an analysis of the price and quality of the offers Hapag received from O.W. Germany and others, and calculated which offer represented the lowest energy cost to Hapag for the subject delivery to the M/V SOFIA EXPRESS.  *Id*. at ¶ 129.  Hapag selected USOT to deliver the subject bunkers to the M/V SOFIA EXPRESS based on Hapag's conclusion that the price and quality of USOT's bunkers represented the lowest energy cost to Hapag.  *Id*. at ¶ 130.  Hapag's price comparison sheet showing Hapag's analysis of the price and quality of USOT's bunkers for the subject delivery to the M/V SOFIA EXPRESS lists USOT as the supplier.  *Id*. at ¶ 131.

On October 23, 2014, Hapag sent its purchase order to O.W. Germany to arrange for the delivery of 2,700 metric tons of bunkers to the M/V SOFIA EXPRESS at the port of Tacoma on or about October 29, 2014.  *Id*. at ¶ 132.  Hapag's purchase order expressly confirms that USOT will act as the supplier of the subject bunkers to the M/V SOFIA EXPRESS.  *Id*. at ¶ 133.  The contract between Hapag and O.W. Germany for the purchase and sale of bunkers for the subject delivery to the M/V SOFIA EXPRESS is subject to German law.  *Id*. at ¶¶ 138-39.

On October 28, 2014, USOT issued its sales confirmation and sales authorization to O.W. Denmark for the subject delivery of 2,700 metric tons of bunkers to the M/V SOFIA EXPRESS at the port of Tacoma on or about October 29, 2014.  *Id*. at ¶ 147.  On October 29, 2014, USOT delivered approximately 2,680.22 metric tons of bunkers to the M/V SOFIA EXPRESS at Tacoma.  *Id*. at ¶ 149.  The M/V SOFIA EXPRESS and Hapag accepted and acknowledged the subject delivery of bunkers by USOT to the M/V SOFIA EXPRESS by stamping USOT's bunker delivery receipt.  *Id*. at ¶ 150.

On or about October 29, 2014, USOT issued its Invoice No. BWTD 83463 to O.W. Denmark in the amount of $1,315,507.80 for the delivery of bunkers by USOT to the M/V SOFIA EXPRESS.  *Id*. at ¶ 152.  Pursuant to Invoice No. BWTD 83463, payment was due to USOT on or before November 28, 2014, but has not been made.  *Id*. at ¶¶ 153-54.

## Argument

## I.

## THE LIEN ACT APPLIES TO USOT'S MARITIME LIEN CLAIMS AGAINST THE VESSELS *IN REM* AS A MATTER OF LAW.

### A.    Standard for Summary Judgment

Summary judgment is appropriate "'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'"  *Wagner v. City of New York*, No. 14-CV-2521(VEC), 2015 WL 5707326, at *2 (S.D.N.Y. Sept. 28, 2015) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).  "'Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.'"  *Ferguson v. Ferrante*, No. 13-CV-4468(VEC), 2015 WL 3404131, at *3 (S.D.N.Y. May 27, 2015) (citing *Scott v. Harris*, 550 U.S. 372, 380 (2007)).

District courts should "'construe the facts in the light most favorable to the nonmoving party and resolve all ambiguities and draw all reasonable inferences against the movant.'"  *Id*. (citing *Delaney v. Bank of Am. Corp.*, 766 F.3d 163, 167 (2d Cir. 2014) (*per curiam*)).  However, the nonmoving party "'must do more than simply show that there is some metaphysical doubt as to the material facts,' and 'may not rely on conclusory allegations or unsubstantiated speculation.'"  *Wagner*, 2015 WL 5707326, at *2 (citing *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005)).  Instead, the nonmoving party "must come forward with

10

'specific facts showing that there is a genuine issue for trial.'"  *Id*. (citing *Sista v. CDC Ixis N.*

*America, Inc.*, 445 F.3d 161, 169 (2d Cir. 2006)).

