**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

HAPAG-LLOYD AG,

Plaintiff,

  - against -

U.S. OIL TRADING LLC, O.W. BUNKER
GERMANY GMBH, and ING BANK N.V.,

Defendants.

14-cv-9949 (VEC)

---

U.S. OIL TRADING LLC,

Plaintiff,

  - against -

M/V VIENNA EXPRESS, her tackle, boilers,
etc., *in rem*, and M/V SOFIA EXPRESS, her
tackle, boilers, etc., *in rem*,

Defendants.

15-cv-6718 (VEC)
(Consolidated)

---

HAPAG-LLOYD AG, as claimant to the
*in rem* defendant M/V VIENNA EXPRESS,

Third-Party Plaintiff,

  - against -

O.W. BUNKER GERMANY GMBH, and
ING BANK N.V.,

Third-Party Defendants.

**O.W. BUNKER GERMANY'S**
**PRETRIAL MEMORANDUM OF LAW**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ ii

SUMMARY OF THE CASE ............................................................................................... 1

FACTUAL & PROCEDURAL BACKGROUND ............................................................... 4

    A.  The Bunker Transactions ...................................................................................... 4

    B.  The Start of Litigation ........................................................................................... 5

    C.  Summary Judgment, USOT's Appeal, and the Second Circuit's Remand ........... 6

THE CLAIMS AND ISSUES TO BE TRIED ..................................................................... 8

THE EVIDENCE ................................................................................................................ 10

    1.  USOT's Evidence ............................................................................................... 10

    2.  OW Germany's and ING's Evidence ................................................................. 13

ADDITIONAL ISSUES THAT MAY ARISE .................................................................... 14

    A.  The Quality of the Fuel ....................................................................................... 14

    B.  The Documents Exchanged by Hapag and OW Germany ................................... 15

    C.  *Bourbon Petrel* ................................................................................................... 19

CONCLUSION ................................................................................................................... 22

# TABLE OF AUTHORITIES

**Cases**                                                                                 **Pages**

*APL Co. Pte Ltd. v. Blue Water Shipping U.S. Inc.*,
   779 F.Supp.2d 358 (S.D.N.Y. 2011).................................................................9

*BAII Banking Corp. v. UPG, Inc.*,
   985 F.2d 685 (2d Cir. 1993)........................................................................13

*Bunker Holdings Ltd. v. Yang Ming Liberia Corp.*,
   906 F.3d 843 (9th Cir. 2018) ..................................................................7, 11

*Chakales v. Hertz Corp.*,
   825 F.Supp. 312 (N.D Ga. 1993) ..............................................................12

*Craig v. Sandals Resorts Int'l*,
   69 F.Supp.3d 322 (E.D.N.Y. 2014) ..........................................................12

*Equilease Corp. v. M/V Sampson*,
   793 F.2d 598 (5th Cir. 1986) .............................................................3, 9, 21

*Farwest Steel Corp. v. Barge Sea-Span 241*,
   828 F.2d 522 (9th Cir. 1987) ............................................................. passim

*Garanti Finansal Kiralama A.S. v. Aqua Marine & Trading Inc.*,
   697 F.3d 59 (2d Cir. 2012)........................................................................11

*In re Manhattan by Sail, Inc.*,
   2018 WL 6684768 (S.D.N.Y. Sept. 14, 2018)..........................................9

*Integral Control Sys. Corp. v. Consol. Edison Co. of NY*,
   990 F.Supp. 295 (S.D.N.Y. 1998) ............................................................10

*Lake Charles Stevedores, Inc. v. Prof. Vladimir Popov M/V*,
   199 F.3d 220 (5th Cir. 1999) ....................................................................21

*Martin Energy Servs. LLC v. M/V Bourbon Petrel*,
   2019 WL 2403145 (E.D. La. June 6, 2019)......................................... 19-21

*Meacham v. Knolls Atomic Power Lab.*,
   358 Fed. Appx. 233 (2d Cir. 2009)............................................................9

*Piedmont & George's Creek Coal Co. v. Seaboard Fisheries Co.*,
   254 U.S. 1 (1920).............................................................................3, 9, 21

*Port of Portland v. M/V Paralla*,
    892 F.2d 825 (9th Cir. 1989) .................................................................... passim

*Puricelli v. Argentina*,
    797 F.3d 213 (2d Cir. 2015)...................................................................................9

*Racal Survey U.S.A., Inc. v. M/V Count Fleet*,
    231 F.3d 183 (5th Cir. 2000) ....................................................................3, 9, 21

*Sands Constr. Co, Inc. v. United Va. Bank*,
    1985 A.M.C. 1165 (E.D. Va. Dec. 3, 1984) ..........................................9, 19, 21

*Sompo Japan Ins. Co. of Am. v. Norfolk S. Ry. Co.*,
    762 F.3d 165 (2d Cir. 2014)...................................................................................9

*The Juniata*,
    277 F. 438 (D. Md. 1922) .....................................................................................19

*U.S. Oil Trading LLC v. M/V Vienna Express*,
    911 F.3d 652 (2d Cir. 2018)......................................................................... passim

*Valero Mktg. & Supply Co. v. M/V Almi Sun*,
    893 F.3d 290 (5th Cir. 2018) ...............................................................................20

*Wilhelmsen Premier Marine Fuels AS v. UBS Provedores Pty Ltd.*,
    519 F.Supp.2d 399 (S.D.N.Y. 2007)....................................................................13

## Statutes

46 U.S.C. § 31341.....................................................................................................8

46 U.S.C. § 31342..................................................................................................1, 9

## Rules

Fed. R. Civ. P. 44.1.............................................................................................4, 17

Fed. R. Evid. 802 ...................................................................................................11

## Other Authorities

Restatement (3d) of Agency § 2.01 (2006)...........................................................11

O.W. Bunker Germany GmbH ("OW Germany") respectfully submits this pretrial brief pursuant to Section 7.C. of the Court's Individual Practices in Civil Cases.

## SUMMARY OF THE CASE

U.S. Oil Trading, LLC ("USOT") issued four invoices for the sale of bunker fuel, but never got paid due to the global collapse of the O.W Bunker Group and the insolvency of its counterparty, O.W. Bunker USA Inc. ("OW USA"). As an alternative remedy, USOT attempted to arrest someone else's ships pursuant to the Commercial Instruments and Maritime Lien Act ("CIMLA"), 46 U.S.C. § 31342, rather than pursue recovery as an unsecured creditor of OW USA.