**B.**      **USOT's Maritime Liens Arise by Operation of Law.**

USOT's maritime liens against the Vessels, *in rem*, arise by operation of law

under the express language of the Lien Act.  *Itel Containers Int'l Corp. v. Atlanttrafik Exp.*

*Service Ltd.*, 982 F.2d 765, 768 (2d Cir. 1992); *see also Rainbow Line v. M/V TEQUILA*, 480

F.2d 1024, 1026 (2d Cir. 1973) ("[M]aritime liens arise separately and independently from the

agreement of the parties, . . .").  Hapag concedes that USOT's maritime lien claims are governed

by the Lien Act.  (*See* 15 Civ. 6718, at Docket No. 60, at 11-12).  Indeed, U.S. courts have

consistently held that the Lien Act applies as a matter of law where, as here, a U.S. company

provides bunkers to a foreign-flagged vessel at a U.S. port.  *See Tramp Oil and Marine Ltd. v.*

*M/V Mermaid I*, 805 F.2d 42, 46 (1st Cir. 1986) (affirming dismissal of maritime lien claim by

foreign intermediate broker and recognizing that the "primary concern of the Federal Maritime

Lien Act is the protection of American suppliers of goods and services.").

In *Gulf Trading & Transp. Co. v. Hoegh Shield*, 658 F.2d 363 (5th Cir. 1981),

*cert. denied*, 457 U.S. 1119 (1982), as here, a physical supplier entered into a contract for the

supply of bunkers with a party other than the vessel's owner.  *Id*. at 364.  Affirming the district

court's order enforcing the supplier's maritime lien, the Fifth Circuit concluded that the Lien Act

applies to a U.S. supplier's maritime lien claim for necessaries provided to a vessel at a U.S.

port.  In so holding, the Fifth Circuit reasoned:

> The congressional intent is that an American supplier of goods,
> services or necessaries to a foreign vessel obtains a maritime lien
> in the vessel when the goods or services are supplied or
> performed in the United States.  It is not disputed that the bunkers
> were furnished by Gulf to the vessel within the jurisdiction of the
> United States and under the shelter of United States law.  This

Court has recognized that (it) was the intent of Congress to make it easier and more certain for stevedores and others to protect their interests *by making maritime liens available where traditional services are routinely rendered* . . . .

        \*      \*      \*      \*

*In the maritime realm, it is expected that when necessaries are furnished to a vessel in an American port by an American supplier, the American Maritime Lien Statute will apply to protect that supplier . . . .*

*Id*. at 367-68 (parentheses in original) (emphasis added).

Under the reasoning in *Tramp Oil* and *Hoegh Shield*, the undisputed record here requires application of U.S. law to USOT's maritime lien claims.  The following facts are undisputed: (1) USOT, a U.S. supplier of bunkers, supplied the Vessels at the port of Tacoma, USOT 56.1 at ¶¶ 1-2, 53, 84, 116 and 149; (2) USOT's bunker delivery receipts - - stamped by the Vessels' Masters or Chief Engineers on behalf of Hapag - - expressly provide that all disputes arising out of the subject deliveries shall be interpreted and enforced in accordance with U.S. maritime law and all statutes related thereto, *id*. at ¶ 10; (3) USOT did not enter into any contract with Hapag for the subject deliveries of bunkers to the Vessels, *id*. at ¶ 7; and (4) USOT's agreements with O.W. Denmark do not contain any choice-of-law clause.  *Id*. at ¶ 9. The Lien Act thus applies to USOT's claims against the Vessels as a matter of law.  *See Hoegh Shield*, 658 F.2d at 366-68 (recognizing that "the initial choice of law determination is significantly affected by the statutory policies surrounding a maritime lien.").

## II.

**STRONG CONGRESSIONAL POLICY UNDERPINNING THE LIEN ACT SUPPORTS USOT'S SHOWING OF A MARITIME LIEN; USOT HAD NO DUTY TO INQUIRE WHETHER ANY O.W. BUNKER ENTITY WAS AUTHORIZED TO INCUR MARITIME LIENS AGAINST HAPAG'S VESSELS AS A MATTER OF LAW.**

As the Second Circuit has recognized: "Unlike other security arrangements, the maritime lien is for the benefit of both the ship and its creditors." *Itel Containers*, 982 F.2d at 768. "On the one hand, it enables ships to obtain repairs and supplies on its own account that might not otherwise be available." *Id.* (citing *Piedmont & Georges Creek Coal Co. v. Seaboard Fisheries Co.*, 254 U.S. 1, 3 (1920)). "On the other hand, it gives the creditor a special property in the ship, which subsists from the moment the debt arises . . . . It is a right in the vessel, a jus in re." *Id.* (citations and internal quotations omitted).