The Second Circuit has already determined that USOT acted as a subcontractor and did not provide the bunkers on order of the vessels' owner/charter, Hapag-Lloyd AG ("Hapag"), or an agent with "presumed" authority, as required by CIMLA. *U.S. Oil Trading LLC v. M/V Vienna Express*, 911 F.3d 652, 662 (2d Cir. 2018). Instead, USOT "acted upon the orders placed by an intermediary," OW USA. *Id.* However, the Second Circuit acknowledged that a "minimal exception" exists to the general rule against subcontractor liens. *Id.* at 663. It therefore remanded on one discrete factual issue: Did Hapag direct that USOT be the physical supplier? *Id.* at 666.

To prevail on its lien claims, USOT must prove that Hapag (the owner/charterer) instructed OW Germany (the general contractor) to use USOT (the subcontractor) as the physical supplier of bunkers to Hapag's vessels. *Id.* at 664. USOT cannot carry its burden of proof. USOT was not a party to any communications between Hapag and OW Germany, and its employees cannot testify about what those communications entailed or conveyed. Likewise, USOT's employees did not author any of the documents exchanged between Hapag and OW

1

Germany, and therefore cannot testify about their meaning or interpretation. In short, USOT has no witness who can testify to the existence of any instructions from Hapag to OW Germany, or any agency authority conferred on OW Germany by Hapag.

The only parties competent to testify about those subjects are Hapag and OW Germany. Their testimony could not be clearer—Hapag did not instruct OW Germany to use USOT, and did not confer any agency authority on OW Germany. Hapag's purchasing director testified during discovery:

> Q: Did Hapag-Lloyd have any control over the selection of the physical supplier?
>
> A: No.
>
> Q: Did Hapag-Lloyd direct O.W. Germany to use U.S. Oil for the supply of fuel in Tacoma?
>
> A: No.

*See* Kock Rule 30(b)(6) Dep. Tr. at 58:7-13; *see also id.* at 138:19-139:5 (stating that Hapag did not appoint OW Germany as its agent). Likewise, the former manager of OW Germany's trading department testified (and will confirm at trial) that "Hapag never instructed OW Germany to contact or conduct business with a particular supplier at the Port of Tacoma." *See* Dkt. #266 (Gronenberg Decl., dated 6/16/2016) ¶ 5.[1]

Just as important, Hapag actually sought to ***avoid*** creating any relationship between it and USOT, and refused to do business with fuel "brokers" on account of past problems with those entities. Hapag's purchasing director testified that Hapag wanted OW Germany to ***own*** the fuel that it sold to Hapag; it did not want OW Germany to simply arrange for Hapag to purchase or receive the fuel from someone else. *See* Kock 30(b)(6) Dep. Tr. at 132:10-133:24. That way, if

---

[1] All docket citations (Dkt. #__ ) are to case no. 14-cv-9949 unless otherwise noted.

there was a problem with the fuel, Hapag would have recourse against and deal exclusively with OW Germany, not the physical supplier.  *Id.* at 157:14-158:11.  An instruction from Hapag to use a particular supplier (thereby binding Hapag to that supplier) would have defeated Hapag's objectives—which is why no such instruction exists.

USOT cannot overcome the testimony of Hapag and OW Germany, and cannot manufacture instructions from Hapag *ex post facto*.  For that reason, the Court should enter judgment against USOT.  But even if the Court were to disagree and find that USOT has carried its burden to demonstrate an instruction from Hapag, USOT's maritime lien claims would still fail because it did not rely on the credit of Hapag's vessels in contracting to sell the bunker fuel to OW USA.  Although a lien claimant is not required to prove that it gave credit the vessel, "the idea of credit to the vessel being a prerequisite to a lien … [is] still very much with us today." *Equilease Corp. v. M/V Sampson*, 793 F.2d 598, 605 (5th Cir. 1986) (en banc) (citing *Piedmont & George's Creek Coal Co. v. Seaboard Fisheries Co.*, 254 U.S. 1 (1920)).  Here, USOT has admitted that it: (a) extended a $10 million line of credit to O.W. Bunker Trading & Supply A/S ("OWT"), the Danish parent company of both OW Germany and OW USA, after conducting an extensive review of OWT's credit application, references, and financial statements; (b) accepted purchase orders from OW USA stating that the bunkers were being purchased for the "account" of OW USA; (c) invoiced and initially looked to OWT for payment as OW USA's parent; and (d) never conducted a credit analysis of Hapag or its vessels. By extending credit to the O.W. Bunker Group and agreeing to sell the bunkers to OW USA on credit, USOT deliberately chose not to rely on the credit of Hapag's vessels.  *See Racal Survey U.S.A., Inc. v. M/V Count Fleet*, 231 F.3d 183, 190 (5th Cir. 2000).  Thus, even if USOT could somehow meet the exception to

3

the general rule against subcontractor liens, USOT still would not be entitled to maritime liens against Hapag's vessels.

Finally, OW Germany respectfully submits that it would be appropriate for the Court to resolve the remaining claims in this case (likely through briefing alone) after resolving USOT's maritime lien claims. The Court already granted summary judgment to OW Germany on its breach of contract claims against Hapag, meaning that there are no factual issues to be tried for them.[2] *See* Order & Opinion, Dkt. #311 at 18-19, 25. The only remaining legal issues for those claims are: (i) whether OW Germany is entitled to pre-judgment interest under German contract and insolvency law; and (ii) whether Hapag's existing interpleader stake is adequate to pay the claims. *Id.* Both issues can be resolved through briefing and/or the submission of additional materials on German law, after trial on USOT's maritime liens. *See* Fed. R. Civ. P. 44.1 (court's determination of foreign law "must be treated as a ruling on a question of law.").

## FACTUAL AND PROCEDURAL BACKGROUND

### A.   *The Bunker Transactions*

This litigation arises from the supply of marine fuel to four oceangoing vessels owned or chartered by Hapag: the *M/Vs Santa Roberta*, *Seaspan Hamburg*, *Sofia Express*, and *Vienna Express* (collectively, the "Vessels"). "[T]here is no dispute that Hapag ordered the bunkers from O.W. Germany; that O.W. Germany ordered the bunkers from O.W. USA; that O.W. USA ordered the bunkers from USOT; and that USOT had no contract with Hapag or with O.W.