The Lien Act provides maritime liens for "necessaries" provided to a vessel. Section 31342 of the Lien Act provides in relevant part:

**§ 31342.  Establishing maritime liens**

(a) Except as provided in subsection (b) of this section, a person providing necessaries to a vessel on the order of the owner or a person authorized by the owner --

(1) has a maritime lien on the vessel;

(2) may bring a civil action in rem to enforce the lien; and

(3) is not required to allege or prove in the action that credit was given to the vessel.

46 U.S.C. § 31342.

**A.    USOT Had No Duty To Inquire Whether the Person Ordering the Bunkers For Hapag's Vessels Was Authorized To Do So As a Matter of Law.**

Prior to 1971, a supplier that provided bunkers to a vessel would not obtain a maritime lien against a vessel for the bunkers if the supplier "knew, ***or by exercise of reasonable***

13

*diligence could have ascertained*, that because of the terms of a charter party . . . *or for any other reason, the person ordering the . . . necessaries was without authority to bind the vessel therefor.*" *See Gulf Oil Trading Co. v. M/V CARIBE MAR*, 757 F.2d 743, 747-49 (5th Cir. 1985) (affirming maritime lien for supplier of bunkers and analyzing Lien Act prior to the 1971 amendments) (emphasis added).

This duty of inquiry constituted a substantial burden for U.S. suppliers of necessaries. *Id.*, at 747; *see also Nacirema Operating Co., Inc. v. S.S. Al Kulsum*, 407 F. Supp. 1222, 1224-26 (S.D.N.Y. 1975) (so recognizing in granting judgment for supplier of necessaries) (citing H.Rep. No. 340, 92d Cong., 1st Sess., reprinted in 1971 U.S. Code Cong. & Admin.News 1363, 1364-65 ("House Report No. 92-340")).[3] "In virtually every instance the supplier was under a duty to ascertain the authority of the individual ordering supplies for a ship to incur liens on the vessel." *Belcher Oil Co. v. M/V Gardenia*, 766 F.2d 1508, 1511 (11th Cir. 1985). As Congress and other U.S. courts have long recognized, the practical effect of this duty of inquiry was that the risk of loss shifted from the vessel owners and its contractual counterparty to the physical supplier of bunkers, "since a reasonably diligent inquiry would almost certainly yield information which would effectively bar any lien." *Id.*; House Report 92-340; *see also M/V Ken Lucky*, 869 F.2d at 478-79 (recognizing same).

Congress amended section 973 of the Lien Act in 1971 by removing the suppliers' duty of inquiry. *M/V CARIBE MAR*, 757 F.2d at 747. The Fifth Circuit summarized the Congressional mandate as follows:

> In 1971, reacting to concerns that difficulty of obtaining a lien was causing crippling losses to stevedoring contractors and others supplying services and goods to vessels, Congress amended

---

[3] House Report No. 92-340 sets forth the legislative history for the bill adopted by Congress in amending the Lien Act (H.R. 6239), and is available at 1971 WL 11348.

> section 973 of the Lien Act by deleting the language imposing on
> the materialman a duty of inquiry . . . . ***Suppliers of necessaries
> are afforded the protection of a lien even when, because of
> temporal or other limitations, they are unable to ascertain the
> existence of a prohibition of lien clause or check the credit of the
> buyer***.

*Id*. at 748-749 (emphasis added); House Report No. 92-340; *see also Belcher Oil*, 766 F.2d at

1511.

      Since 1971, the Lien Act has granted the protection of a maritime lien to bunker

suppliers where, as with USOT here, they do not have actual knowledge of an agreement

between a vessel owner and its contractual counterparty which purports to limit the authority of a

middleman who orders the bunkers "down the chain of supply."  *See M/V Ken Lucky*, 869 F.2d at

479.  In *Ken Lucky*, for example, the Ninth Circuit reversed the district court's decision denying

a bunker supplier a maritime lien and recognized that the Lien Act "now requires that the owner

take affirmative action to notify the supplier of necessaries that the master of a vessel or the

charterer is *not* authorized to order services, the performance of which will result in the creation

of liens." (emphasis in original) (internal quotations and citations omitted).  *See also Trans-Tec

Asia v. M/V HARMONY CONTAINER*, 518 F.3d 1120, 1129 (9th Cir. 2008), *cert. denied*, 555

U.S. 1062 (2008) ("Therefore, even though the charter-party between Splendid and Kien Hung

forbade Kien Hung from incurring liens on the *Harmony*, that fact, standing alone, does not

prevent Trans-Tec from obtaining a maritime lien in this case, as nothing in the record indicates

that Trans-Tec knew of the provision.") (emphasis in original); *Belcher Co. of Alabama, Inc. v.