---

[2]      OW Germany and ING Bank N.V. ("ING"), as alleged assignee of OW Germany's lien rights, also have asserted maritime lien claims against three of Hapag's vessels. The Court would only need to address those claims *if* it first concludes that USOT possesses competing liens. In that situation, the Court would be able to resolve the claims on the basis of briefing and oral argument alone because: (a) the Second Circuit found that "Hapag ordered the bunkers from O.W. Germany," *U.S. Oil Trading*, 911 F.3d at 662; and (b) the Court has already recognized that traders such as OW Germany may possess maritime liens even if they do not physically supply the vessels. *See* Amended Order & Opinion, Dkt. #319 at 24.

Germany." *U.S. Oil Trading*, 911 F.3d at 662; *see also* Amended Order & Opinion, Dkt. #319 at 10 (describing the transactions and the parties' respective contracts).

After the bunkers were delivered to the Vessels at the Port of Tacoma in October 2014, Hapag paid OW Germany for the delivery to the *Santa Roberta*. Soon thereafter, the entire OW Bunker Group collapsed, leading OWT, OW Germany, and OW USA to commence insolvency proceedings in Denmark, Germany, and Connecticut, respectively. Hapag then failed to pay OW Germany for the bunkers delivered to the *Seaspan Hamburg*, *Sofia Express*, and *Vienna Express*. As for USOT, it initially sought payment from OWT, as the entity to which USOT had extended credit and issued its invoices. When OWT failed to pay, USOT turned to Hapag's Vessels.

**B.      *The Start of Litigation***

Hapag commenced case no. 14-cv-9949 (the "Interpleader Action") in this Court on December 17, 2014. It sued USOT, OW Germany, and ING, seeking interpleader relief to determine the proper recipient(s) of payment for the bunkers delivered to the *Seaspan Hamburg, Sofia Express* and *Vienna Express*.[3] Hapag also requested a declaration that USOT has no maritime lien against the *Santa Roberta* on account of Hapag's payment to OW Germany. That same day, USOT commenced case no. 15-cv-6718 (the "Arrest Action") against the *Sofia Express* and *Vienna Express*, *in rem*, in the U.S. District Court for the Western District of Washington (original case no. 14-cv-5982). The Washington court subsequently transferred the Arrest Action to the Southern District of New York in August 2015. The two actions then proceeded through discovery and summary judgment motion practice together, before this Court consolidated them for trial on USOT's maritime lien claims. *See* Dkt. #354.

---

[3]      Hapag also named OWT, OW USA, Crédit Agricole CIB as defendants in case no. 14-cv-9949. *See* Dkt. #84. However, none of those entities participated in the case. Instead, each disclaimed any interest in the interpleader funds and was dismissed with prejudice. *See* Dkts. #115, 157, 163, & 165.

**C.     Summary Judgment, USOT's Appeal, and the Second Circuit's Remand**

USOT moved for summary judgment on its maritime lien claims in May 2016, while ING cross-moved to dismiss them.  *See* Dkts. #223 & #229.  OW Germany separately moved for summary judgment on its *in personam* contract claims against Hapag, arising from Hapag's undisputed failure to pay for the bunkers delivered to the *Seaspan Hamburg, Sofia Express* and *Vienna Express*.  *See* Dkt. #230.

On January 9, 2017, the Court ruled that USOT had failed to establish maritime liens against the Vessels.  *See* Dkt #305; *see also* Dkt #312 and  319 (March 3 and March 22, 2017 Amended Opinions & Order, clarifying that the Court did not grant summary judgment to ING on its own claims, and leaving the January 9, 2017 Opinion & Order unchanged in all other respects).  On March 3, 2017, the Court granted summary judgment to OW Germany on its contract claims against Hapag, and reserved for further briefing the question of whether OW Germany was entitled to pre-judgment interest under German law.  *See* Dkt. #311 at 18-19, 25. The Court then entered a Partial Final Judgment on May 2, 2017, dismissing USOT's maritime lien claims.  Dkt. #330.  USOT then appealed to the Second Circuit.  *See* Dkts. #320 & 333.

On appeal, USOT argued that it had provided the bunkers on the order of Hapag or an authorized Hapag agent, placing heavy emphasis on its communications with Hapag's port agent, non-party Norton Lilly International Inc. ("Norton Lilly").  The Second Circuit squarely rejected those arguments:

> We conclude, substantially for the reasons stated by the district court in *Clearlake*, which parallel those leading our Court to answer such a question in the negative in *Temara*, that **the district court correctly ruled that USOT did not adduce evidence that it was ordered to provide the bunkers by Hapag or by an agent authorized by Hapag to order bunkers**. As described in Part I.B. above, there is no dispute that, for the Subject Vessels, Hapag ordered the bunkers from O.W. Germany; that O.W. Germany ordered the bunkers from O.W. USA; that O.W. USA

ordered the bunkers from USOT; and that USOT had no contract with Hapag or with O.W. Germany. Although USOT argues that it complied with a chain of contracts for orders that originated with the Vessels' owner or charterer, we agree with the district court that in each of the contracts requiring USOT to deliver the bunkers, USOT's counterparty was neither Hapag nor O.W. Germany. **USOT in fact acted upon orders placed by an intermediary between itself and O.W. Germany, and the intermediary was not authorized by the Vessels' owner or charterer to order bunkers for the Vessels**.

We also reject, substantially for the reasons stated by the district court, *see Clearlake*, 239 F.Supp.3d at 689, USOT's argument that either communications from Hapag's port agent Norton Lilly in arranging for delivery, or receipts issued by a Vessel's master or chief engineer acknowledging USOT's bunker deliveries, constituted evidence that USOT provided the bunkers on the order of an agent of the Vessels. *See generally Temara*, 892 F.3d at 521 n.6. **Coordinating delivery and acknowledging receipt do not indicate that the persons so coordinating and/or acknowledging had placed the bunker orders or been authorized by the owner to do so**.

*U.S. Oil Trading*, 911 F.3d at 662 (emphasis added).

However, the Second Circuit remanded on the discrete issue of whether Hapag directed that USOT be the physical supplier pursuant to the "minimal exception" to the general rule against subcontractor liens. *Id*. at 663. The Second Circuit recognized that the exception applies "in circumstances where the general contractor was acting as an agent at the direction of the owner to engage specific contractors." *Id.* (quoting *Farwest Steel Corp. v. Barge Sea-Span 241*, 828 F.2d 522, 526 (9th Cir. 1987)); *see also Bunker Holdings Ltd. v. Yang Ming Liberia Corp.*, 906 F.3d 843, 846 (9th Cir. 2018) ("*Yang Ming*"). Viewing the record in the light most favorable to USOT, the Second Circuit found an issue of fact as to whether Hapag directed OW Germany to use USOT as the physical supplier. *U.S. Oil Trading*, 911 F.3d at 665.