M/V MARTHA MARINER*, 724 F.2d 1161, 1163 (5th Cir. 1984) ("This lien attaches when

necessaries are ordered by and supplied to the charterer, unless the supplier has notice that the

person who orders the necessaries lacked authority to do so.") (footnotes omitted).

**B.     The Recent Decisions in *M/V COSCO Haifa* and *Valero* Have
No Application Here and Ignore the Intent of Congress in
<u>Amending the Lien Act to Remove the Supplier's Duty of Inquiry.</u>**

The recent decisions by Judge Scheindlin in *O'Rourke Marine Services L.P., L.L.P. v. M/V COSCO Haifa*, 15-cv-2992(SAS), 2016 WL 1544742 (S.D.N.Y. April 8, 2016), and by the district court in the Eastern District of Louisiana in *Valero Marketing and Supply Co. v. M/V Almi Sun*, Civil Action No. 14-2712, 2016 WL 475905 (E.D. La. Feb. 8, 2016), are distinguishable on their facts and have no application here.  In *COSCO Haifa*, unlike here, the supplier was not listed in any purchase order by the vessel owner for the supply of bunkers and had no communications at all with the owner or its agents.  Unlike in those cases, moreover, here the owner or charterer selected USOT as the physical supplier, issued its purchase orders naming that supplier, and directed the delivery by that supplier through the owner's or charterer's agents. Further, those decisions, applying the restrictive "subcontractor" analysis urged by Hapag, O.W. Germany and ING, did not address the Congressional policy of the 1971 amendments to the Lien Act that USOT as a physical supplier is ***not*** required to show privity with the owner and/or its agent(s) to satisfy the requirement that USOT delivered the subject bunkers to Hapag's Vessels "on the order of the owner or a person authorized by the owner."  *See S.S. Al Kulsum*, 407 F. Supp. at 1226 (analyzing statutory amendments, granting judgment for the supplier and recognizing that, "given the strong Congressional policy in favor of protecting the stevedore, the statutory presumption of a lien on the vessel must prevail."); *see also M/V SAVA*, 47 F.Supp.2d at 351-53 (granting summary judgment for bunker supplier and recognizing that "party seeking to bar a supplier's maritime lien has the burden of proving that the supplier ***actually*** knew of a no lien clause in the charter party or other contract.").  (emphasis added).

Nor did the courts in *COSCO Haifa* and *Valero* address the Congressional mandate in amending the Lien Act to remove the supplier's duty of inquiry.  The legislative history of the 1971 amendments to the Lien Act confirms the imposition of the affirmative duty **on vessel owners (and/or their contractual counterparties)** to inform a supplier that the party ordering the bunkers lacked authority to do so:

> Your Committee gave careful consideration to this problem of American materialmen where the owner, by chartering or surrendering possession of the vessel, clothes the master thereof with at least apparent authority to bind the vessel for necessaries furnished to the vessel.  The question presented was where a loss occurs in this situation, whether it should be suffered by the owner of the vessel, or the American materialman who furnished such necessaries in good faith.
>
> After careful consideration of the entire record, your Committee has concluded that, as a matter of equity, the owner should bear the loss in such a situation.
>
> As a practical matter, the owner can more easily protect himself contractually by bonds or otherwise at the time he charters the vessel, than can the American materialman who furnishes necessaries to a vessel under great economic pressure to put back to sea.

*Gulf Trading & Transp. Co. v. M/V Tento*, 694 F.2d 1191, 1194 (9th Cir. 1982), *cert. denied*, 461 U.S. 929 (1983) (citing House Report No. 92-340); *see also Ceres Marine Terminals, Inc. v. M/V HARMEN OLDENDORFF*, 913 F. Supp. 919, 924 (D. Md. 1995) (granting summary judgment for supplier and recognizing: "Under current law, therefore, a supplier of necessaries to a vessel is entitled to rely upon the statutory presumption of authority under [the Lien Act] unless a vessel's owner gives actual notice that authority is, in fact, lacking.").  As the Ninth Circuit recognized in *Ken Lucky,* reversing the district court's order denying a supplier of bunkers a maritime lien:

> We recently noted, construing a lien under the Preferred Ship Mortgage Act, that 'one of the purposes of the Maritime Liens Act, 46 U.S.C. [App.] §§ 971-75 . . . is to create liens in favor of those who furnish necessaries for the vessel's operation.  Permitting [a] contrived financial scheme to prevail effectively destroys the liens of suppliers and subverts the purposes of the Maritime Liens Act.