## THE CLAIMS AND ISSUES TO BE TRIED

The only claims to be tried are USOT's maritime lien claims against the Vessels under CIMLA. The Second Circuit made clear that there is only one way for USOT to prevail on those claims: USOT must prove that Hapag directed OW Germany to use USOT as the physical supplier. *U.S. Oil Trading*, 911 F.3d at 662-666. "[M]ere knowledge that a particular subcontractor will be used 'has never been held to be sufficient to establish a lien.'" *Id. a*t 663 (quoting *Port of Portland v. M/V Paralla*, 892 F.2d 825, 828 (9th Cir. 1989)). For the exception to the subcontractor rule to apply, "there must have been (a) an order or direction (b) by the owner/charterer of the vessel that the particular subcontractor be used." *Id.* at 664. "The subcontractor exception **does not apply where there is no significant evidence** 'that the owner intended that [the physical supplier] be engaged as a subcontractor.'" *Id.* (emphasis added; bracket in original) (quoting *Farwest*, 828 F.2d at 526). In sum, the key question to be tried is this: Did Hapag direct OW Germany to use USOT as the physical supplier at Tacoma?

USOT will seek to distract the Court from that question. It likely will argue, for example, that Hapag selected USOT through the communications that USOT had with Hapag's port agent, Norton Lilly, in coordinating the physical deliveries *after* Hapag had already accepted OW Germany's bids. The Court should resist any effort by USOT to take the trial in that direction. The Second Circuit already held that USOT provided the bunkers on the order of OW USA, and that USOT's communications with Norton Lilly did not confer any liens against Hapag's Vessels.[4] *U.S. Oil Trading*, 911 F.3d at 662. The "mandate rule" prohibits USOT from trying to relitigate that topic at trial.

---

[4]     Certain entities are "presumed to have authority to procure necessaries for a vessel," and thereby bind it to a lien, under 46 U.S.C. § 31341(a). Neither Norton Lilly nor OW USA qualify as one of those entities. *See U.S. Oil Trading*, 911 F.3d at 662; *Farwest*, 828 F.2d at 526. Moreover, CIMLA does *not* create any presumed agency authority to "select" a subcontractor on behalf of a vessel owner.

[W]here the mandate limits the issues open for consideration on remand, the district court ordinarily may not deviate from the specific dictates or spirit of the mandate by considering additional issues on remand." *Sompo Japan Ins. Co. of Am. v. Norfolk S. Ry. Co.*, 762 F.3d 165, 175 (2d Cir. 2014). "The mandate rule bars relitigation not only of issues actually decided on appeal, but of issues that 'fall within the scope of the judgment appealed from but were not raised….'" *In re Manhattan by Sail*, *In re Manhattan by Sail, Inc.*, 2018 WL 6684768 at *2 (S.D.N.Y. Sept. 14, 2018) (citation omitted); *see also Puricelli v. Argentina*, 797 F.3d 213, 218 (2d Cir. 2015). A district court "must always look to the opinion to interpret the mandate." *APL Co. Pte Ltd. v. Blue Water Shipping U.S. Inc.*, 779 F.Supp.2d 358, 366 (S.D.N.Y. 2011) (quoting *Meacham v. Knolls Atomic Power Lab.*, 358 Fed. Appx. 233, 235 (2d Cir. 2009) (summary order)). Here, the mandate rule requires the Court to focus on the question remanded by the Second Circuit: Did Hapag direct OW Germany to use USOT?

Finally, although a lien claimant is no longer required to allege or prove that credit was given to the vessel under 46 U.S.C. § 31342(a)(3), "the idea of credit to the vessel being a prerequisite to a lien … [is] still very much with us today." *Equilease*, 793 F.2d at 605 (citing *Piedmont*, 254 U.S. 1). CIMLA merely creates a presumption that necessaries are furnished on the credit of the vessel; it does not bar proof that such necessaries were furnished "on the credit of the owner alone, or as in this case, on the credit of the general contractor." *Sands Constr. Co, Inc. v. United Va. Bank*, 1985 A.M.C. 1165, 1169-70 (E.D. Va. Dec. 3, 1984). "[B]y deliberately choosing not to rely on the credit of a vessel, a supplier, as a matter of law, purposefully intends to forego its right to claim a maritime lien." *Racal Survey*, 231 F.3d at 190. Here, USOT's extension of credit to the O.W. Bunker Group, and its reliance on the same in selling the fuel to

OW USA, would be sufficient to defeat its maritime lien claims even if USOT could somehow carry its heavy burden to establish the exception to the subcontractor rule.

## THE EVIDENCE

*1.*     *USOT's Evidence* [5]

USOT intends to present testimony from three of its own employees—Thor Nielsen, Lee Weber and Cameron Proudfoot.  That testimony cannot establish that Hapag instructed, directed, or ordered OW Germany to use USOT.

First, none of USOT's employees are competent to testify about what instructions (if any) Hapag gave to OW Germany.  They were not privy to any communications between Hapag and OW Germany, and did not author any of the documents exchanged between them.  Thus, USOT's employees do not have personal knowledge of what was said between Hapag and OW Germany, and cannot testify about the meaning or interpretation of the contractual documents that those two parties exchanged.

Second, most of the proposed testimony from Messrs. Weber and Proudfoot is irrelevant and improper.  USOT intends to call those employees to describe (a) USOT's "communications with O.W. USA," (b) USOT's "relationship with O.W. USA, O.W. Germany, Norton Lilly and Hapag," and (c) USOT's alleged "knowledge of typicals and pricing of other bunker fuel providers along the West Coast of the United States."  *See* Dkt. #362 (Declaration of Justin Heilig, dated October 4, 2011), Ex. 6 (USOT's draft witness list).  None of those topics are probative of what Hapag said to OW Germany.  Worse, USOT's focus on those topics is little more than an attempt to relitigate issues that have already been decided by the Second Circuit

---

[5]     As the lien claimant, USOT bears the burden of proof to demonstrate that it can satisfy the limited exception to the general rule against subcontractor liens.  *Integral Control Sys. Corp. v. Consol. Edison Co. of NY*, 990 F.Supp. 295, 298-99 (S.D.N.Y. 1998) (Haight, J.).

against USOT, such as the conclusion that (i) OW USA did not have authority to bind Hapag's Vessels, and (ii) Norton Lilly played no role in ordering the bunkers.  *See U.S. Oil Trading*, 911 F.3d at 662.  And even if USOT's communications/relationships with OW USA and Norton Lilly, or its alleged knowledge of "other bunker fuel providers," were somehow relevant to proving what Hapag said to OW Germany, the proposed testimony would still be inadmissible. Federal Rule of Evidence 802 prohibits USOT from offering the out-of-court statements of non-parties OW USA, Norton Lilly and "other bunker fuel providers" for their truth.