869 F.2d at 478 (citing *Wardley Int'l Bank, Inc. v. Nasipit Bay Vessel*, 841 F.2d 259, 264 (9th Cir. 1988)) (alterations in original).

By contrast, the undisputed record here demonstrates that ***Hapag selected USOT to deliver the subject bunkers to Hapag's Vessels and generated purchase orders naming USOT as the supplier - - the bunkers thus being "on the order of the owner . . ." - - and Hapag's orders were then confirmed with USOT by Hapag's agent, Norton Lilly, before each delivery.*** In short, Hapag "ordered" the deliveries be supplied by USOT.  *Cf. Integral Control Sys. Corp. v. Consolidated Edison Co. of New York*, 990 F.Supp. 295, 301 (S.D.N.Y. 1998); *Lake Charles Stevedores, Inc. v. Professor Vladimir Popov MV*, 199 F.3d 220, 231 (5th Cir. 1999).

Hapag, O.W. Germany and ING nonetheless contend that Hapag did not "order" the bunkers from USOT since it did not specifically authorize O.W. Germany and/or its related O.W. entities to bind either Hapag or its Vessels to any "subcontracts" down the supply chain, but merely "ordered" the bunkers from O.W. Germany.  Such self-serving arguments distort the actual facts and disregard the showing by concrete evidence that Hapag's purchasing managers ordered and selected USOT's deliveries of the bunkers, USOT 56.1 at ¶¶ 34-38, 67-71, 98-102 and 129-133; and the Vessels' Masters, Chief Engineers and agents at Tacoma confirmed Hapag's fuel orders and directed, arranged and accepted on board such deliveries by USOT.  *Id.* at ¶¶ 12-14, 40-41, 48-50, 52-54, 73, 80-82, 84-85, 94-95, 104, 111-13, 115-17, 135, 141-46 and 148-50. The confirming communications between Hapag's agents, Norton Lilly, and USOT

nowhere mention O.W. Germany.  *Id.* at ¶¶ 12-14, 48-50, 52, 80-82, 94-95, 111-13, 115, 141-46

and 148.  *See, e.g., Atlantic and Gulf Stevedores, Inc. v. M.V. Rosa Roth*, 587 F. Supp. 1033,

1034 (S.D.N.Y. 1984) (concluding supplier held a valid maritime lien and recognizing that the

supplier's presumption of authority "cannot be rebutted by a disclaimer made *after* the work was

performed.") (emphasis in original).

### III.

### NO GENUINE ISSUE OF MATERIAL FACT EXISTS: THE UNDISPUTED RECORD SHOWS THAT USOT (1) PROVIDED NECESSARIES; (2) TO THE VESSELS; (3) ON THE ORDER OF THE VESSELS' OWNER OR CHARTERER OR A PERSON AUTHORIZED BY THE OWNER OR CHARTERER - - THUS USOT HOLDS MARITIME LIENS AGAINST THE VESSELS AS A MATTER OF LAW.

As the Second Circuit has recognized, USOT "actually delivered" the subject

bunkers to the Vessels at the port of Tacoma, Washington in October 2014.  *Hapag-Lloyd*, 814

F.3d at 148.  USOT thus "provided necessaries" to the Vessels as a matter of law.  On this record

there can be *no genuine dispute* that USOT supplied the bunkers to Hapag's Vessels "on the

order of the owner or a person authorized by the owner," and thus holds maritime liens against

the Vessels as a matter of law.  *See* 46 U.S.C. § 31342(a).