Third, USOT has no evidence that OW Germany "essentially acted" Hapag's agent and thus exercised authority to bind its Vessels. *U.S. Oil Trading*, 911 F.3d at 664 (citing *Yang Ming*, 906 F.3d at 846.  The question of whether OW Germany acted as an agent (for which USOT also bears the burden of proof) is one that can only be determined by evidence of Hapag's own words and actions, *i.e.*, its manifestations as the alleged principal.[6]  *See Garanti Finansal Kiralama A.S. v. Aqua Marine & Trading Inc.*, 697 F.3d 59, 71 (2d Cir. 2012).  USOT's Rule 30(b)(6) corporate representative, Thor Nielsen, testified that there were *no direct communications* between Hapag and USOT in which Hapag indicated that OW Germany (or OW USA) was acting as Hapag's agent in these transactions.  *See* Nielsen Dep. Tr. at 68:19-69:15.  Thus, the testimony of USOT's employees cannot be used as evidence of agency authority from Hapag.[7]

---

[6]     Although the maritime law recognizes both *actual* and *apparent* agency authority, the latter is inconsistent with the Second Circuit's determination that the exception to the subcontractor rule requires "an order or direction" by the vessel owner/charterer.  *U.S. Oil Trading*, 911 F.3d at 664.  Such a command could only be consistent with actual authority, "meaning explicit permission from the principal to act on its behalf."  *Garanti Finansal*, 697 F.3d at 71 (citing *Rest. (3d) of Agency* § 2.01 (2006)).

[7]     In the "Background" section of its opinion, the Second Circuit noted that USOT had argued that OW Germany and OW USA "were cloaked with at least implied authority while procuring the subject bunkers for Hapag's account."  *U.S. Oil Trading*, 911 F.3d at 659. "Implied" authority is not a separate type of agency authority, but rather "an aspect of the scope of the agent's actual authority."  *Rest. (3d) of Agency* § 2 Intro. Note (2006).  In the context of maritime liens, implied authority has been limited to situations where the subcontractor was "serious[ly] misle[d]" by an agent with "presumed" authority to bind a vessel under 46 U.S.C. § 31341(a).  *Port of Portland*, 892 F.2d at 829 (citing cases).  There is no

*See Craig v. Sandals Resorts Int'l*, 69 F.Supp.3d 322, 328 (E.D.N.Y. 2014) ("Commonly, an outsider will not be privy to the details of what conversation or conduct took place between a principal and the agent."); *Chakales v. Hertz Corp.*, 825 F.Supp. 312, 314 (N.D Ga. 1993) ("Because the existence of the agency relationship is not within the personal knowledge of a person outside the relationship, a bare assertion of agency by an outsider is merely an unsupported conclusion of law.").

USOT also intends to rely on the internal comparison charts that Hapag's Fuel Department created to analyze the bids that it received from its prospective sellers, such as OW Germany. *See* Trial Exhibits OWG-12 through OWG-15. Indeed, USOT's "selection" argument rests almost entirely on those documents, which USOT did not even know existed before discovery in these actions.  Just as USOT's witnesses cannot testify about the meaning of the contractual documents exchanged between Hapag and OW Germany, they also lack the personal knowledge to interpret Hapag's internal comparison charts.  Furthermore, the charts did ***not*** compare or even list the prices that USOT offered to OW USA; they contained the prices that OW Germany offered to Hapag.[8]  *Compare* Trial Exhibits OWG-12 through OWG-15 (charts) *and* OWG-20 through OWG-23 (OW Germany's sales confirmations to Hapag) *with* OWG-32 through OWG-35 (OW USA's purchase orders to USOT).  Any argument to the contrary by USOT would be pure sophistry.

---

evidence whatsoever that USOT was misled by any party, let alone seriously misled by a party with presumed authority.

[8]      Again in the "Background" section, the Second Circuit also quoted paragraph 14 of USOT's Response to OW Germany's Local Rule 56.1 Statement, which argued that Hapag's internal charts "compared the price and quality of the bunkers offered by USOT."  *U.S. Oil Trading*, 911 F.3d at 658. That contention is demonstrably ***false***—and was not accepted as fact by the Second Circuit.

## 2.    *OW Germany's and ING's Evidence*

At trial, OW Germany and ING will present testimony from three witnesses:  (1) Norbert Kock, by deposition, in his capacity as Hapag's Rule 30(b)(6) witness; (2) Boris Gronenberg, former head of OW Germany's trading department; and (3) Thor Nielsen, by deposition, in his capacity as USOT's Rule 30(b)(6) witness.

Messrs. Kock and Gronenberg will testify definitively that Hapag did not direct OW Germany to source the bunker fuel from USOT, and did not confer any sort of agency authority on OW Germany or OW USA.  They will testify that OW Germany identified USOT in its bids to Hapag based on quotations that OW USA had obtained from USOT on its own and in its own discretion.  *See*, *e.g.*, Kock 30(b)(6) Dep. Tr. at 64:8-13. In other words, Hapag did not instruct OW Germany or OW USA to solicit quotations from USOT prior to receiving OW Germany's bids to supply the Vessels.  Furthermore, Messrs. Kock and Gronenberg will testify that: (i) Hapag did not do business with fuel "brokers"; and (ii) OW Germany was a trader or reseller that purchased fuel for its own account and bore full contractual liability to Hapag.[9] *See id.* at 132:21-135:24.  Indeed, Hapag sought to avoid a relationship with USOT (or any other specific physical supplier) by accepting bids only from approved sellers such as OW Germany. Mr. Kock will testify that Hapag did not take into consideration the identities of the local suppliers that its prospective sellers intended to use in evaluating their bids, and that the appearance of USOT's name on Hapag's internal comparison charts played no role in Hapag's decision to select OW

---

[9]      "A broker has no obligation to pay on behalf of its principal in a broker's contract." *Wilhelmsen Premier Marine Fuels AS v. UBS Provedores Pty Ltd.*, 519 F.Supp.2d 399, 406-07 (S.D.N.Y. 2007). "Instead, the principal pays for the services obtained by the broker and the broker receives its commission from the principal." *Id.*  In simplest terms, a broker is a middleman that brings two parties together and is paid a commission for its efforts. *See BAII Banking Corp. v. UPG, Inc.*, 985 F.2d 685, 700 (2d Cir. 1993).