**A.**    **USOT Delivered the Subject Bunkers on the**
          **Order of Hapag and its Agents as a Matter of Law.**

Hapag, as the Vessels' owner or charterer, is presumed to have authority to bind

its Vessels, *in rem*, under the Lien Act.  46 U.S.C. §§ 31341(a)(1) and (a)(3).  Norton Lilly, as

Hapag's agent at the port of supply, is likewise presumed to have authority to incur maritime

liens against Hapag's Vessels as a matter of law.  *Id.* at §§ 31341(a)(4)(A)-(B); *see also M.V.*

*Rosa Roth*, 587 F. Supp at 1034 (recognizing that Norton Lilly, as the charterer's agent, was

presumed to have authority to incur maritime liens against the vessel under the Lien Act).  The

Masters and Chief Engineers of the Vessels are also presumed to have the requisite authority.  *Id.*

at §§ 31341(a)(2)-(3); *see Atlantic & Gulf Stevedores, Inc. v. M/V Grand Loyalty*, 608 F.2d 197, 200-02 (5th Cir. 1979) (Chief Officer possessed management powers envisioned by the Lien Act, and thus had presumed authority as well as actual authority to incur a maritime lien against the vessel); *see also The Eastern*, 257 F. 874 (D. Mass. 1919) (recognizing Chief Engineer's presumed authority). As set forth above, USOT is entitled to rely on this statutory presumption of authority since the record is devoid of evidence that USOT had actual knowledge before delivery that the party ordering the bunkers lacked authority to incur maritime liens against the Vessels. *See S.S. Al Kulsum*, 407 F. Supp. at 1226 ("Any other rule would effectively emasculate the Congressional intent in the 1971 amendment to the [Lien Act.]"); *see also M/V Ken Lucky*, 869 F.2d at 479 (recognizing same).

In *Ken Lucky*, the Ninth Circuit enforced a maritime lien in favor of a physical supplier of bunkers as a matter of law on facts strikingly similar to those in the instant case. There, as here, the supplier delivered bunkers on the credit of the vessel without a contract with the vessel's owner or charterer. *Id.* at 475. There, as here, there was no dispute that the supplier provided necessaries to the vessel under the Lien Act. *Id*. at 476. There, the parties agreed that the order for the bunkers originated from the agent of the vessel's charterer, who is presumed to have authority to do so under the Lien Act. *Id*. at 477; *see also* 46 U.S.C. § 31341(a)(4)(B). The court also recognized that the express language of the Lien Act did not require the physical supplier to establish any agency relationship between the time charterer who ordered the bunkers and the "back-to-back trader" of the bunkers. *Id*. at 477. Here, it is undisputed that the order originated from the Vessels' owner or charterer, Hapag, who is also presumed by statute to have the requisite authority. 46 U.S.C. §§ 31341(a)(1)-(3). Here, Hapag's agent at the port, Norton Lilly, confirmed Hapag's order. Norton Lilly also facilitated and accepted the fuel deliveries in

accordance with Hapag's orders naming USOT as the supplier.  USOT 56.1 at ¶¶ 12-14, 38, 48-50, 52, 71, 80-82, 94-95, 102, 111-13, 115, 133, 141-46 and 148.   Norton Lilly's communications to USOT expressly confirmed the "bunker order" by Hapag, separate and apart from the O.W. USA communications to USOT.  Indeed, Norton Lilly's communications directly to USOT did not even copy any O.W. Bunker entity.

In *Ken Lucky*, as here, the vessel's Chief Engineer accepted and acknowledged receipt of the bunkers with approval from the vessel's Master.  *Ken Lucky*, 869 F.2d at 477-78. Here, there is no dispute that the Vessels' Masters or Chief Engineers accepted and acknowledged receipt of the subject bunkers on behalf of the Vessel and Hapag by stamping USOT's bunker delivery receipt with the Vessel's stamp and the stamp of Hapag.  USOT 56.1 at ¶¶ 53-54, 84-85, 116-17 and 149-50.  The Ninth Circuit in *Ken Lucky* reasoned:

> Ken Lucky concedes that Bulkferts was authorized to bind the vessel.  It is clear that Eurostem, as managing agent for Bulkferts, did order the fuel and it is also clear that Marine Fuel delivered the fuel *to the vessel*.  Section 971 states that any person furnishing supplies or other necessaries to a vessel "upon" the order of a person authorized to bind the vessel shall be entitled to [a maritime] lien . . . .  Bulkferts had statutory authority to order the fuel under section 972 and it did so.  Marine Fuel delivered the fuel to the vessel after Bulkferts ordered it.

*Ken Lucky*, 869 F.2d at 477 (emphasis in original).