Germany's bids.  *See* Trial Exhibit OWG-91 (Declaration of N. Kock dated June 15, 2016) ¶ 8. That testimony alone is enough to defeat USOT's claims.

As for Mr. Nielsen, he will testify by deposition that USOT understood its customer to be OWT, ***not*** Hapag.  *See* Nielsen 30(b)(6) Dep. Tr. at 29:5-15 (testifying that OWT was the customer because that was the entity to which USOT extended credit); *id.* at 38:6-18 (testifying that USOT invoiced OWT); *id.* at 66:7-67:17 (testifying that USOT did not enter into any contracts with Hapag).  He will further testify that USOT only engages in transactions with customers for whom it has conducted a credit analysis and approved an account.  *Id.* at 15:15-16:6 (explaining how one becomes a USOT customer); 19:3-20:16 (explaining USOT's credit analysis process); *id.* at 30:23-31:14 (explaining that the OW Bunker entities could not do business with USOT until they established an account, and that USOT relied on the credit of OWT in establishing the OW Bunker account).  Finally, he will admit that USOT did not conduct a credit analysis of Hapag or its Vessels.  *Id.* at 34:20-35:7.

To find that USOT has satisfied its burdens of proof, the Court would have to disregard the testimony of the only witnesses with personal knowledge of the relations between Hapag and OW Germany, and accept USOT's attempt to manufacture directions and agency authority from Hapag where none exist.

## ADDITIONAL ISSUES THAT MAY ARISE

### A.   *The Quality of the Fuel*

USOT will likely argue that: (i) Hapag cared about the quality of the fuel it was purchasing from OW Germany; and (ii) the quality of the fuel was dependent on OW Germany using USOT.  However, there is no dispute that fuel oil is a *fungible* commodity, and that OW Germany bore contractual liability to Hapag for quality and quantities claims irrespective of

14

whether OW Germany had recourse against a local supplier.  *See* Trial Exhibit OWG-91

(Declaration of N. Kock dated June 15, 2016) ¶¶ 11 & 14.  Furthermore, is not enough for USOT

to point to the typicals in isolation—as if it had not sold the fuel to OW USA, but instead

supplied Hapag directly.  *See Port of Portland*, 892 F.2d at 829.   Instead, USOT must show by

"significant evidence" that Hapag affirmatively instructed OW Germany to use USOT.  *U.S. Oil

Trading*, 911 F.3d at 664; *Farwest*, 828 F.2d at 526. "[M]ere knowledge that a particular

subcontractor will be used 'has never been held to be sufficient to establish a lien.'"  *U.S. Oil

Trading*, 911 F.3d at 663 (quoting *Port of Portland*, 892 F.2d at 828).  Even knowledge that a

particular subcontractor "most likely" will be used is insufficient to give rise to a lien.  *Port of

Portland*, 892 F.2d at 829.

## B.     The Documents Exchanged by Hapag and OW Germany

USOT may also argue that Hapag's purchase orders constituted instructions to use USOT

because they each described OW Germany as "seller" and USOT as "supplier."  *See* Trial

Exhibits OWG-16 through OWG-23.  But the purchase orders (and OW Germany's

corresponding sales confirmations) merely confirmed what OW Germany proposed, not what

Hapag instructed.  Hapag's purchasing director already testified that USOT's identity as supplier

"was provided by OW Germany."  Trial Exhibit OWG-90 (Kock Rule 30(b)(6) Deposition

Exhibit 47) ¶ 13.  He further testified that the contract documents identified USOT as the

supplier for *logistical* reasons—so that the physical delivery could be arranged and performed

without confusion when the fuel arrived at the port.  He testified:

> Q. The information about the local physical supplier that would be
> used by O.W. Germany, is that information that Mr. Gaus [of
> Hapag] would have received from Mr. Selmer [of OW Germany]?
>
> A. Yes, and it's needed for logistical reasons.

*See* Kock Rule 30(b)(6) Dep. Tr. at 64:8-13.  None of that is surprising.  When Hapag solicited

bids for the Vessels, it did not request or instruct that the bids be filled by any particular supplier.

*See* Trial Exhibits OWG-5 through OWG-8 (Hapag's bid requests).  Indeed, a *single* probative

question exposes the impotence of USOT's arguments: If Hapag had "intended that [USOT] be

engaged as a subcontractor" prior to soliciting bids, *U.S. Oil Trading*, 911 F.3d at 663, why did

OW USA contact multiple suppliers?  Likewise, why did Hapag accept multiple bids, based on a

variety of typicals and prices, from various traders?

      USOT fares no better arguing that the purchase orders and sales confirmations "required"

OW Germany to use USOT.  Nothing in those documents, or Hapag's incorporated Marine Fuel

Oil Terms & Conditions of Purchase ("Hapag's Terms"), states that OW Germany is "required"

to use the "supplier" listed on the purchase orders, which were issued *after* Hapag selected OW

Germany as its contractual supplier.  *See* Trial Exhbits OWG-16 through OWG-23 (purchase

orders and sales confirmations); *see also* Trial Exhibit OWG-99 (Hapag's Terms).  To the

contrary, Hapag's Terms contemplate that OW Germany as the "seller" is responsible for

providing the fuel ordered by Hapag *regardless* of what supplier is used and *regardless* of what

that supplier does.  *See* Trial Exhibit OWG-99 ¶¶ 5-6, 12-14.  Section 5 of Hapag's terms

provides that if any discrepancy arises over fuel quality, the issue will be resolved between

Hapag and the "seller," not the supplier.  *Id.* Section 6, in turn, provides that the "seller" warrants

the fuel quality, not the supplier.  *Id.* Section 12 provides that Hapag will make payment to the

"seller," not the supplier.  *Id.* Section 13 provides that any claims regarding the fuel are to be

resolved between Hapag and the "seller."  *Id.* And section 14 provides that the "seller," not the

supplier, has a lien over the fuel in the event Hapag fails to pay for the fuel.  *Id.*