The *Ken Lucky* rule applies here with equal force to support USOT's maritime lien on the following undisputed facts: (1) Hapag, as the Vessels' owner or charterer, analyzed and compared the price and quality of the bunkers offered by USOT with the price and quality offered by other suppliers ***before selecting USOT to deliver the bunkers to Hapag's Vessels***, USOT 56.1 at ¶¶ ¶¶ 34-36, 67-69, 98-100 and 129-131; (2) Hapag used USOT's quality specifications for the subject bunkers to determine that USOT's bunkers represented the lowest energy cost to Hapag and its Vessels, *id*. at ¶¶ 30-36, 64-69, 97-100 and 129-30; (3) the

21

testimony of Hapag's Director of Purchasing and Supply confirms that Hapag selected USOT to deliver the subject bunkers to the Vessels since the price and quality of USOT's bunkers represented the lowest energy cost to Hapag and its Vessels, *id*. at 34-35, 67-68, 98-99 and 129-30; (4) Hapag's agent, Norton Lilly, provided USOT with Hapag's bunker order information days ***before*** the Vessels arrived at the port of Tacoma, and confirmed to USOT that it was authorized to deliver the subject bunkers to Hapag's Vessels, *id*. at ¶¶ 12-14, 48-50, 52, 80-82, 94-95, 111-13, 115, 141-46 and 148; (5) Hapag's price comparison sheets and purchase orders, which Hapag prepared ***before*** each delivery, confirm that the order for the subject bunkers ***originated from Hapag who named USOT as the physical supplier of the bunkers***, *id*. at ¶¶ 34-36, 38, 67-69, 71, 98-100, 102, 129-31 and 133; (6) the sales order confirmations prepared by O.W. Germany and sent to Hapag also name USOT as the supplier of the subject bunkers for each delivery, *id*. at ¶¶ 42-43, 74-75, 105-06 and 136-37; (7) Norton Lilly, Hapag's agent at Tacoma, confirmed the bunker orders to USOT by email and facilitated, acknowledged and accepted the delivery of bunkers by USOT in accordance with Hapag's orders, *id*. at ¶¶ 12-14, 38, 48-50, 52, 71, 80-82, 94-95, 102, 111-13, 115, 133, 141-46 and 148; (8) USOT delivered the bunkers to the Vessels in accordance with Hapag's purchase orders, *id*. at ¶¶ 53, 84, 116 and 149, and held Hapag's Vessels liable for the debts incurred by the Vessels' acceptance of the subject deliveries of bunkers.  *Id*. at ¶¶ 16-19, 55, 86, 118 and 151.  Indeed, USOT's bunker delivery receipts state in relevant part:  "No disclaimer stamp . . . will . . . alter, change or waive U.S. Oil's Maritime Lien against the vessel or waive the vessel's ultimate responsibility and liability for the debt incurred through this transaction." *Id*. at ¶¶ 55, 86, 118 and 151

It is likewise undisputed that the Vessels' Masters or Chief Engineers confirmed Hapag's orders and facilitated, accepted and acknowledged receipt of the bunker deliveries on

behalf of the Vessels and Hapag.  *Id*. at ¶¶ 53-54, 84-85, 116-17 and 149-50; *see M/V Ken Lucky*, 869 F.2d at 478 (recognizing that Chief Engineer's stamp on bunker delivery receipt acknowledging receipt constitutes evidence of authority to bind vessel); *M/V Grand Loyalty*, 608 F.2d at 200.

The record thus amply demonstrates that USOT has valid maritime liens against the Vessels, as a matter of law.  *See M/V SAVA*, 47 F.Supp.2d at 351-53; *S.S. Al Kulsum*, 407 F. Supp. at 1224-26; *M/V Ken Lucky*, 869 F.2d at 476-479; *M/V CARIBE MAR*, 757 F.2d at 746-52; *see also Trans-Tec*, 518 F.3d at 1130-31 ("In sum, putting together the pieces of this statutory puzzle makes evident that because Trans-Tec provided necessaries to the *Harmony* on the order of its charterer, a maritime lien arose in favor of Trans-Tec"); *Triton Marine Fuels Ltd. v. M/V PACIFIC CHUKOTKA*, 575 F.3d 409 (4th Cir. 2009) (reversing district court and remanding with instructions to enter summary judgment against the vessel *in rem* in favor of physical supplier of bunker fuel).