Neither the testimony of USOT's employees nor the arguments of its counsel are capable of giving any meaning to the terms of Hapag's contracts with OW Germany, which are governed by German law.  *See* Trial Exhibit OWG-99 (Hapag's Terms); *see also* Dkt. #311 (Opinion & Order dated Mar. 3, 2017) at 18. If there are any ambiguities about the meaning of Hapag's purchase orders, OW Germany's sales order confirmations, or Hapag's Terms, German law requires them to be resolved by looking to the intent of the contract parties, which can be proved through their testimony about what they meant and/or their course of conduct in doing business with each other.  *See* Declaration of Matthias Kampshoff in Support of Pretrial Brief, dated October 11, 2019.[10]

Here, Hapag's and OW Germany's employees have testified that OW Germany was contractually obligated to supply the fuel to Hapag *regardless* of (a) what supplier was used, and (b) what quality fuel the named supplier actually delivered.  The former manager of OW Germany's trading department declared at the summary stage (and will confirm at trial) that, "[i]n entering into spots sales contracts with Hapag, OW Germany acted as a trader and seller that assumed contractual liability to Hapag for (among other things) quality and quantity claims." Dkt #266 (Gronenberg Decl.) ¶ 7.  Likewise, the director of Hapag's purchasing department testified (as Hapag's Rule 30(b)(6) witness) that Hapag would present disputes about fuel quality solely to OW Germany, not anyone else.  *See* Kock Rule 30(b)(6) Dep. Tr. at 156:13-158:16.  He further testified that, if the product delivered was of lower quality than expected, OW Germany would bear the liability to Hapag.  *Id.* 221:5-24.  In sum, Hapag and OW Germany both agree that the contract documents required OW Germany to deliver certain *fuel*, not to use a specific fuel supplier.

---

[10] Pursuant to Rule 44.1, the Court "may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence."

To be sure, the Second Circuit suggested (in viewing the record in the light most favorable to USOT) that it might be possible to infer an instruction from Hapag to OW Germany based on something that Hapag's lawyers wrote at the summary judgment stage:

> Without more, Hapag's listing of USOT in the purchase orders could perhaps have been viewed as merely suggestive. But in each of those same Rule 56.1 responses as to the meaning of its purchase orders, Hapag went on to state that
>
>> O.W. Germany was *permitted* ... to find a substitute fuel of similar specifications and price *if* USOT was unable to act as the physical supplier.
>
> (Emphases added.) The plain syntactical implication of this statement by Hapag is that unless USOT was unable to perform, O.W. Germany's use of a physical supplier other than USOT was not permitted.

*U.S. Oil Trading*, 911 F.3d at 666 (**ellipsis and emphasis provided by the Second Circuit**). But Hapag's summary judgment statement plainly is not enough for USOT to prove at trial that Hapag instructed OW Germany to use USOT.  *See U.S. Oil Trading*, 911 F.3d at 664 (subcontractor exception requires "significant evidence" that the owner intended for the physical supplier to be engaged) (quoting *Farwest*, 828 F.2d at 526).   If it were enough, the Second Circuit would have remanded this case with an instruction to enter judgment in USOT's favor.

Moreover, Hapag's actual summary judgment statement was not that OW Germany was "permitted" to provide substitute fuel if USOT was not available, but rather that "O.W. Germany was permitted *and required* to find a substitute fuel of similar specifications and price if USOT was unable to act as the physical supplier."  Dkt #251 ¶ 38 (emphasis added).[11]  In sum, Hapag contracted for the *fuel*, not the fuel *supplier*.  Hapag's head of purchasing and Rule 30(b)(6)

---

[11] It is unclear why the Second Circuit chose to omit "and required" through the use of ellipsis.  Likewise, it is unclear why the court did not cite Mr. Kock's actual testimony on this issue. *See* Trial Exhibit OWG-91 (Declaration of N. Kock dated June 15, 2016) at ¶ 12.

witness testified:  "We have no relation to the physical supplier. We are just dealing with O.W. Germany."  *See* Kock Rule 30(b)(6) Dep. Tr. at 158:9-11.  He further testified that Hapag wanted OW Germany to "own" the fuel, not merely procure it from USOT.  *Id*. at 133:16-24.

There is another flaw in USOT's attempt to establish maritime liens by looking to the terms of Hapag's contracts with OW Germany: USOT admits it had no contractual relationship with Hapag.  *See* Dkt 263 ¶ 89 (Trial Exibhit OWG- 111) (admitting there was no contractual relationship with Hapag).  Having admitted that Hapag was not contractually bound to pay USOT's invoices, USOT cannot insist simultaneously that Hapag was in fact bound to do exactly that (or else be subjected to maritime liens) by contracts between Hapag and OW Germany.  A subcontractor "cannot eschew having any relationship with vessel owners, and at the same time claim the right to lien their vessels simply because a general contractor uses" the subcontractor. *Port of Portland*, 892 F.2d at 829; *see also Sands Constr.*, 1985 A.M.C. at 1168 (noting that the owner made its bargain with the contractor, and that the subcontractor "never thought of seeking to hold anyone" liable other than the contractor "until bankruptcy intervened.") (quoting *The Juniata*, 277 F. 438, 440 (D. Md. 1922)).[12]

## C.   *Bourbon Petrel*

Finally, OW Germany anticipates that USOT will rely heavily on the findings of fact and conclusions of law entered in another OW-related matter, *Martin Energy Servs. LLC v. M/V Bourbon Petrel*, 2019 WL 2403145 (E.D. La. June 6, 2019) ("*Bourbon Petrel*").  OW Germany respectfully submits that *Bourbon Petrel* has no authoritative or persuasive value.  <u>First</u>, the

---

[12]     The Ninth Circuit's decision in *Farwest* relied on both *Sands Constr.* and *The Juniata*.  *See* 828 F.2d at 526. In turn, the Second Circuit quoted *Farwest* to state the exception to the general rule against subcontractor liens.  *See U.S. Oil Trading*, 911 F.3d at 663; *see also Yang Ming*, 906 F.3d at 846 ("[T]his case is controlled not by *Ken Lucky*, but instead by our decisions in *Port of Portland* … and *Farwest* …").

decision has been appealed to the Fifth Circuit.  *See* 5th Cir. Docket No. 19-30612.  <u>Second</u>, the case is peculiar and distinguishable on the facts.  The claimant asserted maritime liens ***not*** against the seismic vessels that consumed the bunkers at issue, but rather the supply vessels that delivered the fuel to those seismic vessels.[13]  The district court's determination that bunkers carried as *cargo* qualify as "necessaries" under CIMLA—when they were not consumed by the supply vessels against which the liens were asserted—likely will be overturned on appeal.  Since the enactment of the statute, no other court has held that mere cargo constitutes a "necessary" to a non-consuming vessel.  And for good reason: Maritime liens are construed under the doctrine of *stricti juris*, meaning that they will not be expanded by construction, analogy, or inference.  *U.S. Oil Trading*, 911 F.3d at 661; *Valero Mktg. & Supply Co. v. M/V Almi Sun*, 893 F.3d 290, 292 (5th Cir. 2018).