**B.      O.W. Germany and ING Have No Maritime
         Lien Against the Vessels as a Matter of Law.**

It is undisputed that German law governs Hapag's contract with O.W. Germany for the purchase and sale of the subject bunkers, and that German law does not recognize maritime liens for the supply of bunkers.  *Bominflot, Inc. v. M/V HENRICH S*, 465 F.3d 144, 148 n.6 (4th Cir. 2006).  O.W. Germany thus has no maritime lien against the Vessels as a matter of law.  Any maritime lien claims by ING as "Security Agent" must also fail since ING is entitled to no more than its alleged assignor, O.W. Germany.  *See Farrell Lines, Inc. v. Ceres Terminals Inc.*, 161 F.3d 115 (2d Cir. 1998), *see also Variblend Dual Dispensing Sys., LLC v. Seidel GmbH & Co., KG*, 970 F.Supp.2d 157, 168 (S.D.N.Y. 2013) ("An assignee is subject to all the equities and burdens which attach to the property assigned because he receives no more . . . than his

assignor.") (citations and quotations omitted).

Additionally, USOT is the only claimant to the bond in the Court's registry which represents the M/V SANTA ROBERTA *in rem*.  The undisputed record shows that (1) Hapag paid O.W. Germany the total amount of its invoice for the subject delivery to the M/V SANTA ROBERTA, *see* USOT 56.1 at ¶ 58; and (2) USOT has not been paid by Hapag or any O.W. Bunker entity for the bunkers it delivered to the M/V SANTA ROBERTA in good faith.  *Id*. at ¶ 59.  The payment by Hapag to O.W. Germany extinguished any claim by O.W. Germany and ING for the subject delivery to the M/V SANTA ROBERTA as a matter of law.  *See*, *e.g.*, *Hapag-Lloyd*, 814 F.3d at 152 n.17 (recognizing that a party's maritime lien "certainly would be extinguished" by payment of the debt to that party); *cf. Reinholm Crane & Rigging Co., Inc. v. M/V Ocean Crown*, 484 F. Supp. 935, 937 n.2 (W.D. Wash. 1979) (denying vessel owner's motion for summary judgment and recognizing: "Authority has not been offered and I have found none for the proposition that payment to one ordering necessaries for a vessel, rather than to the supplier . . . discharges the latter's lien under the [Lien Act].").

## IV.

### A BALANCE OF THE EQUITIES MILITATES IN FAVOR OF SUMMARY JUDGMENT FOR USOT; THE COURT SHOULD GRANT USOT'S MOTION FOR SUMMARY JUDGMENT APPLYING EQUITABLE PRINCIPLES OF INTERPLEADER AND ADMIRALTY.

As the Second Circuit recognized on USOT's appeal, this Court - - as an equitable court with interpleader and admiralty jurisdiction - - might be required to "untangle complicated questions of subrogation and set-offs among the parties as it determines payment obligations." *Hapag-Lloyd*, 814 F.3d at 153 n.18  (citing *Pearlman v. Reliance Ins. Co.*, 371 U.S. 132, 136-37, 136 n.12 (1962), and *Am. Fid. Co. v. Nat'l City Bank of Evansville*, 266 F.2d 910, 914 (D.C.Cir. 1959)).  On this record, a balancing of the equities favors USOT.  It is undisputed that USOT is

the only party who actually produced, owned and delivered the bunkers to Hapag's Vessels in good faith with the reasonable expectation to be paid the full value of its invoices. Contrariwise, no party disputes that the reported fraud and poor risk management by the O.W. Bunker group of companies directly resulted in the bankruptcy of O.W. Germany and the instant litigation.[4] Moreover, O.W. Germany could have expected to receive no more than its profit margin from Hapag on each of its invoices in the regular course of its business. Now, O.W. Germany and ING seek to recover a windfall of the total amount invoiced by O.W. Germany to Hapag without paying USOT for its bunkers. Such an unjust result would disregard the intent of Congress in enacting and amending the Lien Act, would defy common sense and fair dealing, and should not be countenanced by this Court.

## CONCLUSION

For the reasons set forth above, the Court should grant USOT's motion for summary judgment in all respects.

Dated: New York, New York
       May 13, 2016

**CLYDE & CO US LLP**

By: /s/ John R. Keough
    John R. Keough
    Casey D. Burlage
    Corey R. Greenwald
    George G. Cornell
    The Chrysler Building
    405 Lexington Avenue, 16th Floor
    New York, New York 10174
    Tel.: (212) 710-3900
    Fax: (212) 710-3950

    *Attorneys for U.S. Oil Trading LLC*

---

[4] In the alternative, absent summary judgment, USOT reserves the right to seek recovery of interpleader funds on the basis of equitable principles of subrogation and unjust enrichment. *Id.*