<u>Third</u>, the district court misapplied the subcontractor exception.  As recognized by the Second Circuit, the exception requires "significant evidence" that the owner intended the physical supplier to be engaged as a subcontractor.  *U.S. Oil Trading*, 911 F.3d at 663 (quoting *Farwest*, 828 F.2d at 526).  The district court did not apply or even acknowledge that standard.

<u>Fourth</u>, the district court erred in finding that the charterer instructed OW USA (pursuant to their global supply contract) to select the physical supplier by directing OW USA to obtain the lowest-priced fuel (all other variables being equal).  An obligation to obtain the lowest-price fuel—under a global supply contract signed more than one year *before* the deliveries—is *not* the equivalent of an order from the vessel's charterer directing its agent to hire a "particular subcontractor," as required by both the Second and Fifth Circuits. *See U.S. Oil Trading*, 911 F.3d at 664; *Valero*, 893 F.3d at 295-96.

---

[13]   OW USA withdrew its own lien claims against the supply vessels and *successfully* asserted them against the consuming seismic vessels in France. *See* 5th Cir. ROA 19-30612.1828:9-18.

<u>Fifth</u>, the district court ignored controlling law with respect to the physical supplier's failure to rely on the credit of the vessels.  A claimant's intent to forego its lien rights may be inferred from the record.  *Equilease Corp.*, 793 F.2d at 606 n.9.  "[B]y deliberately choosing not to rely on the credit of a vessel, a supplier, as a matter of law, purposefully intends to forego its right to claim a maritime lien."  *Racal Survey*, 231 F.3d at 190.  Yet, the district court remarked that "[so] long as the supplier relied on the vessel *to some extent*, waiver will not be found." 2019 WL 2403145 at *5 (emphasis in original).  As evidence of that "some extent," the court identified the boilerplate terms in the physical supplier's invoices and bunker delivery receipts, which stated that the supplier would have a maritime lien.  *Id.*  Under the law of both the Second and Fifth Circuits, those self-serving terms are *meaningless*; maritime liens arise by operation of law and cannot be created by the terms of such documents. *See U.S. Oil Trading*, 911 F.3d at 662 (rejecting the argument that the bunker delivery receipts "constituted evidence that USOT provided the bunkers on order of an agent of the Vessels"); *Lake Charles Stevedores, Inc. v. Prof. Vladimir Popov M/V*, 199 F.3d 220, 232 (5th Cir. 1999). More important, the district court's reliance on those terms conflicts with the Supreme Court's admonition that a party's erroneous belief that the law would afford a maritime lien is "without legal significance." *Piedmont*, 254 U.S. at 10.  In this regard, the facts of *Bourbon Petrel* also are distinguishable from these cases because USOT sold bunker fuel to OW USA on credit, did not invoice Hapag, and did not conduct any credit review of Hapag or the Vessels.  The "logical inference" derived from USOT's actions is that USOT did not rely on the credit of the Vessels, and thus has foregone its right to claim maritime liens against them.  *Racal Survey*, 231 F.3d at 190.  USOT does not get to claim otherwise just because its contractual counterparty went bankrupt. *See Sands Constr.*, 1985 A.M.C. at 1170 (evidence that the lien claimants "dealt only with the

21

contractor and looked initially to the contractor for payment" precluded the claimants from relying on statutory presumption that they extended credit to the vessel).

As this Court recognized at the outset of litigation, USOT found itself in a "sea of unsecured creditors" when the O.W. entities declared bankruptcy. *See* Dkt. #80 at 17. "It did not take a brilliant legal strategist to figure out that, in lieu of standing in line in [OW USA's] Chapter 11 proceeding, [USOT] could jump that line by proceeding directly against the Vessels, *in rem*, … to collect the amounts due." *Id.* Although the Second Circuit threw a lifeline to USOT on appeal, the evidence at trial will demonstrate that USOT: (1) cannot satisfy the exception to the subcontractor rule; and (2) did not rely on the credit of Hapag's Vessels.

## CONCLUSION

Only Hapag and OW Germany are in a position to confirm what they said to each other and what their contracts mean. Both will testify at trial (as they did during discovery) that Hapag did not instruct OW Germany to use USOT as the physical supplier at Tacoma. USOT has no way of overcoming that testimony. It has no employee with personal knowledge of the communications between Hapag and OW Germany, and cannot point to its communications with OW USA or Norton Lilly as evidence of agency authority from Hapag. Moreover, USOT has admitted that it did not consider Hapag to be its customer, and that it sold the bunkers on the credit extended to OW USA's parent company. For all of those reasons, OW Germany will ask the Court to enter judgment against USOT. Finally, after the trial is resolved, OW Germany will ask the Court to set a briefing schedule to address any remaining issues in these actions, including the prejudgment interest owed by Hapag on OW Germany's *in personam* contract claims.

Dated:  October 11, 2019

Respectfully submitted,

MCDERMOTT WILL & EMERY LLP


 /s/ Jacob Hollinger
Timothy W. Walsh
Darren Azman
Jacob Hollinger
340 Madison Avenue
New York, NY 10173
Telephone:  212-547-5400
Facsimile:  212-547-5444

– and –

HILL RIVKINS LLP


 /s/  Justin M. Heilig
Justin M. Heilig
45 Broadway, Suite 1500
New York, NY 10006
Telephone:  212-669-0600
Facsimile:  212-669-0698

*Attorneys for O.W. Bunker Germany GbmH*


## Certificate of Service

I hereby certify that on October 11, 2019, I caused the foregoing document to be filed on the Court's CM/ECF system, thereby effecting service on all counsel of record in this action.


 /s/  Justin M. Heilig


23